# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| **JOHN A. JONES and** | ) | |
| **CARLETON A. JONES, III,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:06-CV-1115** |
| | ) | **Judge Echols** |
| **BDO SEIDMAN, LLP and** | | |
| **GRAMERCY ADVISORS, LLC** | ) | **Magistrate Judge Brown** |
| | ) | |
| **Defendant.** | ) | |

## AMENDED COMPLAINT

### The Parties

1.      Plaintiff, John A. Jones ["John Jones"], is a citizen and resident of Washington County, Tennessee.

2.      Plaintiff, Carleton A. Jones, III ["Carleton Jones"], is a citizen and resident of Washington County, Tennessee.

3.      Defendant, BDO Seidman, LLP ["BDO"], is a limited liability partnership organized and existing under the laws of New York.  Its headquarters and principal place of business are in Chicago, Illinois.

4.      BDO is one of the largest accounting firms in the United States with more than 34 offices and 300 alliance firms nationwide.

5.      At all times relevant to this Complaint, a major component of BDO's practice has been to provide tax advice to its clients.

6.     At all times relevant to this Complaint, BDO held itself out as having special expertise in THE field of federal income taxation. Indeed, BDO claimed to have as much, if not more, expertise in this field as any other accounting or consulting firm.

7.     Mark D. Puckett ["Puckett"], is a partner in BDO. His offices are in Memphis, Tennessee.

8.     All acts and omissions by Puckett as described in this Complaint were made within the scope of his authority as a partner in BDO.

9.     Denis Field ["Field"] was a senior officer of BDO. In January of 2000, he became the Chairman and Chief Executive Officer of BDO. He held that position of Chairman and Chief Executive Officer until he was removed from it on October 23, 2003.

10.     All acts and omissions by Field as described in this Complaint were made within the scope of his authority as a senior officer, Chairman, or Chief Executive Officer of BDO.

11.     Defendant, Gramercy Advisors, LLC ["Gramercy"] is a limited liability company which is organized and exists under the laws of Connecticut. The principal offices and place of business of Gramercy are at 20 Dayton Ave, Greenwich, Connecticut 06830. Its registered agent for process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

12.     Gramercy is an SEC Registered Investment Advisor and an NASD Regulated Broker/Dealer.

13.     Gramercy holds itself out as a Registered Investment Adviser which does the following: (1) identifies, structures, and executes trades designed to achieve its investment objectives. (2) provides clients with services which include goal setting, investment strategies, and

2

tax execution. *See,* Gramercy Form ADV filed with Securities and Exchange Commission.  **[Exhibit 1]**.

14.     Jay Johnston ["Johnston"] is the Co-Managing Partner or Co-Managing Director of Gramercy.

15.     All acts and omissions by Johnston as described in this Complaint were made within the scope of his authority as Co-Managing Partner or Co-Managing Director of  Gramercy.

<u>**Jurisdiction and Venue**</u>

16.     BDO has continuously and systematically engaged in business in this judicial district and throughout Tennessee.

17.     In connection with the events described in this Amended Complaint, Gramercy has conducted business with Messrs. Jones who are citizens of Tennessee.  In connection with those same events, it has sent numerous communications to Tennessee.  The acts and omissions of Gramercy as described in this Complaint have caused injury to John Jones and Carleton Jones ["Messrs. Jones"] within the state of Tennessee.

18.     In addition, Gramercy and BDO have engaged in a civil conspiracy to devise, design, facilitate, promote, sell and implement illegal tax shelters.  Pursuant to that civil conspiracy, BDO and  Gramercy reasonably expected and intended to cause consequences in Tennessee.  In fact, that civil conspiracy did cause consequences in Tennessee because it inflicted great damage upon Messrs. Jones.  BDO committed overt acts in furtherance of that conspiracy and those acts, if committed by a non-resident would have been sufficient to subject the non-resident to jurisdiction under the long arm statute of Tennessee.  Those overt acts of BDO are attributable to Gramercy and subject it to personal jurisdiction in Tennessee.

3

19.    This is a suit between citizens of different states.  The amount in controversy, exclusive of interest and costs, exceeds $75,000.  Therefore, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(a) and (c).

20.    BDO is subject to personal jurisdiction in this judicial district.  Further, a substantial part of the events and omissions giving rise to the claims of "Messrs. Jones" occurred in this district. Therefore, venue is proper under 28 U.S.C. §1391(a) and (c)

### Special Duties Which BDO and Gramercy Owed to Messrs. Jones

21.    BDO and  Gramercy were fiduciaries and stood in a position of trust and confidence with respect to Messrs. Jones.

22.    At all times relevant to this Complaint, Gramercy and BDO owed a fiduciary duty of care and loyalty to Messrs. Jones.

23.    At all times relevant to this Complaint, Gramercy and BDO occupied and held a position and relationship of trust and confidence with respect to Messrs. Jones.

24.    Messrs. Jones justifiably and reasonably placed their trust and confidence in Gramercy and BDO.

25.    At all times relevant to this Complaint, Gramercy and BDO owed to Messrs. Jones a duty to deal with them fairly and in good faith.

26.    At all times relevant to this Complaint, Gramercy and BDO owed to Messrs. Jones a duty to disclose fully all material facts.

27.    At all times relevant to this Complaint, BDO owed to Messrs. Jones a duty to possess and exercise the skill, prudence, and diligence which it represented itself as having in the specialized field of federal income taxation.   In the alternative, BDO owed to Messrs. Jones a duty to exercise

4

the same skill, prudence, and diligence as exercised by other accountants of ordinary skill and capacity who specialized in the field of federal income taxation or who claimed to have special expertise in the field of federal income taxation.

28.    Because BDO and Gramercy were fiduciaries and stood in a position of trust and confidence with respect to Messrs. Jones: (1) the opinions, representations of law and predictions which they gave to Messrs. Jones are actionable as misrepresentations of fact and (2) Messrs. Jones were justified in relying on the opinions, representations of law and predictions which BDO and Gramercy gave to them and which are described in this Amended Complaint.

## **Nature of the Claims**

29.    BDO and Gramercy, pursuant to an elaborate and carefully devised common scheme and conspiracy, fraudulently counseled and advised Messrs. Jones to undertake an investment strategy, claiming and representing that it would yield a reasonable profit and minimize the tax liability of Messrs. Jones from the sale of their businesses.  At the time they did so, BDO and Gramercy knew or should have known that the strategy would not yield the tax treatment as had been represented to Messrs. Jones  Upon information and belief, it is alleged that the primary motive of BDO and Gramercy in their fraud was to exact more than $1,100,000 in fees and commissions from Messrs. Jones.

30.    BDO and Gramercy knew, at the time they recommended this investment strategy to Messrs. Jones, that federal authorities were investigating the legality of similar "abusive tax shelters," known by acronyms such as "BOSS," "Son of BOSS," "BLIPS," "FLIP," "OPIS" "COBRA" and "CARDS."

5

31.     BDO and Gramercy also knew or should have known that, if the strategy were ever scrutinized through an audit or otherwise, it would be disallowed as unlawful by state and federal tax authorities. Neither of them informed Messrs. Jones of this.  Ultimately, the Internal Revenue Service ["IRS"] did classify the strategy as an illegal and abusive tax shelter, subjecting Messrs. Jones to substantial back taxes, interest, penalties, and other damages.

32.     The common scheme and conspiracy of  Gramercy and BDO to market, sell and promote unlawful tax shelters came to light, in part, because of an investigation conducted by the Permanent Subcommittee on Investigations of the United States Senate Committee on Governmental Affairs (the "U.S. Senate" or "Senate").  The results of this investigation were released by the Senate in an initial report dated November 17, 2003, entitled: "U.S. Tax Shelter Industry: the Role of Accountants, Lawyers and Financial Professionals" (This report is referred to hereafter as the "Initial Senate Report").  A second, four volume Report on the Senate's tax shelter investigation (the "Senate Hearing Record") was released in the summer of 2004, and included hundreds of exhibits related to conduct in the scheme to promote illegal tax shelters to unsuspecting clients.  A third and final Senate Report, entitled "The Role of Professional Firms in the U.S. Tax Shelter Industry," was released on February 8, 2005 (the "Senate Report").

33.     As co-promoters and co-conspirators, BDO and  Gramercy played overlapping roles in their tax investment scheme.  BDO identified wealthy clients with large capital gains and suggested that those clients employ Gramercy to implement the tax strategy as part of their overall personal financial planning. Gramercy took on the role of "investment advisor," helped sell the strategy to plaintiffs, and structured many of the transactions associated with it.

6

34.     Messrs. Jones detrimentally relied on their trusted financial and legal advisors at BDO and Gramercy for comprehensive financial and tax planning.  As part of this financial and tax planning, BDO advised Messrs. Jones to engage Gramercy who would then enter certain transactions in order to implement the tax strategy which would allow Messrs. Jones to take large deductions which would eliminate nearly all of their capital gains tax exposure.

35.     As part of the scheme of BDO and Gramercy, BDO prepared tax returns for Messrs. Jones to implement income tax deductions created through the strategy.

36.     BDO and Gramercy knew or should have known that this tax strategy was, in reality, nothing more than an unlawful and abusive tax shelter.  To profit from their illegal scheme, BDO and  Gramercy counted on their ability to conceal the true nature of the strategy from tax authorities and Messrs. Jones.

37.     Despite BDO's knowledge that similar tax strategies had failed and that this strategy would likewise fail, BDO prepared federal and state tax returns implementing the strategy and advised Messrs. Jones to file those returns.  Even after BDO learned that the IRS had begun to audit and disallow capital and other losses claimed through similar tax strategies, it continued to advise Messrs. Jones to use the strategy to offset income and/or capital gains on their income tax returns.

**The Evolution of BDO's Tax Solutions Group and its "Wolf Pack"**

38.     During or about 1998, BDO began to market, sell and promote tax shelter strategies and transactions.

7

39.     On or about October 13, 1999, BDO notified its partners that its "Tax Sales Executive Group" had been renamed as the "Tax Solutions Group" with the responsibility "to continue to assist members of BDO who find potential transactions to prefilter those transactions, structure the transactions, and close and implement the transactions." **[Exhibit 2]**

40.     The most successful partners of BDO in the Tax Solutions Group were described as having wolf-like characteristics of "always friendly but never tame." As a result, these partners were known as the "Wolf Pack." **[Exhibit 2]**

41.     According to BDO's internal documents, the "Wolf Pack" could "turn the grayest sky to green, . . . make it rain whenever we want to" and "turn a raging fire into a green river." **[Exhibit 2]**

42.     Puckett was a member of the "Wolf Pack." *See,* BDO business card of Puckett **[Exhibit 3]**

43.     By Memorandum dated November 16, 1999, BDO's Tax Solutions Group circulated a marketing list of transactions which it was promoting. This included transactions characterized by BDO as "Capital Gains Eliminators." **[Exhibit 2]**

44.     By Memorandum dated November 20, 1999, BDO notified its professional personnel that it had established its "Tax Solutions" business as a separate business line designated as Office 782, that Tax Solutions engagements could only be created within Office 782, and that such engagements could only be setup by a member of its Tax Solutions Group. **[Exhibit 2]**

45.     By Memorandum dated November 20, 1999, BDO notified its professionals that anyone who referred a potential Tax Solutions engagement to Office 782 might qualify for a finder's bonus. **[Exhibit 2]**

8

46.     BDO characterizes as a "super product category" any engagement of the Tax Solutions Group and Office 782.  **[Exhibit 2]**

47.     During 1998, the Tax Solutions Group, then known as the Tax Sales Executive Group, generated profits of $2.2 million for BDO.  **[Exhibit 2]**

48.     By Memorandum dated May 5, 2000, BDO announced to all its partners that its Tax Solutions Group had already generated revenues in the amount of $77,890,425 for the year-to-date and was projecting to generate revenues of $100 million by year end.  **[Exhibit 2]**

49.     BDO easily exceeded its $100 million revenue target by the end of June, 2000 and notified all its employees of these revenues by an e-mail under the banner of "Tax $ell$." **[Exhibit 2]**

50.     In 2000, BDO generated $500,000.00 in fees each business day from its tax shelter business.  Additionally, every million in fees generated from tax shelter business generated as much as a $5 million profit in hourly billings for *traditional* accounting work.  Howard Allenberg, BDO's vice chairman, detailed in a memorandum that tax shelter revenues totaled $101.6 million for the first six months of 2000, up from $2 million in 1998.

51.     The culture of corruption reached the highest echelon of BDO's executive management.  Indeed, the architect of BDO's tax shelter business and the leader of its "Wolf Pack" was Field who became Chairman and Chief Executive Officer of BDO in January 2000.

52.     During 1999, Field made a partner presentation titled "Wolves - - Always Friendly But Never Tame." During that presentation, Field proclaimed that "one word sums up the strategy of the Tax Business Line. Money!" **[Exhibit 2]**

9

53.    In a firm-wide email titled "TAX $ELLS!!!," Field congratulated employees who had generated fees of as much as $4 million on the sale of tax shelters.  One email highlighted a single tax solution transaction that resulted in a "PROFIT OF $995,000 TO THE FIRM!!!"  Another email praised an employee for closing a tax shelter deal "resulting in a PROFIT OF $3 MILLION TO THE FIRM!!!" **[Exhibit 2]**

54.    In fact, BDO touted TAX $ELLS! on documents, coffee mugs, screen savers and mouse pads.  It trumpeted that  TAX $ELLS! was more than a slogan, and that it was a "vision for the future," a strategy for "selling products, increasing fees and increasing profitability," BDO stressed that "[m]ost importantly, TAX $ELLS! is a change in the culture of all our people, and our attitude to tax services."

### Attacks by the IRS on Abusive Tax Shelters Sold by BDO and Others

55.    On or about December 17, 1999, the IRS issued IRS Notice 1999-59, entitled "Tax Avoidance Using Distribution of Encumbered Property."  In that Notice, the IRS stated as follows:

> [t]he Internal Revenue Service Treasury Department have become aware of certain types of transactions as described below, that are being marketed to taxpayers for the purpose of generating tax losses. This Notice is being issued to alert taxpayers and their representatives that *the purported losses arising from such transactions are not properly allowable for federal income tax purposes. . . .*  Through a contrived series of steps, taxpayers claimed tax losses for capital outlays that they have in fact recovered.  *Such artificial losses are not allowable for federal income tax purposes.*

The clear message from the IRS to BDO, Gramercy and others was that purported losses arising from transactions wholly lacking in "economic substance" (*e.g.*, tax strategies such as those recommended to and implemented for Messrs. Jones by BDO and Gramercy) were not allowable for federal income tax purposes.

10

56.    In August, 2000, the IRS once again clearly and unequivocally informed accountants and tax attorneys across the United States that it considered to be illegal tax shelters which were similar to the tax strategies which BDO and Gramercy would recommend to Messrs. Jones and implement for them.  Specifically, on August 11, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis."  This Notice concerned "similar transactions [to those discussed in Notice 1999-59] that purport to generate tax losses for taxpayers."

57.    Most importantly, Notice 2000-44 specified the precise tax-advantaged transaction which BDO and  Gramercy would recommend to Messrs. Jones and implement for them; *i.e*, the "taxpayer purchases call options and simultaneously writes offsetting call options, transfers the options positions to a partnership (or similar entity), and ultimately claims that the basis in his partnership interest "is increased by the cost of the purchased call options but is not reduced under [Internal Revenue Code] §752 as a result of the partnership's assumption of the taxpayer's obligation."  The IRS stated that "[t]he purported losses from these transactions (and from any similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interest) are not allowable as deductions for federal income tax purposes."

58.    The unambiguous message from the IRS to BDO, Gramercy and others through Notice 2000-44 was that purported losses arising from the tax strategy which they would recommended to Messrs. Jones and implement for them was not lawful for federal income tax purposes.  Moreover, Notice 2000-44 plainly warned that "any person who willfully conceals the amount of capital gains and losses in this manner, or who willfully counsels or advises such concealment, may be guilty of a criminal offense."

11

59.    Yet, BDO and Gramercy still recommended this tax strategy to Messrs. Jones and implemented it for them more than one year later.

60.    In September 2000, the IRS received information suggesting that BDO was promoting potentially abusive tax shelters without complying with the registration and listing requirements for organizers and sellers of tax shelters. See 26 U.S.C. § § 6111, 6112.[1]

61.    On or about December 5, 2000, the IRS notified BDO that it believed that BDO was promoting abusive tax shelters substantially similar to those described in Notice 2000-44 and expressly reminded BDO of its obligations under §§ 6111 and 6112 to register any such shelters and to maintain a list of all its clients who had invested in those shelters.  The IRS further requested that BDO provide it with a list of BDO's clients who had invested in those shelters.

62.    Yet, BDO failed and refused to register and maintain lists with respect to abusive tax shelters as required by §§6111 and 6112.

63.    The IRS suspected that BDO had violated §§ 6111 and 6112, by organizing and selling interests in potentially abusive tax shelters without complying with the registration and list-keeping requirements.  Because of that suspicion, the IRS issued a series of summonses to BDO.

_____

[1]Section 6111(a) of the Internal Revenue Code requires organizers of tax shelters to register the tax shelter with the IRS. See 26 U.S.C. § 6111(a). Any tax shelter required to be registered under § 6111, as well as any "arrangement which is of a type which the Secretary determines by regulations as having a potential for tax avoidance or evasion," is considered to be "potentially abusive." 26 U.S.C. § 6112(b). Accordingly, the organizers and sellers of such tax shelters must keep a list identifying each person to whom an interest of the tax shelter [**3]  was sold. See 26 U.S.C. § 6112(a). Failure to comply with the registration and listing requirements of § 6111 and § 6112 can lead to the imposition of penalties. See 26 U.S.C. § § 6707, 6708.

64.     On December 20, 2001, the IRS issued the first summons.   That summons sought records of BDO on a tax shelter which it had sold to Parts Voice Investment, LLC.  In response to that subpoena, BDO produced certain documents but refused to produce three documents on the grounds of privilege.

65.     On May 2, 2002, the IRS issued 20 additional summonses for records of BDO on tax shelter transactions.   These summonses identified twenty types of tax shelter transactions in which it suspected that BDO's clients had invested.

66.     The summonses commanded production of documents and testimony relating to the identified transactions, as well as information about BDO clients who invested in the identified tax shelters.

67.     In response to those subpoenas, BDO claimed that it had no responsive documents or that any responsive documents were privileged.

68.     On June 4, 2002, the IRS petitioned the United States District Court for the Northern District of Illinois to enforce the summons which it had issued for records of BDO on the tax shelter which it had sold to Parts Voice Investment, LLC.

69.     On July 9, 2002, the IRS petitioned the United States District Court for the Northern District of Illinois to enforce the remainder of the summonses.

70.     As a result of the aforesaid actions of the IRS, BDO and Gramercy knew or should have known that the tax strategy which they were recommending to Messrs. Jones would not withstand scrutiny by the IRS and would even result in the assessment of penalties.

71.     Long before BDO gave the tax advice to Messrs. Jones, BDO knew that its advice regarding the legality of the tax strategy was false.  This knowledge of BDO demonstrated by the

13

memorandum which Michael Kerekes authored on or about August 11, 2000.  Kerekes was a

prominent member of the Tax Solutions Group or "Wolf Pack" of BDO.  In this memorandum,

Kerekes stated as follows:

> [T]he [federal law concerning tax shelter] list-keeping
> requirement(s) . . . very probably applies to transactions offered to
> clients before August 11, 2000 where the engagement letters were
> signed on or after August 11 . . . and the list-keeping requirement
> almost certainly applies to transactions first offered to clients on or
> after August 11, 2000.

72.    The Kerekes memorandum, which was prepared more than one year before BDO first

approached Messrs. Jones about the tax strategy and nearly two years before the execution of the

BDO consulting and retainer agreements, states in plain terms: "*It seems clear that our transactions

are listed under Notice 2000-44 . . .it seems very probably that our transactions lack economic

substance and/or are tax structured.*"  These statements, and others like them in the Kerekes

memorandum, completely contradicted the statements made to Messrs. Jones by BDO, and

completely contradicted the advice provided in the opinion letters which BDO delivered to Messrs.

Jones.

73.    Hence, BDO and Gramercy knew that the tax-advantaged strategy being marketed

to Messrs. Jones was unlawful, and intentionally concealed this very material fact.  Instead of

revealing this very material fact to Messrs. Jones, they concealed it and told Messrs. Jones the exact

opposite; *i.e*, that the transactions which were being recommended were distinct from the abusive

tax shelters being attacked by the IRS and that the transactions would withstand any challenge by

the IRS.  Indeed, they continued to recommend the transactions to Messrs. Jones, to implement the

transactions, and to collect huge fees from Messrs. Jones for doing so. BDO and  Gramercy

14

concealed this very material fact in order to sell the tax strategy to Messrs. Jones and thereby reap illicit profits from it.

74.     Messrs. Jones became generally aware that the IRS was attacking tax shelters and questioned BDO about whether the IRS would attack the tax shelter which BDO and Gramercy were recommending to them.   In response to their questions, BDO repeatedly represented that the tax shelter which BDO and Gramercy were recommending to Messrs. Jones was distinct from the types of tax shelters which the IRS was attacking.   It repeatedly assured Messrs. Jones that the tax shelter which it was recommending to them was legitimate and would withstand any scrutiny from the IRS. BDO continued to make these same representations after Messrs. Jones entered the consulting agreements with BDO, and after they had entered the transactions recommended by BDO and Gramercy.

75.     Because Messrs. Jones trusted and had confidence in BDO, they believed BDO. Unfortunately, the trust and confidence which they had in BDO was misplaced.

## How BDO and Gramercy Wrongfully Induced Messrs.  Jones to Enter Consulting Agreements with BDO, Pay Huge Consulting Fees to BDO, and Proceed with the Transactions Which BDO and Gramercy Had Recommended.

76.     As described in this Amended Complaint, BDO and Gramercy made false and misleading statements to Messrs. Jones.  In addition, they failed to state or omitted material facts and actively concealed other material facts.   Messrs. Jones relied to their detriment on these false statements, misleading statements and omissions.  Their reliance was reasonable.

77.     The false statements, misleading statements, and omissions made by Gramercy as alleged in this Complaint were made directly by it or through BDO as its co-conspirator.

15

78.    Because  Gramercy was a co-conspirator with BDO,  Gramercy is liable and responsible for each of the false statements, misleading statements, and omissions made by BDO.

79.    Prior to 2001, John Jones was married to Janet Givens ["Ms. Givens"].

80.    Ms. Givens was the administrator of a nursing home in Tennessee.  She was an officer and member of the board of directors of the Tennessee Healthcare Association ["the Association"]. Most nursing homes in Tennessee are members of the Association.   At the same time, BDO was performing auditing services for many nursing homes throughout Tennessee.

81.    John Jones frequently attended meetings and conventions of the Association while accompanying Ms. Givens to whom he was then married.  During those meetings and conventions, he became acquainted with Puckett who represented BDO at those meetings and conventions.

82.    John Jones and Ms. Givens subsequently engaged Puckett and BDO to prepare a feasability study for an assisted living home which they were contemplating building and operating. They paid $25,000 to BDO for that feasibility study.

83.    During 2001, Puckett became aware that Plaintiffs, John Jones and Carleton Jones ["Messrs. Jones"], were about to sell their stock in several businesses.  He further learned that these sale would require Messrs. Jones to recognize several million dollars of long-term capital gains for federal income tax purposes.

84.    BDO then disclosed to Messrs. Jones certain tax shelter transactions and represented that those transactions were proprietary to BDO and its clients ["the transactions"].

85.    BDO urged Messrs. Jones to engage in these allegedly proprietary transactions.

86.    BDO repeatedly represented the following to Messrs. Jones: (1) the transactions would eliminate or substantially reduce the federal income taxes which Messrs. Jones would be

16

required to pay as the result of selling stock in their various businesses; (2) the courts would reject any attempt by the IRS to challenge the tax benefits which would be realized from the transactions; (3) similar  transactions had been successfully utilized by BDO for other of its clients in order to shelter large capital gains from federal income taxes (4) The IRS had never challenged any of BDO's tax shelter transactions and only two of those transactions were being reviewed by the IRS; (5) BDO would issue an opinion letter confirming to Messrs. Jones that the transactions would receive favorable treatment by the IRS; (6) major law firms had reviewed transactions with structures similar to the transactions which Puckett and BDO were proposing to Messrs. Jones; (7)  those major law firms had issued opinions which stated that the structure of those similar transaction would receive favorable treatment by the IRS;  (8) they would refer Messrs. Jones to a major law firm which would issue an *independent* opinion letter stating that the transactions would receive favorable treatment by the IRS; (9) BDO would vigorously defend the transactions on behalf of Messrs. Jones if the IRS ever challenged those transactions.

87.    These representations were made by BDO for itself and as the co-conspirator with Gramercy.  Therefore,  Gramercy is liable to Messrs. Jones for all harm and injury proximately caused to them as a result of these representations.

88.    Each of the foregoing representations was false or the representation was misleading because BDO omitted to state material facts necessary in order to make the statement, in light of the circumstances under which it was made, not misleading.

89.    BDO and Gramercy knew or should have known that the representations were false, misleading, or both.

17

90.    To the extent that any of these representations might have been opinions or projections, there was no reasonable basis for such an opinion or projection when it was made.

91.    BDO knew or should have known the following: (1) the transactions could not be legally used to eliminate or reduce the federal income taxes which Messrs. Jones would be required to pay as the result of selling stock in their various businesses; (2) the courts would most likely sustain any attempt by the IRS to challenge the tax benefits which would be realized from the transactions; (3) although similar transactions had been utilized by BDO for other of its clients in order to shelter large capital gains from federal income taxes, the IRS was attacking many of those tax shelter transactions, had issued summonses, and had filed two lawsuits to enforce those summonses (4) the opinion letter which BDO had agreed to issue would be flawed and the opinions which the letters would express would be wrong; (6) the major law firms which had issued favorable opinion letters on similar tax shelter transactions had not acted independently but had acted as a co-promoter of the tax shelter with BDO; (7) the opinion letters issued by those major law firms were flawed and the opinions which the letters expressed were wrong; (8) the major law firm to which BDO would refer Messrs. Jones would not be acting *independently* but would be acting as a co-promoter of the tax shelter with BDO and Gramercy; and (9) the opinion letter which the major law firm would issue would be flawed and the opinions which the letter would express would be wrong. Each of these facts was material. However, neither BDO nor Gramercy revealed any of these material facts to Messrs. Jones. If any of these very material facts had been revealed to Messrs. Jones, they would not have signed the consulting agreements, paid consulting fees to BDO, engaged in the transactions, or otherwise proceeded with the tax shelter transactions.

18

92.     Each of the representations were made by Puckett and other professional employees of BDO to Messrs. Jones at various locations, including Davidson County, Tennessee.

93.     Many of these representations were repeatedly made at a lengthy meeting in Davidson County, Tennessee on October 18, 2001. The representations were made by Puckett. The representations were also made via telephone call by another employee of BDO who was described by Puckett and BDO as being a leading expert on such transactions.

94.     In April of 2002, Messrs. Jones, Steve Solys[2] and Puckett (representing BDO) met with Johnston (representing Gramercy) at the offices of BDO in New York.

95.     Prior to the meeting, Puckett told Messrs. Jones that they should not ask any questions of Gramercy concerning the tax implications of the transactions which BDO had recommended. He explained that it was important for Gramercy to be independent and separate from BDO and the tax advice it was giving in order for the transactions to survive any scrutiny by the IRS. Thus, he expressly or impliedly represented that Gramercy was acting independently and separately from BDO and the tax advice it was giving.

96.     In truth and in fact, BDO and Gramercy were not independent. Instead, BDO and Gramercy were acting as co-promoters for the tax shelter which was being sold to Messrs. Jones and had acted as co-promoters on tax shelters which had been sold and recommended to other clients. Neither BDO nor Gramercy ever revealed this to Messrs. Jones.

97.     To make matters worse, BDO and Gramercy even had an established practice of sharing "consulting fees" which were paid to BDO by clients who invested in the tax shelters which BDO had recommended, including the tax shelters which were being recommended to Messrs.

[2]Mr. Solys is the financial planner for Messrs. Jones.

19

Jones. **Exhibit 4.**[3]  Indeed, BDO and Gramercy intended to share the consulting fees which Messrs.

Jones would pay to BDO.  Neither BDO nor Gramercy ever revealed this to Messrs. Jones.[4]

98.     BDO's sharing of consulting fees, including the consulting fees paid by Messrs.

Jones, was an unethical fee-splitting arrangement and in violation of Section 53 of the AICPA Code

of Professional Conduct.  Neither BDO nor Gramercy ever revealed this fee splitting arrangement

to Messrs. Jones.

99.     At the meeting in the New York offices of BDO, Messrs. Jones and Mr. Solys

inquired as to what compensation Gramercy would receive for implementing the transactions. In

response, Puckett and Johnston represented that Gramercy would receive a standard monthly

management fee (equal to a small percentage of assets under management) and annual performance

based fee (20% of the capital appreciation in the accounts of Messrs. Jones, net of management fee

and expenses).  This was false.  They did not disclose that BDO and Gramercy would split the

consulting fees which Messrs. Jones would pay to BDO.

100.     As a registered investment adviser, Gramercy was required to give a Form ADV to

its clients and to file that form with the Securities and Exchange Commission ["SEC"].

101.     Accordingly, Gramercy gave to Messrs. Jones the Form ADV which is attached as

**Exhibit 1.**    Gramercy also filed that Form ADV with the SEC.

_____

[3]At one point, BDO even deposited $800,000 with Gramercy. **[Exhibit 5]**

[4]Apparently, Gramercy had also engaged in paying fees to other accountants in return for
referring clients for execution of tax shelter transactions.  For example, Gramercy made an
undisclosed payment of $75,000 to Carl Hastings at KPMG.  This payment was made in or about
2001.  In return, Hastings recommended or counseled KPMG clients to engage in Gramercy
"distressed debt" tax shelter transactions.  *See*, Government's Memorandum of Law in Support of
its Motion Seeking the Admission of Certain "Other Crimes" Evidence, at pp. 16, 24 filed in *U.S.
v. Stein*, (S.D.N.Y. Docket #05CR-888)**[Exhibit 6]**

102.    Gramercy did not reveal in the Form ADV the fact that BDO was splitting fees with BDO. Instead, it represented at ¶ 8(c) of the Form ADV that it did not have with an accounting firm any arrangement that was material to its advisory business.  This was false.

103.    Thus, Gramercy made the same false representation to the SEC as it and BDO had made to Messrs. Jones.

104.    In reliance on the false statements and misleading statements which BDO and Gramercy had made, Messrs. Jones did the following: (1) entered Consulting Agreements with BDO; (2) Paid $1,185,000 in consulting fees to BDO; (3) entered agreements with Gramercy and signed agreements with Gramercy; (4) used Gramercy as their investment adviser, entered the tax shelter transactions which had been recommended by BDO and Gramercy; (5) paid large amounts to the law firm of De Castro, West, Chodorow, Glickfield & Nass, Inc. ["De Castro West"] for opinion letters; (6) engaged BDO to prepare their 2002 tax returns; and (7) filed those returns and paid BDO for the preparation of those returns.

105.    This reliance of Messrs. Jones on the false statements and misleading statements of BDO and  Gramercy was reasonable.

106.    Pursuant to the Consulting Agreements, BDO was to provide consulting services to Messrs. Jones so that they would attain the most beneficial tax results in the sale of their businesses, as well as other consulting services.

107.    Carleton Jones entered his Consulting Agreement with BDO on May 14, 2002 **[Exhibit 7]**. The Consulting Agreement required him to pay $600,000 in consulting fees to BDO.

108.    John Jones entered his Consulting Agreement with BDO on June 3, 2002 **[Exhibit 8]**. The Consulting Agreement required him to pay $585,000 in consulting fees to BDO

21

109.    Messrs. Jones paid the consulting fees to BDO as follows:

|  | Date | Amount |
|---|---|---|
| John Jones | 6/19/02 | $585,000 |
| Carleton Jones | 6/12/02 | $600,000 |
| **Total** |  | $1,185,000 |

110.    The amounts which Messrs. Jones invested in the transactions were as follows:

| Investor | Date | Amount |
|---|---|---|
| John Jones | 9/11/02 | $1,120,000 |
| Carleton Jones | 9/11/02 | $1,120,000 |
| **Total** |  | $2,240,000 |

111.    The amounts which Messrs. Jones paid to De Castro West were as follows:

| Investor | Amount |
|---|---|
| John Jones | $47,500 |
| Carleton Jones | $47,500 |
| **Total** | $95,000 |

These amounts were paid during or about May and June of 2003.

112.    BDO and Gramercy knew or should have known the following: (1) the transactions could not be legally used to eliminate or reduce the federal income taxes which Messrs. Jones would be required to pay as the result of selling stock in their various businesses; (2) the courts would most likely sustain any attempt by the IRS to challenge the tax benefits which would be realized from the transactions; (3) although similar  transactions had been utilized by BDO for other of its clients in order to shelter large capital gains from federal income taxes, the IRS was attacking many of those tax shelter transactions, had issued summonses, and had filed two lawsuits to enforce those

22

summonses;  (4) the opinion letter which BDO had agreed to issue would be flawed and the opinions

which the letters would express would be wrong; (6) the major law firms which had issued favorable

opinion letters on similar tax shelter transactions had not acted independently but had acted as a co-

promoter of the tax shelter with BDO; (7) the opinion letters issued by those major law firms were

flawed and the opinions which the letters expressed were wrong;  (8) the major law firm to which

BDO would refer Messrs. Jones would not be acting *independently*  but would be acting as a co-

promoter of the tax shelter with BDO and  Gramercy; (9) the opinion letter which the major law firm

would issue would be flawed and the opinions which the letter would express would be wrong; (10)

BDO would not vigorously defend the tax shelter transaction on behalf of Messrs. Jones if the IRS

were to challenge it; (11) Gramercy was not acting independently but was acting as a co-promoter

of the tax shelter with BDO; and (12) BDO and Gramercy would split the consulting fees which

Messrs. Jones would pay to BDO .  Each of these facts was material.  However, neither BDO nor

Gramercy revealed any of these material facts to Messrs. Jones.

113.    If any of these very material facts had been revealed to Messrs. Jones, they would not

have done any of the following: (1) entered Consulting Agreements with BDO; (2) paid $1,185,000

in consulting fees to BDO;  (3) entered agreements with Gramercy and signed agreements with

Gramercy; (4) used Gramercy as their investment adviser, entered the tax shelter transactions which

had been recommended by BDO and  Gramercy; (5) paid large amounts to the law firm of De Castro,

West, Chodorow, Glickfield & Nass, Inc. ["De Castro West"] for opinion letters; (6) engaged BDO

to prepare their 2002 tax returns; and (7) filed those returns and paid BDO for the preparation of

those returns.

23

**The Issuance of the Tax Opinion Letters and Preparation of the 2002 Tax Returns by BDO**

114.    On October 10, 2003, BDO issued its tax opinion letters to Messrs. Jones ["the BDO Opinion Letters"].  In those  letters, BDO opined that the transactions would receive favorable tax treatment from the IRS.

115.    BDO intended for Messrs. Jones to rely on the BDO Opinion Letters.

116.    Messrs. Jones relied on the BDO Opinion Letters and did so to their detriment. Specifically, they relied on those letters when they filed the 2002 income tax returns which BDO had prepared.

117.    Also in 2003, Messrs. Jones employed BDO to prepare their federal income tax returns for the year 2002 ["the 2002 tax returns"].

118.    BDO owed a duty to prepare the 2002 tax returns while exercising the same skill, prudence, and diligence which they represented themselves as having in the specialized field of federal income taxation.   In the alternative, Puckett and BDO owed to Messrs. Jones a duty to prepare the 2002 tax returns while exercising the same skill, prudence, and diligence as exercised by other accountants of ordinary skill and capacity who specialized in the field of federal income taxation or who claimed to have special expertise in the field of federal income taxation.

119.    BDO prepared the 2002 tax returns to reflect deductions from the transactions that eliminated most of the capital gains which Messrs. Jones had realized from the sale of their businesses.  In doing so, BDO breached the duties which they owed to Messrs. Jones.

120.    By preparing the 2002 tax returns to claim deductions from the transactions so that most of the capital gains were eliminated, BDO breached the duties which it owed to Messrs. Jones and caused them to incur penalties which were subsequently assessed by the IRS.

121.    Messrs. Jones reasonably relied upon BDO to prepare their 2002 tax returns properly and in accordance with applicable law.

122.    On or shortly before October 15, 2003, BDO prepared the 2002 tax returns and signed them as the preparer of the returns.

123.    At the time that BDO prepared and filed the 2002 tax returns for Messrs. Jones and issued the tax opinion letters, it knew or should have known that (1) the transactions would receive *un*favorable tax treatment from the IRS and (2) would likely result in the imposition of penalties.

124.    Thus, BDO knew or should have known that the tax opinion letters were flawed and that the 2002 tax returns which it had prepared were incorrect.

125.    Yet, BDO never revealed to Messrs. Jones that the tax opinion letters were flawed or that it had prepared the 2002 tax returns incorrectly.

126.    *Less than 10 days after BDO had issued the tax opinion letter to Messrs. Jones and had prepared their 2002 tax returns*, it removed Field from his positions as Chief Executive Officer of BDO and Chairman of BDO, and placed him on an indefinite leave of absence.  BDO did this on October 21, 2003.

127.    On the date that Field was removed from his positions as Chief Executive Officer and Chairman at BDO (October 21, 2003), Pam Packard, Michael Lichner, Ron Marinella, Adrian Dicker and Dennis Fusco voluntarily resigned from their respective positions as Directors of BDO.

### BDO Was Unwilling to Defend the Very Transactions
### Which It Had Recommended and Sold to Messrs. Jones.

128.    BDO represented to  Messrs. Jones *inter alia* that if the IRS did challenge the tax shelter, BDO would vigorously defend Messrs. Jones. This representation, as well as the other

25

representations which BDO had made to Messrs. Jones, caused them to have great confidence in BDO.

129.    The fact that BDO was willing to prepare and sign the income tax returns of Messrs. Jones increased their trust and confidence in BDO and in the representations which BDO had made.

130.    The trust and confidence which Messrs. Jones had in BDO was increased even further by other representations which Puckett and BDO had made, including the following:  (1)  similar transactions had been successfully utilized by BDO for other of its clients in order to shelter large capital gains from federal income taxes; (2) major law firms had issued letters in which they opined that transactions which had structures similar to the structure of the transactions of Messrs. Jones would receive favorable treatment by the IRS.

131.    From the time that BDO issued its tax opinion letter until the winter of 2005-2006, BDO continued to represent to Messrs. Jones that, more likely than not, the courts would reject any attempt by the IRS to challenge the tax benefits which would be realized from the transactions.[5]

132.    BDO never stated or even implied that penalties might be assessed against Messrs. Jones. Messrs. Jones reasonably relied on this representation when they engaged BDO to prepare their 2002 tax returns.

133.    BDO led Messrs. Jones to believe that there was not even a possibility that the IRS would assess penalties.

_____

[5]Prior to the time that Messrs. Jones entered the Consulting Agreements and paid the consulting fees, BDO and Puckett represented that the transactions would receive favorable treatment.  In the opinion letter which BDO subsequently issued during 2003, BDO opined it was "more likely than not" the transactions would receive favorable treatment by the IRS.

26

134.    BDO never represented or disclosed to Messrs. Jones that there was even a possibility the IRS would impose a penalty.

135.    During the latter part of 2005, the IRS examined the 2002 tax returns of Messrs. Jones.

136.    The IRS then notified Messrs. Jones that it not only was disallowing the deductions from the transactions as shown on the return *but also was imposing penalties*.

137.    The IRS proposed a settlement which would allow Messrs. Jones to deduct the consulting fees which they had paid to BDO but would still disallow the remainder of the deductions which had been taken and would require them to pay the following penalties:

|  | **Amount** |
|---|---|
| John Jones | $149,306.00 |
| Carleton Jones | $149,728.00 |
| **Total** | $299,034.00 |

138.    Instead of vigorously resisting the adverse action of the IRS, BDO told Messrs. Jones that they should acquiesce and accept the settlement which had been proposed by the IRS.  BDO did not recommend or suggest that Messrs. Jones should even attempt to negotiate a better settlement.

139.    BDO told Messrs. Jones this (that they should accept the settlement and should not challenge this action of the IRS) even though BDO had previously represented to Messrs. Jones that *inter alia* it would vigorously resist any attempt by the IRS to deny favorable tax treatment for the transactions and that any attempt such attempt by the IRS would more likely than be rejected by the courts.

27

## CAUSES OF ACTION

### Fraud and Misrepresentation

140.     The allegations of ¶¶ 1 through 139 are adopted and incorporated by reference.

141.     Messrs. Jones reasonable relied upon the false statements, misleading statements, and omissions of BDO and  Gramercy as set forth in this Amended Complaint.  They did so to their detriment.

142.     The false statements, misleading statements were intentional and willful.  In the alternative, they were reckless and grossly negligent.

### Civil Conspiracy

143.     The allegations of ¶¶ 1 through 142 are adopted and incorporated by reference.

144.     Upon information and belief, BDO and Gramercy, acting with possibly others, conspired to devise and promote various abusive tax shelter transactions, including the same transactions which were sold to Messrs. Jones, and they did so for the purpose of receiving and splitting millions of dollars in fees (the "conspiracy").  The receipt of these fees was the sole motive in the development and execution of the conspiracy.  Further, the amount of fees earned by BDO and Gramercy was not based upon or related to the amount of time and effort they expended in providing legal, tax, or accounting services. Instead, it was based upon the amount of capital and/or ordinary losses each client would claim on their respective tax returns.

145.     The receipt of fees and pecuniary gain from those fees was the primary motive for defendants' conduct; the provision of professional services to clients was merely an incidental byproduct of, and not a motivating factor for, the conduct of BDO and Gramercy as alleged herein. Their conspiracy gave each of them a significant pecuniary interest in the advice and professional

28

services they would render, and impaired the exercise of the duty of care, loyalty, and honesty which each of them owed to Messrs. Jones and to their other clients.

146.     Upon information and belief, BDO and Gramercy devised the tax strategies, agreed to provide a veneer of legitimacy to each other's advice concerning the transactions, agreed to the representations that would be made, and agreed to promise the issuance of a purportedly "independent" tax opinion, all before potential clients were solicited.  These "independent" opinion letters were prefabricated and canned and were used for various clients across the United States (with basic factual information inserted depending upon the client).

147.     Upon information and belief, BDO knew that the potential for tax shelters, including the tax shelter which BDO and Gramercy sold to Messrs. Jones, could only be realized if BDO enlisted lawyers and investment firms in their transactions.  Accordingly, BDO enlisted Gramercy (and others) to join with it to design, promote, sell and implement tax shelters, including the tax shelter which was sold to Messrs. Jones.

148.     BDO and Gramercy knew that accountants have the most knowledge of the financial status of their clients.  They also knew that their clients deeply trusted their legal, accounting, and financial advisors, and they abused this trust through their fraudulent conduct.

149.     BDO and Gramercy conspired and acted together to solicit clients, including Messrs. Jones. Messrs. Jones did not seek out BDO or Gramercy.

150.     To do so, BDO and Gramercy promised, opined, and assured the clients, including Messrs. Jones, that the transactions involved a lawful tax-advantaged investment strategy.

29

151.    Upon information and belief, pursuant to the conspiracy, BDO and Gramercy split the various fees obtained from clients that purchased tax shelters, including Messrs. Jones. Such conduct violated Section 53 of the AICPA Code of Professional Conduct.

152.    BDO and Gramercy engaged in a civil conspiracy consisting of an agreement between them to misrepresent to Messrs. Jones the true nature of the tax strategy described herein and to trick Messrs. Jones into paying large fees for worthless products and services. The conspiracy culminated in the preparation and filing of incorrect tax returns.

153.    Examples of the overt acts committed by BDO and Gramercy in furtherance of their conspiracy are detailed throughout this Complaint. Such detailed allegations of overt acts committed in furtherance of the conspiracy are incorporated expressly into this and the other claims for relief.

154.    The scheme of BDO and Gramercy included overt acts such as using established customer relationships and confidential customer information to identify potential clients for their illegal and abusive tax shelters; executing the series of transactions underlying the abusive and illegal tax shelters; preparing and signing inaccurate tax returns; and procuring and providing false tax opinion letters to provide a veneer of legitimacy about the lawfulness and tax consequences of the strategy.

155.    As described throughout this Complaint, the conspiracy was perpetrated by willfully defrauding clients such as Messrs. Jones, and by misrepresenting material facts and by failing to disclose material facts. Had it not been for these willful and intentional misrepresentations, Messrs. Jones would not have participated in the tax strategy. The conduct of BDO and Gramercy was the direct and immediate cause of Messrs. Jones's misinformed decision to invest money in an illegal and abuse tax shelter.

30

156.    The collaboration, participation, and overt acts of BDO and Gramercy in the civil conspiracy were done to induce Messrs. Jones, and others, to invest in the transactions and, in turn, to generate large fees for the conspirators.  BDO and Gramercy wrongfully solicited and encouraged Messrs. Jones and other clients to invest unknowingly in abusive tax shelters without disclosing the conspirators' knowledge of the illegality of the strategy.

157.    BDO and Gramercy successfully implemented and executed their scheme by causing Messrs. Jones and other persons to participate in the same tax shelter which was sold to Messrs. Jones.  Messrs. Jones therefore seek actual damages, together with prejudgment interest, for the injuries sustained.  As a result of the concerted conduct of BDO and Gramercy, Messrs. Jones paid unnecessary fees; incurred costs in connection with an IRS audit; and paid more than $300,000.00 in penalties and interest; each and all of which constitute actual and proximate damages suffered by Messrs. Jones.

158.    The wrongful acts of BDO and Gramercy show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

159.    As a direct and proximate result of the conspiracy of BDO and  Gramercy, Messrs. Jones have proximately suffered great damage.

### Breach of Fiduciary Duty

160.    The allegations of ¶¶ 1 through 159 are adopted and incorporated by reference.

161.    The acts and omissions of BDO and Gramercy as set forth in this Complaint constitute a breach of the fiduciary duties which BDO and Gramercy owed to Messrs. Jones.

31

162.     These breaches of fiduciary duty have proximately caused great damage to Messrs. Jones.

### Recklessness and Gross Negligence

163.     The allegations of ¶¶ 1 through 162 are adopted and incorporated by reference.

164.     The acts and omissions of BDO and Gramercy as set forth in this Complaint were made recklessly.  In the alternative, these acts and omissions were made with gross negligence.

165.     The reckless and grossly negligent acts and omissions of BDO and  Gramercy have proximately caused great damage to Messrs. Jones.

### Tennessee Consumer Protection Act

166.     The allegations of ¶¶ 1 through 165 are adopted and incorporated by reference.

167.     The acts and omissions of BDO and Gramercy as set forth in this Complaint constitute unfair and deceptive acts in violation of the Tennessee Consumer Protection Act, T.C.A. §47-18-101, *et seq.* ["The Act"].

168.     The violations of the Act by BDO and Gramercy have proximately caused great damage to Messrs. Jones.

### Accounting Malpractice and Professional Negligence

169.     The allegations of ¶¶ 1 through 168 are adopted and incorporated by reference.

170.     BDO agreed to provide accounting and consulting services to Messrs. Jones, including giving competent tax advice, and preparing tax returns.

171.     In providing those services, BDO was required to comply with the applicable standard of care and all applicable professional rules of conduct.

172.     In providing those services, BDO was required to act honestly and diligently.

32

173.   BDO failed to comply with the applicable standard of care.

174.   BDO failed to comply with applicable standards of professional conduct.

175.   BDO's failure to comply with the applicable standard of care and applicable standards of professional conduct proximately caused great damage to Messrs. Jones.

### Negligent Misrepresentation

176.   The allegations of ¶¶ 1 through 175 are adopted and incorporated by reference.

177.   As stated in this Complaint, BDO and Gramercy represented to Messrs. Jones that the courts would reject any attempt by the IRS to challenge the tax benefits which would be realized from the transactions.  From the time that BDO issued its tax opinion letter in 2003 until the winter of 2005-2006, BDO represented that, more likely than not, the courts would reject any attempt by the IRS to challenge the tax benefits which would be realized from the transactions. BDO further represented that no penalty would be assessed against Messrs. Jones.

178.   BDO intended for Messrs. Jones to rely on these representations in their business affairs and transactions.

179.   In making these representations, BDO failed to exercise the skill, prudence, and diligence which they represented themselves as having in the specialized field of federal income taxation.

180.   In the alternative, BDO made these representations without exercising the skill, prudence, and diligence as exercised by other accountants of ordinary skill and capacity who specialized in the field of federal income taxation or who claimed to have special expertise in the field of federal income taxation.

181.   BDO knew or should have known that these representations were false.

33

182.    BDO knew or should have known that the IRS would likely challenge the tax benefits which would be realized from the transactions and would impose penalties.  BDO knew or should have known that the courts would sustain that challenge and imposition of penalties by the IRS.

183.    Messrs. Jones reasonably relied on these representations by BDO and did so to their economic detriment.

## Declaratory Judgment

184.    The allegations of ¶¶ 1 through 183 are adopted and incorporated by reference.

185.    Gramercy required Messrs. Jones to sign an Investment Management Agreement ["the Gramercy Agreement"].

186.    Gramercy contends that the provisions of §§ 7(e) and 7(f) of the   Gramercy Agreement require that Messrs. Jones indemnify Gramercy from certain claims, pay the costs which Gramercy incurs in defending such claims, and advance to Gramercy the costs of defending this action.

187.    In pertinent part, the provisions of the Gramercy Agreement upon which  Gramercy relies are as follows:

(e)    To the fullest extent permitted by law, the Client shall indemnify and save harmless the Investment Manager, its members and any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including parties acting as agents for the execution of transactions) (the "Indemnitees"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Client, managing the Account, any investment made under or in connection with this Agreement, or the performance by the Indemnitee of the Investment Manager's responsibilities hereunder and against all taxes, charges, duties or levies incurred by

34

the Investment Manager or any Indemnitee in connection with the purchase or sale or ownership of the Account, provided that an Indemnitee shall be entitled to indemnification hereunder only if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Client and the Indemnitee's conduct did not constitute willful misconduct, gross negligence, a violation of applicable securities laws or criminal wrongdoing. The termination of any proceeding by settlement, judgment, order or upon a plea of <u>nolo contendere</u> or its equivalent shall not, of itself, create a presumption that an Indemnitee did not act in good faith and in a manner that the Indemnitee reasonably believed to be in or not opposed to the best interests of the Client or that the Indemnitee's conduct constitute willful misconduct, gross negligence, a violation of applicable securities laws or criminal wrongdoing.

(f)    Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Client prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

188.    For each of at least four reasons, these provisions are inapplicable or unenforceable.

<u>First</u>, they do not apply to suits between the indemnitors (Messrs. Jones) and the indemnitee (Gramercy). Rather, they only apply to suits brought against the indemnitee (Gramercy) *by third parties* based upon actions taken by the indemnitee (Gramercy) for the benefit of the indemnitors (Messrs. Jones). <u>Second</u>, these provisions are inapplicable because they do not apply to claims for willful misconduct, gross negligence, a violation of applicable securities laws, or criminal wrongdoing by Gramercy. The claims which Messrs. Jones have asserted against Gramercy include claims for willful misconduct and gross negligence. <u>Third,</u> the provisions apply only if Gramercy acted in good faith and in a manner the Gramercy reasonably believed to be in the best interests of Messrs. Jones. Gramercy did not act in good faith and did not reasonably believe that its actions were in the best interests of Messrs. Jones. <u>Fourth</u>, Messrs. Jones signed the Gramercy Agreement in reasonable reliance on the false statements, misleading statements, and omissions of Gramercy

35

which have already been described in this Complaint. This includes the false statements, misleading statements, and omissions which were made by BDO as the co-conspirator of Gramercy. Therefore, Messrs. Jones were wrongfully induced to enter the Gramercy Agreement. Because Messrs. Jones were wrongfully induced to enter the Gramercy Agreement, it is unenforceable.

189.    Any doubts as to the scope or application of the indemnity provisions must be resolved against Gramercy. This is because contracts for indemnity are strictly construed and because Gramercy drafted the Gramercy Agreement which contains the indemnity provisions.

190.    A real and justiciable controversy exists between Gramercy and Messrs. Jones concerning the application, interpretation or construction of the indemnity provisions in the Gramercy Agreement.

191.    Messrs. Jones are entitled to a judgment declaring that (1) Messrs. Jones are not required to indemnify Gramercy for any monetary judgments or awards which are entered against Gramercy and in favor of either or both of Messrs. Jones; (2) Messrs. Jones is not required to indemnify Gramercy for the costs of defending this suit or any other action brought against Gramercy by either or both of Messrs. Jones.; and (3) Messrs. Jones are not required to advance to Gramercy any amounts for the costs of defending this suit or any other action brought against Gramercy by either or both of Messrs. Jones.

192.    Messrs. Jones are also entitled to a judgment declaring that all other exculpation provisions and limitations of liability in the Gramercy Agreement are unenforceable. This is because Messrs. Jones were wrongfully induced to enter the Gramercy Agreement.

36

WHEREFORE, Messrs. Jones demand:

1.     That they have judgment for compensatory damages against all defendants in an amount to be shown at trial.

2.     That they have additional judgment against all defendants for treble damages pursuant to the Act.

3.     That they have additional judgment against all defendants for prejudgment interest.

4.     That they have additional judgment against all defendants for punitive damages.

5.     That this honorable Court enter a judgment declaring that (1) Messrs. Jones are not required to indemnify Gramercy for any monetary judgments or awards which are entered against Gramercy and in favor of either or both of Messrs. Jones; (2) Messrs. Jones is not required to indemnify Gramercy for the costs of defending this suit or any other action brought against Gramercy by either or both of Messrs. Jones; (3) Messrs. Jones are not required to advance to Gramercy any amounts for the costs of defending this suit or any other action brought against Gramercy by either or both of Messrs. Jones; and (4) any and all indemnification provisions, exculpation provisions and limitations of liability in the Gramercy Agreement are unenforceable

6.     That they have additional judgment against all defendants for attorney's fees incurred in connection with this action.

7.     That all costs be taxed to defendants

8.     That a jury be convened to try all issues.

9.     That they have such other and further relief as this Court deems just and proper.

37

s/ Winston S. Evans
Winston S. Evans (#6281)
Thomas W. Shumate IV (#19595)
Evans, Jones & Reynolds, P.C.
1810 One Nashville Place
150 Fourth Avenue North
Nashville, TN 37219-2424
(615) 259-4685

Attorneys for Plaintiffs

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **AMENDED COMPLAINT** has been served via **Electronic Transmission** upon:

Michael L. Dagley, Esq.
Brian D. Roark, Esq.
BASS, BERRY & SIMS, PLC
315 Deaderick St., Suite 2700
Nashville, TN 37238-3001
mdagley@bassberry.com
broark@bassberry.com

Michael S. Poulos, Esq.
Robert S. Markin, Esq.
203 N. LaSalle St., Suite 1900
Chicago, IL 60601
robert.markin@dlapiper.com

this 27th day of March, 2007.

s/ Winston S. Evans

361400.004.ls

38