# E X H I B I T   2

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

| | |
|---|---|
| **JOHN A. JONES and** | ) |
| **CARLETON A. JONES, III,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Case No. 3:06-CV-1115** |
| | ) **Judge Echols** |
| **BDO SEIDMAN, LLP and** | |
| **GRAMERCY ADVISORS, LLC** | ) **Magistrate Judge Brown** |
| | ) |
| **Defendant.** | ) |

## AMENDED COMPLAINT

### The Parties

1.      Plaintiff, John A. Jones ["John Jones"], is a citizen and resident of Washington County, Tennessee.

2.      Plaintiff, Carleton A. Jones, III ["Carleton Jones"], is a citizen and resident of Washington County, Tennessee.

3.      Defendant, BDO Seidman, LLP ["BDO"], is a limited liability partnership organized and existing under the laws of New York. Its headquarters and principal place of business are in Chicago, Illinois.

4.      BDO is one of the largest accounting firms in the United States with more than 34 offices and 300 alliance firms nationwide.

5.      At all times relevant to this Complaint, a major component of BDO's practice has been to provide tax advice to its clients.

6.   At all times relevant to this Complaint, BDO held itself out as having special expertise in THE field of federal income taxation. Indeed, BDO claimed to have as much, if not more, expertise in this field as any other accounting or consulting firm.

7.   Mark D. Puckett ["Puckett"], is a partner in BDO. His offices are in Memphis, Tennessee.

8.   All acts and omissions by Puckett as described in this Complaint were made within the scope of his authority as a partner in BDO.

9.   Denis Field ["Field"] was a senior officer of BDO. In January of 2000, he became the Chairman and Chief Executive Officer of BDO. He held that position of Chairman and Chief Executive Officer until he was removed from it on October 23, 2003.

10.   All acts and omissions by Field as described in this Complaint were made within the scope of his authority as a senior officer, Chairman, or Chief Executive Officer of BDO.

11.   Defendant, Gramercy Advisors, LLC ["Gramercy"] is a limited liability company which is organized and exists under the laws of Connecticut. The principal offices and place of business of Gramercy are at 20 Dayton Ave, Greenwich, Connecticut 06830. Its registered agent for process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

12.   Gramercy is an SEC Registered Investment Advisor and an NASD Regulated Broker/Dealer.

13.   Gramercy holds itself out as a Registered Investment Adviser which does the following: (1) identifies, structures, and executes trades designed to achieve its investment objectives. (2) provides clients with services which include goal setting, investment strategies, and

2

*tax execution. See,* Gramercy Form ADV filed with Securities and Exchange Commission. [**Exhibit 1**].

14.     Jay Johnston ["Johnston"] is the Co-Managing Partner or Co-Managing Director of Gramercy.

15.     All acts and omissions by Johnston as described in this Complaint were made within the scope of his authority as Co-Managing Partner or Co-Managing Director of Gramercy.

## Jurisdiction and Venue

16.     BDO has continuously and systematically engaged in business in this judicial district and throughout Tennessee.

17.     In connection with the events described in this Amended Complaint, Gramercy has conducted business with Messrs. Jones who are citizens of Tennessee. In connection with those same events, it has sent numerous communications to Tennessee. The acts and omissions of Gramercy as described in this Complaint have caused injury to John Jones and Carleton Jones ["Messrs. Jones"] within the state of Tennessee.

18.     In addition, Gramercy and BDO have engaged in a civil conspiracy to devise, design, facilitate, promote, sell and implement illegal tax shelters. Pursuant to that civil conspiracy, BDO and Gramercy reasonably expected and intended to cause consequences in Tennessee. In fact, that civil conspiracy did cause consequences in Tennessee because it inflicted great damage upon Messrs. Jones. BDO committed overt acts in furtherance of that conspiracy and those acts, if committed by a non-resident would have been sufficient to subject the non-resident to jurisdiction under the long arm statute of Tennessee. Those overt acts of BDO are attributable to Gramercy and subject it to personal jurisdiction in Tennessee.

3

19.    This is a suit between citizens of different states.  The amount in controversy, exclusive of interest and costs, exceeds \$75,000.  Therefore, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(a) and (c).

20.    BDO is subject to personal jurisdiction in this judicial district.  Further, a substantial part of the events and omissions giving rise to the claims of "Messrs. Jones" occurred in this district.  Therefore, venue is proper under 28 U.S.C. §1391(a) and (c)

## Special Duties Which BDO and Gramercy Owed to Messrs. Jones

21.    BDO and Gramercy were fiduciaries and stood in a position of trust and confidence with respect to Messrs. Jones.

22.    At all times relevant to this Complaint, Gramercy and BDO owed a fiduciary duty of care and loyalty to Messrs. Jones.

23.    At all times relevant to this Complaint, Gramercy and BDO occupied and held a position and relationship of trust and confidence with respect to Messrs. Jones.

24.    Messrs. Jones justifiably and reasonably placed their trust and confidence in Gramercy and BDO.

25.    At all times relevant to this Complaint, Gramercy and BDO owed to Messrs. Jones a duty to deal with them fairly and in good faith.

26.    At all times relevant to this Complaint, Gramercy and BDO owed to Messrs. Jones a duty to disclose fully all material facts.

27.    At all times relevant to this Complaint, BDO owed to Messrs. Jones a duty to possess and exercise the skill, prudence, and diligence which it represented itself as having in the specialized field of federal income taxation.  In the alternative, BDO owed to Messrs. Jones a duty to exercise

4

the same skill, prudence, and diligence as exercised by other accountants of ordinary skill and capacity who specialized in the field of federal income taxation or who claimed to have special expertise in the field of federal income taxation.

28.     Because BDO and Gramercy were fiduciaries and stood in a position of trust and confidence with respect to Messrs. Jones: (1) the opinions, representations of law and predictions which they gave to Messrs. Jones are actionable as misrepresentations of fact and (2) Messrs. Jones were justified in relying on the opinions, representations of law and predictions which BDO and Gramercy gave to them and which are described in this Amended Complaint.

## Nature of the Claims

29.     BDO and Gramercy, pursuant to an elaborate and carefully devised common scheme and conspiracy, fraudulently counseled and advised Messrs. Jones to undertake an investment strategy, claiming and representing that it would yield a reasonable profit and minimize the tax liability of Messrs. Jones from the sale of their businesses. At the time they did so, BDO and Gramercy knew or should have known that the strategy would not yield the tax treatment as had been represented to Messrs. Jones Upon information and belief, it is alleged that the primary motive of BDO and Gramercy in their fraud was to exact more than $1,100,000 in fees and commissions from Messrs. Jones.

30.     BDO and Gramercy knew, at the time they recommended this investment strategy to Messrs. Jones, that federal authorities were investigating the legality of similar "abusive tax shelters," known by acronyms such as "BOSS," "Son of BOSS," "BLIPS," "FLIP," "OPIS" "COBRA" and "CARDS."

5

31.     BDO and Gramercy also knew or should have known that, if the strategy were ever scrutinized through an audit or otherwise, it would be disallowed as unlawful by state and federal tax authorities. Neither of them informed Messrs. Jones of this. Ultimately, the Internal Revenue Service ["IRS"] did classify the strategy as an illegal and abusive tax shelter, subjecting Messrs. Jones to substantial back taxes, interest, penalties, and other damages.

32.     The common scheme and conspiracy of Gramercy and BDO to market, sell and promote unlawful tax shelters came to light, in part, because of an investigation conducted by the Permanent Subcommittee on Investigations of the United States Senate Committee on Governmental Affairs (the "U.S. Senate" or "Senate"). The results of this investigation were released by the Senate in an initial report dated November 17, 2003, entitled: "U.S. Tax Shelter Industry: the Role of Accountants, Lawyers and Financial Professionals" (This report is referred to hereafter as the "Initial Senate Report"). A second, four volume Report on the Senate's tax shelter investigation (the "Senate Hearing Record") was released in the summer of 2004, and included hundreds of exhibits related to conduct in the scheme to promote illegal tax shelters to unsuspecting clients. A third and final Senate Report, entitled "The Role of Professional Firms in the U.S. Tax Shelter Industry," was released on February 8, 2005 (the "Senate Report").

33.     As co-promoters and co-conspirators, BDO and Gramercy played overlapping roles in their tax investment scheme. BDO identified wealthy clients with large capital gains and suggested that those clients employ Gramercy to implement the tax strategy as part of their overall personal financial planning. Gramercy took on the role of "investment advisor," helped sell the strategy to plaintiffs, and structured many of the transactions associated with it.

6

34. Messrs. Jones detrimentally relied on their trusted financial and legal advisors at BDO and Gramercy for comprehensive financial and tax planning. As part of this financial and tax planning, BDO advised Messrs. Jones to engage Gramercy who would then enter certain transactions in order to implement the tax strategy which would allow Messrs. Jones to take large deductions which would eliminate nearly all of their capital gains tax exposure.

35. As part of the scheme of BDO and Gramercy, BDO prepared tax returns for Messrs. Jones to implement income tax deductions created through the strategy.

36. BDO and Gramercy knew or should have known that this tax strategy was, in reality, nothing more than an unlawful and abusive tax shelter. To profit from their illegal scheme, BDO and Gramercy counted on their ability to conceal the true nature of the strategy from tax authorities and Messrs. Jones.

37. Despite BDO's knowledge that similar tax strategies had failed and that this strategy would likewise fail, BDO prepared federal and state tax returns implementing the strategy and advised Messrs. Jones to file those returns. Even after BDO learned that the IRS had begun to audit and disallow capital and other losses claimed through similar tax strategies, it continued to advise Messrs. Jones to use the strategy to offset income and/or capital gains on their income tax returns.

## The Evolution of BDO's Tax Solutions Group and its "Wolf Pack"

38. During or about 1998, BDO began to market, sell and promote tax shelter strategies and transactions.

7

39.     On or about October 13, 1999, BDO notified its partners that its "Tax Sales Executive Group" had been renamed as the "Tax Solutions Group" with the responsibility "to continue to assist members of BDO who find potential transactions to prefilter those transactions, structure the transactions, and close and implement the transactions." **[Exhibit 2]**

40.     The most successful partners of BDO in the Tax Solutions Group were described as having wolf-like characteristics of "always friendly but never tame." As a result, these partners were known as the "Wolf Pack." **[Exhibit 2]**

41.     According to BDO's internal documents, the "Wolf Pack" could "turn the grayest sky to green, . . . make it rain whenever we want to" and "turn a raging fire into a green river." **[Exhibit 2]**

42.     Puckett was a member of the "Wolf Pack." *See,* BDO business card of Puckett **[Exhibit 3]**

43.     By Memorandum dated November 16, 1999, BDO's Tax Solutions Group circulated a marketing list of transactions which it was promoting. This included transactions characterized by BDO as "Capital Gains Eliminators." **[Exhibit 2]**

44.     By Memorandum dated November 20, 1999, BDO notified its professional personnel that it had established its "Tax Solutions" business as a separate business line designated as Office 782, that Tax Solutions engagements could only be created within Office 782, and that such engagements could only be setup by a member of its Tax Solutions Group. **[Exhibit 2]**

45.     By Memorandum dated November 20, 1999, BDO notified its professionals that anyone who referred a potential Tax Solutions engagement to Office 782 might qualify for a finder's bonus. **[Exhibit 2]**

8

46.     BDO characterizes as a "super product category" any engagement of the Tax Solutions Group and Office 782. **[Exhibit 2]**

47.     During 1998, the Tax Solutions Group, then known as the Tax Sales Executive Group, generated profits of $2.2 million for BDO. **[Exhibit 2]**

48.     By Memorandum dated May 5, 2000, BDO announced to all its partners that its Tax Solutions Group had already generated revenues in the amount of $77,890,425 for the year-to-date and was projecting to generate revenues of $100 million by year end. **[Exhibit 2]**

49.     BDO easily exceeded its $100 million revenue target by the end of June, 2000 and notified all its employees of these revenues by an e-mail under the banner of "Tax $ell$." **[Exhibit 2]**

50.     In 2000, BDO generated $500,000.00 in fees each business day from its tax shelter business. Additionally, every million in fees generated from tax shelter business generated as much as a $5 million profit in hourly billings for *traditional* accounting work. Howard Allenberg, BDO's vice chairman, detailed in a memorandum that tax shelter revenues totaled $101.6 million for the first six months of 2000, up from $2 million in 1998.

51.     The culture of corruption reached the highest echelon of BDO's executive management. Indeed, the architect of BDO's tax shelter business and the leader of its "Wolf Pack" was Field who became Chairman and Chief Executive Officer of BDO in January 2000.

52.     During 1999, Field made a partner presentation titled "Wolves - - Always Friendly But Never Tame." During that presentation, Field proclaimed that "one word sums up the strategy of the Tax Business Line. Money!" **[Exhibit 2]**

9

53.     In a firm-wide email titled "TAX $ELLS!!!," Field congratulated employees who had generated fees of as much as $4 million on the sale of tax shelters. One email highlighted a single tax solution transaction that resulted in a "PROFIT OF $995,000 TO THE FIRM!!!" Another email praised an employee for closing a tax shelter deal "resulting in a PROFIT OF $3 MILLION TO THE FIRM!!!" **[Exhibit 2]**

54.     In fact, BDO touted TAX $ELLS! on documents, coffee mugs, screen savers and mouse pads. It trumpeted that TAX $ELLS! was more than a slogan, and that it was a "vision for the future," a strategy for "selling products, increasing fees and increasing profitability," BDO stressed that "[m]ost importantly, TAX $ELLS! is a change in the culture of all our people, and our attitude to tax services."

## Attacks by the IRS on Abusive Tax Shelters Sold by BDO and Others

55.     On or about December 17, 1999, the IRS issued IRS Notice 1999-59, entitled "Tax Avoidance Using Distribution of Encumbered Property." In that Notice, the IRS stated as follows:

> [t]he Internal Revenue Service Treasury Department have become aware of certain types of transactions as described below, that are being marketed to taxpayers for the purpose of generating tax losses. This Notice is being issued to alert taxpayers and their representatives that *the purported losses arising from such transactions are not properly allowable for federal income tax purposes. . . .* Through a contrived series of steps, taxpayers claimed tax losses for capital outlays that they have in fact recovered. *Such artificial losses are not allowable for federal income tax purposes.*

The clear message from the IRS to BDO, Gramercy and others was that purported losses arising from transactions wholly lacking in "economic substance" (*e.g.*, tax strategies such as those recommended to and implemented for Messrs. Jones by BDO and Gramercy) were not allowable for federal income tax purposes.

10

56.     In August, 2000, the IRS once again clearly and unequivocally informed accountants and tax attorneys across the United States that it considered to be illegal tax shelters which were similar to the tax strategies which BDO and Gramercy would recommend to Messrs. Jones and implement for them. Specifically, on August 11, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis." This Notice concerned "similar transactions [to those discussed in Notice 1999-59] that purport to generate tax losses for taxpayers."

57.     Most importantly, Notice 2000-44 specified the precise tax-advantaged transaction which BDO and Gramercy would recommend to Messrs. Jones and implement for them; *i.e*, the "taxpayer purchases call options and simultaneously writes offsetting call options, transfers the options positions to a partnership (or similar entity), and ultimately claims that the basis in his partnership interest "is increased by the cost of the purchased call options but is not reduced under [Internal Revenue Code] §752 as a result of the partnership's assumption of the taxpayer's obligation." The IRS stated that "[t]he purported losses from these transactions (and from any similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interest) are not allowable as deductions for federal income tax purposes."

58.     The unambiguous message from the IRS to BDO, Gramercy and others through Notice 2000-44 was that purported losses arising from the tax strategy which they would recommended to Messrs. Jones and implement for them was not lawful for federal income tax purposes. Moreover, Notice 2000-44 plainly warned that "any person who willfully conceals the amount of capital gains and losses in this manner, or who willfully counsels or advises such concealment, may be guilty of a criminal offense."

11

59.     Yet, BDO and Gramercy still recommended this tax strategy to Messrs. Jones and implemented it for them more than one year later.

60.     In September 2000, the IRS received information suggesting that BDO was promoting potentially abusive tax shelters without complying with the registration and listing requirements for organizers and sellers of tax shelters. See 26 U.S.C. § § 6111, 6112.[1]

61.     On or about December 5, 2000, the IRS notified BDO that it believed that BDO was promoting abusive tax shelters substantially similar to those described in Notice 2000-44 and expressly reminded BDO of its obligations under §§ 6111 and 6112 to register any such shelters and to maintain a list of all its clients who had invested in those shelters. The IRS further requested that BDO provide it with a list of BDO's clients who had invested in those shelters.

62.     Yet, BDO failed and refused to register and maintain lists with respect to abusive tax shelters as required by §§6111 and 6112.

63.     The IRS suspected that BDO had violated §§ 6111 and 6112,by organizing and selling interests in potentially abusive tax shelters without complying with the registration and list-keeping requirements. Because of that suspicion, the IRS issued a series of summonses to BDO.

_____

[1]Section 6111(a) of the Internal Revenue Code requires organizers of tax shelters to register the tax shelter with the IRS. See 26 U.S.C. § 6111(a). Any tax shelter required to be registered under § 6111, as well as any "arrangement which is of a type which the Secretary determines by regulations as having a potential for tax avoidance or evasion," is considered to be "potentially abusive." 26 U.S.C. § 6112(b). Accordingly, the organizers and sellers of such tax shelters must keep a list identifying each person to whom an interest of the tax shelter [**3] was sold. See 26 U.S.C. § 6112(a). Failure to comply with the registration and listing requirements of § 6111 and § 6112 can lead to the imposition of penalties. See 26 U.S.C. § § 6707, 6708.

12

64.     On December 20, 2001, the IRS issued the first summons. That summons sought records of BDO on a tax shelter which it had sold to Parts Voice Investment, LLC. In response to that subpoena, BDO produced certain documents but refused to produce three documents on the grounds of privilege.

65.     On May 2, 2002, the IRS issued 20 additional summonses for records of BDO on tax shelter transactions. These summonses identified twenty types of tax shelter transactions in which it suspected that BDO's clients had invested.

66.     The summonses commanded production of documents and testimony relating to the identified transactions, as well as information about BDO clients who invested in the identified tax shelters.

67.     In response to those subpoenas, BDO claimed that it had no responsive documents or that any responsive documents were privileged.

68.     On June 4, 2002, the IRS petitioned the United States District Court for the Northern District of Illinois to enforce the summons which it had issued for records of BDO on the tax shelter which it had sold to Parts Voice Investment, LLC.

69.     On July 9, 2002, the IRS petitioned the United States District Court for the Northern District of Illinois to enforce the remainder of the summonses.

70.     As a result of the aforesaid actions of the IRS, BDO and Gramercy knew or should have known that the tax strategy which they were recommending to Messrs. Jones would not withstand scrutiny by the IRS and would even result in the assessment of penalties.

71.     Long before BDO gave the tax advice to Messrs. Jones, BDO knew that its advice regarding the legality of the tax strategy was false. This knowledge of BDO demonstrated by the

13

memorandum which Michael Kerekes authored on or about August 11, 2000. Kerekes was a prominent member of the Tax Solutions Group or "Wolf Pack" of BDO. In this memorandum, Kerekes stated as follows:

> *[T]he [federal law concerning tax shelter] list-keeping requirement(s) . . . very probably applies to transactions offered to clients before August 11, 2000 where the engagement letters were signed on or after August 11 . . . and the list-keeping requirement almost certainly applies to transactions first offered to clients on or after August 11, 2000.*

72.    The Kerekes memorandum, which was prepared more than one year before BDO first approached Messrs. Jones about the tax strategy and nearly two years before the execution of the BDO consulting and retainer agreements, states in plain terms: "*It seems clear that our transactions are listed under Notice 2000-44 . . .it seems very probably that our transactions lack economic substance and/or are tax structured.*" These statements, and others like them in the Kerekes memorandum, completely contradicted the statements made to Messrs. Jones by BDO, and completely contradicted the advice provided in the opinion letters which BDO delivered to Messrs. Jones.

73.    Hence, BDO and Gramercy knew that the tax-advantaged strategy being marketed to Messrs. Jones was unlawful, and intentionally concealed this very material fact. Instead of revealing this very material fact to Messrs. Jones, they concealed it and told Messrs. Jones the exact opposite; *i.e,* that the transactions which were being recommended were distinct from the abusive tax shelters being attacked by the IRS and that the transactions would withstand any challenge by the IRS. Indeed, they continued to recommend the transactions to Messrs. Jones, to implement the transactions, and to collect huge fees from Messrs. Jones for doing so. BDO and  Gramercy

14

concealed this very material fact in order to sell the tax strategy to Messrs. Jones and thereby reap illicit profits from it.

74.    Messrs. Jones became generally aware that the IRS was attacking tax shelters and questioned BDO about whether the IRS would attack the tax shelter which BDO and Gramercy were recommending to them. In response to their questions, BDO repeatedly represented that the tax shelter which BDO and Gramercy were recommending to Messrs. Jones was distinct from the types of tax shelters which the IRS was attacking. It repeatedly assured Messrs. Jones that the tax shelter which it was recommending to them was legitimate and would withstand any scrutiny from the IRS. BDO continued to make these same representations after Messrs. Jones entered the consulting agreements with BDO, and after they had entered the transactions recommended by BDO and Gramercy.

75.    Because Messrs. Jones trusted and had confidence in BDO, they believed BDO. Unfortunately, the trust and confidence which they had in BDO was misplaced.

## How BDO and Gramercy Wrongfully Induced Messrs. Jones to Enter Consulting Agreements with BDO, Pay Huge Consulting Fees to BDO, and Proceed with the Transactions Which BDO and Gramercy Had Recommended.

76.    As described in this Amended Complaint, BDO and Gramercy made false and misleading statements to Messrs. Jones. In addition, they failed to state or omitted material facts and actively concealed other material facts. Messrs. Jones relied to their detriment on these false statements, misleading statements and omissions. Their reliance was reasonable.

77.    The false statements, misleading statements, and omissions made by Gramercy as alleged in this Complaint were made directly by it or through BDO as its co-conspirator.

15

78.     Because Gramercy was a co-conspirator with BDO, Gramercy is liable and responsible for each of the false statements, misleading statements, and omissions made by BDO.

79.     Prior to 2001, John Jones was married to Janet Givens ["Ms. Givens"].

80.     Ms. Givens was the administrator of a nursing home in Tennessee. She was an officer and member of the board of directors of the Tennessee Healthcare Association ["the Association"]. Most nursing homes in Tennessee are members of the Association.   At the same time, BDO was performing auditing services for many nursing homes throughout Tennessee.

81.     John Jones frequently attended meetings and conventions of the Association while accompanying Ms. Givens to whom he was then married.  During those meetings and conventions, he became acquainted with Puckett who represented BDO at those meetings and conventions.

82.     John Jones and Ms. Givens subsequently engaged Puckett and BDO to prepare a feasability study for an assisted living home which they were contemplating building and operating. They paid $25,000 to BDO for that feasibility study.

83.     During 2001, Puckett became aware that Plaintiffs, John Jones and Carleton Jones ["Messrs. Jones"], were about to sell their stock in several businesses. He further learned that these sale would require Messrs. Jones to recognize several million dollars of long-term capital gains for federal income tax purposes.

84.     BDO then disclosed to Messrs. Jones certain tax shelter transactions and represented that those transactions were proprietary to BDO and its clients ["the transactions"].

85.     BDO urged Messrs. Jones to engage in these allegedly proprietary transactions.

86.     BDO repeatedly represented the following to Messrs. Jones: (1) the transactions would eliminate or substantially reduce the federal income taxes which Messrs. Jones would be

16

required to pay as the result of selling stock in their various businesses; (2) the courts would reject any attempt by the IRS to challenge the tax benefits which would be realized from the transactions; (3) similar transactions had been successfully utilized by BDO for other of its clients in order to shelter large capital gains from federal income taxes (4) The IRS had never challenged any of BDO's tax shelter transactions and only two of those transactions were being reviewed by the IRS; (5) BDO would issue an opinion letter confirming to Messrs. Jones that the transactions would receive favorable treatment by the IRS; (6) major law firms had reviewed transactions with structures similar to the transactions which Puckett and BDO were proposing to Messrs. Jones; (7) those major law firms had issued opinions which stated that the structure of those similar transaction would receive favorable treatment by the IRS; (8) they would refer Messrs. Jones to a major law firm which would issue an *independent* opinion letter stating that the transactions would receive favorable treatment by the IRS; (9) BDO would vigorously defend the transactions on behalf of Messrs. Jones if the IRS ever challenged those transactions.

87.    These representations were made by BDO for itself and as the co-conspirator with Gramercy. Therefore, Gramercy is liable to Messrs. Jones for all harm and injury proximately caused to them as a result of these representations.

88.    Each of the foregoing representations was false or the representation was misleading because BDO omitted to state material facts necessary in order to make the statement, in light of the circumstances under which it was made, not misleading.

89.    BDO and Gramercy knew or should have known that the representations were false, misleading, or both.

17

90.     To the extent that any of these representations might have been opinions or projections, there was no reasonable basis for such an opinion or projection when it was made.

91.     BDO knew or should have known the following: (1) the transactions could not be legally used to eliminate or reduce the federal income taxes which Messrs. Jones would be required to pay as the result of selling stock in their various businesses; (2) the courts would most likely sustain any attempt by the IRS to challenge the tax benefits which would be realized from the transactions; (3) although similar transactions had been utilized by BDO for other of its clients in order to shelter large capital gains from federal income taxes, the IRS was attacking many of those tax shelter transactions, had issued summonses, and had filed two lawsuits to enforce those summonses  (4) the opinion letter which BDO had agreed to issue would be flawed and the opinions which the letters would express would be wrong; (6) the major law firms which had issued favorable opinion letters on similar tax shelter transactions had not acted independently but had acted as a co-promoter of the tax shelter with BDO; (7) the opinion letters issued by those major law firms were flawed and the opinions which the letters expressed were wrong;  (8) the major law firm to which BDO would refer Messrs. Jones would not be acting *independently*  but would be acting as a co-promoter of the tax shelter with BDO and  Gramercy; and (9) the opinion letter which the major law firm would issue would be flawed and the opinions which the letter would express would be wrong. Each of these facts was material. However, neither BDO nor  Gramercy revealed any of these material facts to Messrs. Jones. If any of these very material facts had been revealed to Messrs. Jones, they would not have signed the consulting agreements, paid consulting fees to BDO, engaged in the transactions, or otherwise proceeded with the tax shelter transactions.

18

92.    Each of the representations were made by Puckett and other professional employees of BDO to Messrs. Jones at various locations, including Davidson County, Tennessee.

93.    Many of these representations were repeatedly made at a lengthy meeting in Davidson County, Tennessee on October 18, 2001. The representations were made by Puckett. The representations were also made via telephone call by another employee of BDO who was described by Puckett and BDO as being a leading expert on such transactions.

94.    In April of 2002, Messrs. Jones, Steve Solys[2] and Puckett (representing BDO) met with Johnston (representing Gramercy) at the offices of BDO in New York.

95.    Prior to the meeting, Puckett told Messrs. Jones that they should not ask any questions of Gramercy concerning the tax implications of the transactions which BDO had recommended. He explained that it was important for Gramercy to be independent and separate from BDO and the tax advice it was giving in order for the transactions to survive any scrutiny by the IRS. Thus, he expressly or impliedly represented that Gramercy was acting independently and separately from BDO and the tax advice it was giving.

96.    In truth and in fact, BDO and Gramercy were not independent. Instead, BDO and Gramercy were acting as co-promoters for the tax shelter which was being sold to Messrs. Jones and had acted as co-promoters on tax shelters which had been sold and recommended to other clients. Neither BDO nor Gramercy ever revealed this to Messrs. Jones.

97.    To make matters worse, BDO and Gramercy even had an established practice of sharing "consulting fees" which were paid to BDO by clients who invested in the tax shelters which BDO had recommended, including the tax shelters which were being recommended to Messrs.

_____

[2]Mr. Solys is the financial planner for Messrs. Jones.

19

Jones. **Exhibit 4.**[3] Indeed, BDO and Gramercy intended to share the consulting fees which Messrs. Jones would pay to BDO. Neither BDO nor Gramercy ever revealed this to Messrs. Jones.[4]

98.     BDO's sharing of consulting fees, including the consulting fees paid by Messrs. Jones, was an unethical fee-splitting arrangement and in violation of Section 53 of the AICPA Code of Professional Conduct. Neither BDO nor Gramercy ever revealed this fee splitting arrangement to Messrs. Jones.

99.     At the meeting in the New York offices of BDO, Messrs. Jones and Mr. Solys inquired as to what compensation Gramercy would receive for implementing the transactions. In response, Puckett and Johnston represented that Gramercy would receive a standard monthly management fee (equal to a small percentage of assets under management) and annual performance based fee (20% of the capital appreciation in the accounts of Messrs. Jones, net of management fee and expenses). This was false. They did not disclose that BDO and Gramercy would split the consulting fees which Messrs. Jones would pay to BDO.

100.    As a registered investment adviser, Gramercy was required to give a Form ADV to its clients and to file that form with the Securities and Exchange Commission ["SEC"].

101.    Accordingly, Gramercy gave to Messrs. Jones the Form ADV which is attached as **Exhibit 1.** Gramercy also filed that Form ADV with the SEC.

_____

[3]At one point, BDO even deposited $800,000 with Gramercy. **[Exhibit 5]**

[4]Apparently, Gramercy had also engaged in paying fees to other accountants in return for referring clients for execution of tax shelter transactions. For example, Gramercy made an undisclosed payment of $75,000 to Carl Hastings at KPMG. This payment was made in or about 2001. In return, Hastings recommended or counseled KPMG clients to engage in Gramercy "distressed debt" tax shelter transactions. *See*, Government's Memorandum of Law in Support of its Motion Seeking the Admission of Certain "Other Crimes" Evidence, at pp. 16, 24 filed in *U.S. v. Stein*, (S.D.N.Y. Docket #05CR-888)**[Exhibit 6]**

20

102.    Gramercy did not reveal in the Form ADV the fact that BDO was splitting fees with BDO. Instead, it represented at ¶ 8(c) of the Form ADV that it did not have with an accounting firm any arrangement that was material to its advisory business.  This was false.

103.    Thus, Gramercy made the same false representation to the SEC as it and BDO had made to Messrs. Jones.

104.    In reliance on the false statements and misleading statements which BDO and Gramercy had made, Messrs. Jones did the following: (1) entered Consulting Agreements with BDO; (2) Paid $1,185,000 in consulting fees to BDO; (3) entered agreements with Gramercy and signed agreements with Gramercy; (4) used Gramercy as their investment adviser, entered the tax shelter transactions which had been recommended by BDO and Gramercy; (5) paid large amounts to the law firm of De Castro, West, Chodorow, Glickfield & Nass, Inc. ["De Castro West"] for opinion letters; (6) engaged BDO to prepare their 2002 tax returns; and (7) filed those returns and paid BDO for the preparation of those returns.

105.    This reliance of Messrs. Jones on the false statements and misleading statements of BDO and  Gramercy was reasonable.

106.    Pursuant to the Consulting Agreements, BDO was to provide consulting services to Messrs. Jones so that they would attain the most beneficial tax results in the sale of their businesses, as well as other consulting services.

107.    Carleton Jones entered his Consulting Agreement with BDO on May 14, 2002 **[Exhibit 7]**. The Consulting Agreement required him to pay $600,000 in consulting fees to BDO.

108.    John Jones entered his Consulting Agreement with BDO on June 3, 2002 **[Exhibit 8]**. The Consulting Agreement required him to pay $585,000 in consulting fees to BDO

21

109.    Messrs. Jones paid the consulting fees to BDO as follows:

|  | Date | Amount |
|---|---|---|
| John Jones | 6/19/02 | $585,000 |
| Carleton Jones | 6/12/02 | $600,000 |
| **Total** |  | $1,185,000 |

110.    The amounts which Messrs. Jones invested in the transactions were as follows:

| Investor | Date | Amount |
|---|---|---|
| John Jones | 9/11/02 | $1,120,000 |
| Carleton Jones | 9/11/02 | $1,120,000 |
| **Total** |  | $2,240,000 |

111.    The amounts which Messrs. Jones paid to De Castro West were as follows:

| Investor | Amount |
|---|---|
| John Jones | $47,500 |
| Carleton Jones | $47,500 |
| **Total** | $95,000 |

These amounts were paid during or about May and June of 2003.

112.    BDO and Gramercy knew or should have known the following: (1) the transactions could not be legally used to eliminate or reduce the federal income taxes which Messrs. Jones would be required to pay as the result of selling stock in their various businesses; (2) the courts would most likely sustain any attempt by the IRS to challenge the tax benefits which would be realized from the transactions; (3) although similar transactions had been utilized by BDO for other of its clients in order to shelter large capital gains from federal income taxes, the IRS was attacking many of those tax shelter transactions, had issued summonses, and had filed two lawsuits to enforce those

22

summonses; (4) the opinion letter which BDO had agreed to issue would be flawed and the opinions which the letters would express would be wrong; (6) the major law firms which had issued favorable opinion letters on similar tax shelter transactions had not acted independently but had acted as a co-promoter of the tax shelter with BDO; (7) the opinion letters issued by those major law firms were flawed and the opinions which the letters expressed were wrong; (8) the major law firm to which BDO would refer Messrs. Jones would not be acting *independently* but would be acting as a co-promoter of the tax shelter with BDO and Gramercy; (9) the opinion letter which the major law firm would issue would be flawed and the opinions which the letter would express would be wrong; (10) BDO would not vigorously defend the tax shelter transaction on behalf of Messrs. Jones if the IRS were to challenge it; (11) Gramercy was not acting independently but was acting as a co-promoter of the tax shelter with BDO; and (12) BDO and Gramercy would split the consulting fees which Messrs. Jones would pay to BDO . Each of these facts was material. However, neither BDO nor Gramercy revealed any of these material facts to Messrs. Jones.

113.    If any of these very material facts had been revealed to Messrs. Jones, they would not have done any of the following: (1) entered Consulting Agreements with BDO; (2) paid $1,185,000 in consulting fees to BDO; (3) entered agreements with Gramercy and signed agreements with Gramercy; (4) used Gramercy as their investment adviser, entered the tax shelter transactions which had been recommended by BDO and Gramercy; (5) paid large amounts to the law firm of De Castro, West, Chodorow, Glickfield & Nass, Inc. ["De Castro West"] for opinion letters; (6) engaged BDO to prepare their 2002 tax returns; and (7) filed those returns and paid BDO for the preparation of those returns.

23

## The Issuance of the Tax Opinion Letters and Preparation of the 2002 Tax Returns by BDO

114.    On October 10, 2003, BDO issued its tax opinion letters to Messrs. Jones ["the BDO Opinion Letters"]. In those letters, BDO opined that the transactions would receive favorable tax treatment from the IRS.

115.    BDO intended for Messrs. Jones to rely on the BDO Opinion Letters.

116.    Messrs. Jones relied on the BDO Opinion Letters and did so to their detriment. Specifically, they relied on those letters when they filed the 2002 income tax returns which BDO had prepared.

117.    Also in 2003, Messrs. Jones employed BDO to prepare their federal income tax returns for the year 2002 ["the 2002 tax returns"].

118.    BDO owed a duty to prepare the 2002 tax returns while exercising the same skill, prudence, and diligence which they represented themselves as having in the specialized field of federal income taxation.   In the alternative, Puckett and BDO owed to Messrs. Jones a duty to prepare the 2002 tax returns while exercising the same skill, prudence, and diligence as exercised by other accountants of ordinary skill and capacity who specialized in the field of federal income taxation or who claimed to have special expertise in the field of federal income taxation.

119.    BDO prepared the 2002 tax returns to reflect deductions from the transactions that eliminated most of the capital gains which Messrs. Jones had realized from the sale of their businesses. In doing so, BDO breached the duties which they owed to Messrs. Jones.

120.    By preparing the 2002 tax returns to claim deductions from the transactions so that most of the capital gains were eliminated, BDO breached the duties which it owed to Messrs. Jones and caused them to incur penalties which were subsequently assessed by the IRS.

24

121. Messrs. Jones reasonably relied upon BDO to prepare their 2002 tax returns properly and in accordance with applicable law.

122. On or shortly before October 15, 2003, BDO prepared the 2002 tax returns and signed them as the preparer of the returns.

123. At the time that BDO prepared and filed the 2002 tax returns for Messrs. Jones and issued the tax opinion letters, it knew or should have known that (1) the transactions would receive *un*favorable tax treatment from the IRS and (2) would likely result in the imposition of penalties.

124. Thus, BDO knew or should have known that the tax opinion letters were flawed and that the 2002 tax returns which it had prepared were incorrect.

125. Yet, BDO never revealed to Messrs. Jones that the tax opinion letters were flawed or that it had prepared the 2002 tax returns incorrectly.

126. *Less than 10 days after BDO had issued the tax opinion letter to Messrs. Jones and had prepared their 2002 tax returns*, it removed Field from his positions as Chief Executive Officer of BDO and Chairman of BDO, and placed him on an indefinite leave of absence. BDO did this on October 21, 2003.

127. On the date that Field was removed from his positions as Chief Executive Officer and Chairman at BDO (October 21, 2003), Pam Packard, Michael Lichner, Ron Marinella, Adrian Dicker and Dennis Fusco voluntarily resigned from their respective positions as Directors of BDO.

## BDO Was Unwilling to Defend the Very Transactions Which It Had Recommended and Sold to Messrs. Jones.

128. BDO represented to Messrs. Jones *inter alia* that if the IRS did challenge the tax shelter, BDO would vigorously defend Messrs. Jones. This representation, as well as the other

25

representations which BDO had made to Messrs. Jones, caused them to have great confidence in BDO.

129.    The fact that BDO was willing to prepare and sign the income tax returns of Messrs. Jones increased their trust and confidence in BDO and in the representations which BDO had made.

130.    The trust and confidence which Messrs. Jones had in BDO was increased even further by other representations which Puckett and BDO had made, including the following: (1) similar transactions had been successfully utilized by BDO for other of its clients in order to shelter large capital gains from federal income taxes; (2) major law firms had issued letters in which they opined that transactions which had structures similar to the structure of the transactions of Messrs. Jones would receive favorable treatment by the IRS.

131.    From the time that BDO issued its tax opinion letter until the winter of 2005-2006, BDO continued to represent to Messrs. Jones that, more likely than not, the courts would reject any attempt by the IRS to challenge the tax benefits which would be realized from the transactions.[5]

132.    BDO never stated or even implied that penalties might be assessed against Messrs. Jones. Messrs. Jones reasonably relied on this representation when they engaged BDO to prepare their 2002 tax returns.

133.    BDO led Messrs. Jones to believe that there was not even a possibility that the IRS would assess penalties.

_____

[5]Prior to the time that Messrs. Jones entered the Consulting Agreements and paid the consulting fees, BDO and Puckett represented that the transactions would receive favorable treatment. In the opinion letter which BDO subsequently issued during 2003, BDO opined it was "more likely than not" the transactions would receive favorable treatment by the IRS.

26

134. BDO never represented or disclosed to Messrs. Jones that there was even a possibility the IRS would impose a penalty.

135. During the latter part of 2005, the IRS examined the 2002 tax returns of Messrs. Jones.

136. The IRS then notified Messrs. Jones that it not only was disallowing the deductions from the transactions as shown on the return *but also was imposing penalties*.

137. The IRS proposed a settlement which would allow Messrs. Jones to deduct the consulting fees which they had paid to BDO but would still disallow the remainder of the deductions which had been taken and would require them to pay the following penalties:

|  | Amount |
|---|---|
| John Jones | $149,306.00 |
| Carleton Jones | $149,728.00 |
| **Total** | $299,034.00 |

138. Instead of vigorously resisting the adverse action of the IRS, BDO told Messrs. Jones that they should acquiesce and accept the settlement which had been proposed by the IRS. BDO did not recommend or suggest that Messrs. Jones should even attempt to negotiate a better settlement.

139. BDO told Messrs. Jones this (that they should accept the settlement and should not challenge this action of the IRS) even though BDO had previously represented to Messrs. Jones that *inter alia* it would vigorously resist any attempt by the IRS to deny favorable tax treatment for the transactions and that any attempt such attempt by the IRS would more likely than be rejected by the courts.

27

## CAUSES OF ACTION

### Fraud and Misrepresentation

140.    The allegations of ¶¶ 1 through 139 are adopted and incorporated by reference.

141.    Messrs. Jones reasonable relied upon the false statements, misleading statements, and omissions of BDO and Gramercy as set forth in this Amended Complaint. They did so to their detriment.

142.    The false statements, misleading statements were intentional and willful. In the alternative, they were reckless and grossly negligent.

### Civil Conspiracy

143.    The allegations of ¶¶ 1 through 142 are adopted and incorporated by reference.

144.    Upon information and belief, BDO and Gramercy, acting with possibly others, conspired to devise and promote various abusive tax shelter transactions, including the same transactions which were sold to Messrs. Jones, and they did so for the purpose of receiving and splitting millions of dollars in fees (the "conspiracy"). The receipt of these fees was the sole motive in the development and execution of the conspiracy. Further, the amount of fees earned by BDO and Gramercy was not based upon or related to the amount of time and effort they expended in providing legal, tax, or accounting services. Instead, it was based upon the amount of capital and/or ordinary losses each client would claim on their respective tax returns.

145.    The receipt of fees and pecuniary gain from those fees was the primary motive for defendants' conduct; the provision of professional services to clients was merely an incidental byproduct of, and not a motivating factor for, the conduct of BDO and Gramercy as alleged herein. Their conspiracy gave each of them a significant pecuniary interest in the advice and professional

28

services they would render, and impaired the exercise of the duty of care, loyalty, and honesty which each of them owed to Messrs. Jones and to their other clients.

146.    Upon information and belief, BDO and Gramercy devised the tax strategies, agreed to provide a veneer of legitimacy to each other's advice concerning the transactions, agreed to the representations that would be made, and agreed to promise the issuance of a purportedly "independent" tax opinion, all before potential clients were solicited. These "independent" opinion letters were prefabricated and canned and were used for various clients across the United States (with basic factual information inserted depending upon the client).

147.    Upon information and belief, BDO knew that the potential for tax shelters, including the tax shelter which BDO and Gramercy sold to Messrs. Jones, could only be realized if BDO enlisted lawyers and investment firms in their transactions. Accordingly, BDO enlisted Gramercy (and others) to join with it to design, promote, sell and implement tax shelters, including the tax shelter which was sold to Messrs. Jones.

148.    BDO and Gramercy knew that accountants have the most knowledge of the financial status of their clients. They also knew that their clients deeply trusted their legal, accounting, and financial advisors, and they abused this trust through their fraudulent conduct.

149.    BDO and Gramercy conspired and acted together to solicit clients, including Messrs. Jones. Messrs. Jones did not seek out BDO or Gramercy.

150.    To do so, BDO and Gramercy promised, opined, and assured the clients, including Messrs. Jones, that the transactions involved a lawful tax-advantaged investment strategy.

29

151. Upon information and belief, pursuant to the conspiracy, BDO and Gramercy split the various fees obtained from clients that purchased tax shelters, including Messrs. Jones. Such conduct violated Section 53 of the AICPA Code of Professional Conduct.

152. BDO and Gramercy engaged in a civil conspiracy consisting of an agreement between them to misrepresent to Messrs. Jones the true nature of the tax strategy described herein and to trick Messrs. Jones into paying large fees for worthless products and services. The conspiracy culminated in the preparation and filing of incorrect tax returns.

153. Examples of the overt acts committed by BDO and Gramercy in furtherance of their conspiracy are detailed throughout this Complaint. Such detailed allegations of overt acts committed in furtherance of the conspiracy are incorporated expressly into this and the other claims for relief.

154. The scheme of BDO and Gramercy included overt acts such as using established customer relationships and confidential customer information to identify potential clients for their illegal and abusive tax shelters; executing the series of transactions underlying the abusive and illegal tax shelters; preparing and signing inaccurate tax returns; and procuring and providing false tax opinion letters to provide a veneer of legitimacy about the lawfulness and tax consequences of the strategy.

155. As described throughout this Complaint, the conspiracy was perpetrated by willfully defrauding clients such as Messrs. Jones, and by misrepresenting material facts and by failing to disclose material facts. Had it not been for these willful and intentional misrepresentations, Messrs. Jones would not have participated in the tax strategy. The conduct of BDO and Gramercy was the direct and immediate cause of Messrs. Jones's misinformed decision to invest money in an illegal and abuse tax shelter.

30

156.   The collaboration, participation, and overt acts of BDO and Gramercy in the civil conspiracy were done to induce Messrs. Jones, and others, to invest in the transactions and, in turn, to generate large fees for the conspirators. BDO and Gramercy wrongfully solicited and encouraged Messrs. Jones and other clients to invest unknowingly in abusive tax shelters without disclosing the conspirators' knowledge of the illegality of the strategy.

157.   BDO and Gramercy successfully implemented and executed their scheme by causing Messrs. Jones and other persons to participate in the same tax shelter which was sold to Messrs. Jones. Messrs. Jones therefore seek actual damages, together with prejudgment interest, for the injuries sustained. As a result of the concerted conduct of BDO and Gramercy, Messrs. Jones paid unnecessary fees; incurred costs in connection with an IRS audit; and paid more than $300,000.00 in penalties and interest; each and all of which constitute actual and proximate damages suffered by Messrs. Jones.

158.   The wrongful acts of BDO and Gramercy show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

159.   As a direct and proximate result of the conspiracy of BDO and Gramercy, Messrs. Jones have proximately suffered great damage.

## Breach of Fiduciary Duty

160.   The allegations of ¶¶ 1 through 159 are adopted and incorporated by reference.

161.   The acts and omissions of BDO and Gramercy as set forth in this Complaint constitute a breach of the fiduciary duties which BDO and Gramercy owed to Messrs. Jones.

31

162.    These breaches of fiduciary duty have proximately caused great damage to Messrs. Jones.

## Recklessness and Gross Negligence

163.    The allegations of ¶¶ 1 through 162 are adopted and incorporated by reference.

164.    The acts and omissions of BDO and Gramercy as set forth in this Complaint were made recklessly. In the alternative, these acts and omissions were made with gross negligence.

165.    The reckless and grossly negligent acts and omissions of BDO and Gramercy have proximately caused great damage to Messrs. Jones.

## Tennessee Consumer Protection Act

166.    The allegations of ¶¶ 1 through 165 are adopted and incorporated by reference.

167.    The acts and omissions of BDO and Gramercy as set forth in this Complaint constitute unfair and deceptive acts in violation of the Tennessee Consumer Protection Act, T.C.A. §47-18-101, *et seq.* ["The Act"].

168.    The violations of the Act by BDO and Gramercy have proximately caused great damage to Messrs. Jones.

## Accounting Malpractice and Professional Negligence

169.    The allegations of ¶¶ 1 through 168 are adopted and incorporated by reference.

170.    BDO agreed to provide accounting and consulting services to Messrs. Jones, including giving competent tax advice, and preparing tax returns.

171.    In providing those services, BDO was required to comply with the applicable standard of care and all applicable professional rules of conduct.

172.    In providing those services, BDO was required to act honestly and diligently.

32

173.    BDO failed to comply with the applicable standard of care.

174.    BDO failed to comply with applicable standards of professional conduct.

175.    BDO's failure to comply with the applicable standard of care and applicable standards of professional conduct proximately caused great damage to Messrs. Jones.

## Negligent Misrepresentation

176.    The allegations of ¶¶ 1 through 175 are adopted and incorporated by reference.

177.    As stated in this Complaint, BDO and Gramercy represented to Messrs. Jones that the courts would reject any attempt by the IRS to challenge the tax benefits which would be realized from the transactions. From the time that BDO issued its tax opinion letter in 2003 until the winter of 2005-2006, BDO represented that, more likely than not, the courts would reject any attempt by the IRS to challenge the tax benefits which would be realized from the transactions. BDO further represented that no penalty would be assessed against Messrs. Jones.

178.    BDO intended for Messrs. Jones to rely on these representations in their business affairs and transactions.

179.    In making these representations, BDO failed to exercise the skill, prudence, and diligence which they represented themselves as having in the specialized field of federal income taxation.

180.    In the alternative, BDO made these representations without exercising the skill, prudence, and diligence as exercised by other accountants of ordinary skill and capacity who specialized in the field of federal income taxation or who claimed to have special expertise in the field of federal income taxation.

181.    BDO knew or should have known that these representations were false.

33

182.    BDO knew or should have known that the IRS would likely challenge the tax benefits which would be realized from the transactions and would impose penalties. BDO knew or should have known that the courts would sustain that challenge and imposition of penalties by the IRS.

183.    Messrs. Jones reasonably relied on these representations by BDO and did so to their economic detriment.

## Declaratory Judgment

184.    The allegations of ¶¶ 1 through183 are adopted and incorporated by reference.

185.    Gramercy required Messrs. Jones to sign an Investment Management Agreement ["the Gramercy Agreement"].

186.    Gramercy contends that the provisions of §§ 7(e) and 7(f) of the Gramercy Agreement require that Messrs. Jones indemnify Gramercy from certain claims, pay the costs which Gramercy incurs in defending such claims, and advance to Gramercy the costs of defending this action.

187.    In pertinent part, the provisions of the Gramercy Agreement upon which Gramercy relies are as follows:

(e)    To the fullest extent permitted by law, the Client shall indemnify and save harmless the Investment Manager, its members and any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including parties acting as agents for the execution of transactions) (the "Indemnitees"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Client, managing the Account, any investment made under or in connection with this Agreement, or the performance by the Indemnitee of the Investment Manager's responsibilities hereunder and against all taxes, charges, duties or levies incurred by

34

the Investment Manager or any Indemnitee in connection with the purchase or sale or ownership of the Account, provided that an Indemnitee shall be entitled to indemnification hereunder only if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Client and the Indemnitee's conduct did not constitute willful misconduct, gross negligence, a violation of applicable securities laws or criminal wrongdoing. The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that an Indemnitee did not act in good faith and in a manner that the Indemnitee reasonably believed to be in or not opposed to the best interests of the Client or that the Indemnitee's conduct constitute willful misconduct, gross negligence, a violation of applicable securities laws or criminal wrongdoing.

(f)     Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Client prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

188.    For each of at least four reasons, these provisions are inapplicable or unenforceable.

First, they do not apply to suits between the indemnitors (Messrs. Jones) and the indemnitee (Gramercy). Rather, they only apply to suits brought against the indemnitee (Gramercy) *by third parties* based upon actions taken by the indemnitee (Gramercy) for the benefit of the indemnitors (Messrs. Jones). Second, these provisions are inapplicable because they do not apply to claims for willful misconduct, gross negligence, a violation of applicable securities laws, or criminal wrongdoing by Gramercy. The claims which Messrs. Jones have asserted against Gramercy include claims for willful misconduct and gross negligence. Third, the provisions apply only if Gramercy acted in good faith and in a manner the Gramercy reasonably believed to be in the best interests of Messrs. Jones. Gramercy did not act in good faith and did not reasonably believe that its actions were in the best interests of Messrs. Jones. Fourth, Messrs. Jones signed the Gramercy Agreement in reasonable reliance on the false statements, misleading statements, and omissions of Gramercy

35

which have already been described in this Complaint. This includes the false statements, misleading statements, and omissions which were made by BDO as the co-conspirator of Gramercy. Therefore, Messrs. Jones were wrongfully induced to enter the Gramercy Agreement. Because Messrs. Jones were wrongfully induced to enter the Gramercy Agreement, it is unenforceable.

189.    Any doubts as to the scope or application of the indemnity provisions must be resolved against Gramercy. This is because contracts for indemnity are strictly construed and because Gramercy drafted the Gramercy Agreement which contains the indemnity provisions.

190.    A real and justiciable controversy exists between Gramercy and Messrs. Jones concerning the application, interpretation or construction of the indemnity provisions in the Gramercy Agreement.

191.    Messrs. Jones are entitled to a judgment declaring that (1) Messrs. Jones are not required to indemnify Gramercy for any monetary judgments or awards which are entered against Gramercy and in favor of either or both of Messrs. Jones; (2) Messrs. Jones is not required to indemnify Gramercy for the costs of defending this suit or any other action brought against Gramercy by either or both of Messrs. Jones.; and (3) Messrs. Jones are not required to advance to Gramercy any amounts for the costs of defending this suit or any other action brought against Gramercy by either or both of Messrs. Jones.

192.    Messrs. Jones are also entitled to a judgment declaring that all other exculpation provisions and limitations of liability in the Gramercy Agreement are unenforceable. This is because Messrs. Jones were wrongfully induced to enter the Gramercy Agreement.

36

WHEREFORE, Messrs. Jones demand:

1.     That they have judgment for compensatory damages against all defendants in an amount to be shown at trial.

2.     That they have additional judgment against all defendants for treble damages pursuant to the Act.

3.     That they have additional judgment against all defendants for prejudgment interest.

4.     That they have additional judgment against all defendants for punitive damages.

5.     That this honorable Court enter a judgment declaring that (1) Messrs. Jones are not required to indemnify Gramercy for any monetary judgments or awards which are entered against Gramercy and in favor of either or both of Messrs. Jones; (2) Messrs. Jones is not required to indemnify Gramercy for the costs of defending this suit or any other action brought against Gramercy by either or both of Messrs. Jones; (3) Messrs. Jones are not required to advance to Gramercy any amounts for the costs of defending this suit or any other action brought against Gramercy by either or both of Messrs. Jones; and (4) any and all indemnification provisions, exculpation provisions and limitations of liability in the Gramercy Agreement are unenforceable

6.     That they have additional judgment against all defendants for attorney's fees incurred in connection with this action.

7.     That all costs be taxed to defendants

8.     That a jury be convened to try all issues.

9.     That they have such other and further relief as this Court deems just and proper.

37

s/ Winston S. Evans

Winston S. Evans (#6281)
Thomas W. Shumate IV (#19595)
Evans, Jones & Reynolds, P.C.
1810 One Nashville Place
150 Fourth Avenue North
Nashville, TN 37219-2424
(615) 259-4685

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **AMENDED COMPLAINT** has been served via **Electronic Transmission** upon:

Michael L. Dagley, Esq.
Brian D. Roark, Esq.
BASS, BERRY & SIMS, PLC
315 Deaderick St., Suite 2700
Nashville, TN 37238-3001
mdagley@bassberry.com
broark@bassberry.com

Michael S. Poulos, Esq.
Robert S. Markin, Esq.
203 N. LaSalle St., Suite 1900
Chicago, IL 60601
robert.markin@dlapiper.com

this 27th day of March, 2007.

s/ Winston S. Evans

361400.004 ls

38



# FORM ADV

**Uniform Part II**

Gramercy

## Application for Investment Adviser Registration

| Name of Investment Adviser:<br>**Gramercy Advisors LLC** | | | | | |
|---|---|---|---|---|---|
| Address:     (Number and Street)<br>**20 Dayton Avenue** | (City)<br>**Greenwich** | (State)<br>**CT** | (Zip Code)<br>**06830** | Area Code   Telephone number<br>**(203) 552-1900** | |

This part of Form ADV gives information about the investment adviser and its business for the use of clients.
The information has not been approved or verified by any governmental authority.

### Table of Contents

| Item Number | Item | Page |
|---|---|---|
| 1 | Advisory Services and Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 |
| 2 | Types of Clients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 |
| 3 | Types of Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 |
| 4 | Methods of Analysis, Sources of Information and Investment Strategies . . . . . . . . | 3 |
| 5 | Education and Business Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| 6 | Education and Business Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| 7 | Other Business Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| 8 | Other Financial Industry Activities or Affiliations . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| 9 | Participation or Interest in Client Transactions . . . . . . . . . . . . . . . . . . . . . . . . . | 5 |
| 10 | Conditions for Managing Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 |
| 11 | Review of Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 |
| 12 | Investment or Brokerage Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 |
| 13 | Additional Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 |
| 14 | Balance Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 |
| | Continuation Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Schedule F |
| | Balance Sheet, if required . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Schedule G |



**EXHIBIT**

**1**

(Schedules A, B, C, D, and E are included with Part I of this Form, for the use of regulatory bodies, and are not distributed to clients.)

ACN/Form ADV © 1996-1998; Adviser Consultant Network, Inc.

# FORM ADV

**Uniform Part II**

## Application for Investment Adviser Registration

| Applicant | SEC File Number | Date |
|---|---|---|
| Gramercy Advisors LLC | 801-5/149 | 04/01/2003 |

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

**Definitions for Part II**

**Related person** - Any officer, director or partner of applicant or any person directly or indirectly controlling, controlled by, or under common control with the applicant, including any non-clerical, non-ministerial employee.

**Investment Supervisory Services** - Giving continuous investment advice to a client (or making investments for the client) based on the individual needs of the client. Individual needs include, for example, the nature of other client assets and the client's personal and family obligations.

---

**1.   A.   Advisory Services and Fees.** (check the applicable boxes)

For each type of service provided, state the approximate % of total advisory billings from that service. (See instructions below.)

Applicant:

| | | | % |
|---|---|---|---|
| ☒ | (1) | Provides investment supervisory services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100 % |
| ☐ | (2) | Manages investment advisory accounts not involving investment supervisory services . . . . . . . . . . . . . | % |
| ☐ | (3) | Furnishes investment advice through consultations not included in either service described above . . . | % |
| ☐ | (4) | Issues periodicals about securities by subscription . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | % |
| ☐ | (5) | Issues special reports about securities not included in any service described above . . . . . . . . . . . . . . . . | % |
| ☐ | (6) | Issues, not as part of any service described above, any charts, graphs, formulas, or other devices which clients may use to evaluate securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | % |
| ☐ | (7) | On more than an occasional basis, furnishes advice to clients on matters not involving securities . . . . . | % |
| ☐ | (8) | Provides a timing service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | % |
| ☐ | (9) | Furnishes advice about securities in any manner not described above . . . . . . . . . . . . . . . . . . . . . . . . . . | % |

(Percentages should be based on applicant's last fiscal year. If applicant has not completed its first fiscal year, provide estimates of advisory billings for this year and state that the percentages are estimates.)

|   |   | Yes | No |
|---|---|---|---|
| **B.** | Does applicant call any of the services it checked above financial planning or some similar term? . . . . . . . . . . . | ☐ | ☒ |

**C.**   Applicant offers investment advisory services for: (check all that apply)

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ | (1) | A percentage of assets under management | ☐ | (4) | Subscription fees | |
| ☐ | (2) | Hourly charges | ☐ | (5) | Commissions | |
| ☐ | (3) | Fixed Fees (not including subscription fees) | ☒ | (6) | Other | |

**D.**   For each checked box in A above, describe on Schedule F:

- the services provided, including the name of any publication or report issued by the advisor on a subscription basis or for a fee

- applicant's basic fee schedule, how fees are charged and whether its fees are negotiable

- when compensation is payable, and if compensation is payable before service is provided, how a client may get a refund or may terminate an investment advisory contract before its expiration date

**2.   Types of Clients** - Applicant generally provides investment advice to: (check those that apply)

| | | | | | |
|---|---|---|---|---|---|
| ☒ | A. | Individuals | ☒ | E. | Trusts, estates, or charitable organizations |
| ☐ | B. | Banks or thrift institutions | ☒ | F. | Corporations or business entities other than those listed above |
| ☐ | C. | Investment Companies | ☒ | G. | Other (describe on Schedule F) |
| ☒ | D. | Pension and profit sharing plans | | | |

---

Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).

ACN/Form ADV © 1996-1998  Advisor Consultant Network, Inc

2

# FORM ADV

Uniform Part II

## Application for Investment Adviser Registration

| Applicant | SEC File Number | Date |
|---|---|---|
| Gramercy Advisors LLC | 801-57149 | 04/01/2003 |

---

3.  **Types of Investments:** Applicant offers advice on the following: (check those that apply)

    A.   Equity Securities
    ☒   (1) exchange-listed securities
    ☒   (2) securities traded over-the-counter
    ☒   (3) foreign issuers

    ☒   B.   Warrants

    ☒   C.   Corporate debt securities
    (other than commercial paper)

    ☒   D.   Commercial paper

    ☒   E.   Certificates of deposit

    ☒   F.   Municipal securities

    G.   Investment company securities:
    ☐   (1) variable life insurance
    ☐   (2) variable annuities
    ☐   (3) mutual fund shares

    ☒   H.   United States government securities

    I.   Options contracts on:
    ☒   (1) securities
    ☐   (2) commodities

    J.   Futures contracts on:
    ☐   (1) tangibles
    ☐   (2) intangibles

    K.   Interests in partnerships investing in:
    ☐   (1) real estate
    ☐   (2) oil and gas interests
    ☒   (3) other (explain on Schedule F)

    ☒   L.   Other (explain on Schedule F)

---

4.  **Methods of Analysis, Sources of Information, and Investment Strategies.**

    A.   Applicant's security analysis methods include: (check those that apply)

| | | | | | |
|---|---|---|---|---|---|
| (1) | ☒ | Charting | (4) | ☒ | Cyclical |
| (2) | ☒ | Fundamental | (5) | ☐ | Other (explain on Schedule F) |
| (3) | ☒ | Technical | | | |

    B.   The main sources of information applicant uses include: (check those that apply)

| | | | | | |
|---|---|---|---|---|---|
| (1) | ☒ | Financial newspapers and magazines | (5) | ☐ | Timing services |
| (2) | ☒ | Inspections of corporate activities | (6) | ☒ | Annual reports, prospectuses, filings with the Securities and Exchange Commission |
| (3) | ☒ | Research materials prepared by others | (7) | ☒ | Company press releases |
| (4) | ☒ | Corporate rating services | (8) | ☒ | Other (explain on Schedule F) |

    C.   The investment strategies used to implement any investment advice given to clients include: (check those that apply)

| | | | | | |
|---|---|---|---|---|---|
| (1) | ☒ | Long term purchases (securities held at least a year) | (5) | ☒ | Margin transactions |
| (2) | ☒ | Short term purchases (securities sold within a year) | (6) | ☒ | Option writing, including covered options, uncovered options or spreading strategies |
| (3) | ☒ | Trading (securities sold within 30 days) | (7) | ☐ | Other (explain on Schedule F) |
| (4) | ☒ | Short sales | | | |

---

Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).

ACN/Form ADV © 1996-1998  Adviser Consultants Network, Inc.

3

# FORM ADV
## Uniform Part II
## Application for Investment Adviser Registration

| Applicant | SEC File Number | Date |
|---|---|---|
| Gramercy Advisors LLC | 801-57149 | 04/01/2003 |

**5.  Education and Business Standards.**

Are there any general standards of education or business experience that applicant requires of those involved in determining or giving investment advice to clients?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Yes ☒   No ☐

(If yes, describe these standards on Schedule F.)

**6.  Education and Business Background**

For:

- each member of the investment committee or group that determines general investment advice to be given to clients; or
- if the applicant has no investment committee or group, each individual who determines general investment advice given to clients (if more than five, respond only for their supervisors)
- each principal executive officer of applicant or each person with similar status or performing similar functions.

On Schedule F, give the

- name
- year of birth
- formal education after high school
- business background for the preceding five years

**7.  Other Business Activities.** (check those that apply)

☐  A.  Applicant is actively engaged in a business other than giving investment advice

☐  B.  Applicant sells products or services other than investment advice to clients

☐  C.  The principal business of applicant or its principal executive officers involves something other than providing investment advice.

(For each checked box describe the other activities, including the time spent on them, on Schedule F.)

**8.  Other Financial Industry Activities or Affiliations.** (check those that apply)

☐  A.  Applicant is registered (or has an application pending) as a securities broker-dealer.

☐  B.  Applicant is registered (or has an application pending) as a futures commission merchant, commodity pool operator or commodity trading adviser.

  C.  Applicant has arrangements that are material to its advisory business or its clients with a related person who is a:

☒  (1) broker-dealer                          ☐  (7) accounting firm

☐  (2) investment company                     ☐  (8) law firm

☒  (3) other investment adviser               ☐  (9) insurance company or agency

☐  (4) financial planning firm                ☐  (10) pension consultant

☐  (5) commodity pool operator, commodity trading   ☐  (11) real estate broker or dealer
        advisor or futures commission merchant
                                              ☐  (12) entity that creates or packages limited partnerships

☐  (6) banking or thrift institution

(For each checked box in box C, on Schedule F identify the related person and describe the relationship and the arrangements.)

  D.  Is applicant or a related person a general partner in any partnership in which clients are solicited to invest?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Yes ☐   No ☒

(If yes describe on Schedule F the partnerships and what they invest in.)

Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).

4

ADV/Form ADV  © 1995-1998  Adviser Consultant Network, Inc

# FORM ADV

**Uniform Part II**

## Application for Investment Adviser Registration

| Applicant | SEC File Number | Date |
|---|---|---|
| Gramercy Advisors LLC | 801 - 57149 | 04/01/2003 |

9. **Participation or Interest in Client Transactions.**

Applicant or a related person. (check those that apply)

☒ A. As principal, buys securities for itself from or sells securities it owns to any client.

☒ B. As broker or agent effects securities transactions for compensation for any client.

☒ C. As broker or agent for any person other than a client effects transactions in which client securities are sold to or bought from a brokerage customer.

☒ D. Recommends to clients that they buy or sell securities or investment products in which the applicant or a related person has some financial interest.

☒ E. Buys or sells for itself securities that it also recommends to clients.

(For each box checked, describe on Schedule F when the applicant or a related person engages in these transactions and what restrictions, internal procedures, or disclosures are used for conflicts of interest in those transactions.)

10. **Conditions for Managing Accounts.** Does the applicant provide investment supervisory services, manage investment advisory accounts or hold itself out as providing financial planning or some similarly termed services *and* impose a minimum dollar value of assets or other conditions for starting or maintaining an account? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Yes ☒   No ☐

(If yes, describe on Schedule F)

11. **Review of Accounts.** If applicant provides investment supervisory services, manages investment advisory accounts, or holds itself out as providing financial planning or some similarly termed services:

A. Describe below the reviews and reviewers of the accounts. For reviews, include their frequency, different levels, and triggering factors. For reviewers, include the number of reviewers, their titles and functions, instructions they receive from applicant on performing reviews, and number of accounts assigned each.

Gramercy continuously monitors the price of all securities in the portfolio to ensure compliance with all the covenants described in the governing documents of the funds it manages and the conditions set forth in the investment management agreement with its clients. On a daily basis, Gramercy monitors and reviews news wires, selected newspapers and research material provided by brokerage houses to review current investment views and develop new investment ideas. In addition, on a daily basis, Gramercy identifies, structures and executes trades designed to achieve its investment objectives.

As described above, Gramercy provides clients services including goal setting, investment strategies and trade execution. Gramercy's review of such services includes comprehensive financial plans and other reports concerning investment advice. Although the exact review process depends on the nature and terms of the specific engagement, clients' investment strategies and written communication with investment advice is generally reviewed by a Designated Person prior to distribution to ensure conformity with Gramercy's policies and the quality of substantive advice contained in those plans and correspondence.

B. Describe below the nature and frequency of regular reports to clients on their accounts:

Gramercy distributes a monthly letter to clients reporting on the account's net return for the month and current capital balance. There is also a monthly client conference call and web-based fund analytics available for clients to review.

---

Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).

ACN Form ADV  © 1996-1998. Adviser Consultant Network  Inc.

**FORM ADV**                                              Uniform Part II

## Application for Investment Adviser Registration

| Applicant | SEC File Number | Date |
|---|---|---|
| Gramercy Advisors LLC | 801-57145 | 04/01/2003 |

12. **Investment or Brokerage Discretion.**

A.  Does applicant or any related person have authority to determine, without obtaining specific client consent, the:

(1) securities to be bought or sold? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Yes ☒  No ☐

(2) amount of the securities to be bought or sold? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Yes ☒  No ☐

(3) broker or dealer to be used? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Yes ☒  No ☐

(4) commission rates paid? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Yes ☒  No ☐

B.  Does applicant or a related person suggest brokers to clients? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Yes ☐  No ☒

For each yes answer to A describe on Schedule F any limitations on the authority. For each yes to A(3), A(4) or B, describe on Schedule F the factors considered in selecting brokers and determining the reasonableness of their commissions. If the value of product, research and services given to the applicant or a related person is a factor, describe:

•   The products, research and services

•   whether clients may pay commissions higher than those obtainable from other brokers in return for those products and services

•   whether research is used to service all of applicant's accounts or just those accounts paying for it; and

•   any procedures the applicant used during the last fiscal year to direct client transactions in a particular broker in return for product and research services received.

13. **Additional Compensation**

Does the applicant or a related person have any arrangements, oral or in writing, where it:

A.  is paid cash by or receives some economic benefit (including commissions, equipment or non-research services) from a non-client in connection with giving advice to clients? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Yes ☐  No ☒

B.  directly or indirectly compensates any person for client referrals? . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Yes ☒  No ☐

(For each yes, describe the arrangements on Schedule F.)

14. **Balance Sheet.** Applicant must provide a balance sheet for the most recent fiscal year on Schedule G if applicant:

•   has custody of client funds or securities; or

•   requires prepayment of more than $500 in fees per client and 6 or more months in advance

Has applicant provided a Schedule G balance sheet? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Yes ☐  No ☒

Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).

ACN/Form ADV © 1996-1998 Advisor Consultant Network, Inc

6

| Schedule F of Form ADV |  | Continuation Sheet for Form ADV Part II |
|---|---|---|
| **Applicant:** Gramercy Advisors LLC | **SEC File Number:** 801- 57149 | **Date:** 4/1/2003 |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: Gramercy Advisors LLC | IRS Empl. Ident. No.: |
|---|---|
| Item of Form (identify) | Answer |

|  | **Gramercy Advisors LLC** |
|---|---|
| Item 1.D | **Advisory Services and Fees** |
|  | Gramercy Advisors LLC ("Gramercy") manages domestic and offshore private investment vehicles (collectively, the "Funds") and discretionary separate accounts with a focus on emerging markets and distressed debt investments. Gramercy's clients consist of private investment partnerships, and limited liability companies and high net worth individuals. |
|  | Gramercy serves as the managing member of, or investment adviser to, the Funds. For each of the Funds, Gramercy's investment authority is set forth in the governing documents for each such Fund. Gramercy also serves as the sub-advisor for certain private investment partnerships and the scope of Gramercy's investment authority is set forth in the sub-advisory agreements for such entities. |
|  | With respect to the managed accounts, clients enter into investment management agreements with Gramercy, and Gramercy typically forms a limited liability company for each client. As the managing member, Gramercy serves as the managing member of such limited liability company. As the managing member, Gramercy has full discretion and authority to make investment decisions on behalf of the limited liability company, subject to any restrictions contained in the investment management agreement or otherwise agreed to with the client. Gramercy seeks to manage each client's assets in a manner intended to track as closely as practicable the performance of certain of the Funds. Gramercy will engage in trades intended to achieve such result. Typically, each limited liability company is formed only for the client opening an account, and other clients of Gramercy and its affiliates are not invited to invest in such limited liability company. |
|  | With respect to both the Funds and the managed accounts, Gramercy receives a management fee based upon a percentage of assets under management. Such management fee is a fixed percentage of the value of the clients assets under management and payable monthly. Gramercy also receives a performance based fee satisfying Rule 205-3 of the Investment Advisers Act, as amended. Such performance based fee is an annual fee, typically 20% of the capital appreciation of the client's account, after management fee and expenses, but the amount of the management fee and performance fee may under limited circumstances be negotiated based on the size of the account. A description of the management and performance based fees and how such fees are paid may be found in the governing documents for the Funds and the investment management agreements executed with the client or other documentation provided to the client. |
| Item 2 | **Types of Clients** |
|  | Gramercy provides investment supervisory services to high net worth individuals, Fund of Funds, pension plans, corporations, endowments, foundations, and trusts. |
| Item 3.L. | **Types of Investments** |
|  | The accounts managed by Gramercy are invested in a broad range of financial instruments, securities and transactions, including debt (bonds, convertible bonds, loans, trade credits, bank deposits and other types of debt securities) of issuers with their principal business activities and interests located in emerging market countries, a limited amount of equities, and cash (short-term U.S. government securities and bank deposits). |
| Item 4.B.B. | **Methods of Analysis, Sources of Information and Investment Strategies** |
|  | The principals of Gramercy travel throughout the primary investment regions in order to build on and maintain relationships and contacts with local government officials and individuals in the private sector. |

| Schedule F of Form ADV | | Continuation Sheet for Form ADV Part II |
|---|---|---|
| Applicant: | SEC File Number: | Date: |
| Gramercy Advisors LLC | 801- 57149 | 4/1/2003 |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. Full name of applicant exactly as stated in Item 1A of Part I of Form ADV. | IRS Empl. Ident. No.: |
|---|---|
| Gramercy Advisors LLC | |
| Item of Form (Identify) | Answer |

| Item 5. | **Education and Business Standards** |
|---|---|
| | Every individual involved in giving investment advice to clients is required to hold a college degree and have a minimum of 5 years work experience in the financial industry. In addition, individuals are required to have successfully completed a minimum of the NASD Series 7 and 63. |
| Item 6 | **Education and Business Background** |
| | The following persons are the managing members of Gramercy and participate in the determination of the investment advice given to clients. |
| | **Robert S. Koenigsberger** is the Co-Managing Partner of Gramercy Advisors L.L.C. Mr. Koenigsoerger was previously Senior Vice President at Lehman Brothers from 1995-1998. Mr. Koenigsberger initiated the sub-investment grade sovereign loan trading business at Lehman, which resulted in Lehman making a leadership role in the trading of debt securities from Russia, Poland, Bugaria, Ecuador, Panama, Peru and Nicaragua. While maintaining expertise in debt restructuring candidates, Mr. Koenigsberger has actively traded sovereign fixed income securities from all of the major non-investment grade countries. Prior to Lehman Brothers, Mr. Koenigsberger was Vice President at Merrill Lynch where he traded emerging market securities in New York, London and Hong Kong from 1992-1995. Prior to that, Mr. Koenigsberger was Vice President at CR-P Associates where he specialized in debt restructurings, fund management, and mergers and acquisitions from 1987-1991. He holds degrees from Wharton (M.B.A. 1993), University of Pennsylvania (M.A. International Studies, 1993) and the University of California, San Diego (B.A. 1987). Mr. Koenigsberger is a registered representative of the NASD (series 7, 63). |
| | **Jay A. Johnston** is the Co-Managing Partner of Gramercy Advisors, L.L.C. Prior to joining Gramercy Advisors, L.L.C. in September 1999, Mr. Johnston was Managing Director and Head of Emerging Markets Fixed Income Sales at Deutsche Bank Securities, Inc. Previously, Mr. Johnston was Senior Vice President at Lehman Brothers where he was the top producing emerging markets salesperson, ranked second in the firm globally in sales production. From 1994-1996, Mr. Johnston worked in global high yield institutional sales at a variety of institutions incuding ING Baring Securities, Inc., Oppenheimer & Company, Inc. and Dean Witter Reynolds, Inc. From 1983-1984, he was a Portfolio Manager at Patterson Capital Corporation responsible for managing a $1.3 Billion portfolio of fixed income securities for a variety of U.S. savings and loans institutions. Mr. Johnston holds a Bachelor of Science from University of Florida (Finance with Honors, 1983). Mr. Johnston is a registered representative of the NASD (series 7, 63, 24, 3). |
| | **Scott G. Seaman**, CPA, is Chief Financial and Operating Officer of Gramercy Advisors, L.L.C. Prior to joining Gramercy Advisors, L.L.C., Mr. Seaman was the Chief Operating Officer and Chief Financial Officer of J.P. Morgan Fleming Asset Management's Hedge Funds Group and Real Estate Investment Group, from 1999-2002, with responsibility for business growth and operational integrity. Previously, during 1998 he was Manager of the Emerging Markets Strategic Planning Group at J.P. Morgan Securities Inc. responsible for building a global office network. From 1992-1997 Mr. Seaman was head of Emerging Markets Business Analysis and Development, J.P. Morgan Securities, Inc. where he was instrumental in building new products and managing a complex control structure. Prior to joining J.P. Morgan Securities, Inc. he was a Vice President in the J.P. Morgan & Co., Audit Group where he specialized in management consulting to new and rapidly growing sales and trading businesses from 1986 to 1992. Prior to that he was a Senior Audit Analyst at Ernst & Whinney from 1984-1986. He holds a B.S. (Summa Cum Laude) from Long Island University (CW Post Center School of Professional Accountancy 1984), an MBA in finance from New York University – Stern Graduate School of Business (1992), and Mr. Seaman is a registered representative of the NASD (series 7, 63) |

Complete amended pages in full, circle amended items and file with execution page (page 1).

ACNIForm ADV © 1996-1998: Advisor Consultant Network, Inc.
NYK 767062-2/1/50695.0010

8

| Schedule F of Form ADV | | Continuation Sheet for Form ADV Part II |
|---|---|---|
| Applicant: | SEC File Number: | Date: |
| **Gramercy Advisors LLC** | 801 - 57149 | 4/1/2003 |

[Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.]

| 1. Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|
| Gramercy Advisors LLC | |
| Item of Form (Identify) | Answer |

| | |
|---|---|
| | Robert L. Rauch is currently Director of Research of Gramercy Advisors L.L.C. In addition, he heads up the financial advisory practice for the firm focusing on the restructuring of the debt of corporations. Prior to joining Gramercy, he worked as a consultant to hedge funds managed by Van Eck Global and Farallon Capital Management, specializing in the analysis of global distressed corporate debt. He was previously President of The Weston Group, where he was responsible for overseeing the firm's securities brokerage, investment banking, and research activities. In the early 1990s, Mr. Rauch worked as a Vice President with Lehman Brothers and CS First Boston in their emerging market fixed income trading groups. In the second half of the 1980s, he was a Vice President and head trader with First Interstate Bank's loan syndications group, where he was responsible for structuring and syndicating loan facilities to highly-leveraged US and international corporations. Mr. Rauch began his career with Swiss Bank Corporation in 1980, where he served in several corporate lending and credit administration roles focusing on large US corporations. Mr. Rauch received a masters degree in Finance and International Business from the J.L. Kellogg Graduate School of Management at Northwestern University (M.M., 1984) and an undergraduate degree in Political Economy from Williams College (B.A., 1980). He is a member of the American Bankruptcy Institute and a registered representative of the NASD (series 7, 63, 24). |
| Item 8.D. | **Other Financial Industry Activities or Affiliations** |
| | Affiliates of Gramercy, KSHER AA LLC, RMJ Capital Management LLC, Tall Ships Capital Management LLC, Steamboat Capital Management LLC, Gramercy Investment Management LLC, Gramercy Financial Services LLC, serve as the managing members of certain limited liability companies, which are listed on Section 7(b) of Schedule D to the Forms ADV filed by each such adviser. |
| Item 9.A. | **Participation or Interest in Client Transactions** |
| | The managing directors of Gramercy have invested in certain of the Funds. As investors in such Funds, they participate in the investments made by the Funds. |
| | In addition, the managing directors and other employees of Gramercy may trade securities for their own accounts. Personal securities trading by the managing directors or employees of Gramercy could create potential conflicts of interest because the decision to buy or sell a security for the account of a client can affect the value of that security or related security held by such managing director or employee. Additionally, the decision to buy or sell a security by the managing director or employees of Gramercy can affect the value of that security or a related security held by a client. None of the managing directors or employees of Gramercy will purchase or sell securities for their own accounts when purchases or sales of such securities are being made or are under consideration for client accounts. |
| Item 9. Miscellaneous | A broker-dealer affiliate of Gramercy may engage in brokerage transactions in which such affiliate acts as a broker for a client of Gramercy on one side and a third party, including other clients of Gramercy and Gramercy's affiliates, on the other side. These transactions are called agency cross transactions. Gramercy would permit affiliates to engage in agency cross transactions in order to execute trades without impacting the price of a security or in order to save on brokerage commissions, custody expenses or other miscellaneous transaction charges. |
| | In addition, Gramercy or its affiliates may enter into one transaction on behalf of a number of clients and then allocate the proceeds to the clients pro rata. The purpose of such transactions is to provide for the purchase of securities (including through repos and reverse repos) under circumstances where it is impractical, because of cost or other reasons, for the client to acquire the securities directly. |

Complete amended pages in full, circle amended items and file with execution page (page 1).

ACN/Form ADV © 1998-1998; Advent Consultant Network, Inc.
NYK 767062-2.050695 0010

| Schedule F of Form ADV | | Continuation Sheet for Form ADV Part II |
|---|---|---|
| Applicant: | SEC File Number: | Date: |
| Gramercy Advisors LLC | 801- 57149 | 4/1/2003 |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | | IRS Empl. Ident. No.: |
|---|---|---|
| Gramercy Advisors LLC | | |
| Item of Form (identify) | | Answer |

|  |  |
|---|---|
|  | The broker-dealer affiliate of Gramercy does not receive commissions or other fees from the clients of Gramercy for engaging in any brokerage transactions, including agency cross transactions.<br><br>Gramercy is committed to ensuring the security of a client's financial information.  Gramercy does not share protected information (known as non-public information) with non-affiliated third parties, except for routine processing of transactions and as otherwise permitted or required by law. |
| Item 10 | **Conditions for Managing Accounts**<br><br>The minimum investment in the Funds is typically $500,000.  Although Gramercy does not maintain a specific minimum dollar value of assets or other conditions for opening a managed account, Gramercy's services are directed towards high net worth individuals or institutional investors who are prepared to invest substantial sums typically $5MM or more. |
| Items 12.A.(1) and (2) | **Investment or Brokerage Discretion**<br><br>Gramercy's investment discretion and authority is subject to the limitations set forth in the governing documents and confidential offering memoranda of the Funds, copies of which are provided to investors in the Funds.  While certain of the Funds do not require Gramercy to diversify investments or limit the amount of leverage employed, other Funds provide that no more than a set percentage of the a Fund's total assets may be invested in the securities of any one issuer or country and that the Fund may not exceed certain leverage ratios.<br><br>With respect to the managed accounts, Gramercy has broad discretionary authority to determine the type and amount of securities to be bought or sold, with such authority limited  if at all, by clients on a contractual basis.  Any limitations in such authority would be set forth in the investment management agreement between Gramercy and a client.  Gramercy has the right to cause client assets to be invested in the Funds, in which case, the management and incentive fees charged would be governed by the governing documents of the relevant Funds. |
| Item 12.A.(3) | In selecting brokers or dealers with which to execute transactions, Gramercy will use its best judgment to choose the broker or dealer most capable of providing the services necessary to obtain the most favorable execution.  The full range and quality of services available will be considered in making these determinations.  Best execution will be judged by many factors, including the following factors:  price, including commissions, if any; ability to execute and clear trades in an orderly and acceptable manner; and consistent quality of service regarding broad market coverage.  In those instances where it is reasonably determined that more than one dealer or broker can offer the services needed to obtain most favorable execution, consideration may be given to those dealers or brokers who supply investment research, statistical information and other services related to investment research  In all cases, Gramercy determines that the fees are reasonable for the services rendered. |
| Item 13.A. | **Other Compensation** |
| Item 13.B. | See Item 12.A.(3) above.<br><br>Affiliates of Gramercy have arrangements with a small number of firms who direct clients to Gramercy.  Copies of such agreements are provided to such clients. |

Complete amended pages in full, circle amended items and file with execution page (page 1).

ACN/Form ADV © 1996-1998; Advisor Consultant Network, Inc.<br>NYK 767063-2.050695 0009

## Selected Exhibits Relating to BDO Seidman Enforcement Actions

Tax Analysts has made available selected exhibits associated with the Justice Department's July 10 release of its enforcement actions against BDO Seidman.

**Document Type:** Justice Department Documents

**Tax Analysts Document Number:** Doc 2002-16496 (24 original pages) [PDF]

**Tax Analysts Electronic Citation:** 2002 TNT 136-8

**Citations:** (10 Jul 2002)

=============== FULL TEXT ===============

### EXHIBIT 21

September 26, 2000

Internal Revenue Service
LM:PFTG
Office of Tax Shelter Analysis
1111 Constitution Avenue, N.W.
Washington, DC 20224

Ref: BDO Seidman, LLP

To Whom It May Concern:

The above referenced accounting and consulting firm has been offering tax shelters to hundreds of individuals and some corporations through out the United States as evidenced by the enclosed materials. When they first started this "tax product" program very little information was made available to BDO's partners and staff since there was some concerns about the IRS picking up on what they were doing and putting a stop to it. During the process more information was made available but they were still very guarded about making much information available.

EXHIBIT
2

Opportunities came up with corporate gains but we were told they did not want to do anything with corporations since the tax return would require an M-1 item listed on the reconciliation of book income to taxable income and that would be a red flag to the IRS. In addition there were times when the tax product team and senior management of BDO became very nervous when the IRS had requested tax shelter information from certain Big 5 firms and emergency meetings were called to discuss and slow down the tax product sales. I recall one such meeting and the conclusion that I heard was reached was that they would continue to sell the tax products until congress changed the tax laws since typically the tax law was not retroactively applied and that the products were based on sound legal opinions and strategies. The legal opinions are suppose to protect the tax payer from penalties and it was explained to me that any interest penalty would be offset by the earnings the taxpayer may have benefited from by having the tax dollars not paid to the IRS available to the person to earn on until payment had to be made.

BDO and some legal firms have made a tremendous amount of money off of these tax products at a great expense to the American taxpayer and federal government. They plan on continuing these sales until the tax laws are changed or some other prohibitions are encountered. These tax products are worse than Al Capone in the amount of tax dollars literally not reported and paid due to the abusive tax shelters being utilized. We are talking about millions of tax dollars lost or deferred. I have heard of numerous instances in which the CPA for the potential taxpayer considering the tax product has strongly recommended that their client stay away from the tax strattel or dubious tax product that may ultimately be determined to be an abusive tax shelter.

I wish to remain anonymous at this point until I learn about any legal protection that may be available to me since I am sure BDO would pursue my demise. However, I would be willing to be a witness if adequate protection and compensation could be offered me. I will call 1-800-829-1040 periodically and use the following code as my identification to be able to stay in touch so to speak.

EXHIBIT 22

Nancy Hannafin
Tax Department
233 N. Michigan Avenue
Ste 2500
Chicago, IL 60620

Dear Ms. Hannafin:

We believe that your organization was involved in the promotion of transactions substantially similar to those described in Notice 2000-44, 2000-36 I.R.B. 255. Such transactions may be tax shelters within the meaning of Section 6111 of the Internal Revenue Code. If so, the transactions would have been subject to the registration requirements of Section 6111, and your firm would have an obligation to maintain a list of investors and to make that list available for our inspection as required by Section 6112.

For each transaction, we request (1) a detailed description of the transaction, including a description of its structure and the intended tax benefits, (2) a copy of any written materials that were presented to potential or actual participants in connection with the offering of sales of interests in the transaction, including any analyses or opinions relating to the intended tax benefits of the transaction, and (3) the list of investors in the transaction.

If it is your position that the transactions your firm promoted are not subject to the requirements of those Code sections, please provide us with an explanation and supporting information for your position.

Please forward the information requested in this letter to my attention to the address listed below within ten calendar days of the date this letter is received by your office.

Internal Revenue Service
110 West 44th Street 6th Floor
New York, New York 10036
Attn: Stanley Colbert
LM:FSH:1114

If you have any questions, you may call Revenue Agent Stanley Colbert, ID# 13-21193, at (212) 264-1595 or I may be reached at (212) 719-6118.

Sincerely,

Michael R. Friedman
Team Manager, ID# 13-24456

c   Chris Leisner

2002 TNT 136-9 - Justice Department Documents (Copyright, 2002, Tax Analysts)                    Page 4 of 1

## EXHIBIT 23

BDO Seidman, LLP
Chicago, Ill

## MEMORANDUM

To: Partners

Date: October 13, 1999

From: Denis Field

Re: Tax Solutions Group

The Tax Sales Executive Group has been renamed and is now the Tax Solutions Group.
The Group has been reorganized with the aim of making it more focused. Its
responsibilities will be to continue to assist members of BDO Seidman LLP who find
potential transactions to prefilter those transactions, structure the transactions, and close
    d implement the transactions. The Tax Solutions Group is also responsible for quality
control. The reorganized group have been allocated specific responsibilities and time
budgets to carry out this work. The new group is as follows:

Tax Solutions Group

Adrian Dicker
Charlie Bee
Denis Field

Larry Cohen
David Dimuzio
Bob Dudzinsky
Randy Frischer
Morry Gottlieb
Bob Greisman
Kurt Huntzinger
Michael Kerekes
Joe Klausner

Don Lenz
Mike Lichner
Lorin Luchs
Mike O'Hare
Paul Shanbrom

Adrian Dicker, Charlie Bee and Denis Field have overall responsibility for the
development of this business line. They have allocated various responsibilities to the
group above. The responsibilities to assist in various territories are set out on the attached
schedules. Larry Cohen and Lorin Luchs will be involved primarily in structuring and
quality control and have not been allocated to territories. Your first contact for a potential
transaction should be to a member of the Tax Solutions Group other than Adrian Dicker,
Charlie Bee and Denis Field. Usually you would go to the person allocated to your area.
They may well pass you on to another member of the group once they have prefiltered
the transaction. You should follow the instructions of the member of the group in order to
qualify for the maximum finders bonuses as set out in the recently issued revised Bonus
Program.

The Tax Solutions Group is now having weekly conference calls to keep them as up to
date as possible regarding all the different aspects of the various transactions. As we all
know, communication has been our greatest challenge and the hope is that a better
informed core group will help with this. Members of the Tax Solutions Group will then in
turn communicate with you in whatever way is most effective in your area. This may be
via conference calls or meetings. It is unlikely to be via pieces of paper setting out the
transactions.

Note that it is the responsibility of members of the Tax Solutions Group to develop
relationships with Lincoln and the Alliance firms. Anyone who is not a member of the
Tax Solutions Group is encouraged to develop their own relationships with other ADCs
with the assistance of the Group.

## EXHIBIT 24

## MEMORANDUM

To: All Partners and Managers

Date: November 16, 1999

2002 TNT 136-8 - Justice Department Documents (Copyright, 2002, Tax Analysts)          Page 6 of 17

Re: Tax Solutions

From: redacted

The following is a summary of the most widely applicable tax solutions with which the related office has experience and knowledge. These highly profitable solutions can be implemented with minimal (if any) assistance of other offices thereby keeping more profit in. This memo is intended to be an overview of some of the more applicable solutions and not a detailed discussion of the fact requirements. If you think that any of these solutions may be useful to a current client or prospect, please contact the tax department for further consultation.

- <u>Pennsylvania corporate net income ("CNI") tax</u> - BDO has developed a tax-planning solution. which, under current Pensylvania law, can eliminate a corporation's PA CNI tax. The tax savings can be significant, immediate, and, in most circumstances, quite simple to implement. Also, other than the BDO fee, the cost of implementation may be minimal. In the right circumstances, this strategy is the proverbial "no-brainer" as it carries with it minimal tax exposure upon appeal. This solution may apply to other states in addition to Pennsylvania CNI tax and has no effect for federal purposes.
  - o Pricing = based upon percentage of tax savings
- <u>Merger & acquisition related costs</u> - Many companies capitalize and amortize what they consider to be M&A related costs. Depending upon the type of cost incurred, the tax treatment of these costs can vary significantly from the book treatment. Often, costs categorized as acquisition related are really consulting related costs that may be currently tax deductible. Further, costs related to an expansion of an existing trade or business can be expensed rather than capitalized for tax. Accordingly, a thorough analysis of all capitalized costs should be done to determine if any capitalized costs can be deducted currently in lieu of capitalization. In many circumstances, the tax savings to the client can be significant and immediate.
  - o Pricing = consulting fees based upon hourly billing rates
- <u>Sales & use tax managed compliance</u> - The BDO tax department has extensive hands on experience with regard to state sales and use taxes and managed compliance reduces a business's cost of administering the liability. This service benefits clients with a large physical presence in a state. It applies to any client who makes exempt purchases but is especially ideal for manufacturers.
  - o Pricing = fixed fee basis

- Stock option, executive compensation and benefit planning -. The BDO tax department has extensive experience with regard to executive compensation and bonus planning, NQSO, ISO and restricted stock option planning, golden parachute planning, benefit plan audits, etc.
  - o Pricing = consulting fees based upon hourly billing rates
- Sales and use tax audit defense and overpayment review This service provides representation and advisory assistance to clients during state-initiated sales tax audits. BDO monitors the audit to ensure that the state uses favorable testing methodologies and completes the audit timely. An overpayment analysis is also conducted to review purchases and determine the extent of any overpayments and ensure that client refunds are received.
  - o Pricing = either fixed fee or contingent fee basis
- Research & development ("R&D") income tax credit - The BDO tax department has extensive experience with regard to the U.S. federal R&D tax credit. The benefit we can provide to the client is developing a plan they can utilize to capture the required R&D data (employee payroll, supplies, contractors, etc.). Since this is a tax credit, the impact of any tax savings generated will be dollar for dollar. For companies with significant R&D costs, BDO can assist the client in establishing a tax savings mechanism for many years to come.
  - o Pricing = consulting fees based upon hourly billing rates
- Capital Gain Eliminators - Applies to individuals or corporations with capital gains. Solutions can be tailored for taxpayers with gains exceeding $5 million.
  - o Pricing = based upon percentage of tax savings
- Personal Holding Company ("PHC") Elimination - Appropriate target is a PHC where the assets inside the PHC are appreciated over the tax basis in an amount that exceeds $10 million. These solutions are generally easy to sell but hard to find.
  - o Pricing = based upon percentage of tax savings
- Net operating loss ("NOL") and capital loss "refreshers" - For U.S. federal and state corporate income tax purposes, most NOL and capital loss carry forwards have a statutory life which if left unutilized can expire before the taxpayer has the opportunity to benefit from them. For U.S. federal NOL purposes, the life is either 15 or 20 years depending upon the year incurred. However, many states provide for a much shorter life (sometimes 5 years) for NOL's. Further, the U.S. federal capital loss carry forward life is also limited to 5 years. With this solution, a U.S. company can "refresh" the carry forwards and extend their useful life. Eligible companies must have good credit and expiring or unusable carry forwards exceeding $5 million.
  - o Pricing = based upon percentage of tax savings

· 2002 TNT 156-8 - Justice Department Documents (Copyright, 2002, Tax Analysts)        Page 8 of 17

## EXHIBIT 25

## MEMORANDUM

To: All Professional Personnel

Date: November 20, 1999

Re: Time Charges in Connection with Tax Solutions

From: Howard Allenberg

Several questions have been raised regarding charging time to Tax Solutions engagements. I thought it would be helpful to set out the firm's policy on this issue and why we have this policy. As you may know, we have established the Tax Solutions business as a separate business line and it has been designated as Office 782. The firm wishes to encourage you to find transactions, but discourage you from becoming significantly involved in highly specialized and time consuming activities such as structuring and implementation. The primary issues driving this policy are quality
·  itrol, efficiency and also ensuring that individuals meet the goals set for them for their main business line responsibilities.

If the Tax Solutions business line were operating in isolation it would obviously like everyone in the firm to be engaged in this business 100% of the time. Individuals would also like this since it would maximize bonus opportunities. However, let us not forget that we must also maintain and grow a healthy and profitable core practice, as well as high margin consulting and specialized services. We must not become reliant on the Tax Solutions business as a key source of profitability. Accordingly this policy has been designed to discourage individuals from spending more time than is necessary on these Tax Solution engagements by restricting an individuals' ability to charge time in respect of these engagements.

Accordingly, the firm's policy is that only members of the Tax Solutions Group may charge time to the engagements created in Office 782 unless there has been specific authorization by Adrian Dicker, Charlie Bee or Denis Field. Time spent by members of the firm in finding transactions should be treated as general marketing time of the individual's office, unless it is felt that such time can be recovered by the office as a fee
s  arate from any Tax Solutions fee. Each person needs to balance their desire to earn a

bonus by finding transactions, against the impact it will have on their ability to reach their goals in respect of their business line responsibilities.

There may be occasions, *although we expect them to be rare*, where members of the firm who are outside of the Tax Solutions Group may need to become involved in some detailed aspect of a Tax Solutions engagement. In such a case, only Adrian Dicker, Charlie Bee or Denis Field can allocate a time budget to an individual for time to be charged to Office 782. Any time charged to Office 782 which has not been approved in advance by one of these three partners will be rejected and charged back to the individual's office.

Tax Solution engagements are to be billed and collected only by Office 782-they will not be allocated to the local offices or other business lines. Tax Solution engagements can be created only within Office 782 and may only be set up by a member of the Tax Solutions Group. All existing Tax Solution engagement codes are currently being cleared or transferred centrally into Office 782. By capturing all revenues, time and expenses in Office 782, instead of allowing such transactions to occur in a local practice office, we can better analyze our operating results in all parts of our business. Thanks for your understanding and cooperation in adhering to these important policies.

Best wishes for a happy Thanksgiving!

## EXHIBIT 26

Business Line Strategy

Tax Services
Wolves -Always Friendly
But Never Tame

Wolves - Always Friendly But Never Tame

## SOME HISTORY

When I was in my youth in 1984, Seidman and Seidman sent me away from the Grand Rapids office to the New York office to learn how to be logical, analytical, and practical. I came back thirteen years later to Chicago clinically eccentric-in the best case-and in the worst case MAD!!! I would just like to state I possibly might be completely sane and intellectually logical in my radical thinking!!

**We can turn the grayest sky to green.**

ane 30, 1998 $2.2 Million Actual Profit

We can make it rain whenever we want it to!

June 30, 1999 $14.8 Million Actual Profit

**We can turn a raging fire into a green river.**

June 30, 2000 $75+ Million Profit Goal

With all the power we possess we can change BDO into a green ocean.

Business Line Strategy

Tax Services
Wolves - Always Friendly
But Never Tame

⁻ r us. the **unattainable** must have special attraction. Our ambitions and fantasies must be strong enough to repel aside the doubts which lesser individuals might have. **Determination** and **faith** are our strongest weapons.

Three characteristics and attributes we must carry with us:

**Faith** in Ourselves

**Great Determination**

And Unlimited **Endurance**

We must travel this next year to distant heights. Accomplishing the unattainable means setting our sights high and destroying each rebuff with more determination to see our fantasies through to their fulfillment.

Tax Business Line Strategy

• One word sums up the Tax strategy

' 2002 TNT 136-8 - Justice Department Documents (Copyright, 2002, Tax Analysts)      Page 11 of 11

One word sums up the strategy of the Tax Business Line.

MONEY!

All of us in the Firm need to focus on money. Think Green. Green is good! There's nothing wrong with trying to make more money.

And I'm not talking only about the Firm's profitability. I'm also talking about individual profitability.

## Our Focus

**How do we get the money?** -There are several pieces to the profitability puzzle.

We must focus on our **talent.** We're in a talent business - our clients pay for talent, and we must buy the best talent we can afford.

We must create a very strong **culture.** We need to continue to participate in and encourage the breeding of the Wolf Pack throughout the entire Firm. We need to
laborate, cooperate and concentrate. These are the ingredients of the Wolf Pack formula for success.

Next, with regard to **training** dollars - they must be directly correlated to driving earnings. We have to support the talent and expertise we have by providing opportunities to stay on top of the game. Always.

And finally, **accountability** and **rewards.** This is easy. Those who perform get it, and those who don't perform do not. Think green. You bring in the money, you get the money.

## Why Are We Here?

Why are we here?

The name of the game is Profitability. And we can be much more profitable.

We have to move our focus away from compliance. The truth is compliance provides low
  fit margins, high risk and fixed costs. We need to reduce costs and increase efficiency
- we can't devote limited resources to serving unprofitable accounts.

So we'll continue to use Compliance as a great source for cross- selling our value-added services.

But we need to charge appropriately for those services, based on the value we bring to the client's business - not as an adjunct for Compliance.

Look at it this way -

Home run fees of $1 million equal time-based fees of $5 million.

We need to increase our clients' appreciation of value and focus on our most profitable areas.

### Where Is The Money?

**Where is the real money?** SHOW ME THE MONEY -- It's right in front of our faces. Our clients have the money. And we have the services they'll pay for.

Our tax practice and assurance are our channels for sales. But here's what we're going to sell.

Tax consulting contributes more than **30%** of our revenue and a significantly higher percentage of our earnings. We can sell corporate tax, state and local tax, sales and use tax, multi-state tax, international tax and partnership tax. And we have GREAT tax consultants.

The Lincoln Alliance is critical. Financial planning and financial services are going to be an important part of this Firm's fabric for the next 10 to 20 years. Just look at the demographics. **Baby Boomers are aging. They're living longer, and they HAVE money. Follow the money!** It's a good strategy.

And then, of course, there's the super product category. Tax Solutions. But tax solutions can't be our focus. They can't be our life preserver. We have to leverage our clients and sell them tax consulting, financial services, Lincoln services, corporate finance and all the other value-added services that were originally generated by our assurance and tax partners over the years.

Profits From Tax Solutions

Profit                    Actual          Work In

|  Budget | Profit | Process |
|---|---|---|
| June 30,1998 $1 Million | $2.2 Million | $1.1 Million |
| June 30,1999 $5 Million | $14.9 Million | $25 Million |
| June 30, 2000 $25 Million | $75+Million* | $100 Million |

Look at the profits from Tax Solutions.

In 1998, we realized $2.2 million in profit.

In 1999, we soared to $14.8 million.

This year, we have committed to deliver **$25 million in profits** from tax solutions. $25 million.

But we're setting our sights even higher than that. Right now we're expecting actual profits of **$75 million. (Original Goal was $50 million in profits, Denis increased profits to $75 million following the annual partner meeting.)**

And you should know that, just as we did last year, we're perfectly willing to adjust these numbers higher if we must.

How Do We Increase Profitability

- Provide top producers with sizable bonuses
- Goal for Fiscal Year 2000 - $10-125 million in General bonuses
- Goal for Fiscal Year 2000 - $7.13 million in Tax Solution bonuses
- Oh! And make sure our expenses do not exceed our revenue

How exactly do we increase profitability?

We need to reward our top producers with sizable bonuses. This year was a good year with $4.6 million in tax solution bonuses.

But next year, we'll reach new heights. **Our goal for the year 2000 is $7.3 million in tax solution bonuses and $10.125 million in general bonuses!** Pretty impressive, isn't it?

Just one small thing to keep in mind . . . **Make sure expenses don't exceed revenue or** w will lose our _____.

## Stairway to Profitability

At BDO, we have a number of stairways to success.

Our stairway to profitability is **one step at a time.**

Leveraging our assurance and tax clients to sell tax consulting

Lincoln services and tax solutions.

### Stairway to Money
### Tax Solutions

**Here's the stairway to money. The green stuff. The motivator.**

- First step. It can't be emphasized enough. **Leverage your client relationships.** Of course you have to make sure you have a relationship that can be leveraged.
- Then, when you see an **opportunity, capitalize on it.**
- And you do that by **advancing our leading talent.** People will pay for talent.
- After this foundation is laid, the partners and everyone at BDO will sell it. <u>We'll close the deal!</u>
- Then you **reach the pinnacle - you're at the top** and you're successful. You know what you'll find there?

**The money.** Your reward for a job well done.

### Looking Ahead

Let's look ahead to the **ingredients for success** at BDO.

We'll <u>hire the best</u> talent we can afford.

We'll <u>provide the technical training</u> needed to ensure we're always on the cutting edge.

We'll <u>make people accountable for driving profitability</u>, and we can do that by giving them a cut of the action.

We'll <u>enhance the reward system</u> at BDO. But let's focus on the center box.

· 2002 TNT 136-8 - Justice Department Documents (Copyright. 2002, Tax Analysts)                Page 15 of

A culture change. We have to foster a strong culture of

ollaboration

Cooperation and

Concentration

### The Wolf Pack Formula
### for Teamwork

Nothing is more important than **collaboration, cooperation and concentration.** The Wolf Pack formula for teamwork . . . And for success.

### The Wolf Pack Formula

Collaboration, cooperation and concentration must become the HALLMARK of BDO - across the entire Firm.

And do you know what that adds up to?

**Compensation!**

### FY 2000 Goals

- Profit budgeted for June 30, 2000: $25 million
- Anticipated actual profit: $50 million
- General bonus payout in 2000: $10.125 Million
- Tax Solutions bonuses in 2000: $7.13 million

The proof is in the money. Let's look again at our Year 2000 goals.

Our tax solutions profit goal for the year 2000 is $25 million **FIVE TIMES** what it was in 1999.

But we're setting our sights even higher than that. We're anticipating profits of $50 million, also five times the previous year and **TWENTY-FIVE TIMES** what it was just t . years ago.

For such astounding growth, it's only fitting that we should set our sights high for rewards as well. We want to establish a general bonus fund - funded by tax solutions - of .0.125 million for the year 2000. to reward the people who make it happen day in and day out.

And we hope to pay $7.13 million in tax solutions bonuses next year.

### The Next Millennium

You can all get in on this sea of green at BDO. With the power, talent, and knowledge we possess in our Wolf Pack, we can turn BDO into a green, green ocean.

I hope you'll be part of the pack.

I wish to acknowledge:

Charlie Bee - The key person in Tax Solutions

Terry Kelly - The developer of the Wolf Pack

S' awn Carson - The innovator of the Stairway to Profitability

Thank you all.

### EXHIBIT 27

### MEMORANDUM

To: To All Partners

Date: May 5, 2000

Re: WolfPack Successes

From: Howard B. Allenberg

This week has been an exciting and productive week for the BDO WolfPack. First, a Tax Solution transaction was closed and a wire transfer was received for $900,000. Then, the largest Tax Solution transaction in the Firm to date was closed for $4,400,000, edging out a . .,800,000 transaction that had closed last month and which, at the time, held the,

distinction of "largest" to that point. !!! Well, if your hearts are not pumping enough with these successes, hold on. Yesterday we received a wire transfer for $1,750,000, which .presented just the first payment on *a $6,250,000*Tax Solution transaction-which is now the undisputed "king" of the Tax Solution transactions-at least as of today!!!!.

As you may recall, at the beginning of our fiscal year the budget for Tax Solution Revenues was $15 million, just a slight increase over our actual results for FY 1999. As you may also remember, at our Annual Partners' meeting the Tax Group did a presentation on "green is good" and the bar was raised not once, but twice-first to $50 million-then, boldly to $75 million. And we are certain there were a number of skeptics in the audience at $50 million, not to mention when the goal was announced at $75 million.

Well, skeptics of the world, it's time to join the WolfPack! As a result of these huge successes this past week, we are pleased to report that our Tax Solution Revenues year-to-date are. . . .. . . . hang on. . . *$77,089,425*. . . of which more than $56 million has been collected year-to-date. And there is MORE to come based on the transactions in the pipeline. Close your eyes and visualize this. . . . $100 Million. . . . . $100 Million. . . . .$100 Million. . . . it is clearly within striking range!

 ∠ all owe a great amount of thanks to our Tax Solutions Group and the many other Partners and employees who have taken the initiative to bring these remarkable financial solutions to our clients and contacts. These results could not have been achieved without their creativity and marketing ability and drive, not to mention their Cooperation . . . . Collaboration . . . Concentration. . . . and Communication. . . . among themselves and with our clients.

Way to go WolfPack. . . *let's hit $100. . . .or do we hear* MORE!!!

cc: Denis M. Field

Code Section: Miscellaneous
Geographic Identifier: United States
Subject Area: Compliance
Cross Reference:
Institutional Author: Justice Department



**BDO Seidman, LLP**
Accountants and Consultants

Clark Tower
5100 Poplar Avenue, Suite 3600
Memphis, Tennessee 38137
Telephone: (901) 680-7600 Fax: (901) 680-7601
Direct Dial: (901) 680-7608 Res: (901) 754-1386
e-mail: mpuckett@bdo.com

**Mark D. Puckett, CPA**
Partner



Cooperation. Collaboration. Concentration. Communication.

EXHIBIT

3



Robert Greisman - Re: Fees-New Transaction                                          Page 1

From:       Charles Bee
To:         Robert Greisman
Date:       Thu, Apr 5, 2001  3:35 PM
Subject:    Re: Fees-New Transaction

The "all-in" cost to the investor is lower and the Jimmy pays legal fees. This should mean that we can
take the difference.  I don't think that it was hugely greater for us.  I do think we have got to agree on the
amount of the investment by the taxpayer based on his schedule.  Obviously, the higher the better.  We
need to decide this by Monday.  What do you think?  Let's send to the Opinion Committee for their review.
Jim thinks that an "all-in" cost to the client of 10% is the ceiling.  We have done much better.  This will be a
market driven analysis but we should set parameters and targets.   I don't think Michael's 10% equity will
fly.

>>> Robert Greisman 04/05/01 04:15PM >>>
Charlie:
When we have our TOC call on Monday at 10 on the new deal, we should also cover pricing and fees.
(You should have received a pricing sheet from Jimmy after our call with him early in the week.) In
comparing to Gramercy, I think it's about the same fee to us. Assuming no expenses in Gramercy deal,
we net 4 6 (capital at 7% x 2/3) and 6.6% ordinary (10% x 2/3). With Jimmy, it looks like we'd be at 4.5%
capital and 5% ordinary. (see his worksheet.) Moreover, if he's only taking 2.25% I presume we'll be on
our own in absorbing ADC fees, whereas Gramercy shares them with us. All that said, not a bad deal with
Jimmy, but not head and shoulders better than Gramercy. Let me know if you see it differently.
Bob

        Cooperation...     Collaboration...     Concentration...     Communication...

GOVERNMENT'S
EXHIBIT

A-47

7 BDO 00001567

EXHIBIT

4



Robert Greisman - Re: TOC-Conclusion Needed          Page 1

From:       Pam Packard
To:         Bee, Charles; Cohan, Lawrence; Field, Denis; Gr...
Date:       Sun, Apr 29, 2001 12:44 PM
Subject:    Re: TOC-Conclusion Needed

I feel strongly that the client should pay the attorney's fee directly. The advice would appear to be more independent.

With respect to the balance of the fee, my preference would be for BDO to be paid solely for consulting, thereby appearing to have been given "in the normal course of business". If it is problematic from a marketing perspective, I could live with us paying Helios.

>>> Robert Greisman 04/26/01 03:19PM >>>
In connection with the Helios (Haber) transaction--please respond the this question: Should Helios charge its fee and we charge our fee independently; or should we charge the entire fee and pay Helios, as we do with Gramercy? Please respond to the committee with your answer and reasoning by the close of business on Monday April 30 (sooner if possible) so that we can bring our pricing considerations on this structure to a conclusion.
Thanks.
Bob

         Cooperation..     Collaboration...     Concentration...     Communication...

#4

GOVERNMENT'S
EXHIBIT
A-54

13 BDO P     00235



Page 1 of 1

**Robert A. Jones - TS - Gramercy Deposit**

**From:** Robert A. Jones
**To:** Allenberg, Howard; Bos, Charles; Field, Denis
**Subject:** TS - Gramercy Deposit
**CC:** Shanbrom, Paul

Re: Status of the $800K deposit with Gramercy.

Gramercy intends to pay back our deposit by June 30, 2002. This information was conveyed to me by Bob Young, CFO and Paul Shanbrom, who spoke to Jay Johnston about this issue.

The deposit is for 50% (Gramercy paid the other 50%) of broker's fees for distressed debt funds. BDO's portion was paid to Gramercy in January, 2001 and was initially intended to be repaid to BDO by October, 2001.

I requested written confirmation from Bob Young, which he said he would be glad to provide.

about blank

GOVERNMENT'S
EXHIBIT

A-46

1/23/2002

5 BDO 00007350

EXHIBIT

5

4.    **Hasting**

Hasting's receipt of secret compensation from tax shelter promoter Gramercy, which he failed properly to report to the IRS, is unquestionably relevant to his knowledge and intent regarding the underlying charges. Like the tax evasion allegations against Hasting contained in the Indictment, Hasting's personal income tax evasion was committed through stealth reporting designed to hide income from the IRS. More particularly, Hasting received a $75,000 item of income from tax shelter promoter Gramercy as a "Thank You" for Hasting having referred clients to Gramercy for tax shelter transactions. Significantly, Hasting never reported that item of income on the face of his IRS 1040, as he was required to do; instead, even though the $75,000 represented "fee" or "other income" to him, Hasting limited the reporting of that fee income to the K-1 provided to him by Gramercy (who paid him not through a check or wire transfer, but through a credit to Hasting's personal account at Gramercy), and thereafter "erased" any tax liability stemming from his receipt of the income by personally engaging in a Gramercy tax shelter transaction.

The foregoing evidence — demonstrating Hasting's pattern of tax fraud activities — is highly probative of Hasting's knowledge, willfulness, and intent with respect to the charged conduct. Again, such evidence tends to show that the conduct charged in the Indictment was part of an intentional plan undertaken by Hasting, to evade his tax reporting obligations, and not the result of Hasting's good faith belief regarding

24



EXHIBIT

6

of at least $737,803 and $819,824, respectively. More particularly, Greenberg falsely
and fraudulently claimed that these "losses" were his distributive share of KPMG non-
passive losses. Through the KPMG-related false entries on his 2000 and 2001 returns,
Greenberg failed to pay income tax on an additional $1,557,627.

#### 4.     Carl Hasting's Uncharged Personal
Tax Evasion For The 2001 Tax Year

In or about 2001, in connection with his promotion while at KPMG of

fraudulent "distressed debt" tax shelters together with a promoter known as Gramercy,
Hasting was paid a secret $75,000 commission by Gramercy in consideration for Hasting
recommending or counseling KPMG clients to engage in Gramercy "distressed debt" tax
shelter transactions. The secret payment was made to Hasting when one of the principals
of Gramercy caused the crediting of $75,000 to Hasting's own account with Gramercy, an
entity through which Hasting executed two personal "distressed debt" tax shelter
transactions in 2001 and 2002. Although Hasting was issued a K-1 by Gramercy that
reflected the $75,000 side payment, Hasting failed to accurately report his receipt of the
secret side income on his U.S. Individual Income Tax Return. That is, Hasting knowingly
failed to report the referral to on the face of his IRS Form 1040, as he should have.
Hasting also hid his receipt of the side fee from his employer, KPMG.

16

## CONSULTING AGREEMENT

This Consulting Agreement ("Agreement") is entered into as of the 14th day of May, 2002 (the "Effective Date") by and between Carleton A. Jones (the "Client") and BDO Seidman, LLP, a New York registered limited liability partnership ("BDO"), with offices at 5100 Poplar Avenue, Suite 2600, Memphis, TN 38137.

### WITNESSETH

WHEREAS, the Client is interested in making certain investments (the "Transactions");

WHEREAS, BDO is in the business of providing accounting, tax and consulting services; and

WHEREAS, the Client desires BDO to provide certain consulting, tax and accounting services in connection with the Transactions, and BDO desires to provide such consulting services to the Client, all upon the terms and conditions provided herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Term. Unless earlier terminated as provided herein, the term of this Agreement shall commence on the Effective Date and shall continue through December 31, 2003 (the "Term").

2.      Services.      (a)      During the Term, BDO agrees to provide the following consulting services to the Client (the "Services"): consulting services in conjunction with the sale of equity interest(s) in certain entities, including assistance in determining the overall tax and economic effects of potential sales price(s) and allocations thereof, assisting the Client and/or the Client's advisors in structuring the Transaction(s) to attain the most beneficial tax results, and assisting with certain income tax, estate tax, personal financial planning and other financial aspects of various anticipated investment activities. **BDO is not in the business of providing investment or legal advice or related services, thus, none of the services to be rendered by BDO to Client can or will include investment or legal advice and should not be considered as investment or legal advice. Client acknowledges and represents that it will, and is, not relying upon BDO for investment or legal advice or related services.**

(b)      BDO will provide the Client with an opinion reasonably acceptable to Client's counsel concerning the federal income tax consequences of the Transactions. The

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE



EXHIBIT

7

2

opinion will be in addition to and not in lieu of the opinion the Client will receive from legal counsel. The fee for the opinion to be provided by BDO is included in the Consulting Fee set forth in this Agreement.

(c)    The Services hereunder do not include the preparation of any tax returns by BDO. Your tax returns may be selected for review by the tax authorities, and any proposed adjustments by the examining agents are subject to certain rights of appeal. Further, the Services hereunder do not include representation in any such review or any subsequent appeals. We are available on request to prepare tax returns for you or to represent you in any such proceedings. BDO's representation will be subject to a separate engagement letter(s), and we will render additional invoices for the time and expenses incurred.

(d)    BDO is bound by the ethics of its profession as Certified Public Accountants in the performance of its services hereunder. BDO however is not a guarantor of its advice and will be liable to Client only in the event one or more aspects of such professional advice constitutes professional negligence. Client agrees that BDO and its personnel shall not be liable to the Client for any claims, liabilities, or expenses relating to this Agreement for an aggregate amount in excess of the fees paid by the Client to BDO pursuant to this Agreement.

3.    Fees.

(a)    In consideration for the performance of the Services, the Client shall pay BDO $600,000 (the "Consulting Fee"). If the Client's account, after default, is referred to an attorney or collection agency for collection, the Client shall pay all of BDO's reasonable expenses incurred in such collection efforts including, without limitation, court costs and reasonable attorneys' fees. In the event that BDO's performance of the Services results in BDO being required to spend time or incur expenses with respect to any subsequent legal process or litigation involving a third party (for example, testifying in a litigation matter), BDO will charge the Client for that time at BDO's prevailing hourly rates and for reimbursement of those expenses.

(b)    The total Consulting Fee shall be due and payable from the Client to BDO on or before May 28, 2001 either by wire transfer to an account designated by BDO in writing to the Client or by Client check, whichever manner of payment is requested by BDO.

4.    Termination.

(a)    Either party shall have the right to terminate this Agreement if -

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

3

    (i)    the other party breaches or defaults under this Agreement and fails to cure such breach or default within seven (7) days after receiving written notice from the non-breaching party; or

    (ii)    the other party becomes insolvent or makes an assignment for the benefit of creditors, or a receiver or similar officer is appointed to take charge of all or part of such other party's assets.

    (b)    The terms and conditions of Paragraphs 3, 5, 6, 7, 8, and 14 shall survive any expiration or termination of this Agreement. Client's obligation to pay the Consulting Fee as specified in paragraph 3 shall be unaffected by any expiration or termination of this Agreement. No refund of the Consulting Fee will be made in the event of any expiration or termination of this Agreement.

5.    Indemnification.    The Client, at its own expense, shall release and indemnify, defend and hold BDO and its affiliates, along with their respective partners, employees, agents, designees, insurers and assignees, harmless from and against, all losses, claims, damages, liabilities, costs and expenses (including reasonable legal or other out-of-pocket expense) incurred, caused by or arising out of the performance of the Services by BDO for the Client, the Transactions, or any transaction related thereto, or the Client's breach of this Agreement. This indemnity excludes a final adjudication that BDO engaged in gross negligence or willful misconduct in performing the Services which gave rise to the loss, claim, damage, liability, cost or expense sought to be recovered. Pending any such final decision, the indemnification and reimbursement provisions of this Agreement shall apply and the Client shall perform its obligations to reimburse BDO for its expenses.

6.    No Warranty.    **BDO makes no warranties, express or implied, under this Agreement with respect to the Services or otherwise. BDO expressly disclaims any implied warranty of merchantability or fitness for a particular purpose or use.** As stated above, the Services to be provided in connection with this Agreement include the issuance of an opinion regarding the federal income tax consequences of the Transactions. In this regard, BDO accepts responsibility for the opinion BDO will provide to Client. BDO does not assume any responsibility whatsoever, and shall not be held liable for any legal and/or tax opinions not prepared by BDO regarding any strategies that may be implemented by Client during the term of this Agreement. Client acknowledges and agrees that BDO has advised the Client to retain a law firm for legal as well as tax opinions on any strategies or Transactions in which Client engages during the term of this Agreement. The Client's exclusive remedy, and BDO's sole liability to the Client, for any cause whatsoever related in any way to this Agreement or to the Services provided by BDO to Client, shall be limited to the dollar amount of the Consulting Fees actually paid to BDO by the Client under this Agreement. The foregoing limitation of liability shall apply regardless of the form of action, whether contract or tort, including, without limitation, negligence. Notwithstanding anything to the contrary, in no event shall BDO be liable for

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

4

any loss of profit, revenue, or other commercial injury or any special, incidental, punitive, indirect or consequential damages suffered by the Client or any third party, whether or not BDO has been advised of the possibility of such loss, injury, damages or third party claim, under any cause of action arising out of or relating to this Agreement or the Services provided by BDO to the Client in connection with this Agreement.

7.    No Assignment.    Neither party shall assign this Agreement, in whole or in part, without the prior written consent of the other party, which written consent shall not be unreasonably withheld. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the successors, legal representatives and assignees of the parties hereto.

8.    Dispute Resolution.

(a)    If any dispute, controversy or claim arises in connection with the performance or breach of this Agreement, either party may, upon written notice to the other party, request mediation in accordance with the then current Dispute Resolution Rules for Professional Accounting and Related Services Disputes (Including Mediation) of the American Arbitration Association ("AAA") Such mediation shall be assisted by a neutral mediator acceptable to both parties and shall require the best efforts of the parties to discuss with each other in good faith their respective positions and, respecting their different interests, to finally resolve such dispute.

(b)    Each party may disclose any facts to the other party or to the mediator, which it, in good faith, considers necessary to resolve the dispute. However, all such disclosures shall be deemed in furtherance of settlement efforts and shall not be admissible in any subsequent legal proceeding against the disclosing party. Except as agreed by both parties, the mediator shall keep confidential all information disclosed during negotiations. The mediator shall not act as a witness for either party in any subsequent arbitration between the parties.

(c)    Such mediation shall conclude within sixty days from receipt of the written notice unless extended by mutual consent. The parties may also agree at any time to terminate or waive mediation . The costs incurred by each party in such negotiations shall be borne by it; the fees and expenses of the mediator, if any, shall be borne equally by the parties.

(d)    If any dispute, controversy or claim arises in connection with the performance or breach of this Agreement and cannot be resolved by mediation within sixty days (or the parties agree to waive that process) then such dispute, controversy or claim shall be settled by binding arbitration under the then current Dispute Resolution Rules for Professional Accounting and Related Services Disputes (Including Mediation) of the American Arbitration Association ("AAA"), and shall take place in either the cities of

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

5

Nashville, Johnson City or Memphis, Tennessee as mutually agreed by the parties unless the parties agree to a different locale. The arbitrator(s) shall permit each party to engage in limited discovery with a period of 60 days to complete any such discovery.

(e)  Unless the parties agree to a single arbitrator, such arbitration shall be conducted before a panel of three (3) persons, one (1) chosen by each party and the third selected by the two (2) party-selected arbitrators. The arbitration panel shall have no authority to award non-monetary or equitable relief, and any monetary award shall not include punitive damages. The confidentiality provisions applicable to mediation shall also apply to arbitration.

(f)  Judgment on the award issued by the arbitration panel may be entered in any federal or state court of competent jurisdiction. All reasonable costs of both parties, as determined by the arbitrators, including (1) the fees and expenses of the AAA and the arbitrators, and (2) the costs, including reasonable attorneys' fees, necessary to confirm the award in court shall be borne entirely by the non-prevailing party (to be designated by the arbitration panel in the award) and may not be allocated between the parties by the arbitration panel.

9.  Enforceability.  If any provision of this Agreement is declared invalid or unenforceable, such provision shall be deemed modified to the extent necessary and possible to render it valid and enforceable. In any event, the unenforceability or invalidity of any provision shall not affect any other provision of this Agreement, and this Agreement shall continue in full force and effect, and be construed and enforced, as if such provision had not been included, or had been modified as above provided, as the case may be.

10.  Independent Contractor.  BDO and the Client acknowledge that the relationship between the parties to this Agreement is exclusively that of an independent contractor and that BDO's obligations to the Client are exclusively contractual in nature. Nothing herein contained shall be construed to imply a joint venture, partnership or principal-agent relationship between BDO and the Client, and neither party shall have the right, power or authority to obligate or bind the other to any third party in any manner whatsoever.

11.  Governing Law.  This Agreement shall be governed and construed in accordance with the laws of the State of Tennessee, except for its conflict of law principles.

12.  Entire Agreement.  This Agreement (including Appendix A, which is incorporated herein as if the terms thereof were fully set forth in this Agreement) sets forth the entire agreement between the parties with respect to the subject matter herein, superseding all prior agreements, negotiations or understandings, whether oral or written.

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

6

with respect to such subject matter. This Agreement may not be amended or modified except in a writing signed by duly authorized representatives of the Client and BDO.

13.    Notice.    All notices and other communications required or desired to be given pursuant to this Agreement will be given in writing and will be deemed duly given upon personal delivery, or on the third day after mailing if sent by registered or certified mail, postage prepaid, return receipt requested, or on the day after mailing if sent by a nationally recognized overnight delivery service which maintains records of the time, place and recipient of delivery.

| | |
|---|---|
| If to BDO: | BDO Seidman, LLP |
| | Attention:  Mark D. Puckett |
| | 5100 Poplar Avenue, Suite 2600 |
| | Memphis, TN 38137 |
| | Phone: 901-680-7608 |
| If to Client: | Mr. Carleton A. Jones |
| | 2734 East Oakland Avenue, #18 |
| | Johnson City, TN 37601 |
| | Phone: 423-929-3111 |
| | Fax: 423-282-3025 |

423-282-3025

or to such other person, entity, address or facsimile number as a party may respectively designate in like manner, from time to time.

14.    Confidentiality Privilege

        (a)    A confidentiality privilege under Internal Revenue Code Section 7525 may pertain to certain communications between BDO (federally authorized tax practitioners) and the Client regarding federal tax advice provided pursuant to this Agreement. The Client understands that BDO makes no representation, warranty or promise and offers no opinion with respect to the applicability of such confidentiality privilege, if any, and the Client understands and agrees to this circumstance should such privilege be determined not to apply in any circumstance.

        (b)    By retaining BDO, the Client agrees that BDO is authorized to claim the privilege on the Client's behalf with respect to any applicable communications, up to and until such time as the Client may waive any such privilege in writing, or BDO may otherwise be required by law to disclose such communications in compliance with any court order, subpoenas, summonses, or incurs costs in defending the assertion of the privilege on the Client's behalf, the Client will be responsible for such costs.

15.    Miscellaneous

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

7

(a)    The Client represents and warrants that it has the full power and authority to enter into this Agreement and to carry out the transactions provided for herein. In addition, the Client represents that it has not entered into any agreement regarding the subject matter hereunder with any other party that covers the period during which BDO is authorized to act and provide services hereunder.

(b)    The failure of either party to require performance by the other of any provision hereof shall in no way affect the right to require performance at any time thereafter, nor shall the waiver of a breach of any provision hereof be taken to be a waiver of any succeeding breach of such provision or as a waiver of the provision itself.

(c)    The paragraph headings set forth in this Agreement are for the convenience of the parties, and in no way define, limit, or describe the scope or intent of this Agreement and are to be given no legal effect.

(d)    A copy of BDO's privacy policy is attached as Appendix B.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

BDO SEIDMAN, LLP                         CARLETON A. JONES ("CLIENT")

By: _____              By: _____

Name: Mark D. Puckett

Title:  Partner

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

## APPENDIX A TO CONSULTING AGREEMENT

This Appendix A is incorporated in and made a part of the Consulting Agreement between Carleton A. Jones (the "Client" or "I") and BDO Seidman, LLP ("BDO"), dated May 14, 2001, as if this Appendix were set forth in full therein, and is subject to all of the terms and conditions of the Agreement. In connection with certain investments (the "Transactions") that I am making, I acknowledge that:

• BDO has advised me that, prior to entering into the Transactions, I should consult with a tax attorney or tax advisor independent of BDO concerning the potential tax treatment of the Transaction and the potential tax consequences to me of participating in the Transactions, and I have done so or declined to do so;

• BDO has advised me, and I understand, that like all tax positions, the tax treatment of the Transactions is subject to audit and challenge by the Internal Revenue Service (hereinafter "IRS") and/or a state or local taxing authority;

• BDO has advised me, and I understand, that if the IRS and/or a state or local taxing authority challenges the tax treatment of the Transactions they could assert that I owe additional tax, interest and penalties. Any such liability is solely my responsibility;

• I understand that in contributing property to any limited liability company that receives a contribution of property in the course of the Transactions, I can either contribute (a) a combination of certain leveraged assets and additional unleveraged assets or (b) solely unleveraged assets. BDO has recommended that I contribute solely unleveraged assets and has advised me that certain additional tax risks may arise if leveraged assets are contributed to the limited liability company. I represent that I have independently considered the type of assets to contribute;

• BDO has made no representation concerning whether these Transactions might or might not cause my tax return to be examined by the IRS, or other taxing authority. Additionally, BDO has advised me that these transactions may be required to be disclosed in my income tax returns;

• Federal, state and local laws, including tax laws, are subject to change. Changes in the law could be retroactive and could affect the tax treatment of the Transactions. BDO will not advise me of changes in the law unless specifically engaged in writing to do so;

• IRS regulations require BDO to maintain certain records for some tax-advantaged transactions and, on request, to provide this information to the IRS. Among the information required to be provided are the identity of investors and a description of the tax advantaged expected to be derived from the transaction. I understand that the Transactions could be subject to these rules;

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

9

•BDO has informed me that they have not registered the Transactions as a tax shelter under the Internal Revenue Code. I understand that there can be no assurance that the IRS will agree with this determination;

•BDO does not provide investment or legal advice to its clients, and has not provided me with investment or legal advice concerning the Transactions; and

•I have received, reviewed, and evaluated such information and materials as I and my advisors deemed relevant, and have made an independent decision to participate in the Transactions.

Carleton A. Jones

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

APPENDIX B TO CONSULTING AGREEMENT BETWEEN
CARLETON A. JONES AND BDO SEIDMAN, LLP

#### BDO Seidman, LLP Privacy Policy

BDO Seidman, LLP may obtain nonpublic personal information about your family, income, expenditures, investments, estate, insurance coverage, or other personal matters that BDO Seidman, LLP may need in order to perform the services for which you have engaged the firm. This information may be obtained from the following sources:

a.   Forms you fill out to obtain our services;

b.   Documents that you provide to us;

c.   Documents that you authorize us to obtain from others;

d.   Discussions with you;

e.   Discussions with others that you authorize us to undertake.

BDO Seidman, LLP does not disclose any nonpublic personal information about our clients or former clients to anyone, except as required by law.

We restrict access to nonpublic personal information about you to our professionals and staff who need to know such information in order for BDO Seidman, LLP to provide you with its services. We maintain physical, electronic and procedural safeguards that comply with federal regulations and professional requirements to guard the confidentiality of your nonpublic personal information.

## CONSULTING AGREEMENT

This Consulting Agreement ("Agreement") is entered into as of the 3rd day of June, 2002 (the "Effective Date") by and between John A. Jones (the "Client") and BDO Seidman, LLP, a New York registered limited liability partnership ("BDO"), with offices at 5100 Poplar Avenue, Suite 2600, Memphis, TN 38137.

### WITNESSETH

WHEREAS, the Client is interested in making certain investments (the "Transactions");

WHEREAS, BDO is in the business of providing accounting, tax and consulting services; and

WHEREAS, the Client desires BDO to provide certain consulting, tax and accounting services in connection with the Transactions, and BDO desires to provide such consulting services to the Client, all upon the terms and conditions provided herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Term. Unless earlier terminated as provided herein, the term of this Agreement shall commence on the Effective Date and shall continue through December 31, 2003 (the "Term").

2.    Services.    (a)    During the Term, BDO agrees to provide the following consulting services to the Client (the "Services"): consulting services in conjunction with the sale of equity interest(s) in certain entities, including assistance in determining the overall tax and economic effects of potential sales price(s) and allocations thereof, assisting the Client and/or the Client's advisors in structuring the Transaction(s) to attain the most beneficial tax results, and assisting with certain income tax, estate tax, personal financial planning and other financial aspects of various anticipated investment activities. **BDO is not in the business of providing investment or legal advice or related services, thus, none of the services to be rendered by BDO to Client can or will include investment or legal advice and should not be considered as investment or legal advice. Client acknowledges and represents that it will, and is, not relying upon BDO for investment or legal advice or related services.**

(b)    BDO will provide the Client with an opinion reasonably acceptable to Client's counsel concerning the federal income tax consequences of the Transactions. The

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

EXHIBIT

B

TEL: 7 2/1  2 35PM                                          No. 6932   P.  2

2

opinion will be in addition to and not in lieu of the opinion the Client will receive from legal counsel. The fee for the opinion to be provided by BDO is included in the Consulting Fee set forth in this Agreement. It is anticipated that such opinion will include relevant issues and law for such calendar year addressed by the opinion.

(c)     The Services hereunder do not include the preparation of any tax returns by BDO. Your tax returns may be selected for review by the tax authorities, and any proposed adjustments by the examining agents are subject to certain rights of appeal. Further, the Services hereunder do not include representation in any such review or any subsequent appeals. We are available on request to prepare tax returns for you or to represent you in any such proceedings. BDO's representation will be subject to a separate engagement letter(s), and we will render additional invoices for the time and expenses incurred.

(d)     BDO is bound by the ethics of its profession as Certified Public Accountants in the performance of its services hereunder. BDO however is not a guarantor of its advice and will be liable to Client only in the event one or more aspects of such professional advice constitutes professional negligence. Client agrees that BDO and its personnel shall not be liable to the Client for any claims, liabilities, or expenses relating to this Agreement for an aggregate amount in excess of the fees paid by the Client to BDO pursuant to this Agreement.

3.     Fees.

(a)     In consideration for the performance of the Services, the Client shall pay BDO $585,000 (the "Consulting Fee"). If the Client's account, after default, is referred to an attorney or collection agency for collection, the Client shall pay all of BDO's reasonable expenses incurred in such collection efforts including, without limitation, court costs and reasonable attorneys' fees.

(b)     The total Consulting Fee shall be due and payable from the Client to BDO on or before June 7, 2002 either by wire transfer to an account designated by BDO in writing to the Client or by Client check, whichever manner of payment is requested by BDO.

(c)     In the event that BDO's performance of the Services results in BDO being required to spend time or incur expenses with respect to any subsequent legal process or litigation involving a third party (for example, testifying in a litigation matter), BDO will charge the Client for that time at BDO's prevailing hourly rates and for reimbursement of those expenses.

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

FEB 1 2423  3:05PM                                    NO.0555   P. 4

3

4.    Termination.

(a)    Either party shall have the right to terminate this Agreement if –

(i)    the other party breaches or defaults under this Agreement and fails to cure such breach or default within seven (7) days after receiving written notice from the non-breaching party, or

(ii)    the other party becomes insolvent or makes an assignment for the benefit of creditors, or a receiver or similar officer is appointed to take charge of all or part of such other party's assets.

(b)    The terms and conditions of Paragraphs 3(c), 5, 6, 7, 8, and 14 shall survive any expiration or termination of this Agreement.

5.    Indemnification.    The Client, at its own expense, shall release and indemnify, defend and hold BDO and its affiliates, along with their respective partners, employees, agents, designees, insurers and assignees, harmless from and against, all losses, claims, damages, liabilities, costs and expenses (including reasonable legal or other out-of-pocket expense) incurred, caused by or arising out of the performance of the Services by BDO for the Client, the Transactions, or any transaction related thereto, or the Client's breach of this Agreement. This indemnity excludes a final adjudication that BDO engaged in negligence or willful misconduct in performing the Services which gave rise to the loss, claim, damage, liability, cost or expense sought to be recovered. Pending any such final decision, the indemnification and reimbursement provisions of this Agreement shall apply and the Client shall perform its obligations to reimburse BDO for its expenses.

6.    No Warranty.    BDO makes no warranties, express or implied, under this Agreement with respect to the Services or otherwise. BDO expressly disclaims any implied warranty of merchantability or fitness for a particular purpose or use. As stated above, the Services to be provided in connection with this Agreement include the issuance of an opinion regarding the federal income tax consequences of the Transactions. In this regard, BDO accepts responsibility for the opinion BDO will provide to Client. BDO does not assume any responsibility whatsoever, and shall not be held liable for any legal and/or tax opinions not prepared by BDO regarding any strategies that may be implemented by Client during the term of this Agreement. Client acknowledges and agrees that BDO has advised the Client to retain a law firm for legal as well as tax opinions on any strategies or Transactions in which Client engages during the term of this Agreement. The Client's exclusive remedy, and BDO's sole liability to the Client, for any cause whatsoever related in any way to this Agreement or to the Services provided by BDO to Client, shall be limited to the dollar amount of the Consulting Fees actually paid to BDO by the Client under this Agreement. The foregoing limitation of liability shall apply regardless of the form of action, whether contract or tort, including, without limitation,

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

FEB 1 2015 7:567M                                    K.,9399   P. p

4

negligence. Notwithstanding anything to the contrary, in no event shall BDO be liable for any loss of profit, revenue, or other commercial injury or any special, incidental, punitive, indirect or consequential damages suffered by the Client or any third party, whether or not BDO has been advised of the possibility of such loss, injury, damages or third party claim, under any cause of action arising out of or relating to this Agreement or the Services provided by BDO to the Client in connection with this Agreement.

7.     No Assignment.     Neither party shall assign this Agreement, in whole or in part, without the prior written consent of the other party, which written consent shall not be unreasonably withheld. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the successors, legal representatives and assignees of the parties hereto.

8.     Dispute Resolution.

(a)     If any dispute, controversy or claim arises in connection with the performance or breach of this Agreement, either party may, upon written notice to the other party, request mediation in accordance with the then current Dispute Resolution Rules for Professional Accounting and Related Services Disputes (Including Mediation) of the American Arbitration Association ("AAA") Such mediation shall be assisted by a neutral mediator acceptable to both parties and shall require the best efforts of the parties to discuss with each other in good faith their respective positions and, respecting their different interests, to finally resolve such dispute.

(b)     Each party may disclose any facts to the other party or to the mediator, which it, in good faith, considers necessary to resolve the dispute. However, all such disclosures shall be deemed in furtherance of settlement efforts and shall not be admissible in any subsequent legal proceeding against the disclosing party. Except as agreed by both parties, the mediator shall keep confidential all information disclosed during negotiations. The mediator shall not act as a witness for either party in any subsequent arbitration between the parties.

(c)     Such mediation shall conclude within sixty days from receipt of the written notice unless extended by mutual consent. The parties may also agree at any time to terminate or waive mediation. The costs incurred by each party in such negotiations shall be borne by it; the fees and expenses of the mediator, if any, shall be borne equally by the parties.

(d)     If any dispute, controversy or claim arises in connection with the performance or breach of this Agreement and cannot be resolved by mediation within sixty days (or the parties agree to waive that process) then such dispute, controversy or claim shall be settled by binding arbitration under the then current Dispute Resolution Rules for Professional Accounting and Related Services Disputes (Including Mediation) of the

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

FROM  7.2n09  2.57PM                                         NO.0859   P. 9

5

American Arbitration Association ("AAA"), and shall take place in either the cities of Nashville, Johnson City or Memphis, Tennessee as mutually agreed by the parties unless the parties agree to a different locale. The arbitrator(s) shall permit each party to engage in limited discovery with a period of 60 days to complete any such discovery.

(e)    Unless the parties agree to a single arbitrator, such arbitration shall be conducted before a panel of three (3) persons, one (1) chosen by each party and the third selected by the two (2) party-selected arbitrators. The arbitration panel shall have no authority to award non-monetary or equitable relief, and any monetary award shall not include punitive damages. The confidentiality provisions applicable to mediation shall also apply to arbitration.

(f)    Judgment on the award issued by the arbitration panel may be entered in any federal or state court of competent jurisdiction. All reasonable costs of both parties, as determined by the arbitrators, including (1) the fees and expenses of the AAA and the arbitrators, and (2) the costs, including reasonable attorneys' fees, necessary to confirm the award in court shall be borne entirely by the non-prevailing party (to be designated by the arbitration panel in the award) and may not be allocated between the parties by the arbitration panel.

9.    Enforceability.    If any provision of this Agreement is declared invalid or unenforceable, such provision shall be deemed modified to the extent necessary and possible to render it valid and enforceable. In any event, the unenforceability or invalidity of any provision shall not affect any other provision of this Agreement, and this Agreement shall continue in full force and effect, and be construed and enforced, as if such provision had not been included, or had been modified as above provided, as the case may be.

10.    Independent Contractor.    BDO and the Client acknowledge that the relationship between the parties to this Agreement is exclusively that of an independent contractor , i.e., BDO is rendering professional services in the capacity of a professional services firm and that BDO's obligations to the Client are exclusively contractual in nature. Nothing herein contained shall be construed to imply a joint venture, partnership or principal-agent relationship between BDO and the Client, and neither party shall have the right, power or authority to obligate or bind the other to any third party in any manner whatsoever.

11.    Governing Law.    This Agreement shall be governed and construed in accordance with the laws of the State of Tennessee, except for its conflict of law principles.

12.    Entire Agreement.    This Agreement (including Appendix A, which is incorporated herein as if the terms thereof were fully set forth in this Agreement) sets forth the entire agreement between the parties with respect to the subject matter herein,

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

FEB. 1 2005  2:57PM                                    NO.1052   P. 7

6

superseding all prior agreements, negotiations or understandings, whether oral or written, with respect to such subject matter. This Agreement may not be amended or modified except in a writing signed by duly authorized representatives of the Client and BDO.

13.    Notice.       All notices and other communications required or desired to be given pursuant to this Agreement will be given in writing and will be deemed duly given upon personal delivery, or on the third day after mailing if sent by registered or certified mail, postage prepaid, return receipt requested, or on the day after mailing if sent by a nationally recognized overnight delivery service which maintains records of the time, place and recipient of delivery.

| | |
|---|---|
| If to BDO: | BDO Seidman, LLP |
| | Attention:  Mark D. Puckett. |
| | 5100 Poplar Avenue, Suite 2600 |
| | Memphis, TN 38137 |
| | Phone: 901-680-7608 |
| | |
| If to Client: | Mr. John A. Jones |
| | 2308 Rambling Road |
| | Johnson City, TN 37604 |
| | Phone: 423-282-5128 |
| | |
| With Duplicate Original to: | Richard A. Johnson, Esq. |
| | Waller Lansden Dortch & Davis, LLC |
| | 511 Union Street, Suite 2100 |
| | Nashville, TN 37239 |
| | Phone: 615-244-6380 |

or to such other person, entity, address or facsimile number as a party may respectively designate in like manner, from time to time.

14.    Confidentiality Privilege

(a)    A confidentiality privilege under Internal Revenue Code Section 7525 may pertain to certain communications between BDO (federally authorized tax practitioners) and the Client regarding federal tax advice provided pursuant to this Agreement.  The Client understands that BDO makes no representation, warranty or promise and offers no opinion with respect to the applicability of such confidentiality privilege, if any, and the Client understands and agrees to this circumstance should such privilege be determined not to apply in any circumstance.

(b)    By retaining BDO, the Client agrees that BDO is authorized to claim the privilege on the Client's behalf with respect to any applicable communications, up to and

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

7

until such time as the Client may waive any such privilege in writing, or BDO may otherwise be required by law to disclose such communications in compliance with any court order, subpoenas, summonses, or incurs costs in defending the assertion of the privilege on the Client's behalf, the Client will be responsible for such costs.

15.    Miscellaneous.

(a)    The Client represents and warrants that it has the full power and authority to enter into this Agreement and to carry out the transactions provided for herein. In addition, the Client represents that it has not entered into any agreement regarding the subject matter hereunder with any other party that covers the period during which BDO is authorized to act and provide services hereunder.

(b)    The failure of either party to require performance by the other of any provision hereof shall in no way affect the right to require performance at any time thereafter, nor shall the waiver of a breach of any provision hereof be taken to be a waiver of any succeeding breach of such provision or as a waiver of the provision itself.

(c)    The paragraph headings set forth in this Agreement are for the convenience of the parties, and in no way define, limit, or describe the scope or intent of this Agreement and are to be given no legal effect.

(d)    A copy of BDO's privacy policy is attached as Appendix B.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

BDO SEIDMAN, LLP

By:

Name: Mark D. Puckett

Title:  Partner

JOHN A. JONES ("CLIENT")

By: John A. Jones

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

FEB 7 2001 1:00PM                                                            NO 0514  P  7

## APPENDIX A TO CONSULTING AGREEMENT

This Appendix A is incorporated in and made a part of the Consulting Agreement between John A. Jones (the "Client" or "I") and BDO Seidman, LLP ("BDO"), dated June 3, 2002, as if this Appendix were set forth in full therein, and is subject to all of the terms and conditions of the Agreement. In connection with certain investments (the "Transactions") that I am making, I acknowledge that:

•BDO has advised me that, prior to entering into the Transactions, I should consult with a tax attorney or tax advisor independent of BDO concerning the potential tax treatment of the Transaction and the potential tax consequences to me of participating in the Transactions, and I have done so or declined to do so;

•BDO has advised me, and I understand, that like all tax positions, the tax treatment of the Transactions is subject to audit and challenge by the Internal Revenue Service (hereinafter "IRS") and/or a state or local taxing authority;

•BDO has advised me, and I understand, that if the IRS and/or a state or local taxing authority challenges the tax treatment of the Transactions they could assert that I owe additional tax, interest and penalties. Any such liability is solely my responsibility;

•I understand that in contributing property to any limited liability company that receives a contribution of property in the course of the Transactions, I can either contribute (a) a combination of certain leveraged assets and additional unleveraged assets or (b) solely unleveraged assets. BDO has recommended that I contribute solely unleveraged assets and has advised me that certain additional tax risks may arise if leveraged assets are contributed to the limited liability company. I represent that I have independently considered the type of assets to contribute;

•BDO has made no representation concerning whether these Transactions might or might not cause my tax return to be examined by the IRS, or other taxing authority. Additionally, BDO has advised me that these transactions may be required to be disclosed in my income tax returns;

•Federal, state and local laws, including tax laws, are subject to change. Changes in the law could be retroactive and could affect the tax treatment of the Transactions. BDO will not advise me of changes in the law unless specifically engaged in writing to do so;

•IRS regulations require BDO to maintain certain records for some tax-advantaged transactions and, on request, to provide this information to the IRS. Among the information required to be provided are the identity of investors and a description of the tax advantages expected to be derived from the transaction. I understand that the Transactions could be subject to these rules;

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

9

•BDO has informed me that they have not registered the Transactions as a tax shelter under the Internal Revenue Code as BDO believes that such Transactions are not required to be registered. I understand that there can be no assurance that the IRS will agree with this determination;

•BDO does not provide investment or legal advice to its clients, and has not provided me with investment or legal advice concerning the Transactions; and

•I have received, reviewed, and evaluated such information and materials as I and my advisors deemed relevant, and have made an independent decision to participate in the Transactions.

John A. Jones

John A. Jones

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE



APPENDIX B TO CONSULTING AGREEMENT BETWEEN
JOHN A. JONES AND BDO SEIDMAN, LLP

### BDO Seidman, LLP Privacy Policy

BDO Seidman, LLP may obtain nonpublic personal information about your family, income, expenditures, investments, estate, insurance coverage, or other personal matters that BDO Seidman, LLP may need in order to perform the services for which you have engaged the firm. This information may be obtained from the following sources:

a.    Forms you fill out to obtain our services;

b.    Documents that you provide to us;

c.    Documents that you authorize us to obtain from others;

d.    Discussions with you;

e.    Discussions with others that you authorize us to undertake.

BDO Seidman, LLP does not disclose any nonpublic personal information about our clients or former clients to anyone, except as required by law.

We restrict access to nonpublic personal information about you to our professionals and staff who need to know such information in order for BDO Seidman, LLP to provide you with its services. We maintain physical, electronic and procedural safeguards that comply with federal regulations and professional requirements to guard the confidentiality of your nonpublic personal information.