# EXHIBIT 5



# Gramercy

- Home
- About Us
- Management
- About the Fund
- Performance Results
- Client Statements
- Contact Us
- Terms and Conditions



At Gramercy, we are an event-driven investment management company that specializes in fixed income distressed securities. Our unique combination of investment and risk management skills, aggressively applied to inherently inefficient markets, enables Gramercy to generate consistently positive investment performance with low volatility and low correlation to traditional financial markets. The Gramercy approach to both undervalued and overvalued situations requires a deep familiarity with a market event, involves vigorous participation to shape outcomes, and necessitates a precise assessment of event success probability and time to conclusion. It is through Gramercy's expert exploitation of these market opportunities that we consistently extract maximum value for our investors.

## Satmex: Latin Finance Magazine Restructuring Deal of the Year (2006)



## About the Firm - Gramercy 

Gramercy and affiliates is an SEC Registered Investment Advisor and an NASD Regulated Broker/Dealer as well as the investment manager to the Gramercy Emerging Market Fund (GEMF), the Gramercy Mexico NPL Fund, the Gramercy Mexico NPL Fund II, the Gramercy Global Optimization Fund (GGOF) and a number of private investment partnerships and managed accounts. Gramercy was founded in 1998 on the principle that an event-driven selection process for overvalued and undervalued debt securities offers consistently superior returns versus most other investment vehicles. The strategic application of this approach to emerging market bonds has provided the catalyst for consistently positive returns with low volatility and low correlation to traditional asset classes.

As a result of their first-hand experience realizing value from distressed emerging market investments through debt restructurings at Merrill Lynch, Deutsche Bank and Lehman Brothers, the managing partners were confident they could generate superior absolute returns. Armed with a detailed understanding of global emerging market risk factors and a proven ability to gauge market sentiment, the Firm launched GEMF in April of 1999. For over six years, GEMF has consistently outperformed the emerging market debt and equity markets, as well as all traditional fixed income and equity indices.

Return objectives are achieved through opportunistic investing in the emerging markets by generating precise assessments of restructuring event success probability and time to conclusion. Gramercy proactively participates in the restructuring of each investment situation in order to maximize recovery in minimal time, often leading creditor committees and functioning as a catalyst to expedite deal completion. Gramercy hedges the portfolio at most times to protect against emerging market volatility generally and to specifically produce alpha from the short-side to exploit market weakness.

GEMF invests in U.S. and Euro dollar-denominated assets trading in the global capital markets and under ǝ jurisdiction of U.S. or U.K. law. The Fund normally invests in approximately 15 themes which are idenced by 35 – 50 individual securities. GEMF does not use leverage and is limited to 1.5 to 1 as per the Private Placement Memorandum. Country, credit, security and position-entry concentration limits are adhered to, as is a strict calibrated stop-loss policy. Cash balances have been about 30% on average since inception to enable our opportunistic style to exploit distressed situations when they are identified by our traders and/or research team.

The Gramercy Mexico NPL Funds (GMNPLF) invest in portfolios of non-performing loans ("NPL") being sold at auctions by the Mexican government and/or by private institutions, and may be comprised of commercial and industrial loans, consumer loans (e.g. credit cards and consumer receivables), commercial and residential mortgage loans and other types of non-performing assets. These investments are in the local Mexican markets. NPL portfolios are particularly attractive today because NPL portfolio investments can offer superior performance that historically has been virtually non-correlated to fixed income or equity market performance. The GMNPLFs engage the services of a Mexico-based loan servicer, Pendulum Associates ("Pendulum"), pursuant to a performance based compensation system, in order to assist GMNPLFs in all due diligence, administration, collections, restructuring and reporting activities. Portfolio investments are expected to be self-liquidating over a relatively short period of time and within the four year life of these quasi-private equity funds.

Gramercy Global Optimization Fund (GGOF) is a new fund that builds upon the 8 year track record of Fondo de Inversion Global Optimization (GOF). GOF is a Chilean listed Global Equity Fund whose principal clients are the Pension Funds of Chile. On July 1, 2005 Gramercy became the sub-advisor to the Chilean Fund. As with the Chilean Fund, Gramercy Global Optimization Fund seeks to outperform the MSCI All-Country World Total Return Index by investing in undervalued closed-end funds and ETF's that are traded in the U.S. and U.K. The investment team uses a quantitative process whose central component is the Portfolio Optimizer. At frequent intervals in time the investment team makes an appropriate selection from the efficient set of portfolios, where risk is defined as portfolio tracking error versus the MSCI benchmark.

Our deep familiarity with the emerging markets and vigorous participation in shaping market events generates our competitive investment advantage. Our opportunistic investment strategy on both the long d short side, coupled with prudent risk management expertise, enables Gramercy to deliver consistently .sitive investment performance with muted downside deviation and low volatility. It is through proactive exploitation of these inherently inefficient markets that GEMF, our flagship fund, has achieved a 16% annual compound return since its 1999 inception.



npl trade takes off

# Nurturing an Asset Class

by Maria O'Brien

In Latin America's unsettlingly calm financial markets, a small but growing band of risk seeking investors is migrating to a new and untested class of assets: non-performing loans (NPLs). Buyers are lured by the promise of 20%-40% returns for an investment horizon of 18-24 months. But seasoned participants say it takes a lot more patience, sweat and endurance to get close to 25%. Plus, a reliable supply of assets is unlikely to materialize until the next regional financial crisis hits.

Since the last wave of corporate restructurings was worked out, traditional distressed debt investors have been on the hunt for new assets. Intermediaries like auditors and consultants, are trying to drum up interest among the region's banks to repackage and sell NPLs. "There is not a lot of supply in the distressed world right now, and because distressed debt has been successful in Latin America over the last three years, a lot of money is going into it," says David Martens, director of distressed assets for the Americas at ABN Amro.

Robert Rauch, head of research at hedge fund Gramercy Advisors, which has invested $260 million in NPLs in Mexico over the past three years, says his firm awaits opportunity in Latin America. "We are building up a reasonable cash cushion and we are waiting," explains Rauch. "It might be another year for the next systemic downturn."

Mohammed Grimeh, global head of emerging markets debt and equities at Lehman Brothers, which bought one of Latin America's largest NPL portfolios to date – a $500 million basket of corporate loans made by Brazil's Banco Real and sold by ABN Amro – says: "We are looking at other countries, such as Mexico

**A market for non-performing loans is growing fast in Latin America as investors hunt down yield. But the birth of a true asset class awaits a regional crisis.**



Consumer loan growth should boost NPL supply.

and Argentina" before adding that the opportunities are "limited."

According to IFC estimates, Latin America's ratio of NPLs to total loans averages around 6%, or roughly $20 billion. Brazil is the largest market with $6.5 billion, which represents 3.3% of the total banking assets. Mexico is second largest, with $4.7 billion or 2.1% of total assets, Chile third with $2.0 billion or 2.8%, and Argentina's $1.2 billion represents 5.4% of the total.

Investors expect growth as lending revives. Christian Stracke, head of emerging markets research at CreditSights, predicts Brazilian NPLs could rise to 4.5% of total credits from 3%, driven by fast growth in consumer lending. Others are looking forward to a systemic clean up of the Argentine banking system. "We would be very interested to take a look at the opportunities there," asserts Rauch.

### Drought Threatens Growth

Latin American NPL auctions are increasing in frequency, averaging one a month since July 2006. Joseph Boyle, a New York-based trader at Exotix, a broker of distressed emerging markets debt and alternative investments, says investors who would have traditionally bought distressed corporate debt are casting their sights on NPL assets as they seek yield up and down the price chain. "There is huge appetite for something that someone can apply credit skills to," Boyle says.

## npl trade takes off

NPLs are a natural substitute for distressed corporate debt, which has evaporated into a handful of names such as Mexican steel company AHMSA, and some Argentine firms. Banks like JPMorgan, Citibank, Lehman Brothers and Bank of America continue to trade this. However, there is not yet enough critical mass in the market. "Latin America is not like Asia where supply came out of government agencies. The supply is mostly coming out of private banks," explains Grimeh. Mexico is the exception. It cleaned up the financial system in a government-backed purchase of failed bank portfolios in the late 1990s. But it is a market that has developed to a point that investors no longer think returns are attractive, since increased competition has driven up prices at auction.

Sporadic supply from Brazil, the region's largest market, is enough to keep investors interested. Hernán Magariños, a vice president in PricewaterhouseCoopers corporate advisory and restructuring sees Lehman's purchase of the Banco Real portfolios as "an inflection point for the NPL market in Latin America" since it sparked interest from both buyers and sellers. PricewaterhouseCoopers is preparing five other NPLs portfolios for auction in Brazil this year.

Financial institutions and regulators are also waking up to the benefits of divesting NPLs. In December 2006, Banco Mercantil do Brasil sold a $200 million retail portfolio to Morgan Stanley for an undisclosed sum. Mercantil then prepared to auction off a portfolio of NPLs to small and medium enterprises in early 2007. Banks in Argentina are also preparing sales. The biggest sale of 2007 is expected to be from the Colombian government, which is said to be readying a $1 billion plus portfolio of NPLs from state-owned banks. And a Chilean bank is said to have auctioned a $1 billion portfolio in 2006. Costa Rica and the Dominican Republic are also heard readying auctions.

Foreign banks complying with Basel II regulations by repackaging NPLs in their home markets are doing the same for Latin subsidiaries. Next year is the deadline for financial institutions to comply with the capital accord. Andrés de la Cruz, an attorney with Cleary Gottlieb Steen & Hamilton, says compliance with Basel II in Germany helped accelerate the NPL market there, particularly since banks started to look beyond the primary market and saw a secondary for their portfolios. "Banks are seeing the sales of portfolios as another way of funding their operations. Now when they originate the loans, they turn around and slice and dice them and try to sell to the market," says de la Cruz, who is based in Frankfurt.

That is possible in a developed market like Germany because there is reliable supply, transparency, harmonized documentation and a larger base of investors. However, Latin America still has a long way to go to reach that level of sophistication.

### Veil of Secrecy

There is scant information on the NPLs being sold by Latin American banks, which have been privately unloading loan portfolios for years. Sellers fear negative publicity from portfolio sales to hedge funds, for example. These secretive sales are typically conducted on a bilateral basis, making it very difficult to quantify the size of the market.

Unlike the publicly traded debt of companies, the NPL portfolios are typically illiquid and command much lower prices. Grimeh declined to disclose the details of Lehman's purchase of the Banco Real corporate NPL portfolio, but the bank is rumored to have paid 11 cents on the dollar. Similarly, Argentine workout platform Southern Financial Partners is rumored to have paid 20 cents on the dollar for the $250 million portfolio of NPLs it bought from BankBoston in Argentina last year.

Growing interest in auctions has some investors worried. As the CEO of one workout company says: "I see a lot of interest in distressed assets from investment banks for amounts that just don't make sense for $3 million to $4 million portfolios." He adds, "These are not liquid assets. It isn't like there are secondary buyers. These investments require time and attention to achieve these [double digit] returns."

Those dabbling in the region typically team up with a local servicing company and pay a flat fee or a bonus scheme based on faster workout times. But seasoned NPL investors say this strategy is likely to fail. The head of one global distressed desk at a major bank that spent years building a recovery platform says investors need to retain control of the process. "The ability to recover is key," adds PricewaterhouseCoopers' Magariños. "You can have the best financial models, the best valuations and the best lawyers, but that matters less if you don't have a team in the field that knows how to collect."

Gramercy bought a servicing company in Mexico – Pendulum – to keep tabs on collection. "Working a portfolio is time intensive because a significant amount of the return is back ended," says Rauch. "It is hard to work beyond the low hanging fruit, the ones that take three to four years that you need to chase down through a legal process." Gramercy has around 60,000 loans to work through in the next three to four years in Mexico.

There are many barriers to NPL growth, not least market inefficiencies that squeeze margins. The cost of notaries, taxes payable on transactions and the time spent chasing documentation erodes returns. More importantly, though, as the regional good times continue the lack of a reliable pipeline of deals is much more likely to kill the market in its infancy. **LF**

### Starting from a Small Base
NPL markets by size in US$ billions

| Country | US$ billions | % of total financing |
|---|---|---|
| China | 840 | 22 |
| Germany | 300 | 4 |
| Japan | 125 | 1 |
| India | 31 | 5 |
| Thailand | 15 | 8 |
| Poland | 12 | 5 |
| Indonesia | 10 | 8 |
| Taiwan | 10 | 1 |
| Korea | 9 | 1 |
| Brazil | 7 | 3 |
| Philippines | 5 | 5 |
| Mexico | 5 | 2 |
| Chile | 2 | 3 |
| Argentina | 1 | 5 |

Source: IFC

# Courting Trouble

by Maria O'Brien

Brazilian airline Varig's June bankruptcy filing hardly surprised anyone, since it's been in trouble for years. But the decision by Varig's new managers to file for protection from its creditors was significant because it came just days after Brazil passed new bankruptcy laws.

Varig's $4.8 billion debt load makes this the largest Brazilian restructuring since the government spent $6.39 billion to bail out state-owned commercial bank Banco do Brasil in 1996. The Varig bankruptcy will pit Brazil's largest and oldest airline against the government – Varig's largest creditor – as well as other heavyweights, such as Varig's pension fund Aerus and foreign-owned leasing agents at General Electric, Boeing and AIG.

"Varig is going to be a big test for Brazil," says Leonardo Pereira, chief financial officer for Brazilian cable TV operator Net Serviços, which completed a $450 million out-of-court debt restructuring of its own last March. Pereira spoke at *LatinFinance*'s second Corporate Restructuring Round Table, held in New York in August.

### Little Progress

Brazil's new laws strengthen creditor rights somewhat, breaking a long Latin American tradition of favoring borrowers and shareholders over lenders. Laws approved in Argentina and Mexico over the last five years, critics say, do not go far enough in advancing creditor rights. And creditors still complain that Latin America's courts are as slow, bureaucratic and unpredictable as ever.

"I have no confidence in the legal systems [in Latin America]," says Ed Dartley, counsel to W.R. Huff Asset

**Brazil has made significant strides toward improving creditor rights in bankruptcy cases, but creditors gripe that it's still tough to get repaid.**



**Robert Rauch**



**Ed Dartley**

Management, which holds high yield bonds. This means that investors in Latin American debt need to choose their investments wisely. Corporates based in junk-rated Latin American countries usually offer attractive yields because the risk of nonpayment is considerable. "Since you don't have any real protections, you have to look at the company to see what type of management you've got, what type of shareholders you've got, what your expectations could be if you ever had to go through a restructuring with that particular company, and then adjust your expectations accordingly," Dartley says.

Varig's creditors will find out what they can expect soon enough. The new law gives Varig 60 days to present a bankruptcy court with a restructuring plan and a further 180 days to negotiate with creditors. If Varig and its creditors cannot reach an agreement, the next step would be liquidation.

Brazil's new bankruptcy law also provides for an out-of-court restructuring with final court approval at the end, based on the pre-packaged bankruptcy process under the US Bankruptcy Code. Creditors avoid costly, drawn-out court proceedings, while still giving companies court protection from creditors. Brazil's law also envisages debtor-in-possession (DIP) financing to ensure that lenders

## restructuring round table

don't cut off a company that's already in bankruptcy, allowing it to stay in business. DIP loans get paid first if the company goes from bankruptcy into liquidation. While Brazil now allows this type of financing, Mexican and Argentine bankruptcy laws do not.

Argentina's bankruptcy law, the 2002 *Ley de Concursos y Quiebras*, does provide for out-of-court restructuring, however. In Argentina they are called an *Acuerdo Preventivo Extrajudicial* (APE). The APE requires only 50% of unsecured creditors to approve a restructuring, steering committees are optional, and the debtor is not required to prove financial distress. Mexico's answer to Chapter 11, the *Ley de Concursos Mercantiles*, came into effect in 2000, but was not tested until Corporación Durango's 2004 restructuring of $1 billion in debt and accrued interest. Durango, a paper maker, completed its restructuring in Mexico in February, reducing its debt by $400 million and covering 100% of its previous obligations with new debt, equity or cash.

### Half-Baked

Critics still argue that most Latin American bankruptcy legislation is ill-conceived. Argentina, in particular, amended existing APE legislation in 2002 to allow companies to restructure unsecured debt with the consent of a majority of their unsecured creditors, without having to resort to *concurso preventivo* proceedings. The lower threshold speeds up the often lengthy negotiations and prevents rogue creditors from holding up the process. In Mexico and Brazil, the debtor needs 51% of creditors to agree a restructuring plan before they proceed with a pre-packaged restructuring.

Creditors complain that the lower thresholds required for out-of-court restructurings in Argentina make it too easy for debtors to drive a hard bargain. The new laws have also failed to improve disclosure. For example, Argentina's APE does not require debtors to disclose financial information to creditors. "Management still maintains 100% control over every single last thing. If you as a creditor get



**Louis Solomon**

a little disappointed in what's going on, you can't get information," says Robert L. Rauch, director of research at hedge fund Gramercy Advisors.

In a reorganization in the US, creditors can expect to receive at least as much compensation as they'd get if the company were liquidated. But that's not necessarily the case in Latin America, because in many cases the final agreement doesn't undergo an independent judicial review to verify whether liquidation would provide more compensation to creditors, Rauch says.

"We need to have some independent judicial function, some sense of fundamental fairness, and then you're going to be able to need to test what's going on by some litmus other than the company itself remaining in control," says Louis Solomon, partner at US law firm Proskauer Rose.

Many lenders – both in the US and in Latin America – argue that Latin American courts have a deep bias against creditors. "The civil law system has historically favored the underdog, the little guy, the laborer, the employee, the owner of the company," says Gordon Johnson, a former consultant on insolvency and creditor rights reforms at the World Bank.

The courts are so unpredictable that creditors try wherever possible to avoid using the court system to put a company into bankruptcy. "We try to negotiate rather than fight it out in a system where anything can happen," says Victor Marroquín, partner at Peruvian law firm Estudio Cárdenas Marroquín Merino.

### Negotiations Rule

Gramercy's Rauch says that roughly two thirds of the restructurings precipitated by the 2001-2002 economic downturn in Latin America have already been completed, largely through mutual, out-of-court restructuring. The remaining third will likely be resolved through difficult negotiations. Rauch says these will involve "a much greater reliance on litigation as a tool or even as an end-resolution than several years ago." He says, "We are now down to discussions with companies whose shareholders are far more greedy and less willing to do a deal that's reasonable. Two years ago there was really much more of a consensual attempt to reach a solution to a difficult situation."

Gramercy is engaged in court cases against two Latin American companies. Rauch has been a spokesman for creditors that sued Mexican cell phone company Iusacell, which has failed to reach a restructuring agreement since it was bought by Mexican businessman Ricardo Salinas Pliego in 2003. Gramercy was also part of the creditor group that filed a petition with a federal court in New York to force Mexican satellite company Satmex into involuntary bankruptcy in the US. The Mexican government is one of Satmex's primary shareholders and restructuring talks have dragged on for more than a year.

Some companies, such as Mexican auto parts company San Luis, Argentina's Banco de Galicia y Buenos Aires and Brazil's Net Serviços, had to be more flexible with creditors because they rely on external financing. "At the beginning of the crisis in Argentina, the 25 largest companies (with) international debt immediately entered into restructuring negotiations," says Johnson. "They began discussions because they knew that their livelihood

and their ability to continue to operate internationally depended on their willingness to be reasonable and fair with their creditors." Most companies settled quickly, with modest debt reductions. No major Argentine company won the same terms as the government got for its own sovereign debt, which was reduced by 75% per an agreement reached this year.

### Fighting It Out

When it does come down to suing a debtor company, US-based creditors often file their suits in US courts, typically in New York. Huff's Dartley says: "These countries and companies issued a lot of debt through the US markets that is governed by US law. The indentures were marketed in the US capital markets."

Huff took Argentine cable operators Multicanal and Cablevisión to court in the US in 2004. It sought to oppose an out-of-court APE settlement Multicanal had reached with certain holders in Argentina, and to win a better offer for US retail bondholders. Multicanal had offered institutional creditors to exchange about $500 million in existing unsecured notes for a combination of new unsecured notes, cash and up to 35% of Multicanal's equity. But it only offered US retail investors the cash payment option.

Although the New York court recognized Multicanal's APE, it also ruled that US retail bondholders who chose cash should be given the opportunity to choose other options offered under the original APE.

Huff also filed suit in the US against Brazilian media group Globopar in 2003, but the court dismissed this case because Globopar had no US assets. Still, Dartley insists that taking Globopar to court in the US was worthwhile. He says, "Globopar improved its deal several times." Globopar more than doubled its offer to bondholders in its $1.3 billion debt restructuring completed in July.

### Striking Back

Latin American companies have responded by filing under section 304 of Chapter 11 of the US Bankruptcy Code, which requires creditors to abide by the restructuring process taking place under the jurisdiction of a foreign country. In May 2004, Corporación Durango used this law to stop creditors from taking action in the US while it restructured $1 billion in unsecured debt and accrued interest in Mexico. In 2004, a US bankruptcy court granted Durango a permanent injunction that blocked creditors from challenging the Mexican proceedings or pressing for their own agreement in US courts, and Durango completed its restructuring in Mexico.

Creditors are dismayed that local courts can have the final say. Brazil and Argentina have specialist bankruptcy courts but few of the judges in Mexico are experienced in dealing with complex insolvency cases. Says Carlos Martínez, a partner at Proskauer Rose: "In the case of Durango, they went to Durango District Court. You cross your fingers and you hope that the guy knows what he's doing or at least he's smart enough to ask somebody else for their advice."

Brazil has probably made the most progress in tackling these structural deficiencies, through its specialized bankruptcy court in São Paulo. Says Johnson: "We are familiar with the judges in that court, both at the trial level and at the appellate level, and these are really top-notch judges. If you get the laws working [in conjunction with] well-trained judges, I think we can begin to expect to see positive developments in [Brazil's insolvency] system."

Varig's creditors must hope he's right. Varig filed with the US Bankruptcy Court in New York under Section 304 to prevent creditors seizing assets or filing suit against the airline in the US while it restructures in Brazil. LF

### Equity? No Thanks

When a public company restructures in the US, creditors will typically to trade debt for equity. The liquid US equity markets provides them with a fast exit or a way to recoup losses should the stock appreciate. But equity in Latin American companies still doesn't count for much. Stock markets are illiquid and volatile. Offering equity to bond holders usually means little, particularly since dominant shareholders – usually controlling families – remain in charge. This is particularly infuriating, since these are the people who drove the company into debt in the first place. The arrangement also entrenches a reverse moral hazard – owners can over-borrow with little risk of ever losing control of their companies.

In the case of Mexico's Corporación Durango, owners ceded 17% of the company's equity in its restructuring, but creditors say the equity isn't worth much. Robert L. Rauch, director of research at hedge fund Gramercy Advisors, says: "Most controlling families don't extract value out of corporate entities through the shares themselves." He says they typically benefit from controlling a company, by placing relatives in senior positions or through related-party transactions. "And, again, with only a couple of exceptions, I've never seen someone cede control in a restructuring. So equity in most cases is not really worth a whole lot," says Rauch.

Gordon Johnson, a former consultant on insolvency and creditor rights reforms at the World Bank says: "Most laws around the world don't give the benefit to the party that's writing [the debt] off. If you are a financial institution you may not [be able] to take that loss as a write-off against any of your future profits. So until the tax legislation in a lot of these countries is reformed, we are not going to see [debt-for-equity swaps] become any more popular than they have been."

www.debtwire.com

**Proprietary Intelligence**

 DEBT

| | |
|---|---|
| 01/18/05: | **Argentina debt swap offer rebuffed by Gramercy, will wait for change in government if necessary, managing director says** |
| Story: | Argentina's debt exchange offer, which was made public last week, has been strongly criticized by Gramercy Advisors, which has said it will wait for a change in government if necessary rather than agree to the current proposal, the managing director of the hedge fund said today. |
| | "We can wait as long as the Argentine people allow the politicians to wait," Robert Koenigsberger said. "If Mr. Kirchner is incapable of being reasonable and fair with the country's creditors because of the political decisions that he has made, then we can wait until a new government is elected or otherwise comes to power, to engage in a negotiation based upon Argentina's ability to pay," he added. |
| | In an official statement released last week, Gramercy rejected Argentina's first official offer since the South American country defaulted on its USD 102.6bn debt in December 2001, and encouraged other investors to follow suit. Gramercy explained its stance by stating that the offer is unilateral in nature, is not a result of good faith negotiations, is not consistent with Argentina's capacity to pay and is not consistent with market precedents. Gramercy also said that the offer fails to properly recognize and value past due interest claims. |
| | The Connecticut based company also pointed out that the offer is Argentina's first real offer to creditors, suggesting that it should be considered just the beginning of negotiations not the end, and adding that participating in the current exchange eliminates the possibility of higher recoveries. |
| | "I believe it is important for everyone to understand that Argentina's sovereign obligations do not disappear solely on the basis of unilateral repudiation," said Koenigsberger. "That is, history is full of examples of countries whereby certain regimes repudiated debt only to see that debt honored by future governments." |
| | Gramercy is on the steering committee of the US-based creditor group, Argentina Bondholders Committee "ABC" as well as the Global Committee of Argentina Bondholders, "GCAB." |
| **Source:** | Debtwire |
| **Intel. Grade:** | Confirmed |
| **Opportunity ID:** | 171481 |

For further information please contact: Debtwire, 3 East 28th Street, 4th Floor, New York NY 10016. Tel: +1-212-686-5418



January 14, 2005

Re:     Argentina Exchange Offer

We have been asked for a reaction to Argentina's Exchange Offer that was made public earlier this week: an offer that we believe will fail to resolve Argentina's sovereign default. Gramercy, for the reasons outlined below, intends to reject the current offer, an offer that is really only Argentina's first official offer made to the market since Argentina defaulted on their obligations in December, 2001. We encourage other investors to follow suit.

Simple points which compel Gramercy to reject Argentina's current exchange offer:

1. The offer is unilateral in nature. It is not a result of good faith negotiations.
2. The offer is not consistent with Argentina's capacity to pay.
3. The offer is not consistent with market precedents.
4. The offer fails to properly recognize and value past due interest claims.
5. The offer is Argentina's first real offer to creditors, hence it is just the beginning of negotiations not the end.
6. GCAB and its member organizations will remain in-place to represent creditor interests around the world.
7. Participating in the current exchange eliminates the possibility of higher recoveries.
8. The offer is not in accordance with Argentina's commitments under its IMF program.

Gramercy is on the steering committee of the US-based creditor group, Argentina Bondholders Committee "ABC" as well as the Global Committee of Argentina Bondholders, "GCAB." We will continue to work within these groups for deal enhancements sufficient enough to merit our participation in any such deal. We believe simple modifications of the transaction could be effected which would significantly alter the exit valuation of the deal. Absent of any such amendments, we will seek to recover the contractual amounts due to us through litigation and collection efforts. After having studied the exchange offer, Argentina's intended payment methods and well established precedents (Elliot vs. Republic of Peru, Pravin Banker vs. Republic of Peru and Elliot vs. Republic of Panama and others) we expect success in any such endeavor.

One of the positives of the current exchange offer is that Argentina has now officially established a floor value for the securities of approximately 30-35% of principal face value. We interpret Argentina's current offer as an opening of negotiations rather than the completion. As such, we will be working diligently over the coming days and weeks to release a counter-proposal.

Sincerely,

Robert Koenigsberger
Co-Managing Partner



## Product Overview  Print

**Investment Management**
Gramercy manages over $1 Billion in various funds and separately managed accounts, with a long and successful track record. Our specialized distressed securities investing can be accessed via several investment vehicles:

- Gramercy Emerging Market Fund LLC (3C1)
- Gramercy Emerging Market Fund 3C7
- Gramercy Emerging Market Fund, Ltd

- Gramercy Mexico NPL Fund

- Gramercy Mexico NPL Fund II

- Gramercy Global Optimization Fund

- Gramercy Separately Managed Accounts

**Brokerage Services**
We offer to self-directed investors the opportunity to receive professional execution of emerging markets and global fixed income trades, either in order to accumulate positions or capitalize on short term market inefficiencies.

- Gramercy Financial Services

**Investment Advisory**
ˑr research and restructuring specialists are available to advise investors who require assistance in ..avigating the complexities of emerging markets as they conduct industrial or financial business in emerging economies.

- Gramercy Financial Advisors

# FORM ADV
## Application for Investment Adviser Registration
**Uniform Part II**

| Applicant | SEC File Number | Date |
|---|---|---|
| Gramercy Investment Advisors LLC | 801 - 63425 | |

9. **Participation or Interest in Client Transactions.**

   Applicant or a related person: (check those that apply)

   ☐ A.   As principal, buys securities for itself from or sells securities it owns to any client.

   ☐ B.   As broker or agent effects securities transactions for compensation for any client.

   ☐ C.   As broker or agent for any person other than a client effects transactions in which client securities are sold to or bought from a brokerage customer.

   ☐ D.   Recommends to clients that they buy or sell securities or investment products in which the applicant or a related person has some financial interest.

   ☐ E.   Buys or sells for itself securities that it also recommends to clients.

   (For each box checked, describe on Schedule F when the applicant or a related person engages in these transactions and what restrictions, internal procedures, or disclosures are used for conflicts of interest in those transactions.)

10. **Conditions for Managing Accounts.** Does the applicant provide investment supervisory services, manage investment advisory accounts or hold itself out as providing financial planning or some similarly termed services *and* impose a minimum dollar value of assets or other conditions for starting or maintaining an account? .................................................  Yes ☒   No ☐

    (If yes, describe on Schedule F)

11. **Review of Accounts.** If applicant provides investment supervisory services, manages investment advisory accounts, or holds itself out as providing financial planning or some similarly termed services:

    A. Describe below the reviews and reviewers of the accounts. **For reviews**, include their frequency, different levels, and triggering factors. **For reviewers**, include the number of reviewers, their titles and functions, instructions they receive from applicant on performing reviews, and number of accounts assigned each.

    The senior management team of Gramercy Investment Advisors ("GIA") includes the four principals listed below (page 9, Item 6). These principals and senior officers are responsible for managing the Funds. These professionals review and monitor Gramercy Mexico NPL Fund, LLC, Gramercy Mexico NPL Fund II, LLC and Gramercy Global Optimization Fund ("GGOF") (collectively, the "Funds") on a daily or less frequent basis (depending on the type of non-performing loan ("NPL") portfolios involved).

    The senior management of Pendulum Associates consists of two people and Pendulum has an internal staff that currently numbers over seventy individuals. Pendulum is involved in the day-to-day collections of the NPLs through activities such as the establishment of call centers, the performance of structured and systematic mailings and the institution of foreclosures and other legal actions. Pendulum will provide GIA with written monthly reports and details on a transaction-by-transaction basis. Resolutions of any asset with an unpaid principle balance of over Ps. 1 million will require GIA's approval in the weekly credit committee meeting.

    The GGOF portfolio management team has worked together for the entire 8 year track record of GOF. Renowned Nobel Laureate, Harry Markowitz, is the consultant to GOF and GGOF. Dr. Markowitz actively participates in the weekly meetings with the Portfolio Manager, Tony Tessitore.

    B. Describe below the nature and frequency of regular reports to clients on their accounts:

    Members of the Funds will receive annual audited financial statements of the Funds, tax information regarding the Funds necessary for the completion of each Member's tax returns, and reports no less than quarterly providing summary financial information on the Funds. In addition, GIA distributes a monthly letter to clients reporting on the account's net return for the month and current capital balance. There is also a monthly client conference call and web-based fund analytics available for clients to review.

Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).

Gramercy

Page 1 of 1

# Gramercy

- Home
- About Us
- Management
- About the Fund
- Performance Results
- Client Statements
- **Contact Us**
  - Contacts
  - Directions
  - Request for Information
- Terms and Conditions



## Contacts

🖨 Printer Friendly Version

| | | |
|---|---|---|
| **Sales and Marketing** <br> Richard Giacomo | rgiacomo@gramercy.com | (203) 552-1960 |
| **Business Management** <br> Scott Seaman | sseaman@gramercy.com | (203) 552-1903 |
| **Operations** <br> Rob Lanava | rlanava@gramercy.com | (203) 552-1902 |
| **Fund Administration** <br> Diane Balsamo | dbalsamo@gramercy.com | (203) 552-1919 |
| **Accounting** <br> John DelVirginia | jdv@gramercy.com | (203) 552-1907 |
| **Legal** <br> David Metzman | dmetzman@gramercy.com | (203) 552-1909 |
| **Trading** <br> Jay Johnston <br> Robert Koenigsberger | jjohnston@gramercy.com <br> rk@gramercy.com | (203) 552-1900 <br> (203) 552-1900 |
| **Research** <br> Robert Rauch | rrauch@gramercy.com | (203) 552-1905 |
| **Technology** <br> Michael Harris | mharris@gramercy.com | (203) 552-1917 |

**General Information**
20 Dayton Avenue
Greenwich, CT 06830
Tel: 203.552.1900
Fax: 203.552.1901

Terms and Conditions | Request for Information | Contact Us | Privacy Policy | Business Continuity Plan
Copyright © 2001 - 2007 Gramercy. All rights reserved.





## Directions to 20 Dayton Avenue   Print

### Train Directions
Walk up Greenwich Avenue (one way street), past the Post Office and cross the street. On your left you will see the Board of Education (BoE). Take the diagonal path that heads towards the parking lot on the right side of the BoE. Follow this path past the BoE and walk down steps that lead to a path overlooking a running track and baseball diamond. Follow the path to steps up, which take you behind Greenwich Town Hall. Dayton Avenue is located directly across the street from Town Hall. We are the first driveway on the left.

### Train Schedule

### Driving Directions:
**From Manhattan:**
Take Deegan Expressway (I-87) Northbound to Cross Westchester Expressway (I-287) Eastbound * (See "From Westchester")
**From New Jersey and Upstate New York:**
Take Tappan Zee Bridge to Cross Westchester Expressway (I-287) Eastbound * (See "From Westchester")
**From Westchester Airport:**
Take I-684 Southbound to Cross Westchester Expressway (I-287) Eastbound * (See "From Westchester")
**\* From Westchester:**
Take Cross Westchester Expressway (I-287) Eastbound to I-95 Northbound ** (See "From I-95")
**From JFK:**
Take I-678 Northbound to I-95 Northbound ** (See From I-95)
**From LGA:**
Follow exit signs to "Long Island/Parkway East/Whitestone Bridge" (Grand Central Parkway).
Follow signs to I-678 Northbound and Whitestone Bridge. Take I-678 Northbound to I-95 Northbound **
(See From I-95)
**From I-95:**
Take I-95 Northbound to Exit 3. Keep left as you exit. Make a left onto Arch Street. *** (See From Arch St)
**From Northern Connecticut:**
Take I-95 Southbound to Exit 3. Keep right as you exit. Make a right onto Arch Street. *** (See From Arch St)
**\*\*\* From Arch St:**
Proceed straight under the I-95 and the railroad tracks overpass. At the fork, bear left onto Sound View Drive. Go up the hill and bear right onto Field Point Road. Take the second left onto Dayton Avenue (Town Hall will be on your right). We are the first driveway on the left.

Gramercy                                                                                      Page 2 of 2

