# E X H I B I T   8

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
            Petitioner,          )
                                )
    v.                          )    Civil Action NO. 02 C 4822
                                )
BDO SEIDMAN, LLP, regarding     )    Hon. James F. Holdeman
promoter examination of BDO Seidman, )
LLP,                            )
                                )
            Respondent.          )
                                )

**FILED**
SEP 1 3 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**DOCKETED**
SEP 1 4 2004

## NOTICE OF FILING

The United States gives notice that it is filing the attached corrected and superceding

SECOND SUPPLEMENTAL DECLARATION OF SANDRA ALVELO, Docket No. 136.

Paragraph 99 has been corrected to more accurately describe the transaction as a short sale

transaction and to correct a transposition with respect to the amounts of the fees paid. Paragraph

253 is being corrected because the filed declaration inadvertently omitted two lines from the

quoted warranty language. The filed exhibits remain unchanged and are not being replaced.

PATRICK J. FITZGERALD
United States Attorney

CRAIG OSWALD
Assistant U.S. Attorney

JOHN LINDQUIST
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6561

140

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,                )
                                         )
          Petitioner,                    )
                                         )
     v.                                  )
                                         )    Civil Action NO. 02 C 4822
BDO SEIDMAN, LLP, regarding              )
promoter examination of BDO Seidman,     )    Hon. James F. Holdeman
LLP,                                     )
                                         )
          Respondent.                    )
                                         )

**FILED** *SEP 1 3 2004* CLERK, MICHAEL W. DOBBINS, U.S. DISTRICT COURT

## SECOND SUPPLEMENTAL DECLARATION OF SANDRA ALVELO

**DOCKETED**
**SEP 1 4 2004**

Sandra Alvelo, pursuant to 28 U.S.C., Sec. 1746, declares:

1.  I have previously filed a declaration in this case setting forth my position as a Revenue

    Agent employed by the Internal Revenue Service, assigned to a promoter investigation of

    BDO Seidman, LLP ("BDO");

2.  I make this declaration based upon my review of the documents produced by BDO in

    response to the promoter summonses issued to BDO;

3.  I have also reviewed certain documents produced by the law firms of Jenkens & Gilchrist

    ("J&G") and Sidley Austin Brown & Wood ("SAB&W"), which are referenced herein;

4.  As detailed herein, the facts show that BDO was in the business of developing and

    marketing pre-packaged tax shelters and that it marketed these pre-packaged tax shelters to

    intervenors;

5.  All intervenors' privilege claims appear to relate to these pre-packaged tax shelter products,

    which are also detailed herein by investor and/or investor group;

**Business Structure for Marketing Pre-Packaged Tax Shelters**

6.  A BDO memorandum dated November 19, 1997 reflects that for the year ending June 30,

    1998, BDO established a BONUS PLAN FOR THE SALE OF DESIGNATED TAX

    PRODUCTS [See BDO memo dated November 19, 1997, Govt. Ex. A-1 (formerly marked

    Govt. Ex. 41)];

Ho

7.    The stated objective of BDO's bonus program was:

**Objective**
To encourage the sale of "value-added" tax products to our existing
audit, tax and BTS client base and, perhaps even more importantly,
to target outside that base. The sale of such products will lead to
significant profits for BDO Seidman, LLP. The bonus plan is
designed to encourage *all* members of BDO Seidman to actively
seek such opportunities and to reward those members for their
efforts, when successful.
\* \* \*

**Eligible Tax Products**
The sale of tax products designated on the product list previously
circulated by Denis Field are the only products presently eligible for a
bonus under this plan.
\* \* \*

**Allocation of the Bonus Pool**
90% of the bonus pool will be allocated among the team responsible for
generating the initial target introduction, selling the product and
implementing the product;
10% of the bonus pool will be allocated to the team that developed
the tax product.

[See BDO memo dated November 19, 1997, Govt. Ex. A-1 (formerly Govt. Ex.

41)];

8.    A BDO memorandum dated May 20, 1999, entitled "BEST PRACTICES AND

PROCEDURES IN TAX SOLUTIONS: ESTABLISHING VALUE" provides:

Best sales practices:
In the Tax Solutions area, best sales practices allows the client to evaluate:
    Reward;
    Risk;
    Convenience; and
    Price.

In a Tax Solutions sale, there is always competition. It may be
competition from another service provider or it may simply be
competition from the alternative of not using a Tax Solution. Best
sales practices allow the client to compare us to that competition in
the areas of:

        Substantive correctness;
        Economic potential;
        Risk management techniques; and
        Reporting techniques.

Ultimately, a complete and well-crafted presentation allow the
prospect to feel comfortable with our methods; to understand why
they are better than competitors'; and to realize that we are being
honest about what is involved.

-2-

[See BDO memo dated May 20, 1999, Govt. Ex. A-2 (formerly Govt. Ex. 42)];

9.    Notes produced by BDO, entitled "Best Selling/Marketing Practices," described BDO's

use of a "marketing opinion" to market tax shelters and describe BDO's marketing role

with the concise equation:

•   BDO = Promoter

[See BDO notes, p.1, Govt. Ex. A-3];

10.    Under the sub-heading "Best follow-up practices," the BDO Best Practices memo

provides:

In the Tax Solutions area, best follow-up practices include:

Assisting client with the tax opinion process;

Participation in the reporting process;

File review to ensure that needed documents, and
only needed documents, are in file; and

Ensuring that any needed follow-up transactions take place.

[See BDO memo dated May 20, 1999, Govt. Ex. A-2];

11.    BDO created a powerpoint presentation which describes its Tax Leader Group, its Tax

Sales Executive Group, and lists Tax Products [See BDO Power Point Presentation,

Govt. Ex. A-4];

12.    The role of BDO's "Tax Leader Group" was to organize and develop Tax Products [See

BDO Power Point Presentation, Govt. Ex. A-4];

13.    The responsibilities of BDO's "Tax Leader Group" included "Quality Control" [See

BDO Power Point Presentation, Govt. Ex. A-4];

14.    The "Tax Leader Group" included Charles Bee, Adrian Dicker, Denis Field, Alan

Griffith, and Michael Kerekes [See BDO Power Point Presentation, Govt. Ex. A-4];

15.    The "National Sales Executive Group" included 20 partners and Morry Gottlieb (for

Florida) [See BDO Power Point Presentation, Govt. Ex. A-4];

16.    The BDO Power Point Presentation instructed:

• Your Role
-     Identify candidate for Tax Products
-     Keep your Eyes open
-     Identify potential Alternative distribution Channel
-     Participate in significant Bonus

[See Power Point Presentation, Govt. Ex. A-4];

17.     The listed "Tax Products" included a "Capital Gain Eliminator" and an "Ordinary Income Eliminator" [See BDO Power Point Presentation, Govt. Ex. A-4];

18.     It appears that in September 1999, BDO marketed a tax product called the Basis Enhanced Security Transaction (BEST) by providing potential investors a summary of the transaction, prepared by Jenkens & Gilchrist, and requiring potential investors to sign a Jenkens & Gilchrist Confidentiality Agreement [See BDO facsimile dated September 28, 1999, Govt. Ex. A-5];

19.     By memorandum dated October 13, 1999, BDO announced that its "Tax Sales Executive Group," had been renamed and reorganized as its "Tax Solutions Group"

with the aim of making it more focussed. [sic] Its responsibilities will be to continue to assist members of BDO Seidman LLP who find potential transactions to prefilter those transactions, structure the transactions, and close and implement the transactions. The Tax Solutions Group is also responsible for quality control.

[See BDO Memorandum dated October 13, 1999, Govt. Ex. A-6 (formerly Govt. Ex. 23)];

20.     Handwritten notes produced from BDO entitled "Tax Advantaged Strategies," dated November 6, 1999, reflect that BDO used "Consulting Agreements" in "direct engagements" and that where BDO was "paid by a third-party" there was "No Direct Relationship" [See BDO notes dated November 6, 1999, Govt. Ex. A-7];

21.     During 1999 BDO also assisted Sentinel Advisors, Inc., with its development of a new tax product employing options transactions called the "Option Spread Strategy" [Bergmann Dep., pp.14-40, Govt. Ex. C-3 (formerly as Govt. Ex. 76)];

22.     According to Ari Bergmann, the president of Sentinel Advisors, Inc., BDO was its accountant and in early 1999 assisted Sentinel in the development of a tax product

- 4 -

employing option transactions [Bergmann, pp.14-15, 18, 30-31, 33, Govt. Ex. C-3
(formerly as Govt. Ex. 76)];

23. By letter dated July 20, 1999, BDO wrote Bergmann advising Sentinel and New Vista on
whether its option product had to be registered [See BDO Opinion letter dated July 20,
1999, Govt. Ex. C-4 (formerly as Govt. Ex. 86)];

24. BDO also provided Sentinel with a model opinion to assist it in marketing the "Option
Spread Strategy," in which it was referenced as an "Investment in Foreign Currency"
[See Dep. of Ari Bergmann, pp. 18, 30-31, 33, Govt. Ex. C-3; BDO marketing opinion,
Govt. Ex. C-6 (also marked as Dep. Ex. MM-11)];

25. This BDO marketing opinion disclaimed on its face:

> **THIS OPINION CONSIDERS CERTAIN FEDERAL
> INCOME TAX CONSEQUENCES OF A PROPOSED
> INVESTMENT TRANSACTION AND IS BASED ON A
> HYPOTHETICAL FACT PATTERN. THE OPINION IS
> INTENDED ONLY TO FACILITATE A DISCUSSION OF
> THE ISSUES, AND SHOULD NOT BE RELIED UPON BY
> ANYONE.**

[See BDO opinion, Govt. Ex. C-6];

26. Sentinel prepared a Power Point Presentation on the "Option Spread Strategy" to
Investors which contained an Executive Summary that stated:

> Sentinel's strategic relationships with investment and commercial
> banks, law firms and accounting firms enable an efficient
> execution of the financial structures that we design.
>
> . . . the call option spread transaction proposed by Sentinel
> Advisors presents compelling investment opportunity. Sentinel
> Advisors has performed extensive analysis of the call option spread
> opportunity and would like to outline the various elements of the
> transaction.

[See Sentinel Power Point Presentation, Govt. Ex. C-5];

27. According to Ari Bergman of Sentinel "the majority of [investors] enter the consulting
agreement with . . . New Vista, one of our entities" [Bergmann, p.36, l.7-9, Govt. Ex. C-
3];

28.   New Vista charged purchasers of its "Option Spread Strategy" a "flat fee" [Bergmann, p.37, l.8-15, Govt. Ex. C-3];

29.   Bergmann does not recall any written agreements between BDO and Sentinel regarding what each party's role would be [See Dep. of Ari Bergman, p.35, ln.21-23 , Govt. Ex. C-3];

30.   Sentinel and BDO had an understanding that Sentinel would, in turn, pay BDO an "R&D" commission of "between 15 and 40 percent" of the sale [Bergmann, p.38, ln.9-10; p.40, ln.16-20, Govt. Ex. C-3];

31.   Bergmann characterizes the fee New Vista paid to BDO as "R&D" [See Dep. of Ari Bergman, pp. 38, 40-42, Govt. Ex. C-3];

32.   BDO in turn invoiced New Vista, LLC, for "services rendered concerning product development" and its out of pocket expenses [See sample BDO invoices to New Vista, LLC, Govt. Ex. C-12 (redacted)];

33.   By memorandum dated November 16, 1999, BDO provided all its partners and managers with a list of its Tax Products and the pricing structure based upon a percentage of the tax savings, stating "[t]hese highly profitable solutions can be implemented with minimal (if any) assistance from other offices thereby keeping more profit ...." [See BDO memo dated November 16, 1999, Govt. Ex. A-8 (formerly Govt. Ex. 24)];

34.   By memorandum dated November 20, 1999, BDO notified all its Professional Personnel:

> As you may know, we have established the Tax Solutions business as a separate business line and it has been designated as Office 782.
> * * *
> [T]he firm's policy is that only members of the Tax Solutions Group may charge time to the engagements created in Office 782 unless there has been specific authorization .... Time spent by members of the firm in finding transactions should be treated as general marketing time of the individual's office, unless it is felt that such time can be recovered by the office as a fee separate from any Tax Solutions fee.
> * * *
> There may be occasions, *although we expect them to be rare,*

> where members of the firm who are outside of the Tax Solutions
> Group may need to be come involved in some detailed aspect of a
> Tax Solutions engagement.

[BDO memorandum dated November 20, 1999, Govt. Ex. A-9 (formerly Govt.

Ex. 25)];

35.   BDO reported to its partners "One word sums up the strategy of the Tax Business Line.

MONEY!," explaining:

> The name of the game is profitability. And we can be much more
> profitable. We have to move our focus away from compliance.
> The truth is compliance provides low profit margins, high risk and
> fixed costs. We need to reduce costs and increase efficiency -- we
> can't devote limited resources to serving unprofitable accounts.
>
> So we'll continue to use Compliance as a great source for cross-
> selling our value-added services.

[See BDO Business Line Strategy, pp.3-5, Govt. Ex. A-10 (formerly Govt. Ex. 26)];

36.   A BDO memo confirms that BDO marketed its Tax Products directly to its own clients

and to others, and also used distribution channels through third-parties:

> We will address two aspects of profitability, the **pricing of our tax
> products** and the **distribution** of our tax products. Proper and aggressive
> pricing of our sophisticated tax products will allow our entrepreneurial
> skills to be rewarded, and allow us to maximize our profits.
>
> Using **distribution** channels in addition to our own client base will allow us to
> further increase profits by repeat sales of the ideas which we generate.
> ***
> **Value is the key. Where possible, we should charge by reference to
> value, not based on hourly fees. Our competitors are pricing their tax
> consulting work in this manner and so can we and will we.**
>
> Who are our competitors in the tax consultancy market and how are they
> pricing? They are not only other accounting firms. They are also
> attorneys and increasingly banks. To give you an example of a banks'
> approach to pricing consider the following based on an idea we have
> previously sold. The bank calls a potential target. They ask if the target is
> doing business in Tennessee - the answer yes. Does the target pay taxes in
> Tennessee - the answer yes. Would they like to not pay taxes to Tennessee
> - the answer not surprisingly is yes. The bank then says we have a method
> of doing this which we estimate will make/save 400 say $300,000 a year
> on an ongoing basis. Our fee for this is half the first year savings and you
> keep the rest. This is a typical transaction. There is no discussion by a
> bank as to what its cost might be because there is no such thing as cost to
> the bank for such an idea. The entire fee is geared to value. This is the

- 7 -

essence of good pricing. We can and will price on this basis.

Let us turn now to distribution.

The question is how to take our tax planning ideas to the external market on a higher volume basis. One sale is good, two is better but how are we going to make a hundred sales? How can we maximize the distribution of our ideas to targets given the resources we have. We need outside assistance. To help with this we are using telemarketing which is proving to be successful.

\* \* \*

Another approach is to use an intermediary which already has established a large distribution network.

We have been talking to several intermediaries but let me tell you about one in particular - Deutsche Bank. Deutsche Bank is a very large bank with the capital resources to effectively sell tax driven structured finance products; just the sort of products we are developing. They would take those ideas, go to the target and have a discussion starting with say 50% as the savings up front as the fee. Deutsche Bank is very good at negotiating fees. With their background and experience in this market they have a much better chance of obtaining agreement for this level of fee up front. As soon as the basis of the engagement is established they then introduce us as advisors. The target is told that they don't have to pay us anything. We are advising Deutsche Bank. When the deal closes, we then bill Deutsche Bank on a preagreed value billing basis.

The advantage of using a financial intermediary such as Deutsche Bank in this way is that it deals with both the pricing and the distribution issue at the same time. They like the idea very much because it allows them to leverage their business off our ideas, just as it allows us to leverage our ideas off their distribution and pricing expertise.
**TAX SELLS!.**

[BDO Memorandum, p.1-3, Govt. Ex. A-11 (formerly Govt. Ex. 36)] (emphasis in

original);

37. BDO labeled potential investors as "targets" [See BDO memo dated November 19,

1997, Govt. Ex. A-1; BDO memo, Govt. A-11, p.3];

38. J&G produced a list of 43 "clients" who invested in Bricolage, Gramercy, or J&G "type

transactions" in 2000, all of whom were also claimed by BDO in this action to have been

BDO "clients" [See list, Govt. Ex. B-16 (redacted)];

39. J&G produced a list of 16 "clients" who participate in Gramercy/Bricolage type

transactions, which listed the amounts of the capital and/or ordinary loss to be generated,

the amount of the loss utilized, and the amount of the fee to Gramercy and/or Bricolage

[See Gramercy/Bricolage Fees, Govt. Ex. B-17 (redacted)];

40.    In June 2000, BDO began developing a new strategy with "ICA/Bicolage/RJ Rubel [sic]

Brown & Wood (Opinion writers)," which, as detailed herein, was a distressed debt

product [See BDO notes dated 6/15/200, Govt. Ex. A-12 (formerly Govt. Ex. 78)];

41.    By e-mail dated August 11, 2000, RJ Ruble of the law firm of Brown & Wood, notified

Thomas Smith of Brown & Wood:

> It looks like the IRS will issue a notice on Friday [August 11,
> 2000], similar to the prior BOSS Notice, stating that transactions
> such as the binary option transaction and the loan premium
> transactions that were the core of these firms' tax products for the
> last 2 years don't work and are abusive.

[See e-mail dated August 11, 2000, Govt. Ex. A-13 ,(formerly Govt. Ex. 81)];

42.    On August 13, 2000, the IRS issued Notice 2000-44 [See IRS Notice 2000-44, Govt. Ex.

A-14 (formerly Govt. Ex. 8-A)];

43.    By e-mail dated August 22, 2000, Thomas Smith, of the law firm of Brown & Wood,

notified Brown & Wood's Management Committee:

> It talked to R.J. Ruble about what was happening in the Tax
> Products world given recent events. R.J. is busy developing and
> creating new products and attempting to revise existing products in
> light of the recent IRS notices. He states that in no way has his
> practice disappeared and he is upbeat on the prospects for new or
> revised tax products.

[See e-mail dated August 22, 2000, Govt. Ex. A-15 (formerly Govt. Ex. 81)];

44.    On November 5, 2000, BDO outlined the future direction of its Tax Solution Practice as

follows:

    I.    Future Direction of Tax Solution Practice (Bee, Field, Greisman, Lichner and
       Packard)

       •    Large portfolio of tax-advantaged transactions that can produce value-
        added fees to the Firm (Examples Distressed debt on high end, 21st
        Securities conversions on low end, and installment sale basis shift, Non-
        Qualified Option transaction, Section 1058 transaction, etc. etc. in
        between).

- use of "special teams" to close and implement (i.e. Blinka/Gibson for non qualified transaction).
- Role of TSG moving to identifying and qualifying opportunities then bringing in "special team" to close and implement.
- Need to continually identify and develop new transactions...TSG to develop and expand contacts and sources for new ideas.
- Insurance-based transactions will be important and we all need to expand our knowledge of insurance.
       * * *

III.    Quality Assurance Critical (Cohen, Greisman and Packard)

- QA will be key in development and execution of transactions.
- Tax Opinion Committee must approve all new transactions: Committee will get help from inside and outside experts, as needed based on subject matter.

IV.    Update on Distressed Debt Transaction and Binary Transaction (Bee)

[See TSG Agenda 11/5/00, Govt. Ex. A-16];

45.    The binary option transaction is the same as or substantially similar to one of the abusive tax shelter transactions identified in IRS Notice 2000-44;

46.    The distressed debt transaction is a hybrid of the abusive tax shelter transactions identified in IRS Notices 2000-44, 2002-50, and 2002-65;

47.    As detailed herein, BDO, Brown & Wood and Gramercy co-developed, promoted and marketed a binary option tax shelter;

48.    By e-mail dated November 16, 2000, Jay Johnston of Gramercy Advisors, notified Charlie Bee of BDO and Ruble of B&W that Gramercy had translated data in Brazilian Real for use in their distressed debt product [See e-mail dated November 16, 2000, Govt. Ex. A-17];

49.    By e-mail dated December 1, 2000, Lawrence Cohen of BDO forwarded Ruble of B&W a file marked "binary opinion" [E-mail dated December 1, 2000, Govt. Ex. A-18];

50.    By e-mail dated December 22, 2000, Ruble of B&W forwarded Johnston of Gramercy and Larry Cohen and Michael Kerekes of BDO "a first cut at the basic opinion for the

- 10 -

Fund deals," attached as a file marked "BDO Model Distressed Debt Fund," "to take a look at" and "give me your thoughts" [See e-mail dated December 22, 2000, Govt. Ex. A-19];

51. By e-mail dated December 27, 2000, Johnston of Gramercy responded "[p]lease see the changes that I made and let me know what your thoughts are," to which he attached a file marked "BDO Model Distressed Debt Fund Opinion Draft.doc" [See e-mail dated December 27, 2000, Govt. Ex. A-20];

52. By e-mail dated January 2, 2000, Lawrence Cohen of BDO responded "I've marked some comments on the draft basis opinion" to which he attached a file marked "BDO Distressed Debt Fund Draft Preliminary Basis Opinion.doc" [See e-mail dated January 2, 2000, Govt. Ex. A-21];

53. By e-mail dated January 2, 2000, Ruble of B&W responded to Cohen with "Thanks" [See e-mail dated January 2, 2000, Govt. Ex. A-22];

54. J&G has produced a draft of its opinion on Investment in Distressed Debt Fund dated December 31, 2000 [See Draft Distressed Debt opinion dated December 31, 2000, Govt. Ex. A-23];

55. By e-mail dated January 3, 2001, David Kelley, of ICA, notified Ruble, of B&W:

> The time to consider the drafting of the POPs opinions is upon us. I believe I need three (maybe four). I will get you names, sizes, factual information required by your draft opinion, and anything else that you request. Please let me know. What do you think your timetable might be?

[See e-mail dated January 3, 2001, Govt. Ex. A-24];

56. The POPS transaction is the same as or substantially similar to the abusive tax shelter transaction identified in IRS Notice 2002-50;

57. By e-mail dated January 3, 2001, Ruble of B&W responded to Kelley of ICA:

> I'l [sic] also need the back up documents. I would say, barring unforseen events, 7 to 10 business day after I get everything. Thanks.

- 11 -

[See e-mail dated January 3, 2001, Govt. Ex. A-25];

58.    By e-mail dated January 4, 2001, Ruble of B&W forwarded, at the request of Johnston of

Gramercy, a copy of the model distressed debt fund opinion to an outside attorney,

Siegal, who had a client doing a distressed debt transaction:

> At hte [sic] request of Jay Johnston I am forwarding to you the
> form of tax opinion that we propose to issue. The attached has
> been reviewed by BDO Seidman and by Jay.

[See e-mail dated January 4, 2001, Govt. Ex. A-26];

59.    By e-mail dated February 9, 2001, Siegal approved the model distressed debt fund

opinion:

> "Looks fine, please finalize."

[See e-mail dated February 9, 2001, Govt. Ex. A-27];

60.    By e-mail dated January 12, 2001, David Kelley of ICA Bricolage, wrote to Ruble of

B&W with respect to a KPMG tax product known as the Common Trust Fund Option:

> We are trying toget [sic] this transaction to market with KPMG by
> the end of the month. How long will it take you to whip up a draft
> opinion once we give you the factual template?

[See e-mail dated January 12, 2001, Govt. Ex. A-28];

61.    By e-mail dated January 23, 2001, Jay Johnston of Gramercy Advisors wrote to Ruble of

B&W, "[h]ow are we doing on tax opinions? On the binaries, what information do you

need from me to get things done. Let me know how I can help." [See e-mail dated

January 23, 2001, Govt. Ex. A-29];

62.    By e-mail dated January 23, 2001, Ruble of B&W wrote to Samyak Veera of ICA:

> I'm happy to help. To get out engagement letters I need to know
> the name and address of the taxpayer. I will then need the facts for
> each opinion. What I have done with other clients is to prpare [sic]
> a draft with balks [sic] that you could fill in. I will try to get you
> the POPS by the end of this week. As to the COINS, I will send
> you a model based on a similar deal for another cliet. [sic] If you
> could then review the facts and let me know howe [sic] they differ
> from your deal, I will create a new model for you and you can fill
> in the relevant blanks.

[See e-mail dated January 23, 2001, Govt. Ex. A-30];

63.     By e-mail dated January 26, 2001, Ruble of B&W wrote to Johnston of Gramercy:

> I have a long standing relationship with partners in the
> Personal Financial Planning group at KPMG. One of their San
> Francisco partners and an old friend, Randy Bickham, inquired
> whether I would be able to put him in contact with someone who
> could manage a 704(c) type of fund and find the distressed debt.
> He had heard about the structure in the market and has a limited
> number of clients, perhaps 3 or 4 (but at least 1 in the 100 million
> range), who would probably be willing to get into some kind of tax
> enhanced investment fund, but would be less comfortable about a
> pure loss type of transaction.
>
> **I did not mention you, because I'm sensitive to your
> relationship with BDO.** On the other hand others do similar
> deals, so I don't believe that the technology is proprietary. Would
> you have an interest in speaking with Randy on the basis that the
> conversation would be held in confidence by all concerned?

[See e-mail dated January 26, 2001, Govt. Ex. A-31 (emphasis supplied)]

64.     On January 25, 2001, BDO's Tax Opinion Committee determined that Larry [Shanbrom]

was to "oversee progress on hedge fund and binary transaction opinions and that Michael

[Kerekes] was to be 'point person' on the spread opinion" [See TOC Summary dated

January 25, 2001, ¶2, Govt. Ex. A-32];

65.     On January 25, 2001, BDO's Tax Opinion Committee determined that "as a matter of

procedure, we want to be sure all clients are aware of Notice 2000-44 and list

requirements, including distressed debt clients." [See TOC Summary dated January 25, 2001, ¶2, Govt. Ex. A-32];

66.    On January 25, 2001, BDO's Tax Opinion Committee determined that BDO would "meet with [David] Kelley [of ICA] and others to help develop their new transaction" and "to renegotiate the fee split." [See TOC Summary dated January 25, 2001, ¶4, Govt. Ex. A-32];

67.    On January 25, 2001, BDO's Tax Opinion Committee determined that:

> The policy of use of Consulting Agreements on ALL transactions will be reiterated with financial penalties to apply for non-compliance.
>
> We will move toward an operating approach of bifurcated teams, with a selling and closing team, and an implementation team, and use of more "experts" with the TSG to deal with certain transactions. Thus, intent [sic] to have penalties, more review and bifurcated teams to assure better risk management.

[See TOC Summary dated January 25, 2001, ¶11, Govt. Ex. A-32];

68.    By e-mail dated January 29, 2001, Jay Johnston of Gramercy wrote to Ruble of B&W, stating:

> Let me know if there are things you need from Gramercy to assist in the completion of the opinions. Also, are you still okay writing a 2000-44 opinion for .... They should be virtually identical.

[See e-mail dated January 29, 2001, Govt. Ex. A-33 (redacted)];

69.    On February 8, 2001, Greisman of BDO wrote a memo to the BDO Tax Opinion Committee stating:

> As you know, several of the law firms include "should" level opinions on avoidance of the 20% penalty due to reasonable reliance on a tax opinion. Jenkens & Gilchrist does not include such as [sic] opinion. They will, however, upon request provide the client a memorandum that describes the penalty rules. A copy of that memorandum is enclosed. Please review this and comment on contents. Also, provide your views as to the need for such a memo to be provided to the client. I'd prefer that they do as the other firms, and include an opinion, but they won't. I believe we

- 14 -

should have them send this memo to all of our clients for whom
they are providing opinions.

[See BDO memo dated February 8, 2001, Govt. Ex. A-34];

70.    By e-mail dated February 28, 2001, Kelley of ICA asked Ruble of B&W for an update on

the POPS opinions  [See e-mail dated February 28, 2001, Govt. Ex. A-35];

71.    By e-mail dated March 12, 2001, Ruble of B&W wrote Kelley of ICA regarding the

proposed opinion for the POPS transaction, with a copy to Samyak Veera of Bricolage:

> I've attached the opinion that we propose to issue. It is very much
> like the Memo that you saw last fall. Although you have kindly
> sent all the backup documents to our office, I want to make sure
> that  this is in form and substance satisfactory to you before we
> start issuing the opinions to your clients.

[See e-mail dated March 12, 2001, Govt. Ex. A-36];

72.    By e-mail dated March 16, 2001, Ruble of B&W forwarded Cohen of BDO a file marked

"BDO Distressed Debt Fund Basis...." [See e-mail dated April 16, 2001, Govt. Ex. A-37];

73.    By e-mail dated April 12, 2001, Ruble of B&W forwarded the "BDO Distressed Debt

Fund Basis ..." document to Johnston of Gramercy and Cohen of BDO  [See e-mail dated

April 12, 2001, Govt. Ex. A-38];

74.    By e-mail dated April 12, 2001, Ruble of B&W wrote Cohen of BDO, stating:

> [w]ere working on [the Binary options] now.  I can't get the rep
> letter set up without the attachment and I can't do that until we
> incorporate Jay's info into the text.  That will happen tonight on all
> but ....  Jay sent info on those, but in mime, which is totally
> incompatible with our sstem[sic].  We won't be able to get those
> converted until tomorrow am.

[See e-mail dated April 12, 2001, Govt. Ex. A-39 (redacted)];

75.    By e-mail dated April 20, Kelley of ICA forwarded Ruble of B&W a memorandum, with

a "powerpoint showing the stripped down base case," for a "new product," stating:

> Samyak [Veera] and I are working on the trading strategy as well
> as business purpose arguments for each step. This product, if we
> can get an opinion, will be marketed as a replacement for COINS,
> for which there is a large demand. Tell me what you think.

[See e-mail dated April 20, 2001, Govt. Ex. A-40];

- 15 -

76.  The Currency Option INvestment Srategy ("COINS") is the same as or substantially

     similar to one of the abusive tax shelter transactions identified in Notice 2000-44;

77.  On April 30, 2004, Judge Scheindlin issued a ruling in the class action, *Denny v. Jenkens*

     *& Gilchrist, et al. [including BDO]*, 2004 WL 936843 (S.D.N.Y. April 30, 2004), finding

     that BDO's consulting agreements were "mutually fraudulent" insofar as they failed to

     describe the true nature of the services to be rendered [See *Denny v. Jenkens & Gilchrist*,

     *et al. [including BDO]*, 2004 WL 936843 (S.D.N.Y. April 30, 2004), *appeal pending*,

     Govt. Ex. A-41];

78.  On June 16, 2004, Judge Scheindlin granted a motion to stay pending appeal and

     amplified her prior finding of mutual fraud by BDO and plaintiffs, detailing:

> In the course of considering the parties' arguments, I asked
> counsel for BDO and counsel for plaintiffs whether BDO provided
> consulting services to plaintiffs for anything other than COBRA.
> *See* 3/14/04 Transcript ("Tr.") at 6. Counsel for both BDO and
> plaintiffs acknowledged that the only work BDO did on plaintiffs'
> behalf was in connection with COBRA. Moreover, counsel
> informed the Court that although the Blumin and DeStefano
> Agreements obligated BDO to assist Jefyle Equipment and
> Diamond Roofing, respectively, with their expansions, BDO
> provided no such services. Similarly, though the Denney
> Agreement stated that BDO would assist Denney, Weeks, and
> Kiristis with the transfers of their businesses, the transfers had
> already occurred at the time the Denney Agreement was executed,
> and BDO provided no work in connection with those transfers. *See
> id.* at 6, 10.
>
> Based on these facts, I concluded that the agreements between
> BDO and plaintiffs were mutually fraudulent because they were
> intended to conceal the nature of the work that BDO was
> performing, and described work that was never performed and that
> the parties never intended be performed. *See Denney I*, 2004 WL
> 936843, at *6. Because the contracts are mutually fraudulent, the
> arbitration clauses contained therein cannot be enforced.

     [See *Denny v. Jenkens & Gilchrist, et al. [including BDO]*, 2004 WL 1367179 (S.D.N.Y.

     June 16, 2004), *appeal pending*, Govt. Ex. A-42];

79.  The Denny Class is defined to include all Persons who, from January 1, 1999, through

     December 31, 2003, inclusive, either (1) consulted with, relied upon, or received oral or

written opinions or advice from Jenkens & Gilchrist or any Jenkens & Gilchrist attorney concerning any one or more of the Tax Strategies and who in whole or in part implemented, directly or indirectly, any one or more of the Tax Strategies or (2) filed with a Person described in (1) a joint tax return for the year(s) in which such Tax Strategy was implemented, and (3) the legal representatives, heirs, successors, and assigns of all Persons described in (1) and (2). The "Class" includes, without limitation, the individuals, partnerships, limited liability companies, trusts, corporations and other legal entities that Jenkens & Gilchrist or any Jenkens & Gilchrist attorney advised concerning, that were formed in connection with, or that engaged or were utilized in any one or more of the Tax Strategies.   The term "Tax Strategies" is defined as those tax-reducing strategies that are the basis of the Denney, Camferdam and Riggs suits, as well as all other tax-reducing strategies advised upon, opined about, designed or recommended by any of the J & G Defendants involving (a) basis-enhancing investment transactions, (b) basis-enhancing derivatives structures, (c) basis leveraged investment swap spreads, (d) hedge option monetization of economic remainders, (e) basis adjustment remainder trusts, (f) gain option partnerships, or (g) other basis-enhancing, basis-preserving, and / or gain-avoidance transactions utilizing options and / or indebtedness and involving corporations and / or partnerships. [See *Denney v. Jenkens & Gilchrist*, 2004 WL 1197251, fns.4 & 7 (S.D.N.Y. May 19, 2004) (NO. 03-CV-5460 (SAS)),  Govt. Ex. A-43];

**Hawkins - 1999 Transaction**

80.    Dwayne Hawkins signed a confidentiality agreement with Jenkens & Gilchrist dated May 6, 1999 with respect to certain financing structures [See J&G Confidentiality Agreement, Govt. Ex. B-1];

81.    Hawkins signed the J&G confidentiality agreement dated May 6, 1999, along with Steve

Grove and Jim Myers, the author and recipient, respectively, of an e-mail dated May 24, 1999, to which Hawkins has asserted privilege [See J&G Confidentiality Agreement, Govt. Ex. B-1];

82. By facsimile dated May 26, 1999, Walter Koziol, a BDO partner, forwarded a copy of the executed J&G confidentiality agreement to J&G, with a cover sheet on which he noted that Grove was Hawkins' accountant [See facsimile dated May 26, 1999, Govt. Ex. B-2];

83. The J&G confidentiality agreement states:

> Undersigned [the tax shelter participant] and J&G are acting solely as independent contracting parties, and neither party shall be deemed to be the agent or fiduciary of the other. Further, this Agreement shall not create a partnership or joint undertaking among the parties. Undersigned will be solely responsible for the evaluation of the financial, tax, and accounting consequences of the Structures and J&G shall not be deemed to have made any representations with respect thereto unless separately contracted for.

[See J&G Confidentiality Agreement, ¶6, Govt. Exs. B-1];

84. On or about July 22, 1999, Dwayne Hawkins signed a BDO Consulting Agreement on behalf of Mid-Atlantic Finance Company, Inc., under which BDO agreed to provide certain defined services to Mid-Atlantic in exchange for a fee of $420,000 [See Mid-Atlantic Consulting Agreement dated July 22, 1999, Govt. Ex. B-3 (formerly Govt. Ex. 83)];

85. The BDO Consulting Agreement with Mid-Atlantic dated July 22, 1999 defines the services to be provided by BDO to Mid-Atlantic to be in connection with an expansion of Mid-Atlantic's business operations into new strategic markets ("Expansion") and to include:

> assistance in financing business, real estate ventures and financing corporation activities, assistance with like kind exchanges, assistance with international tax issues, assistance in planning the Expansion, consideration of related impact on Dwayne Hawkins, Crown Auto Dealership, Inc. and related entities and assisting the

- 18 -

Company and/or its advisors in determining tax treatments of the
transactions associated with Expansion.

[See Mid-Atlantic Consulting Agreement dated July 22, 1999, Govt. Ex. B-3];

86.    The BDO Consulting Agreement with Mid-Atlantic dated July 22, 1999 contains a "No

Warranty" paragraph in which BDO disclaims:

**No Warranty.  BDO makes no warranties, express or implied, under this
Agreement.  BDO expressly disclaims any implied warranty of
merchantability or fitness for a particular purpose or use.**
\* \* \*
BDO's Services hereunder do not include, and BDO assumes no
responsibility whatsoever for, any legal and/or tax opinions
regarding any strategies that may be implemented, and has advised
the Company to retain a law firm for legal and/or tax opinions on
any strategies or transactions they enter into.

[See Mid-Atlantic Consulting Agreement dated July 22, 1999, ¶5, Govt. Ex. B-3];

87.    By facsimile dated August 9, 1999, Walter Koziol of BDO forwarded to J&G "the

information on the Mid-Atlantic transaction" [See facsimile dated August 9, 1999, Govt.

Ex. B-4];

88.    Under a cover note dated August 19, 1999, Donna Guerin of J&G forwarded Dwayne

Hawkins "brokerage accounts and forms for the entities that we have formed for your

transaction with BDO Seidman, Walt Koziol" [See note dated August 9, 1999, Govt. Ex.

B-5];

89.    By facsimile dated August 25, 1999, Deutsche Bank provided J&G with the new account

numbers for Dwayne Hawkins for the following entities:  DH Petersburg Investments

LLC; 34th Street Partners; and Mid-Atlantic Finance Company, Inc. [See facsimile dated

August 25, 1999, Govt. Ex. B-6];

90.    By letter dated August 25, 1999, J&G wrote to Deutsche Bank's general counsel with

respect to DH Petersburg Investments LLC, 34th Street Partners, and Mid-Atlantic

Finance Company, Inc., representing:

This letter will serve to confirm your understanding that we have
consulted with the above-captioned investors on the investment
strategies to be employed and believe that the above-captioned

- 19 -

investors understand the financial and tax ramifications of such investment strategies. To the extent Jenkens & Gilchrist were to render a tax opinion relating to the investment strategies to be employed by the above-captioned investors, such opinion would be favorable as it relates to meeting the requirements for substantial authority under IRC Sec. 6662. If Jenkens & Gilchrist should be engaged to render such a tax opinion, such opinion will be available for your review in accordance with procedures acceptable to counsel for such investors in order to assure the availability and protection of the attorney-client privilege with respect to such information.

[Letter dated August 25, 1999, Govt. Ex. B-7];

91.    By facsimile dated September 1, 1999, J&G forwarded Dwayne Hawkins instructions to

fund a margin account at Deutsche Banc Alex Brown [See facsimile dated September 1,

1999, Govt. Ex. B-8];

92.    Jim Myers is listed by Alex Brown as having trade authorization for DH Petersburg

Investments, LLC [See facsimile dated December 9, 1999, p.3/5, Govt. Ex. B-9

(redacted)];

93.    By letter dated December 16, 1999, J&G forwarded certain documents to Hawkins to be

signed, noting that the dates and amounts are to be filled in later [See letter dated

December 16, 1999, Govt. Ex. B-10];

94.    By facsimile dated April 12, 2000, J&G forwarded Hawkins an invoice in the amount of

$480,000 for its services "at the request of Walt Koziol of BDO Seidman" [See facsimile

dated April 12, 2000, Govt. Ex. B-11];

95.    J&G signed off on the "tax opinion" for Mid Atlantic Finance on 3/8/00, 4/3/00 and

4/6/00 [Tax Opinion Sign-Off Form, Govt. Ex. B-12];

96.    J&G prepared a Transaction Document Index for Hawkins' 1999 Transaction [See

Transaction Document Index, Govt. Ex. B-13 (formerly Govt. Ex. 86)];

97.    By letter dated April 14, 2000, J&G forwarded a legal opinion to Hawkins dated January

31, 2000, noting that the partnership return for 34th Street Partners was due by April 17,

2000 and that a duplicate was being sent "to your tax and financial advisor" Walt Koziol,

of BDO [See letter dated April 14, 2000, with copy of J&G opinion, Govt. Ex. B-14];

98.    The J&G opinion on the Hawkins 1999 transaction is described as a $15 million short
       sale [See J&G opinion dated April 12, 2000, p.2, Govt. Ex. B-14];

99.    It appears that Hawkins paid an aggregate fee of $900,000 for the $15 million short sale
       transaction, including $420,000 to BDO and $480,000 to J&G [See BDO Consulting
       Agreement, Govt. Ex. B-3; J&G invoice, Govt. Ex. B-11];

100.   The aggregate fee of $900,000 is exactly 6% of $15 million;

101.   The BDO Consulting Agreement with Mid-Atlantic dated July 22, 1999 does not disclose
       the true nature of the services  provided by BDO;

102.   By letter dated December 5, 2001, the IRS notified Jack Kirkland, Hawkin's accountant,
       that it was opening an examination of the 1999 Form 1120S of Mid-Atlantic Finance
       Company, Inc., and set an initial meeting for January 22, 2002   [See Govt. Ex. B-25];

103.   Hawkins executed an individual representation agreement with BDO dated January 22,
       2002 to represent Mid-Atlantic Finance Company, Inc. in examination of its 1999 Form
       1120S [See Govt. Ex. B-26];

104.   Hawkins appears to be a member of the Denny Class with respect to this transaction;

**Hawkins' 2000 Transaction**

105.   On or about July 18, 2000, Dwayne Hawkins signed another BDO Consulting Agreement
       on behalf of Mid-Atlantic Finance Company, Inc., under which BDO agreed to provide
       certain defined services to Mid-Atlantic in connection with certain investment
       "Transactions" that Hawkins wished to make in exchange for a fee of $930,000 [See
       Mid-Atlantic Consulting Agreement dated July 18, 2000, Govt. Ex. B-15 (formerly Govt.
       Ex. 84)];

106.   The BDO Consulting Agreement with Hawkins dated July 18, 2000 does not define or
       describe the investment Transactions with respect to which BDO was to provide services;

107.   The BDO Consulting Agreement with Mid-Atlantic dated July 18, 2000 defines the term

- 21 -

"services" to include:

> consulting services in conjunction with the sale of equity interest(s)
> in certain entities, including assistance in determining the overall
> effects of potential sales price(s) and allocations thereof, assisting
> the Client and/or his advisors in structuring the transaction(s) to
> attain the most beneficial tax results, and assisting the Client
> and/or his representatives in its discussions and/or negotiations
> with potential purchasers or sellers, on as specifically requested
> basis.  Additionally, BDO agrees to provide assistance to the Client
> and/or his representatives with certain income and estate planning
> as well as assisting with certain income tax, estate tax, personal
> financial planning and other financial aspects of various anticipated
> investment activities.

[See Mid-Atlantic Consulting Agreement dated July 18, 2000, Govt. Ex. B-15];

108.    The BDO Consulting Agreement with Mid-Atlantic dated July 18, 2000 contains a "No

Warranty" paragraph in which BDO disclaims:

> No Warranty.  **BDO makes no warranties, express or implied,
> under this Agreement.  BDO expressly disclaims any implied
> warranty of merchantability or fitness for a particular purpose
> or use.**
> * * *
> BDO's Services hereunder do not include, and BDO assumes no
> responsibility whatsoever for, any legal and/or tax opinions
> regarding any strategies that may be implemented, and has advised
> the Company to retain a law firm for legal and/or tax opinions on
> any strategies or transactions they enter into.

[See Mid-Atlantic Consulting Agreement dated July 18, 2000, ¶5, Govt. Ex. B-15];

109.    Hawkins is listed by J&G as having invested in a "Gramercy" type transaction in the

amount of "12 OI" -- namely, to eliminate $12 million of ordinary income [See list, Govt.

Ex. B-16 (redacted)];

110.    Hawkins is listed by J&G as having utilized the entire loss generated and having paid a

fee to Gramercy in the amount of $120,000 [See Gramercy/Bricolage Fees, Govt. Ex. B-

17 (redacted)];

111.    BDO produced a "control sheet," which it used to monitor implementation of its

engagement letter, dated July 18, 2000 [See Control Sheet, Govt. Ex. B-19 (formerly

- 22 -

Govt. Ex. 85)];

112. On October 17, 2000, Hawkins executed, on behalf of DH Petersburg Investments, LLC, a subscription agreement with the Gramercy Global Recovery Fund, LLC [See Gramercy Subscription, Govt. Ex. B-20];

113. On March 22, 2001, J&G invoiced Dwayne Hawkins $60,000.00 [See J&G invoice dated March 22, 2001, Govt. Ex. B-21];

114. J&G signed off on a "tax opinion" to Hawkins on the 2000 Transaction on 3/8/01, 3/21/01, and 4/2/01 [Tax Opinion Sign-Off Form, Govt. Ex. B-22];

115. By letter dated April 30, 2001, J&G forwarded an opinion to Dwayne Hawkins dated January 12, 2001 "with respect to the investment that you had made last year in Gramercy Advisors, L.L.C.," with a copy to Paul Shanbrom of BDO [See letter dated April 30, 2001, with copy of J&G opinion, Govt. Ex. B-23];

116. J&G produced a copy of its January 12, 2001 opinion on the Hawkins 2000 Transaction to the Government after Hawkins failed to intervene in *United States v. Jenkens & Gilchrist*, Case No. 03 C 5693 (NDIL), pursuant to an order dated May 14, 2004 [J&G Opinion dated January 12, 2001, Gov. Ex. B-24];

117. The J&G opinion dated April 30, 2001, on the Hawkins 2000 Transaction states:

> In fact, on August 11, 2000, the IRS issued Notice 2000-44, which describes two transactions with respect to which the IRS concluded that tax losses generated were "artificial" and not allowable to the taxpayer. One of the described transactions bears similarities to the Transactions described in our enclosed opinion. While Notice 2000-44 sets forth the IRS position on these transactions, the Notice does not change the existing law which we rely upon herein.

[See J&G Opinion dated January 12, 2001, p.8, Govt. Ex. B-24];

118. By letter dated August 21, 2000, Dwayne Hawkins signed a letter to Lehman Brothers representing on behalf of DH Petersburg Investments LLC, that "it has consulted with its own financial, tax and legal advisors, with respect to the Transactions and IRS notice

2000-44" [See letter dated August 21, 2000, Govt. Ex. B-18];

119.    The BDO Consulting Agreement with Mid-Atlantic dated July 18, 2000, reflects a fee of $930,000, the invoice from J&G dated March 12, 2000, reflects a fee of $60,000 due to J&G, and Gramercy was to be paid $120,000 on the Transaction, for an aggregate obligation of $1,110,000;

120.    The aggregate fee of $1,110,000 is 9.25000% of $12 million, the amount of the ordinary income tax shelter loss generated by the transaction purchased by Dwayne Hawkins from Gramercy, J&G, and BDO;

121.    The BDO Consulting Agreement with Mid-Atlantic dated July 18, 2000 does not disclose the true nature of the services provided by BDO;

122.    Hawkins appears to be a member of the Denny Class with respect to this transaction;

**The Ervin brothers' 1999 Sentinel Transaction**

123.    In March, 1999, David DiMuzio, a BDO partner, attempted, unsuccessfully, to sell the Ervin brothers, Robert, Timothy and Gary, a J&G tax shelter transaction by asking them to sign a J&G confidentiality agreement [See J&G Confidentiality Agreement, Govt. Ex. C-2];

124.    As an alternative, DiMuzio arranged for the Ervins to meet with a representative from Sentinel Advisors, Inc., with whom BDO had developed another product, and by letter dated August 23, 1999, DiMuzio forwarded Martin McElroy, the Ervins' accountant, a model opinion recommending the product [See Letter dated August 23, 1999, Govt. Ex. C-7 (formerly Govt. Ex. 77); BDO marketing opinion, Govt. Ex. C-6];

125.    By letter dated September 8, 1999, DiMuzio confirmed with the Ervins that "Sentinel Advisors agreed to a 5% fee, assuming a transaction of at least $40 million" [See Letter dated September 8, 1999, Govt. Ex. C-8 (formerly Govt. Ex. 78)];

126.    On September 24, 1999, the Ervin brothers contracted with New Vista, LLC to purchase an option transaction developed by Sentinel [See Ervin Consulting Agreements with New

Vista, Govt. Exs. C-9 through C-11 (formerly Govt. Exs. 73, 74 and 75)];

127.    The New Vista consulting agreements reflect that the three Ervin brothers each contracted

to pay New Vista a $750,000 fee, for an aggregate fee of $2.25 million [See Ervin

Consulting Agreements with New Vista, Govt. Exs. C-8 through C-10];

128.    It appears that BDO in turn invoiced New Vista, LLC, for "services rendered concerning

product development" and its out of pocket expenses [See sample BDO invoices to New

Vista, LLC, Govt. Ex. C-12(redacted)];

129.    The Ervin brothers participated in the Sentinel option transaction through Jade Trading,

LLC, as equal partners;

130.    The Ervin brothers have brought a United States Court of Federal Claims action for

judicial review of final partnership administrative adjustments, *Jade Trading, LLC, et al.*

*v. United States*, Fed. Cl. No. 03-2164T, contesting the Commissioner's disallowance of

the Sentinel option transaction;

131.    By letter dated August 1, 2004, counsel for the Ervins agreed to produce to the United

States copies of all legal opinions obtained by the Ervin brothers with respect to their

Sentinel option transaction and produced the following four opinions by the law firm of

Curtis, Mallett, Prevost, Colt & Mosley:

        i.    11 page letter dated July 7, 2000, concerning investments in foreign
              currency and transactions;
        ii.   124 page opinion dated July 7, 2000, concerning investments in foreign
              currency and transactions;
        iii.  14 page letter dated July 7, 2000, concerning the applicability of the
              accuracy related penalty provisions; and
        iv.  23 page memorandum dated October 11, 2000, discussing Notice 2000-44

[See letter dated August 12, 2004, and opinions, Govt. Exs.  Govt. Ex. C-13
through C-16];

**Lowry & Moffitt 2000 Binary Option Transactions**

132.   It appears that R.K. Lowry, Jr. and John P. Moffitt were part of a six person investment
       group from Union Gas to purchase a binary option tax shelter [See e-mail dated May 8,
       2001, Govt. Ex. D-13];

133.   Lowry signed a BDO consulting agreement dated November 15, 2000, under which BDO
       agreed to provide Lowry certain defined services in connection with certain investment
       "Transactions" that he wished to make in exchange for a fee of $2,584,000 [See BDO
       Consulting Agreement with Lowry, Govt. Exs. D-1 (formerly Govt. Ex. 89)];

134.   Moffitt signed a nearly identical BDO consulting agreement dated November 15, 2000,
       under which BDO agreed to provide certain defined services in connection with certain
       investment "Transactions" that he too wished to make, in exchange for a fee of
       $2,508,000 [See BDO Consulting Agreement with Moffitt, Govt. Exs. D-2 (formerly
       Govt. Ex. 90)];

135.   Both the Lowry and the Moffitt consulting agreements with BDO contain nearly identical
       fee payment schedules;

136.   BDO treated the Lowry and Moffitt transactions as one transaction for purposes of
       computing bonuses from the sale and implementation of the transactions [See BDO
       Calculations, Proforma - Lowry, Moffitt #119344, Govt. Ex. D-3 (formerly Govt. Ex.
       91)];

137.   The BDO Consulting Agreements with Lowry and Moffitt do not define or describe the
       investment "Transactions" with respect to which BDO was to provide them services [See
       BDO Consulting Agreement with Moffitt, Govt. Exs. D-1 and D-2];

138.   BDO's November 15, 2000 BDO Consulting Agreements with Lowry and Moffitt each
       define the term "services" identically as including:

       consulting services in conjunction with the sale of equity interest(s)
       in certain entities, including assistance in determining the overall
       effects of potential sales price(s) and allocations thereof, assisting

the Client and/or his advisors in structuring the transaction(s) to
attain the most beneficial tax results, and assisting the Client
and/or his representatives in its discussions and/or negotiations
with potential purchasers or sellers, on as specifically requested
basis. Additionally, BDO agrees to provide assistance to the Client
and/or his representatives with certain income and estate planning
as well assisting with certain income tax, estate tax, personal
financial planning and other financial aspects of various anticipated
investment activities.

[See BDO Consulting Agreements with Lowry, Moffitt, Govt. Exs. D-1, D-2];

139. Descriptions of services in the BDO Consulting Agreements with Lowry and Moffitt are

also identical to the description of services in the BDO Consulting Agreement with Mid-

Atlantic dated July 18, 2000 [See BDO Consulting Agreements with Lowry, Moffitt, and

Mid-Atlantic, Govt. Exs. D-1, D-2, and B-15];

140. The BDO Consulting Agreement with Lowry and Moffitt contain an "Indemnification"

paragraph, in lieu of the "No warranty" paragraph, in which BDO disclaims:

Indemnification. The Client, at its own expense, shall release and
indemnify, defend and hold BDO and its affiliates, along with their
respective partners, employees, agents, designees, insurers and
assignees, harmless from and against, all losses, claim, damages,
liabilities, costs and expenses (including reasonable legal or other
out-of-pocket expense) incurred, caused by or arising out of the
Services, the Transactions, or any transaction related thereto....

[See BDO Consulting Agreements with Lowry, Moffitt, and Mid-Atlantic, ¶5, Govt. Exs.

D-1, D-2, and B-15];

141. Based upon subsequent communications, detailed below, it appears that the BDO

consulting agreements with Lowry and Moffitt were used to purchase the binary option

transaction that BDO and Brown & Wood co-developed with Gramercy;

142. By e-mail dated April 13, 2001, Ruble wrote to Lawrence Cohen of BDO, with a copy to

Jay Johnston of Gramercy Advisors, under the subject line "Binaries that I have," stating:

I am attaching the 6 binaries that I have and have incorporate [sic]
information from Jay [Johnston]. Please review the facts on the
first 5 pages. Please add any additional fact, such as additional
cash, options, contributions to partnerships that you are aware of. I
will then do everything in my power to turn them, but I cannot

> make any promises as to time at this point. Because the rep letter
> relies on an accurate statement of facts, as set forth in the
> attachment, I can't even get the rep letters to you and Paul, which I
> sincerely want to do until I get the full facts (if there are any more
> from you, Jay, Paul or some [sic] anybody else).

[See e-mail dated April 13, 2001, Govt. Ex. D-4 (redacted)];

143.    The referenced attachments to the e-mail dated April 13, 2001, include the files "BDO

Binary (Lowry-L-Falling C..." and "BDO Binary Moffit-J-Jason)," which appear to be

draft opinions for Lowry and Moffitt [See e-mail dated April 13, 2001, Govt. Ex. D-4];

144.    As detailed herein, BDO co-developed this binary option "Tax Solution" with B&W and

ICA-Bricolage;

145.    By e-mail dated April 17, 2001, Ruble of B&W wrote Kerekes of BDO:

> what's the "first opinion"?

[See e-mail dated April 17, 2001, Govt. Ex. D-5];

146.    By e-mail dated April 17, 2001, Kerekes of BDO responded:

> Whichever of the four you prepare first.

[See e-mail dated April 17, 2001, Govt. Ex. D-6];

147.    By e-mail dated April 20, 2001, Ruble forwarded his secretary, Sodano, an e-mail from

Lawrence Cohen in which Cohen states "[t]he [Binary Model] opinion looks fine, with

two minor points" and proposed edits to pages 21 and 31 of the opinion [See e-mail

dated April 20, 2001, Govt. Ex. D-7 (redacted)];

148.    By e-mail dated April 25, 2001, Michael Kerekes wrote to R.J.Ruble stating, inter alia:

> I am glad to hear about the binary opinions going out . . . .

[See e-mail dated April 25, 2001, Govt. Ex. D-8 (redacted)];

149.    On April 26, 2001, B&W invoiced Lowry and Moffitt $34,000 and $16,666, respectively

[See B&W invoices, Govt. Ex. D-9];

150.    By letter dated April 27, 2001, B&W forwarded Lowry and Moffitt a proposed

engagement letter under which Lowry and Moffitt would consent that any dispute that

might arise regarding the opinion would be subject to mandatory arbitration [See B&W

- 28 -

letters dated April 27, 2001, Govt. Ex. D-10];

151. It appears that B&W had an agreement with BDO that it would charge an aggregate fee of $100,000 for the opinions to Lowry and Moffitt, and four other related investors [See B&W e-mail dated April 30, 2001, Govt. Ex. D-11];

152. By e-mail dated May 1, 2001, Moorman of BDO notified Sodano of B&W of problems with Lowry and Moffitt because of apparent cookie-cutter errors in the "rep letter" attachments to the investor group [See e-mail dated May 1, 2001, Govt. Ex. D-12];

153. By letter dated May 8, 2001, B&W sent BDO corrected invoices and engagement letters for the six members of the Union Gas investment group, including Lowry and Moffitt [See e-mail dated May 8, 2001, and Moffitt attachments, Govt. Ex. D-13];

154. By e-mail dated May 18, 2001, Sodano of B&W notified Larry Cohen of BDO that B&W had now received all the payments due from the Union Gas investment group, including Lowry and Moffitt, and that he could release the opinions [See e-mail dated May 18, 2001, Govt. Ex. D-14 (redacted)];

155. By e-mail dated May 18, 2001, Sodano of B&W notified Moorman of BDO that she had the payments and executed engagements, "but no rep letters" [See e-mail dated May 18, 2001, Govt. Ex. D-15];

156. Lowry, Moffitt, and BDO appear to have intentionally failed to disclose the true nature of their contract in the consulting agreements dated November 15, 2000;

**Lowry & Moffitt 2001 Transactions**

157. By letters dated December 31, 2001, B&W confirmed that it had been retained by Lowry and Moffitt to render an opinion with respect to a "distressed debt investment" [See B&W letters dated December 31, 2001, Govt. Exs. D-16 and D17];

158. By e-mail dated May 3, 2002, Sodano of B&W asked Cohen of BDO what the fees to B&W would be for the B&W's "Distressed Debt/Option Trade Opinions," which had been "discussed" with Ruble [See e-mail dated May 3, 2002, Govt. Ex. D-18 (redacted)];

159. By return e-mail dated May 3, 2002, Cohen of BDO notified Sodano of B&W of the amount of B&W's fees, including Lowry and Moffitt, which were to be $53,000 and $51,500, respectively [See e-mail dated May 3, 2002, Govt. Ex. D-18 (redacted)];

160. By e-mail dated May 8, 2002, Cohen of BDO wrote to Ruble of B&W "clarifying" which investors were to receive engagement letters [See e-mail dated May 8, 2002, Govt. Ex. D-19];

161. BDO does not appear to have marketed these transactions directly to Lowry and Moffitt, insofar as BDO has not produced copies of any consulting agreements with Lowry or Moffitt for the year 2001;

**Ray Lane Transaction -POPS transaction**

162. By e-mail dated March 14, 2001, Samyak Veera, of Bricolage, sent Ruble of B&W a revised facts section of the proposed Lane opinion, marked "Lane Opinion Facts.doc," and for comparison purposes the full original draft of the POPS opinion [See E-mail dated March 14, 2001, Govt. Ex. E-1];

163. By e-mail dated March 15, 2001, Ruble forwarded these changes to his secretary, Susan Sodano [See E-mail dated March 15, 2001, Govt. Ex. E-2];

164. On March 23, 2001, the law firm of Brown & Wood forwarded a draft of the Lane opinion to Michael Kerekes of BDO "for further review" [See e-mail dated March 16, 2001, Govt. Ex. E-3];

165. Sodano separately copied Samyak Veera of Bricolage with her e-mail to Kerekes and the draft of the Lane opinion [See e-mail dated March 23, 2001, Govt. Ex. E-4];

166. By e-mail dated April 3, 2001, Ruble wrote to David Kelly:

> I should also have Lane out, but don't know when Kerekes
> comments are going to stop.

[See e-mail dated April 6, 2001, Govt. Ex. E-5];

167. By e-mail dated April 6, 2001, Lawrence Cohen of BDO wrote to Ruble of B&W, stating: "Michael [Kerekes] will provide the final BDO sign off, but I wanted to send you a few

- 30 -

comments on the opinion." [See e-mail dated April 6, 2001, Govt. Ex. E-6];

168.    By return e-mail dated April 9, 2001, Ruble of B&W confirmed to Cohen of BDO that he

had incorporated Cohen's comments on his opinion [See e-mail dated April 9, 2001,

Govt. Ex. E-7];

169.    By e-mail dated April 10, 2001, Ruble wrote to Michael Kerekes:

> Based upon conversations with Bricolage earlier in the year our
> fees for POPS transactions would be $150,000 for deals in which
> the loss was $15 million or less and $250,000 if the loss was over
> $15 million. I don't know if this was ever actually communicated
> to you and, if not, whether this is a surprise. This email is not
> intended to hold things up, but merely to clarify the situation since
> I now realize that with as many people involved as there has been
> there is not always efficient communication. If this fee is correct, I
> believe the Lane fee would be $250,000, but I will await to hear
> from you.

[See e-mail dated April 10, 2001, Govt. Ex. E-8];

170.    It appears that on April 10, 2001, Brown & Wood sent Lane an invoice in the amount of

$250,000 and a proposed engagement letter under which he would consent that any

dispute that might arise regarding the opinion would be subject to mandatory arbitration

[See B&W invoice and letters dated April 10, 2001, Govt. Ex. E-9];

171.    By e-mail dated April 18, 2001, David Kelley notified Ruble:

> On another matter, it has been determined unceremoniously by
> Michael Kerekes that we owe you the fee on the Ray Lane deal.
> BDO actually owes it by our recollection but, unfortunately, they
> are bigger and we can't fight them.

[See e-mail dated April 18, 2001, Govt. Ex. E-10];

172.    By e-mail dated April 18, 2001, Kerekes of BDO wrote to Ruble:

> I understand that David Kelley either has informed  you or soon
> will inform you that ICA will pay your bill in the Ray Lane matter.
> I believe that Ray has sent back your engagement letter, so it
> sounds as if you will soon be issuing his opinion.

[See e-mail dated April 18, 2001, Govt. Ex. E-11];

173.    By e-mail dated May 3, 2001, Kerekes advised Sodano:

> I pestered David Kelley about the [Lane] payment, and he said he

was ready to pay it but needed an invoice.

[See E-mail dated May 3, 2001, Govt. Ex. E-12];

174.    By e-mail dated May 4, 2001, Sodano forwarded Kelley a copy of the Lane invoice [See
E-mail dated May 3, 2001, Govt. Ex. E-12];

175.    BDO does not appear to have marketed this POPs transaction directly to Lane, but
through a third-party such as Bricolage, insofar as BDO has not produced copies of any
consulting agreement with Lane;

**Gupta Transaction**

176.    Jai N. Gupta executed BDO confidentiality agreement dated May 3, 2001, with respect to
a proposed investment strategy " brought to [Jai N. Gupta's] attention by BDO .... " [See
BDO confidentiality agreement with Gupta, Govt. Ex. F-1 (formerly Govt. Ex. 81)];

177.    The BDO confidentiality agreement provides, *inter alia*, that Jai N. Gupta will keep
BDO's information confidential, but it does not provide that BDO will keep the client's
information confidential.

178.    Jai N. Gupta also executed a BDO Consulting Agreement dated May 10, 2001, under
which BDO agreed to provide certain defined services to "Jai N. Gupta and his
designees" in exchange for an aggregate fee of $6,400,000 [See BDO Consulting
Agreement dated May 10, 2001, Govt. Ex. F-2 (formerly Govt. Ex. 82)];

179.    By facsimile dated May 18, 2001, Jai N. Gupta sent the executed documents to BDO,
with a handwritten note stating:

> I am sending you the signed documents. However, I have made
> one change on page 2 of the Consulting Agreement for the reason
> that I may not be able to take any money out of the Company
> before its closing. If I could, I shall send the funds before then.

[See BDO confidentiality agreement with Gupta, Govt. Ex. F-1];

180.    The BDO Consulting Agreement dated May 10, 2001 states "Client desires BDO to
provide certain tax and business consulting services in connection with the Transaction"
[See BDO Consulting Agreement with Gupta, Govt. Exs. F-2];

181.    The BDO Consulting Agreement dated May 10, 2001defines the term "services" as

including:

> consulting services in conjunction with the sale of business assets
> including, assistance in structuring the Transaction, assisting the
> Client and/or its representatives in discussions and/or negotiations
> with investment advisors on a specifically requested basis.

[See BDO Consulting Agreement with Gupta, Govt. Exs. F-2];

182.    The BDO Consulting Agreement dated May 10, 2001 defines the proposed "Transaction"

as follows:

> For purposes of this Agreement, (I) the term "Transaction" shall
> mean the transfer, whether by sale, lease, contribution or otherwise,
> of (A) the Assets, or (B) any ownership or controlling interest of
> any Affiliate (as defined below) which either directly or indirectly
> through another Affiliate owns all or any part of the Business.

[See BDO Consulting Agreement with Gupta, Govt. Exs. F-2];

183.    The BDO Consulting Agreement dated May 10, 2001 contains both "Release" and "No

warranty" paragraphs in which BDO disclaims:

> Release.  Client, at its own expense, shall release, defend and hold
> BDO and its affiliates, along with their respective partners,
> employees, agents, designees, insurers and assignees, harmless
> from and against, all losses, claim, damages, liabilities, costs and
> expenses (including reasonable legal or other out- of-pocket
> expense) incurred, caused by or arising out of the Services, the
> Transactions, or any transaction related thereto....
>
> No Warranty.  **BDO makes no warranties, express or implied,
> under this Agreement. BDO expressly disclaims any implied
> warranty of merchantability or fitness for a particular purpose
> or use.**
> * * *
> BDO's Services hereunder do not include, and BDO assumes no
> responsibility whatsoever for, any legal and/or tax opinions
> regarding any strategies that may be implemented, and has advised
> the Company to retain a law firm for legal and/or tax opinions on
> any strategies or transactions they enter into.

[See BDO Consulting Agreement with Gupta, ¶¶5 & 6, Govt. Exs. F-2];

184.    BDO's Bonus Pool Calculations for the Gupta transaction reflect that BDO was to pay

Helios $2,150,000 of the $6,400,000 fee due under the BDO Consulting Agreement with

Gupta and that BDO would also have third-party costs of $100,000.00  [See BDO Bonus

Pool Calculation for Gupta, Govt. Ex. F-3];

185.   Helios is a co-promoter of abusive tax shelters;

186.   Helios provided BDO with a representations letter for purposes of BDO preparing an

opinion on the Helios transactions [See Helios draft representation letter, Gov. Ex. F-4]

187.   Based upon my review of those documents, this was a "Tax Solution" to eliminate $128

million in capital gains, on which Gupta paid BDO a 5% fee, or $6.4 million;

188.   BDO has not produced copies of any consulting agreements with Chand, Ram or Shashi

Gupta, or any of the Gupta trusts.

189.   The BDO Consulting Agreement with Jai N. Gupta dated May 10, 2001 did not disclose

the true nature of the services to be provided by BDO;

**Nussdorf 1999 and 2000 Transactions**

190.   It appears that in 1999 Glenn Nussdorf contracted with New Vista, LLC to purchase an

option transaction developed by Sentinel [See New Vista Consulting Agreements with

GN LLC, Govt. Ex. G-7];

191.   It appears that the Nussdorfs also purchased a "Tax Solution" indirectly from BDO in

2000 insofar as BDO has failed to produce a consulting agreement related to this

transaction, but prepared opinions for the Nussdorfs dated 4/15/01 [See Privilege Loge,

Doc. Codes S-15, T-14, T-15, U-2, U-5, and U-6];

**Nussdorf 2001 Transaction**

192.   By e-mail dated March 9, 2001, Klausner of BDO notified Denis Field, BDO's Tax

Director:

> I are [sic] planning a presentation to the key advisor [for Quality
> King] on distressed debt for [sic] 65 million (ordinary income) for
> 2001.  Last year E&Y made a presentation to them, so I am
> assuming that the next transaction will be competitive.
>
> Can I have any flexibility re the fee?

[See e-mail dated March 9, 2001, Govt. Ex. G-6];

- 34 -

193.    By e-mail dated March 9, 2001, Denis Field, responded:

> yes get 8% but you can go down to 6%

[See e-mail dated March 9, 2001, Govt. Ex. G-6];

194.    Quality King Distributors, Inc. (Doe Entity 442), Arlene Nussdorf (Jane Doe 45), Glenn

Nussdorf (John Doe 219), Stephen Nussdorf (John Doe 220), and Ruth Nussdorf (Jane

Doe 46) executed BDO Consulting Agreements dated October 9, 2001, under which

BDO agreed to provide certain defined services in exchange for an aggregate fee of

$2,540,000 [See Quality King and Nussdorf consulting agreements, Govt. Exs. G-1

through G-5 (formerly Govt. Exs. 92-96)];

195.    The BDO Consulting Agreement with Quality King defines the services to be provided

for $2.5 million as:

> consulting services in conjunction with certain income tax issues
> arising form the conduct of the Client's business operations.

[See BDO Consulting Agreement with Quality King, Govt. Ex. G-1, ¶2];

196.    The BDO Consulting Agreement with Quality King contains a "No warranty" paragraph

in which BDO disclaims:

> No Warranty. **BDO makes no warranties, express or implied,**
> **under this Agreement. BDO expressly disclaims any implied**
> **warranty of merchantability or fitness for a particular purpose**
> **or use.**
> * * *
> BDO's Services hereunder do not include, and BDO assumes no
> responsibility whatsoever for, any legal and/or tax opinions
> regarding any strategies that may be implemented, and has advised
> the Company to retain a law firm for legal and/or tax opinions on
> any strategies or transactions they enter into.

[See BDO Consulting Agreement with Quality King, ¶5, Govt. G-1];

197.    The BDO Consulting Agreements with the individual Nussdorfs define the services to be

provided, $10,000 apiece, as:

> consulting services in conjunction with certain income tax, estate
> tax, personal financial planning and other financial aspects of
> various anticipated investment activities.

- 35 -

[See BDO Consulting Agreement with Nussdorfs, Govt. Exs. G-2 through G-5,

¶2];

198.    The BDO Consulting Agreement with each of the individual Nussdorfs each contains an

attached Appendix in which the individual investors each acknowledged:

> •BDO has advised me that, prior to entering into the Transactions, I
> should consult with a tax attorney or tax advisor independent of
> BDO concerning the potential tax treatment of the Transaction and
> the potential tax consequences to me of participating in the
> Transactions, and I have done so or declined to do so.

[See BDO Consulting Agreement with individual Nussdorfs, Appendix A, Govt.

Exs. G-2 through G-5];

199.    BDO consulting agreements dated October 9, 2001, under which BDO agreed to provide

certain defined services in exchange for an aggregate fee of $2,540,000, did not disclose

the true nature of the services to be provided by BDO;

**Khan 1999 Transaction**

200.    Shahid Khan, on behalf of Flex-N-Gate, Canada, ULC, signed a BDO consulting

agreement dated July 24, 1999 under which BDO agreed to provide certain defined

services to Flex-N-Gate, ULC in exchange for a fee of $1,580,000 [See Khan consulting

agreement, Govt. Ex. H-17;

201.    The BDO Consulting Agreement with Flex-N-Gate dated July 24, 1999, defines the term

"services" as including:

> consulting services in conjunction with Transactions, including
> assistance in determination of sales prices and allocations thereof,
> assistance in structuring the Transactions, assisting the Client
> and/or his advisors in structuring the Transactions to attain the
> most beneficial tax results, preparation of the 1999 income tax
> returns for the Client and/or its shareholders, and assisting the
> Client and/or his representatives in its discussions and/or
> negotiations with potential purchasers or sellers on a specifically
> requested basis, as well as in income and estate tax planning and
> other personal financial planning.

[See BDO Consulting Agreement with Flex-N-Gate, Govt. Exs. H-17];

202.    The BDO Consulting Agreement with Flex-N-Gate does not define the proposed

"Transaction"[See BDO Consulting Agreement with Flex-N-Gate, Govt. Exs. H-17];

203.    The BDO Consulting Agreement with Flex-N-Gate contains a "No warranty" paragraph

in which BDO disclaims:

> No Warranty.    **BDO makes no warranties, express or implied,
> under this Agreement. BDO expressly disclaims any implied
> warranty of merchantability or fitness for a particular purpose
> or use.**
>                          * * *
> BDO's Services hereunder do not include, and BDO assumes no
> responsibility whatsoever for, any legal and/or tax opinions
> regarding any strategies that may be implemented, and has advised
> the Company to retain a law firm for legal and/or tax opinions on
> any strategies or transactions they enter into.

[See BDO Consulting Agreement with Flex-N-Gate, ¶5, Govt. Exs. H-17];

204.    By facsimile dated November 16, 1999, Shanbrom of BDO forwarded Guerin of J&G

"information on a new transaction for Shahid Kahn [sic]" stating:

> We will need a new partnership and S Corporation for him.  Please
> prepare the necessary documents and federal express them to the
> client at Flex-N-Gate.

[See facsimile dated 11/16/99, Govt. Ex. H-1];

205.    By letter dated November 16, 1999, J&G forwarded formation documents to Khan for

execution [See letter dated November 16, 1999, Govt. Ex. H-2];

206.    By letter dated November 16, 1999, J&G wrote to Deutsche Bank's general counsel with

respect to SRK Wilshire Investments LLC, SRK Wilshire Partners and SRK Wilshire

Partners, representing:

> This letter will serve to confirm your understanding that we have
> consulted with the above-captioned investors on the investment
> strategies to be employed and believe that the investors understand
> the financial and tax ramifications of such investment strategies.
> To the extent Jenkens & Gilchrist were to render a tax opinion
> relating to the investment strategies to be employed by the above-
> captioned investors, such opinion would be favorable as it relates
> to meeting the requirements for substantial authority under IRC
> Sec. 6662.  If Jenkens & Gilchrist should be engaged to render
> such a tax opinion, such opinion will be available for your review
> in accordance with procedures acceptable to the counsel for such
> investors in order to assure the availability and protection of the
> attorney-client privilege with respect to such information.

[Letter dated November 16, 1999, Govt. Ex. H-3];

207.    By facsimile dated November 22, 1999, Deutsche Bank forwarded to Sandy Burnside of

J&G new account numbers for the new entities SRK Wilshire Investments LLC, SRK

Wilshire Partners and SRK Wilshire Partners [See facsimile dated November 22, 1999,

Govt. Ex. H-4];

208.    By letter dated December 8, 1999, J&G forwarded Khan numerous documents for

execution, stating:

> Please sign each where indicated. Please do not fill in any blanks
> which appear in those documents at this time (i.e., either dates or
> amounts) due to the fact that certain calculations must first be
> completed.

[See letter dated December 8, 1999, Govt. Ex. H-5];

209.    By letter dated March 22, 2000, J&G forwarded Khan various corporate and limited

liability documents for execution, along with a copy of its invoice    [See letter dated

March 22, 2000, Govt. Ex. H-6];

210.    J&G invoiced SRK Wilshire Investors, Inc., c/o Shahid Khan, $112,000.00 [See J&G

invoice dated March 22, 2000, Govt. Ex. H-7];

211.    J&G signed off on a "tax opinion" to SRK Wilshire Investors on the 2000 Transaction on

3/22/00, 3/27/00, and 4/1/00 [Tax Opinion Sign-Off Form, Govt. Ex. H-8];

212.    By e-mail dated March 31, 2000, Paul Shanbrom of BDO authorized J&G to release

opinions to 14 named investors, including Khan [See facsimile dated March 31, 2000,

Govt. Ex. H-9];

213.    By letter dated April 3, 2000, J&G forwarded Khan an opinion dated March 20, 2000 re

SRK Wilshire Partners and SRK Wilshire Investors, Inc., with a copy to Paul Shanbrom

of BDO [See letter dated April 3, 2000, with copy of J&G opinion, Govt. Ex. H-10];

214.    The J&G opinion dated March 20, 2000, discloses that Khan transaction employed binary

options [See J&G Opinion dated March 20, 2000, p.2, Govt. Ex. H-11];

215.    BDO Consulting Agreement with Flex-N-Gate dated November 12, 1999, did not

- 38 -

disclose the true nature of the services to be provided by BDO;

216.    Khan and Flex-N-Gate appear to be a members of the Denny Class with respect to this

transaction;

**Khan 2000 Transaction**

217.    Shahid Khan, on behalf of Flex-N-Gate, Canada, ULC, signed a BDO consulting

agreement dated July 24, 2000 under which BDO agreed to provide certain defined

services to Flex-N-Gate, ULC in exchange for a fee of $3,200,000 [See Khan consulting

agreement, Govt. Ex. H-18];

218.    The BDO Consulting Agreement with Flex-N-Gate dated July 24, 2000, defines the term

"services" as including:

> consulting services in conjunction with Transactions, including
> assistance in determination of sales prices and allocations thereof,
> assistance in structuring the Transactions, assisting the Client
> and/or his advisors in structuring the Transactions to attain the
> most beneficial tax results, preparation of the 2000 and 2001
> income tax returns for the Client and/or its shareholders, and
> assisting the Client and/or his representatives in its discussions
> and/or negotiations with potential purchasers or sellers on a
> specifically requested basis, as well as in income and estate tax
> planning and other personal financial planning.

[See BDO Consulting Agreement with Flex-N-Gate dated July 24, 2000, Govt.

Exs. H-18];

219.    The BDO Consulting Agreement with Flex-N-Gate dated July 24, 2000 does not define

the proposed "Transaction"[See BDO Consulting Agreement with Flex-N-Gate dated

July 24, 2000, Govt. Exs. H-18];

220.    The BDO Consulting Agreement with Flex-N-Gate dated July 24, 2000 contains a "No

warranty" paragraph in which BDO disclaims:

> No Warranty.  **BDO makes no warranties, express or implied, under
> this Agreement.  BDO expressly disclaims any implied warranty of
> merchantability or fitness for a particular purpose or use.**
> * * *
> BDO's Services hereunder do not include, and BDO assumes no
> responsibility whatsoever for, any legal and/or tax opinions regarding any
> strategies that may be implemented, and has advised the Company to

- 39 -

> retain a law firm for legal and/or tax opinions on any strategies or
> transactions they enter into.

[See BDO Consulting Agreement with Flex-N-Gate, ¶5, Govt. Exs. H-17];

221.    Documents produced by J&G reflect that the 2000 "Tax Solution" generated an ordinary

income loss to Khan in the amount of $55 million that was fully utilized and that

Bricolage was paid a fee of $499,500 [See Govt. Exs. B-16 and B-17 (redacted)];

222.    BDO Consulting Agreement with Flex-N-Gate dated July 24, 2000, did not disclose the

true nature of the services to be provided by BDO;

223.    Khan and Flex-N-Gate appear to be a members of the Denny Class with respect to this

transaction;

224.    J&G signed off on the "tax opinion" for Shahid Khan on 3/10/01, 3/26/01 and 4/2/01

[Tax Opinion Sign-Off Form, Govt. Ex. H-14];

225.    By letter dated April 15, 2001, J&G forwarded Shahid Khan its tax opinion dated January

12, 2001, with respect to the investment you made last year in Thermosphere FX

Partners, LLC" [See letter dated April 14, 2000, with copy of opinion Govt. Exs. H-15

and H-16];

226.    The J&G opinion on the Khan 2001 Transaction states:

> In fact, on August 11, 2000, the IRS issued Notice 2000-44, which
> describes two transactions with respect to which the IRS concluded that
> tax losses generated were "artificial" and not allowable to the taxpayer.
> One of the described transactions bears similarities to the Transactions
> described in our enclosed opinion. While Notice 2000-44 sets forth the
> IRS position on these transactions, the Notice does not change the existing
> law which we rely upon herein.

[See J&G Opinion dated January 12, 2001, p.8, Govt. Ex. H-16];

**Khan 2001 Transaction**

227.    Shahid Khan, on behalf of Flex-N-Gate, Canada, ULC, signed a BDO consulting

agreement dated November 5, 2001, under which BDO agreed to provide certain defined

services to Flex-N-Gate, ULC in exchange for a fee of $1,275000 [See Khan consulting

agreement, Govt. Ex. H-12 (formerly Govt. Ex. 87)];

- 40 -

228.   The BDO Consulting Agreement with Flex-N-Gate defines the term "services" as

including:

> consulting services in conjunction with Transactions, including assistance
> in determination of sales prices and allocations thereof, assistance in
> structuring the Transactions, assisting the Client and/or his advisors in
> structuring the Transactions to attain the most beneficial tax preparation
> income tax returns for the Client and/or its shareholders, and assisting the
> Client and/or his representatives in its discussions and/or negotiations with
> potential purchasers or sellers on a specifically requested basis, as well as
> in income and estate tax planning and other personal financial planning.

[See BDO Consulting Agreement with Flex-N-Gate, Govt. Exs. H-12];

229.   The BDO Consulting Agreement with Flex-N-Gate does not define the proposed

"Transaction"[See BDO Consulting Agreement with Flex-N-Gate, Govt. Exs. H-12];

230.   The BDO Consulting Agreement with Flex-N-Gate contains a "No warranty" paragraph

in which BDO disclaims:

> <u>No Warranty</u>.  **BDO makes no warranties, express or implied, under
> this Agreement. BDO expressly disclaims any implied warranty of
> merchantability or fitness for a particular purpose or use.**
> * * *
> BDO's Services hereunder do not include, and BDO assumes no
> responsibility whatsoever for, any legal and/or tax opinions regarding any
> strategies that may be implemented, and has advised the Company to
> retain a law firm for legal and/or tax opinions on any strategies or
> transactions they enter into.

[See BDO Consulting Agreement with Flex-N-Gate, ¶5, Govt. Exs. H-12];

231.   On March 22, 2001, J&G invoiced Khan $275,000 for an opinion on the Transaction [See

J&G Invoice dated March 22, 2001, Govt. Ex. H-13];

232.   BDO Consulting Agreement with Flex-N-Gate dated November 5, 2001 did not disclose

the true nature of the services to be provided by BDO;

233.   Khan and Flex-N-Gate appear to be a members of the Denny Class with respect to this

transaction;

**Cuillo Transaction**

234.    Robert S. Cuillo executed a BDO confidentiality agreement dated May 3, 2001, with

respect to a proposed investment strategy "brought to [Cuillo's] attention by BDO .... "

[See Confidentiality Agreement, Govt. Ex. I-1 (formerly Govt. Ex. 70)];

235.    The BDO confidentiality agreement provides, *inter alia*, that Cuillo will keep BDO's

information confidential, but it does not provide that BDO will keep the client's

information confidential.

236.    Cuillo signed a Retainer Agreement with BDO dated November 16, 2001, on behalf of

Luxury Imports of Palm Beach, Inc. ("Luxury"), under which BDO agreed to provide

certain defined services to Luxury in exchange for a fee of $1,420,000 [See BDO

Retainer Agreement, Govt. Ex. I-2 (formerly Govt. Ex. 71)];

237.    The BDO Retainer Agreement with Luxury defines the services to be provided for $1.42

million as:

> consulting services in conjunction with certain income tax issues arising
> form the conduct of the Client's business operations.

[See BDO Retainer Agreement, Govt. Ex. I-2 (formerly Govt. Ex. 71)];

238.    The BDO Retainer Agreement with Luxury does not reference any proposed

"Transaction" [See BDO Retainer Agreement, Govt. Ex. I-2 (formerly Govt. Ex. 71)];

239.    The BDO Retainer Agreement with Luxury contains a "No warranty" paragraph in which

BDO disclaims:

> No Warranty.  **BDO makes no warranties, express or implied, under
> this Agreement.  BDO expressly disclaims any implied warranty of
> merchantability or fitness for a particular purpose or use.**
> * * *
> BDO's Services hereunder do not include, and BDO assumes no
> responsibility whatsoever for, any legal and/or tax opinions regarding any
> strategies that may be implemented, and has advised the Company to
> retain a law firm for legal and/or tax opinions on any strategies or
> transactions they enter into.

[See BDO Retainer Agreement, ¶5, Govt. Ex. I-2 (formerly Govt. Ex. 71)];

240.    Cuillo also signed a personal Consulting Agreement with BDO dated November 16,

2001, under which BDO agreed to provide certain defined services in exchange for a fee

of $50,000 [See BDO Retainer Agreement, Govt. Ex. I-3 (formerly Govt. Ex. 72)];

241.    The BDO Consulting Agreement with Cuillo dated November 16, 2001, states that

"Client is interested in making certain investments (the "Transactions"), but does not

further define the term "Transactions" [See BDO Consulting agreement, Govt. Ex. I-3];

242.     The BDO Consulting Agreement with Cuillo defines the services to be provided,

$50,000 as:

> consulting services in conjunction with certain income tax, estate tax,
> personal financial planning and other financial aspects of various
> anticipated investment activities.

[See BDO Consulting Agreement, ¶2, Govt. Exs. I-3];

243.    The BDO Consulting Agreement with Cuillo contains an attached Appendix A in which

he acknowledges:

> BDO has advised me that, prior to entering into the Transactions, I should
> consult with a tax attorney or tax advisor independent of BDO concerning
> the potential tax treatment of the Transaction and the potential tax
> consequences to me of participating in the Transactions, and I have done
> so or declined to do so.

[See BDO Consulting Agreement with Cuillo, Appendix A, Govt. Ex. I-3];

244.    The aggregate fee due to BDO under the Consulting Agreement and Retainer dated

November 16, 2001, is $1.47 million [See Exs. I-2 and I-3];

245.    The retainer and consulting agreements dated November 16, 2001, were in fact a contract

to purchase a distressed debt transaction for the aggregate amount of $1.47 million [See

BDO summary of Cuillo transaction dated November 30, 2001, Govt. Ex. I-4; Bonus

Pool Calculation, Govt. Ex. I-5];

246.    BDO was to pay Gramercy $499,800 of the $1,470,000 gross fee [See BDO Bonus Pool

Calculation for Cuillo, Govt. Ex. I-5];

247.    Cuillo appears to have purchased a distressed debt transaction from BDO under the BDO

Retainer and Consulting Agreements dated November 16, 2001, to eliminate $24.5

- 43 -

million in capital gains;

248. The fee of $1.47 million appears to have been computed as 6% of the amount of the transaction [See BDO Check list, Govt. Ex. I-6];

249. The BDO Retainer and Consulting Agreements dated November 16, 2001 did not disclose the true nature of the services to be provided by BDO;

**Garman Transaction**

250. On August 4, 2000, Richard Garman signed a BDO Consulting Agreement under which BDO agreed to provide Garman certain defined services in connection with certain investment "Transactions" that he wished to make in exchange for a fee of $1,230,000 [See BDO Consulting Agreement with Garman, Govt. Ex. J-1 (also Govt. Ex. 79)];

251. The BDO Consulting Agreements with Garman does not define or describe the investment "Transactions" with respect to which BDO was to provide him services [See BDO Consulting Agreement with Garman, Govt. Ex. J-1];

252. The BDO Consulting Agreement with Garman defines the term "services" as including:

consulting services in conjunction with Transactions, including assistance in determination of sales prices and allocations thereof, assistance in structuring the Transactions, assisting the Client and/or his advisors in structuring the Transactions to attain the most beneficial tax results, and assisting the Client and/or his representatives in its discussions and/or negotiations with potential purchasers or sellers on a specifically requested basis, as well as in income and estate tax planning and other personal financial planning.

[See BDO Consulting Agreements with Garman, Govt. Exs. J-1];

253. The BDO Consulting Agreement with Garman contains both the "Indemnification" and the "No Warranty" paragraphs, in which BDO disclaims:

Indemification.   The Client, at its own expense, shall release and indemnify, defend and hold BDO and its affiliates, along with their respective partners, employees, agents, designees, insurers and assignees, harmless from and against, all losses, claim, damages, liabilities, costs and expenses (including reasonable legal or other out-of-pocket expense) incurred, caused by or arising out of the Services, the Transactions, or any transaction related thereto....

No Warranty.   **BDO makes no warranties, express or implied, under this Agreement.  BDO expressly disclaims any implied**

- 44 -

> **warranty of merchantability or fitness for a particular purpose
> or use.**
>
>       * * *
>
> BDO's Services hereunder do not include, and BDO assumes no
> responsibility whatsoever for, any legal and/or tax opinions regarding any
> strategies that may be implemented, and has advised the Company to
> retain a law firm for legal and/or tax opinions on any strategies or
> transactions they enter into.

[See BDO Consulting Agreement with Garman, ¶¶5 & 6, Govt. Ex. J-1];

254. BDO prepared a control sheet dated September 19, 2000 which appears to have been used

by BDO for monitoring implementation of the Garman transaction [See BDO Control

Sheet, Govt. Ex. J-2];

255. The BDO control sheet for the Garman transaction indicates that Bricolage was the

investment advisor [See BDO Control Sheet, Govt. Ex. J-2];

256. Based upon my review of the files related to the Garman transaction, Garman was in

reality purchasing a "Tax Solution" from BDO to eliminate capital gains in the amount of

$6 million and ordinary income in the amount of $9 million, for which BDO charged a

fee in the amount of $1,230,000;

257. It appears that BDO's fee in the amount of $1,230,000 was computed as a percentage of

these two eliminations;

258. The BDO Consulting Agreement dated August 4, 2000 did not disclose the true nature of

the services to be provided by BDO.


I declare under the penalty of perjury that the foregoing is true and correct.


Executed on the September 9, 2004, at New York City, N.Y.

SANDRA ALVELO
Revenue Agent,
Internal Revenue Service
New York, New York


- 45 -

CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED by the undersigned that a copy of the NOTICE OF FILING and corrected and superceding SECOND SUPPLEMENTAL DECLARATION OF SANDRA ALVELO was served by Federal Express on September 9, 2004, upon the following:

Lawrence M. Hill, Esquire
Dewey Ballantine LLP
1301 Avenue of the Americas
NY, NY 10019
(212) 259-8330 (T)

George W. Connelly
Juan F. Vasquez, Jr.
Chamberlain, Hrdlicka, White,
Williams & Martin
1200 Smith Street, 14th Floor
Houston, TX 77002
(713) 658-1818 (T)

JOHN LINDQUIST (DC 391819)
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6561