# EXHIBIT 9

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, )
       Petitioner, )
    v. )
     ) Civil Action NO. 02 C 4822
BDO SEIDMAN, LLP, regarding )
promoter examination of BDO Seidman, ) Hon. James F. Holderman
LLP, )
     )
       Respondent. )

FILED
APR 28 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### FIFTH SUPPLEMENTAL DECLARATION OF SANDRA ALVELO

Sandra Alvelo, pursuant to 28 U.S.C., Sec. 1746, declares:

1. I am a duly commissioned Revenue Agent employed by the Internal Revenue Service in its Large and Mid-size Business (LMSB) Division, Compliance Group 1220, Financial Services Industry, with a post of duty in Manhattan, New York;

2. I am conducting an investigation into the application of promoter penalties, pursuant to I.R.C. §§ 6700, 6707 and 6708, to BDO Seidman, LLP ("BDO") for the years 1995 through 2005, inclusive;

3. I make this declaration for purposes of assisting the court in evaluating Intervenor's claim that Intervenor Document A-40 contains privileged tax advice from BDO and their contention that it should not be subject to the crime-fraud exception;

4. I previously made a Supplemental Declaration in further support of the United States' Motion to Compel; a Second Supplemental Declaration with respect to Intervenors' privilege claims; a Third Supplemental Declaration with respect to 35 documents produced by BDO on September 27, 2004; and a Fourth Supplemental Declaration in support of the United States' Sur-Reply;

5. Intervenors described Document A-40 as an internal BDO e-mail from Michael Kerekes to Robert Greisman and Larry Cohen, with a copy to Paul Shanbrom, for the purpose of providing tax advice to Intervenor Cuillo (and others) with respect to their investment in "a

portfolio of emerging market distressed debt." See Intervenors' privilege log and Memorandum filed 4/14/05, pp. 3-4;

6. Based upon my examination of BDO thus far, I have found that BDO was in the business of developing and marketing pre-packaged abusive tax shelters solely intended for tax avoidance;

7. Based upon my examination of BDO thus far, I have found that in 2001, BDO and Gramercy marketed prepackaged distressed debt tax shelter transactions to Intervenors Cuillo, Khan, Lowry, and Moffit;

8. Based upon my examination of BDO thus far, I have found that in 2001 BDO and Helios marketed prepackaged tax shelter transactions to Gupta and the Nussdorfs;

9. Based upon my examination of BDO thus far, I have found that these Intervenors' transactions appear to have been engaged in solely for the purpose of tax avoidance;

10. Based upon my examination of BDO thus far, I have found that BDO and Intervenors attempted to conceal the true nature of their transactions;

11. Based upon my examination of BDO thus far, I have found that BDO knew that Intervenors lacked a legitimate business purpose for entering into these transactions;

12. Based upon my examination of BDO thus far, I have found that Intervenors and BDO attempted to disguise the true nature of the transactions and BDO's services using vaguely worded consulting agreements;

13. Based upon my examination of BDO thus far, I have found that BDO was selling "potentially abusive tax shelters" within the meaning of IRC §6112(b) prior to amendment by the American Jobs Creation Act, P.L. 108-357 §815(b)(2);

14. Based upon my examination of BDO thus far, I have found that the Helios transactions that BDO sold to Gupta and the Nusdorffs are hybrids of the Notice 2000-44 transactions; the distressed debt transaction that BDO sold and implemented for Intervenor Cuillo has aspects of the transactions described in IRS Notice 2000-44;

15. The COBRA transaction is a transaction described in IRS Notice 2000-44;

16. Based upon my examination of BDO thus far, I have found that BDO used "boiler-plate" form documents to implement distressed debt transactions and the Helios Transactions;

**BDO's Business Structure for Marketing Pre-Packaged Distressed Debt Tax Shelters**

17. Michael Kerekes, the author of Document A-40, was a member of BDO's "Tax Leader Group" which BDO established in 1999 to organize and develop Tax Products. See BDO Power Point Presentation, Govt. Ex. A-4;

18. As a member of BDO's tax leader group, Kerekes authored "BEST PRACTICES AND PROCEDURES IN TAX SOLUTIONS: ESTABLISHING VALUE," a BDO training memo for the best practices and procedures to sell "Tax Solutions," a term that appears to be a BDO synonym for tax shelters. Kerekes advises in this training memo that, "[m]ost clients would prefer never to find out whether their tax positions are correct." See BDO memo dated May 20, 1999, Govt. Ex. A-2;

19. On August 13, 2000, the IRS released Notice 2000-44, in which it identified the "binary option transaction" as a tax avoidance transaction using artificially high basis to generate tax losses. See IRS Notice 2000-44, Govt. Ex. A-14;

20. Based upon my investigation thus far, I have found that BDO marketed a "binary option transaction" similar to the transactions described in IRS Notice 2000-44;

21. On of the transactions BDO designed and marketed has been identified in lawsuits brought against BDO by shelter participants as COBRA. The term COBRA, according to these lawsuits, is an acronym for "Currency Options Bring Reward Alternatives," under which Ernst & Young appears to have marketed a similar product;

**BDO's Development of Hybrid Transactions**

22. By e-mail dated August 28, 2000, Jimmy Haber, the President of Diversfied Group, Inc., was sent notes from a meeting between Ivan Ross and Morry Gottlieb of BDO. It appears

-3-

the meeting was held to discuss the impact of Notice 2000-44 on BDO's tax shelter business:

> [Gottlieb of BDO said that] BDO considers itself the distribution channel and said they are desperate for product. He said they considered Diversified but went with ICA [during 2000] because they had a prior relationship with some ex-Deutschebank and Chase employees who went to ICA. He also said that they made more money with ICA than they would have with Jimmy [Haber of Diversified]. He mentioned that at the beginning they charged 8% for their FX option trade, when others were at 5%.

See e-mail dated August 23, 2000, Govt. Ex. A-44, attached hereto;

23. On November 5, 2000, BDO's Tax Opinion Committee ("TOC") noted that the future direction of its Tax Solution Practice should include distressed debt transactions. See TSG Agenda 11/5/00, Govt. Ex. A-16;

24. During 2000, BDO marketed distressed debt products developed by both Gramercy Advisors and ICA/Bricolage. See e-mail dated August 11, 2000, Govt. Ex. A-13; TSG Agenda dated November 5, 2000, Govt. Ex. A-16; e-mail dated November 16, 2000, Govt. Ex. A-17; e-mail dated December 22, 2000, Govt. Ex. A-19; e-mail dated December 27, 2000, Govt. Ex. A-20; e-mail dated January 2, 2000, Ex. A-21; e-mail dated January 2, 2000, Govt. Ex. A-22; e-mail dated January 4, 2001, Govt. Ex. A-26; e-mail dated February 9, 2001, Govt. Ex. A-27;

25. On January 25, 2001, BDO's TOC required that all distressed debt investors be made aware of IRS Notice 2000-44 and the list requirements. See TOC Summary dated January 25, 2001, ¶2, Govt. Ex. A-32;

**2001 New Product Development - Distressed Debt and Helios**

26. By facsimile dated January 8, 2001, Michael Kerekes proposed a new distressed debt transaction to BDO's Tax Solutions Committee. The fifth step in the transaction requires the taxpayer to, inter alia, contribute additional assets to an LLC so that the taxpayer can claim a greater "loss passing through from LLC AA." This step must occur "[n]o later than

the end of the year in which LLC AA disposed of the security." See Kerekes facsimile dated January 8, 2001, Govt. Ex. A-45, attached hereto;

27. A BDO e-mail dated January 23, 2002, reflects that in January 2001, BDO paid Gramercy $800,000 as a 50% deposit of the broker's fees for distressed debt funds (with Gramercy paying the other 50%), and that it was initially intended that BDO's portion of the deposit would be repaid by Gramercy to BDO by October, 2001. See e-mail dated January 23, 2002, Govt. Ex. A-46, attached hereto;

28. ~~By e-mail dated March 5, 2001, Paul Shanbrom of BDO asked RJ Ruble of Brown &~~ Wood ("B&W") to assist in marketing BDO's distressed debt product by forwarding a redacted copy of B&W's 2000 opinion to a prospective investor. See BDO e-mail dated March 9, 2001, Govt. Ex. A-52, attached hereto;

29. By e-mail dated April 5, 2001, Robert Greisman of BDO wrote to Charles Bee of BDO concerning the agenda for a TOC meeting to compare BDO's fee structure with Gramercy to that of Diversified Group, Inc. ("Diversified"), stating:

> When we have our TOC call on Monday at 10 on the new deal, we should also cover pricing and fees. (you should have received a pricing sheet from Jimmy [Haber of Diversified] after our call with him early in the week.) In comparing to Gramercy, I think it's about the same fee to us. Assuming no expenses in Gramercy deal, we net 4.6 (capital at 7% x 2/3) and 6.6% ordinary (10% x 2/3). With Jimmy, it looks like we'd be at 4.5% capital and 6% ordinary (see his worksheet.) Moreover, if he's only taking 2.25% I presume we'll be on our own in absorbing ADC fees, whereas Gramercy shares them with us. All that said, not a bad deal with Jimmy, but not head and shoulders better than Gramercy. Let me know if you see it differently.

See BDO e-mail dated 4/5/01, Govt. Ex. A-47, attached hereto;

30. Charles Bee of BDO responded:

> The "all-in" cost to the investor is lower and Jimmy [Haber of Diversified] pays legal fees. This should mean that we can take the difference. I didn't think this was hugely greater for us. I do think we have got to agree on the amount of the investment by the taxpayer based on his schedule. Obviously, the higher the better. We need to decide by Monday. What do you think? Let's send to the Opinion

-5-

> Committee for their review. Jim thinks the "all-in" cost to the client of 10% is the ceiling. We have done much better. This will be a market driven analysis but we should set parameters and targets. I don't think Michael's 10% equity will fly.

See BDO e-mail dated 4/5/01, Govt. Ex. A-47, attached hereto;

31. Charles Bee further commented (a few minutes later):

> I went over Diversified's "listing" analysis. It raises some interesting points, in particular, #5 but I don't see how they are concluding that a 5% of tax profit potential exempts promoters from listing. However, this is not inconsistent with the IRS boast that none of the deals have "any" profit potential.
>
> Did you see that OTSA [IRS Office of Tax Shelter Analysis] is setting up teams for each promoter. this worries me about Diversified and ICA/Bricolage. The newspapers have contacted all of them as well as us. We got our letter. They are putting together information about us and them. I think we ought to be hedging our bets. They don't have "privilege". I think we should go forward with Gramercy on some kind of transaction, similar to the ICA deal and Diversified's deal but different. We should also go forward with Bricolage for the time being. What do you think?

See BDO e-mail dated 4/5/01, Govt. Ex. A-48, attached hereto;

32. Handwritten notes produced by BDO, dated 4/5/01, state:

> Thoughts: I'd like to see more of an "investment story"... desire to engage in some form of "alternative" investments... and that BDO is employed to evaluate tax aspects of structure. Client could do this trading or could employ a strategy that provides a tax advantage strategy. All fee to Div[ersified], with cons[ulting] agreement with Div[ersified] group and client... gives us better chance at getting fee -- but no privilege.
>
> \* \* \*
>
> story is that BDO will engage in broad range of tax planning (all subject to privilege) do we need some other "deliverable" to justify fee
>     i.e. Lincoln?
>     Tax review letter
>     standby consulting?

See BDO handwritten notes dated 4/5/01, Govt. Ex. 49;

33. By e-mail dated April 10, 2001, Michael Kerekes provided his "preliminary thoughts" on revisions to the design of the new distressed debt product, with a summary which reflects

-6-

the "step-transaction" character of the distressed debt product. See BDO e-mail dated 4/10/01, Govt. Ex. A-50;

34. By e-mail dated April 17, 2001, Robert Greisman forwarded the TOC an outline of the new distressed debt structure for approval, which not only corroborates that the primary purpose of the distressed debt product is tax avoidance, but also reflects that the opinion writers were not independent. See BDO e-mail dated 4/17/01, Govt. Ex. A-51;

35. By facsimile dated April 23, 2001, Robert Greisman confirmed a conference call to be held on April 26 with Jimmy Haber of Diversified, which, as reflected in subsequent BDO e-mail dated April 26, 2001, appears to have been with respect to Diversified's Helios product. See BDO facsimile dated April 23, 2001, Govt. Ex. A-53, attached hereto;

36. Jimmy Haber, the president of Diversified Group, Inc., appears to have also used the name Helios in doing business;

37. Helios prepared a written presentation on its product entitled "Financial Derivatives Investment Strategy." See Helios presentation, Govt. Ex. A-52, attached hereto;

38. By e-mail dated April 26, 2001, at 3:19 p.m., Robert Greisman reported to BDO's TOC:

> In connection with the Helios (Haber) transaction -- please respond the this question: Should Helios charge its fee and we charge our fee independently, or should we charge the entire fee and pay Helios, as we do with Gramercy? Please respond to the committee with your answer and reasoning by the close of business on Monday April 30 (sooner if possible) so that we can bring our pricing considerations on this structure to a conclusion.

See e-mail dated April 26, 2001, at 3:19 p.m., Govt. Exs. A-54 and A-55, attached hereto;

39. Michael Kerekes of BDO responded by e-mail the same day:

> I prefer having BDO collect the entire fee and then pay Helios. There are at least two reasons for doing so:
> 
> (1) It's none of the client's business who is receiving what part of the total fee;
> 
> (2) There may be an argument that if we pay Helios, Helios derives some protection from our accountant-client privilege (something of

-7-

> a long shot, but I wouldn't mind litigating it for a couple of years while statutes run); and
>
> (3) While this means the client does not directly pay for the legal opinion, I think that is fine because it is well established that an attorney-client relationship can exist without the direct (or for that matter, without any) payment of fees.
>
> We haven't really thought about reason (2) before. Following Charlie's lead on the basic privilege issue, it may turn out to be a powerful consideration. We might want to get the input of someone more knowledgeable on the subject to figure out whether it can significantly help us. If so, we may want to extend it beyond this transaction.

See e-mail dated April 27, 2001, at 7:14 p.m., Govt. Ex. A-56, attached hereto;

40. By e-mail dated April 29, 2001, Pam Packard of BDO responded:

> I feel strongly that the client should pay the attorney's fee directly. The advice would appear to be more independent.
>
> With respect to the balance of the fee, my preference would be for BDO to be paid solely for consulting, thereby appearing to have been given "in the normal course of business". If it is problematic from a marketing perspective, I could live with us paying Helios.

See e-mail dated April 29, 2001, at 12:44 p.m., Govt. Ex. A-54, attached hereto;

41. By e-mail dated April 29, 2001, at 7:20 p.m., Laura Luchs of BDO responded:

> I agree with Pam [Packard]. I had always though that this was the decision we had reached at an initial meeting we had in NY.

See e-mail dated April 29, 2001, at 7:20 p.m., Govt. Ex. A-55, attached hereto;

42. On May 2, 2001, Michael Kerekes reported to BDO's TOC that an issue had arisen with respect to "packages of distressed debt Jay Johnston [of Gramercy] wants to acquire to use in our transactions." Kerekes explains that if the debt is subject to the "mark to market" rules in the Internal Revenue Code, it "would of course render it useless for our purposes." See Kerekes memo dated May 2, 2001, Govt. Ex. A-57, attached hereto;

43. In a memo dated May 21, 2001, Michael Kerekes noted that 4 law firms were providing comments on a draft tax opinion for the Helios product, and that those comments would be shared with BDO. See Kerekes memo dated May 21, 2001, Govt. Ex. A-58, attached

hereto;

44. By e-mail dated May 21, 2001, Robert Greisman of BDO raised questions about the draft opinion for the Helios product. See e-mail dated May 21, 2001, Govt. Ex. A-59, attached hereto;

45. By e-mail dated May 30, 2001, Greisman forwarded to BDO's TOC Diversified's response to BDO's comments on the draft tax opinion for the Helios product, stating:

> Attached are Helios' comments to our comments on the draft tax opinion. Also attached are sample details of the gain leg/loss leg trade. That should be of particular interest as we attempt to understand the details, including profit potential. I'm not sure that helps us with the amount a client may expect to lose on that trade, but it's a start. We do need to conclude on the precise trade structure soon, as next week implementation will begin on a trade for Dudzinsky's client.

See e-mail dated May 30, 2001, Govt. Ex. A-60, attached hereto;

46. By e-mail dated June 20, 2001, Robert Greisman of BDO distributed a contact list for the Helios product that he had received from Helios, which included the following law firms: Bryan Cave, LLP, Lord, Bissell & Brook, Proskauer Rose, LLP, and Sidley Austin Brown & Wood, LLP, presumably the 4 law firms commenting on the draft opinion. See e-mail dated June 20, 2001, Govt. Ex. A-61 and Kerekes memo dated May 21, 2001, Govt. Ex. A-58, attached hereto;

47. By e-mail dated July 24, 2001, Larry Cohen of BDO reported to BDO's TOC of his concern with the Helios product because the gain or loss trades appeared to be pre-determined or "locked-in." See BDO e-mail dated 7/24/01, Govt. Ex. A-62, attached hereto;

48. By e-mail dated November 21, 2001, Greisman of BDO circulated a draft of an IRS representation agreement, to be used along with BDO's Consulting Agreement "in those cases where BDO agrees to provide IRS audit help to close the deal." See Greisman e-mail dated November 21, 2001, Govt. Ex. A-63, attached hereto;

Case 1:02-cv-04822   Document 185   Filed 04/28/2005   Page 10 of 102

49. A concern was raised by Pam Packard of BDO that under the terms of the representation agreement, BDO would be required to provide audit services in excess of the retainer fee. See e-mail dated November 27, 2001, Govt. Ex. A-63, attached hereto;

50. By e-mail dated November 26, 2001, Michael Kerekes reported to BDO's TOC an issue with respect to the "basis raising" leg of the transaction. See Kerekes e-mail dated November 26, 2001, Govt. Ex. A-64, attached hereto;

51. By e-mail dated November 27, 2001, Larry Cohen of BDO responded "Oops," and agreed that with Kerekes' proposal, even though it required an adjustment to the so-called "business purpose" for the transaction. Kerekes had proposed a solution which required a liquidation of all or substantially all assets to cash and some justification for doing so. See Cohen e-mail dated November 27, 2001, Govt. Ex. A-65, attached hereto;

52. By e-mail dated November 28, 2001, Lawrence Cohen wrote to members of BDO's National Tax Consulting Group, asking:

> In order to do quality control and plan for the issuance of opinions, please complete the attached sheet for each calendar year 2001 transaction.

Cohen e-mail dated November 28, 2001, Govt. Ex. A-68, attached hereto;

**Cuillo 2001 Gramercy Distressed Debt Transaction**

53. By reply e-mail dated November 30, 2001, Morry Gottlieb of BDO reported that Cuillo purchased a Gramercy distressed debt product. See e-mail dated November 30, 2001, Govt. Ex. A-67, attached hereto;

54. Michael Kerekes classified Intervenor Cuillo as having participated in a "GI" transaction. See Kerekes memo dated April 17, 2002, Govt. Ex. A-68, attached hereto (partially redacted for other investor names);

55. BDO's Consulting Agreement with Cuillo and Retainer Agreement with Luxury Imports of Palm Beach, Inc. ("Luxury"), a wholly owned corporation, reflect that Cuillo contracted to pay $1.47 million to BDO for this product. See ¶¶234-245 of Second Supplemental

Declaration of Sandra Alvelo and BDO Consulting and Retainer Agreements dated November 16, 2001, Govt. Exs. I-2 and I-3;

56. BDO's Bonus Pool Calculations for the Cuillo transaction reflect that out of this $1.47 million BDO paid $499,800 to Gramercy. See BDO Bonus Pool Calculation for Cuillo, Govt. Ex. I-5;

57. By e-mail dated December 17, 2001, Michale Kerekes asked Morry Gottlieb to confirm that Cuillo had purchased a $22 million transaction using both equity and spread option to generate a capital loss all in 2001. See Kerekes e-mail dated 12/16/01, Govt. Ex. A-69, attached hereto;

58. Morry Gottlieb of BDO confirmed by e-mail dated December 17, 2001:

> Loss should be $24,700,00 @95% or $23,465,000 allocated to Cuillo. I have no confirmation on spread trades. Cuillo will be putting in 100% basis ASAP. Amended and restated Operating Agreement executed 12/14. Awaiting drop down to lower tier.

See Gottlieb e-mail dated 12/17/01, Govt. Ex. A-70, attached hereto.

59. By e-mail dated December 18, 2001, Kerekes detailed his understanding of Cuillo's "basis situation." See Kerekes e-mail dated 12/18/01, Govt. Ex. A-71, attached hereto;

60. By reply e-mail dated December 18, 2001, Morry Gottlieb of BDO stated:

> Michael, I have not received documentation to confirm breakdown, but client did transfer $3,300,000 to IMA, so numbers look good.
> * * *

See Gottlieb e-mail dated 12/18/01, govt. Ex. A-71, attached hereto;

61. By reply e-mail dated December 18, 2001, Kerekes stated:

> I need you to tell me what will be the amount and composition of that final contribution. are you actively pursuing the client?

See Kerekes e-mail dated 12/18/01, govt. Ex. A-72, attached hereto;

62. BDO prepared a checklist for Cuillo's 2001 Gramercy distressed debt transaction. See Checklist, Govt. Ex. A-73 attached hereto;;

63. BDO also prepared a summary of Cuillo's 2001 Gramercy distressed debt transaction. See summary, Govt. Ex. A-74, attached hereto;

- 11 -

**Khan 2001 Gramercy Distressed Debt Transaction**

64. By reply e-mail dated December 4, 2001, Paul Shanbrom of BDO reported that Shahid Khan purchased a Gramercy II product to eliminate $25 million of ordinary income in 2001. See e-mail dated December 4, 2001, Govt. Ex. A-71, attached hereto;

65. Michael Kerekes classified Khan as having participated in a "GII" transaction. See Kerekes memo dated April 17, 2002, Govt. Ex. A-77, attached hereto (partially redacted for other investor names);

66. BDO's Consulting Agreement with Khan, through Flex-N-Gate, Canada, evidences that Khan contracted to pay BDO $1,275000 for this product. See BDO Consulting Agreement with Flex-N-Gate dated November 5, 2001, Govt. Ex. H-12;

**Lowry & Moffit 2001 Gramercy Distressed Debt Transaction**

67. By reply e-mail dated December 4, 2001, Paul Shanbrom of BDO reported that Lowry and Moffitt purchased a Gramercy product. See e-mail dated December 4, 2001, Govt. Ex. A-68, attached hereto;

68. By letters dated December 31, 2001, B&W confirmed that it had been retained by Lowry and Moffitt to render an opinion with respect to a "distressed debt investment." See B&W letters dated December 31, 2001, Govt. Exs. D-16 and D17;

69. By e-mail dated May 3, 2002, Sodano of B&W asked Cohen of BDO what the fees to B&W would be for the B&W's "Distressed Debt/Option Trade Opinions," which had been "discussed" with Ruble. See e-mail dated May 3, 2002, Govt. Ex. D-18 (redacted);

**Gupta 2001 Helios Transaction**

70. By reply e-mail dated November 28, 2001, Dudzinsky of BDO reported that the Gupta Intevenors purchased a $100 million Helios transaction to generate a $75 million capital loss and a $25 million ordinary loss. See e-mail dated November 28, 2001, Govt. Ex. A-66, attached hereto;

71. Michael Kerekes classified the Guptas as having participated in Helios transactions. See

Kerekes memo dated April 17, 2002, Govt. Ex. A-77 attached hereto (partially redacted for other investor names).

72. By e-mail dated December 16, 2001, Michael Kerekes wrote to Robert Dudzinsky of BDO asking that he confirm that Gupta had purchased a $100 million Helios transaction to generate a $75 million capital loss and a $25 million ordinary loss, all in 2001, and "that this information was specifically provided to Helios." See Kerekes e-mail dated 12/16/01, Govt. Ex. A-69, attached hereto;

73. ~~BDO' Consulting Agreement with Gupta evidences the Guptas contracted to pay $6.4 million to BDO for this product. See ¶¶176-183 of Second Supplemental Declaration of Sandra Alvelo and BDO Consulting Agreement with Gupta, Govt. Exs. F-2;~~

74. BDO's Bonus Pool Calculations for Gupta's 2001 transaction reflect that BDO in-turn paid $2,150,000 to Helios and $100,000.00 to the law firm of Bryan Cave. See BDO Bonus Pool Calculation for Gupta, Govt. Ex. F-3;

**Nussdorf 2001 Helios Transaction**

75. Michael Kerekes classified the Nussdorfs as having participated in Helios transactions. See Kerekes memo dated April 17, 2002, Govt. Ex. A-77 attached hereto (partially redacted for other investor names);

76. BDO's Consulting Agreements with the Nussdorfs and Quality King, their wholly owned corporation, reflect that the Nussdorfs paid $2.54 million to BDO for this product. See ¶¶192-199 of Second Supplemental Declaration of Sandra Alvelo and BDO Consulting Agreements, Govt. Exs. G-1 through G-5;

**YEAR END PLANNING FOR TAX SHELTER PRODUCTS**

77. By e-mail dated December 20, 2001, Michael Kerekes circulated a chart of the expected dispositions and stated:

> I'll work on the top-ups list tonight and should have it out be fairly early tomorrow.

See Kerekes e-mail dated December 20, 2001, Govt. Ex. A-74, attached hereto (partially redacted);

78. By e-mail dated December 20, 2001, Paul Shanbrom provided an update to Michael Kerekes' memo and stated that, with respect to one participant, ". . . the income/loss is still being calculated and should be finalized by the end of the day tomorrow." See Shanbrom e-mail dated December 20, 2001, Govt. Ex. A-75, attached hereto (partially redacted);

79. By e-mail dated December 21, 2001, Lawrence Cohen replied:

> At the risk of sounding petulant and undiplomatic, the close of business is simply too late and is unacceptable. A core group of us have been working every day all day [around] the clock the last few weeks to assure proper execution of all the transactions, and the work is far from complete. There remains a lot of work and coordination that must be done in order to assure timely and accurate execution of the investments, the LLCs and the sale/exchanges.
>
> We **must** have the information by 2 pm New York time today.

See Cohen e-mail dated December 20, 2001, Govt. Ex. A-75, attached hereto (partially redacted);

80. By e-mail dated December 26 and 27, 2001, Michael Kerekes circulated a list of the "top-ups" that needed to be made to the various transactions, including Intervenor Cuillo. See Kerekes e-mails dated December 26 and 27, 2001, Govt. Ex. A-76, attached hereto;

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on the April 27, 2005, at New York City, N.Y.

_____
SANDRA ALVELO
Revenue Agent,
Internal Revenue Service
New York, New York