# E X H I B I T   10



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|   |   |
|---|---|
| | ) |
| | ) |
| | )    Case No: |
| Ronen Olshansky, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )    **JUDGE CHIN** |
| | ) |
| Gramercy Advisors LLC, | ) |
| | )    Plaintiff Demands a Trial by Jury |
| | ) |
| Defendant | ) |
| | ) |

Plaintiff, Ronen Olshansky ("Plaintiff"), by his attorneys, Samuel Goldman & Associates, as and for his Complaint against Gramercy Advisors LLC ("Gramercy"), alleges as follows:

## INTRODUCTION

1.    This is an action arising from the unlawful termination of Plaintiff's employment as a Vice President of Gramercy (a hedge fund manager). Plaintiff was terminated because he told Gramercy and its principals that they should comply with United States tax laws regarding abusive tax shelters, and because Gramercy perceived the threat that Plaintiff would act as a whistleblower on Gramercy's very lucrative, but unlawful business of structuring transactions, which generated large tax losses, but had little or no economic substance.

## PARTIES AND JURISDICTION

2. Plaintiff is a citizen of the State, County and City of New York. He received his B.A. with a major in Economics from Yale University in 1996, and shortly thereafter began working at Lehman Brothers, as an analyst in its Emerging Markets Bond Desk.

3. Gramercy is a limited liability company formed under the laws of the S tate o f Delaware, having its principal place of business in the State of Connecticut. Upon information and belief, Gramercy is registered as an investment advisor under the Investment Advisor Act of 1940, and functions as a hedge fund manager, managing private funds, in a number of investment vehicles which invest in emerging market bonds.

4. All of the Members in Gramercy reside in of the State of Connecticut.

5. Gramercy and its Members do business in the City and State of New York, by among other things, soliciting investors for the various funds managed by Gramercy and meeting with various business counterparts in Manhattan.

6. The matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

7. Subject matter jurisdiction is predicated on 28 U.S.C. Sec. 1331 and on diversity of citizenship.

## FACTS COMMON TO ALL CLAIMS

8. Plaintiff was employed by Gramercy as a Vice President, from April 8, 2002 through September 15, 2003, when Plaintiff was unlawfully terminated from his employment.

2

9.      Plaintiff and the principals of Gramercy came to know each other while they were all employed at Lehman Brothers. In early 2002, one of Gramercy's principals approached Plaintiff about coming to work for Gramercy as an investment analyst and bond trader, using the expertise he had acquired at Lehman Brothers in the foreign currency markets.

10.     Subsequently, Plaintiff was offered a position as Vice President and was promised that he would work as an investment analyst and bond trader.

11.     Prior to the commencement of his employment, Plaintiff was given a written offer of employment by Gramercy, which was executed by both parties on or about March 15, 2002 (the "Offer Letter"). The Offer Letter contained a provision that Plaintiff could not be terminated other than on 30 days prior written notice.

12.     During his employment with Gramercy, Plaintiff worked out of Gramercy's offices in Greenwich, Connecticut, and Plaintiff performed substantially all of his duties for Gramercy in the State of Connecticut.

13.     At all times during his employment with Gramercy, Plaintiff received at least satisfactory job performance reviews.

14.     Plaintiff was initially paid an annual base salary of $130,000 per annum, plus bonuses.

15.     On or about July 12, 2002, Plaintiff was granted a mid-year bonus of $25,000.

16.     On or about December 13, 2002, Plaintiff was awarded a $200,000 end of year bonus for the nine months which he had worked during 2002, payable during the first quarter of 2003.

3

In addition, Plaintiff received a profit sharing bonus equal to $40,000 at the end of calendar year 2002.

17.    Thus, Plaintiff's total compensation for the nine months he was employed by Gramercy in 2002 was $362,500.

18.    Plaintiff was also notified in December 2002 that his annual salary for 2003 would be increased to $150,000, an increase of approximately 15%.

19.    Plaintiff received payment of the $200,000 year-end bonus in January 2003 and his salary was adjusted to $150,000 per annum as of January 1, 2003.

20.    Over the course of Plaintiff's employment, he began to realize that he was not being asked to trade in securities or do investment analysis. Rather, he was being asked to work on the structuring of large transactions which generated significant tax losses for Gramercy clients, while sheltering them from the economic risk of incurring actual cash losses or gains of any significance.

21.    Over time, it became clear to Plaintiff that these tax oriented transactions were responsible for a substantial proportion of Gramercy's profits, while Gramercy's ostensible core business of trading in securities for investors accounts for investment gains was doing poorly, and in fact substantially underperforming comparable market indices.

22.    On or about July 18, 2003, Plaintiff was awarded a mid-year bonus of $25,000.

23.    In June or July 2003, Gramercy received from BDO Seidman, an accounting firm with which Gramercy had extensive business activities, an Information and Document Request from the US Internal Revenue Service (the "IDR"), questioning a transaction that Gramercy had structured and executed on behalf of a partnership managed by

4

Gramercy and largely owned by a client referred to Gramercy by BDO Seidman.

24.     The IDR questioned the investment rationale of this transaction as well as the economic value and substance of the "worthless assets" which were purchased for the partnership and which had generated large tax losses for Gramercy's and BDO Seidman's mutual client.

25.     The IDR, together with the burgeoning high profile Congressional and prosecutorial focus on abusive tax shelters and those who packaged them, caused considerable nervousness and concern among Gramercy's principals.

26.     At a meeting held at the end of July 2003 in Gramercy's offices, with outside professionals participating by conference call, the focus of discussion was how to structure a partnership for a new investor which would generate significant capital losses to offset the capital gains attributable to the sale of a family business. At this meeting, Plaintiff suggested that in order to comply with Federal law and IRS regulations, Gramercy should consider registering the transaction with the IRS as a "potentially abusive tax shelter."

27.     Plaintiff was immediately informed by one of Gramercy's principals that he should not concern himself with this issue, and that other people would deal with it.

28.     Shortly thereafter and as a result of his comments at the July 2003 meeting, Plaintiff's duties and responsibilities at the firm were substantially diminished. Instead of reporting directly to one of Gramercy's principals, Plaintiff was informed that he would now be reporting to a newly hired employee, who effectively took over Plaintiff's duties and responsibilities. Plaintiff was given significantly reduced responsibilities, which involved minimal decision making and external contacts. Plaintiff's duties were

5

downgraded to tasks such as diagramming transactions and generating spreadsheets.

29.    Plaintiff was also requested to write a memorandum on each of the tax oriented transactions that Plaintiff had been involved in, setting forth the investment rationale and economic substance behind these transactions.

30.    Plaintiff informed Gramercy's principal that he would not lie or make up facts in preparing these memoranda.

31.    Plaintiff had also informed Gramercy's principal that he was particularly uncomfortable with the lack of substance and transparency of the firm's investments in Russia.

32.    In response, a principal of Gramercy had told Plaintiff that he had a vivid imagination to suspect "cloak and dagger elements" and that, going forward, the principal would manage the relationship with the Russian partners himself.

33.    Subsequently, Plaintiff fearful for his job, prepared internal memoranda attempting to substantiate these transactions, as best he could. Plaintiff finished preparing these memoranda on or about August 20, 2003.

34.    On September 15, 2003, Plaintiff returned from a short trip to Europe and called into the office. During this call, he was informed that he had been terminated, effective that day. Either on September 15th or the next day, a package containing all of Plaintiff's personal possessions from his office was delivered to Plaintiff's home by courier. The package was accompanied by a proposed separation agreement.

35.    Gramercy told Plaintiff that the reason for his termination was that he had charged certain personal items to his business credit card.

36.     However, this reason was pre-textual. Plaintiff had, consistent with general practice, on several prior occasions charged personal items to his business credit card and written a personal check to the firm to cover his expenses which were personal. Plaintiff had also informed Gramercy's book-keeping department of the personal charges and had requested that it should send him the credit card bill when it was received so he could pay those expenses which were personal.

37.     The real reason for which Plaintiff was fired was because: (1) he had told the principals of Gramercy firm that they should comply with the United States tax laws relating to abusive tax shelters, including the law requiring them to register certain transactions which created very large tax losses, but almost no likelihood of economic gain, as potentially abusive tax shelters under the Internal Revenue Code; and (2) because Gramercy's principals feared that Plaintiff would be a "whistleblower" on their unlawful activities, and that Plaintiff would not cooperate with them in trying to justify their bogus transactions as having economic reality or in structuring future abusive tax shelters.

38.     The document Plaintiff received enclosed with his personal possessions was entitled "Separation Agreement and General Release" and dated as of September 15, 2003. This proposed agreement offered Plaintiff as his entire severance benefit one month of base salary, or $12,500, payable in two semi-monthly installments, but only if he signed the Separation Agreement and General Release. From this payment, Gramercy stated it would deduct the sum of $295.78 on account of the personal charges incurred on the company charge card.

39.     Plaintiff was also informed by Gramercy that he would receive his legislatively mandated COBRA medical insurance benefits, but only after Plaintiff signed the

7

Separation Agreement and General Release.

40.    Plaintiff refused to sign the Separation Agreement and General Release, and was never paid the $12,500 that was due him as earned wages, or given his COBRA medical insurance benefits.

## FIRST CLAIM

### (Fraud in the Inducement)

41.    Gramercy and one of Gramercy's principals induced Plaintiff to accept employment with Gramercy by promising Plaintiff employment as an investment analyst and bond trader.

42.    This representation and promise made to induce Plaintiff to accept employment with Gramercy was knowingly false when made.

43.    Gramercy did not intend to give Plaintiff work as an analyst and trader, but rather Gramercy intended Plaintiff to work on structuring and implementing tax shelter partnerships of dubious legality.

44.    Plaintiff relied on the representations and promises made by Gramercy and its principals in accepting the job offered him at Gramercy.

45.    Plaintiff would not have accepted the offer or signed such documents had he known that he would not be engaged in mainstream trading and securities analysis activities, but rather in structuring and implementing tax shelters of dubious legality.

46.    Plaintiff relied on the representation of Gramercy and its principal to Plaintiff's material detriment.  Instead of being able to advance his career by gaining valuable experience as a trader and analyst, Plaintiff spent his tenure at Gramercy learning how to

8

structure and administer abusive tax shelters.

47.    Given the extent of the current attack on these types of abusive shelters in Congress and by various law enforcement agencies, Plaintiff's experience working in this area is of negative value in furthering his career or in obtaining alternative employment.

48.    Defendant's actions severely damaged Plaintiff's career in investment banking, hurt his prospects for future employment and diminished his earnings potential.

49.    As a result of Defendant's willful misrepresentations and fraudulent conduct, Plaintiff has suffered damage to his property, business, trade, profession or occupation, including lost earnings and earnings capacity. Plaintiff has suffered and continues to suffer a loss of earnings and other employment benefits and economic damages.

50.    As a direct result of Defendant's fraudulent conduct, Plaintiff has suffered and will continue to suffer emotional distress, including anguish and anxiety. Plaintiff is therefore entitled to general and compensatory damages in amounts to be proven at trial.

51.    Defendant's fraudulent conduct was willful, intentional and outrageous.

52.    Plaintiff should therefore be entitled to an award of punitive damages, reasonable attorneys' fees and costs.

## SECOND CLAIM

### (Violation of Connecticut General Statutes Sec 31-51q and of Plaintiff's First Amendment and Connecticut Constitutional Rights)

53.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 52 of this Complaint as if fully set forth herein.

54.    Connecticut General Statutes Sec 31-51q provides: "Any employer . . . who

9

subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment of the United States Constitution or section 3, 4, or 14 of article first of the Constitution of the state. . . . shall be liable to such e mployee for d amages c aused b y such discipline or discharge, including punitive damages, a nd for r easonable a ttorney's f ees a s part of the costs of any such action for damages . . . . ."

55.     Section 4 of Article I of the Connecticut State Constitution mirrors the first amendment to the federal constitution in protecting freedom of speech.

56.     Plaintiff was unlawfully terminated from his employment as a result of (a) his statement to Gramercy's principals and others outside the firm indicating that they should comply with federal tax laws, including without limitation his statement that they should file certain of their transactions as potentially abusive tax shelters; and (b) Defendant's effort to prevent Plaintiff from reporting Gramercy's activities relating to abusive tax shelters to the federal tax authorities.

57.     Plaintiff was subjected to unlawful discharge on account of his exercise of protected rights guaranteed by the First Amendment of the United States Constitution and the Constitution of the State of Connecticut, Article First, Sec. 4, in violation of Connecticut General Statutes Sec 31-51q and 42 U.S.C. Sec. 1983.

58.     As a result of Defendant's unlawful conduct, Plaintiff has incurred damage to his property, business, trade, profession or occupation, including lost earnings and earnings capacity. Plaintiff has suffered and continues to suffer a loss of earnings and other employment benefits and economic damages.

59.     As a direct result of Defendant's unlawful conduct, Plaintiff has suffered and will

10

continue to suffer emotional distress, including anguish and anxiety, Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

60.     Defendant's conduct constituted an intentional, wanton and outrageous violation of Plaintiff's constitutionally protected rights.

61.     Plaintiff is entitled to an award of punitive damages, reasonable attorneys fees and costs in accordance with the provisions of Connecticut General Statutes Sec 31-51q.

## THIRD CLAIM

### (Breach of Covenant of Good Faith and Fair Dealing)

62.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 61 of this Complaint as if fully set forth herein.

63.     Implicit in the employment contract between Plaintiff and Gramercy was a covenant of good faith and fair dealing.

64.     Defendant violated this covenant of good faith and fair dealing by inducing Plaintiff to come to work for them by falsely promising him that he would work as an investment analyst and securities trader, when in fact Defendant intended that he work on their tax shelter transactions.

65.     Defendant violated this covenant of good faith and fair dealing by terminating Plaintiff's employment for being an actual and potential "whistleblower," and for telling Gramercy's principals that Gramercy should obey the federal tax laws and that Plaintiff would not manufacture facts that were not true to justify certain transactions as having economic substance.

66.     Plaintiff also violated the covenant of good faith and fair dealing by withholding

11

and depriving Plaintiff of wages earned in violation of Connecticut General Statutes Sec 31-71c (b) and 31-71e, which prohibits such activities.

67.    As a direct result, Plaintiff has suffered damage to his property, business, trade, profession or occupation, including lost earnings and earnings capacity. Plaintiff has suffered a nd c ontinues t o s uffer a loss of earnings and other employment benefits and economic damages. Plaintiff is therefore entitled to general and compensatory damages in amounts to be proven at trial.

68.    Gramercy's breach was intentional, willful, reckless and malicious, and as a result, P laintiff i s e ntitled t o a n a ward o f p unitive d amages, reasonable attorneys' fees and costs.

## FOURTH CLAIM

### (Violation of Connecticut Unfair Trade Practices Act)

69.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

70.    The C onnecticut U nfair T rade P ractices A ct, C onnecticut General Statutes Sec. 42-110b, provides that "No person shall engage in u nfair m ethods o f c ompetition a nd unfair or deceptive acts or practices in the conduct of any trade or business."

71.    Gramercy has engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its business by (a) not informing prospective employees that they would be asked to work on abusive tax shelters, (b) fraudulently promoting, selling, or implementing abusive tax shelters, (c) falsely representing to investors that Gramercy is engaged exclusively in trading in emerging market securities

12

for profit, (d) failing to disclose to investors that Gramercy devotes a substantial portion of its resources to packaging and executing tax shelters lacking in economic substance, and (e) otherwise aiding, abetting or engaging in deceptive, fraudulent or illegal business practices or requesting its employees to do so.

72.    As a result of Defendant's unlawful conduct, Plaintiff has incurred damage to his property, business, trade, profession or occupation, including lost earnings and earnings capacity. Plaintiff has suffered and continues to suffer a loss of earnings and other employment benefits and economic damages.

73.    As a direct result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer emotional distress, including anguish and anxiety, Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

74.    Defendant acted with reckless, willful and callous disregard for Plaintiff's rights, and intentionally and with malice, violated those rights, thereby entitling Plaintiff to an award of punitive damages, reasonable attorneys' fees and costs.

75.    In addition, Plaintiff seeks an injunction against Defendant enjoining Defendant from: (a) not informing prospective employees that they would be asked to work on abusive tax shelters, (b) fraudulently promoting, selling, or implementing abusive tax shelters, (c) falsely representing to investors that Gramercy is engaged exclusively in trading in emerging market securities for profit, (d) failing to disclose to investors that Gramercy devotes a substantial portion of its resources to packaging and executing tax shelters lacking in economic substance, and (e) otherwise aiding, abetting or engaging in deceptive, fraudulent or illegal business practices or requesting any Gramercy employee to do so.

13

## FIFTH CLAIM

(Violation of Public Policy Protecting "Whistleblowers")

76.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 75 of this Complaint as if fully set forth herein.

77.     At all relevant times, Plaintiff had a reasonable belief that the conduct which he observed, opposed and reported, violated both state and federal law, including the Internal Revenue Code of the United States.

78.     Gramercy and its principals wrongfully terminated Plaintiff's employment. Such termination was in violation of the public policy of the United States and the State of Connecticut, including without limitation (a) the U.S. Internal Revenue Code, (b) the Connecticut Free Speech Act, Connecticut General Statutes Sec 31-51q, (c) the Connecticut Private Employee's Whistleblower Act, Connecticut General Statutes Sec 31-51m, (d) the Sarbanes-Oxley Act of 2002, (e) the Connecticut Corporate Anti-Fraud Act., (2003 Conn. Pub. Act 03-259, Secs. 33-39), (f) the Connecticut Unfair Trade Practices Act, Connecticut General Statutes Sec 42-110b, (g) 18 U.S.C. 1512 and 1513, and (h) various other Connecticut and federal statutes, including various provisions of the Internal Revenue Code, the Securities and Exchange Act of 1934 (and rules and regulations promulgated thereunder), and other laws regulating the accounting and financial practices of companies. Among other things, such fundamental public policies (1) prohibit employers from dismissing or retaliating against employees who oppose or refuse to participate in illegal conduct; (2) require that companies provide true and accurate information in their tax returns and public accounting statements (and other such information relied upon in the sale of a company's securities), (3) prohibit employers

14

from dismissing or retaliating against employees who protest an employer's accounting, financial and tax practices or who the employer believes will provide truthful, yet damaging, information to the government authorities; and (4) prohibit employers from engaging in unfair business practices.

79.     Gramercy wrongfully terminated Plaintiff in violation of his common law rights to protection, as a "whistleblower".

80.     As a direct result of Gramercy's unlawful conduct, Plaintiff has been dismissed from his employment, even though at all times Plaintiff competently and diligently performed his duties at Gramercy. As a result of Gramercy's unlawful conduct, Plaintiff has incurred damage to his property, business, trade, profession or occupation, including lost earnings and earnings capacity. Plaintiff has suffered and continues to suffer a loss of earnings and other employment benefits and economic damages.

81.     As a direct result of Gramercy's unlawful conduct, Plaintiff has suffered and will continue to suffer emotional distress, including anguish and anxiety, Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

82.     Gramercy acted with reckless, willful or callous disregard for Plaintiff's rights and with malice, fraud or oppression toward Plaintiff, thereby entitling Plaintiff to an award of punitive damages, reasonable attorneys' fees and costs.

## SIXTH CLAIM

### (Earned Wages)

83.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 82 of this Complaint as if fully set forth herein.

15

84.     It is an established custom and practice in the securities and hedge fund industries, that employees receive a very substantial portion of their annual compensation in the form of bonuses and profit sharing allocations.

85.     Plaintiff's acceptance o f Gramercy's offer was predicated on Plaintiff receiving such bonuses and profit sharing in accordance with industry practice. Plaintiff would not have accepted Gramercy's offer, but for such understanding regarding compensation.

86.     Plaintiff's bonus and profit sharing compensation constitutes an integral part of his compensation package.

87.     The course of dealing between the parties evinces a promise that annual and semi-annual bonus and profit sharing payments constitute an integral part of plaintiff's compensation.

88.     During the nine months that Plaintiff worked for Gramercy in calendar year 2002, Plaintiff received \$265,000 of his total compensation of \$362,500, or 73.1%, in the form of bonuses and profit sharing.

89.     Plaintiff's annualized compensation for 2002 was \$483,333.

90.     Assuming Plaintiff's 15% salary increase in 2003 was applied across the board, Plaintiff's total annualized compensation for 2003 would have been \$555,833.

91.     Through September 15, 2003, Plaintiff had received a total of \$125,000 in total compensation from Gramercy for work done in calendar year 2003.

92.     Gramercy failed to give Plaintiff 30 days advanced notice of termination, as was required under the Offer Letter.

93.     Even if Plaintiff had not been wrongfully terminated, Plaintiff would be entitled to receive from Gramercy as earned wages the total sum of \$440,034 through October 15,

16

2003, the first date his termination could have been made effective under the Offer Letter.

94.     Plaintiff is justly entitled to receive from Gramercy an additional sum of $315,034 in earned wages through October 15, 2003.

## SEVENTH CLAIM

### (Unjust Enrichment and *Quantum Meruit*)

95.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 94 of this Complaint as if fully set forth herein.

96.     Plaintiff has performed valuable services for Gramercy which directly and substantially contributed to the profitability of Gramercy's business.

97.     Plaintiff is entitled to receive compensation for his work and labor which he performed for Gramercy on the basis of unjust enrichment and *quantum meruit*, in an amount not less than $315,034.

## EIGHTH CLAIM

### (Violation of Connecticut General Statutes Secs. 31-71c(b) and 31-71e)

98.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 97 of this Complaint as if fully set forth herein.

99.     Connecticut General Statutes Sec. 31-71c(b) provides: "Whenever an employer discharges an employee, the employer shall pay the employee's wages in full not later than the business day next succeeding the date of such discharge."

100.    Connecticut General Statutes Sec. 31-71e provides: "No employer may withhold or divert any portion of an employee's wages."

17

101.    Defendant failed and refused to pay Plaintiff <u>any</u> of the sums Plaintiff was due as earned wages, unless Plaintiff signed a general release releasing Gramercy from all further liability to Plaintiff, irrespective of cause. This includes $12,500 in base salary, as well as the bonus and profit-sharing payments Plaintiff was entitled to.

102.    This failure to pay and withholding of wages constitute violations of CGS Secs. 31-71c(b) and 31-71e.

103.    Pursuant to CGS Sec 31-72, Defendant is therefore obligated to pay Plaintiff twice the full amount of the wages withheld, with interest, costs and such reasonable attorney's fees as may be allowed by the court.

## NINTH CLAIM

### (Violation of Federal COBRA Act)

104.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 103 of this Complaint as if fully set forth herein.

105.    Gramercy is obligated by Federal law, under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), to provide Plaintiff with the right to have Plaintiff's medical insurance maintained in full force and effect.

106.    Gramercy informed Plaintiff upon Plaintiff's termination that it would comply with COBRA only if Plaintiff signed the proposed Separation and General Release Agreement which it presented to Plaintiff.

107.    Gramercy never gave Plaintiff the notice he was entitled to under the federal COBRA law regarding the retention of his medical insurance, nor did Gramercy continue Plaintiff's medical insurance in full force and effect.

18

108.     Defendant should be enjoined from violating Plaintiffs COBRA rights, should be required to put Plaintiff in the same position he would have been in had Defendant fully performed its statutory obligations and should be obligated to pay all statutory and other damages which the Court deems just and proper.

## TENTH CLAIM

### (Intentional Infliction of Emotional Distress)

109.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 108 of this Complaint as if fully set forth herein.

110.     Defendant's conduct was extreme and outrageous and was done with the intent of causing Plaintiff to suffer emotional distress and/or with reckless disregard as to whether Plaintiff would suffer emotional distress.

111.     As a result of Defendant's intentional, malicious, wanton, extreme and outrageous violation of Plaintiff's rights, Plaintiff has been caused to and did suffer and continues to suffer severe emotional and mental distress, anguish, humiliation, embarrassment, fright, shock, pain, discomfort and anxiety.

112.     Defendant acted with reckless, willful or callous disregard for Plaintiffs rights and with malice, fraud or oppression toward Plaintiff, thereby entitling Plaintiff to an award of punitive damages, reasonable attorneys' fees and costs.


WHEREFORE, Plaintiff prays for judgment as follows:

> a. On the FIRST CLAIM, awarding Plaintiff monetary damages in an amount to be proven at trial, but not less than $5,000,000, with interest

19

thereon.

b. On the SECOND, THIRD, FOURTH and FIFTH CLAIMS, awarding Plaintiff monetary damages in an amount to be proven at trial, but not less than $1,600,000, with interest thereon.

c. On the FOURTH CLAIM, granting Plaintiff injunctive relief against Defendant enjoining it from: (a) not informing prospective employees that they would be asked to work on abusive tax shelters, (b) fraudulently promoting, selling, or implementing abusive tax shelters, (c) falsely representing to investors that Gramercy is engaged exclusively in trading in emerging market securities for profit, (d) failing to disclose to investors that Gramercy devotes a substantial portion of its resources to packaging and executing tax shelters lacking in economic substance, and (e) otherwise aiding, abetting or engaging in deceptive, fraudulent or illegal business practices or requesting any Gramercy employee to do so.

d. On the SIXTH, SEVENTH and EIGHTH CLAIMS, awarding Plaintiff monetary damages in an amount to be proven at trial, but not less than $315,034, with interest thereon.

e. On the NINTH Claim, awarding Plaintiff statutory and other monetary damages in an amount to be proven at trial.

f. On the NINTH Claim, enjoining Defendant from violating Plaintiffs rights under the Federal COBRA statute, directing Defendant to restore Plaintiff's medical insurance in accordance with the requirements of law.

g. On the TENTH Claim, awarding Plaintiff monetary damages in an amount

20

to be proven at trial, but not less than $5,000,000, with interest thereon.

h. On the FIRST, SECOND, THIRD, FIFTH, NINTH and TENTH CLAIMS, awarding Plaintiff punitive damages in an amount to be determined.

i. Awarding Plaintiff his costs and expenses of this litigation, including reasonable attorneys' fees, costs and disbursements.

j. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: December 15, 2003

SAMUEL GOLDMAN & ASSOCIATES

By

260 Madison Avenue, 18th Fl.
New York, NY 10016
212-725-1400
Attorneys for Plaintiff

CERTIFIED AS A TRUE COPY ON

THIS DATE

BY

( ) Clerk
(✓) Deputy

21