**APPENDIX A
TO MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS, STAY OR TRANSFER**

I.  **GRAMERCY HAS HAD SUFFICIENT MINIMUM CONTACTS WITH TENNESSEE FOR THE MIDDLE DISTRICT OF TENNESSEE TO EXERCISE JURISDICTION OVER IT.**

   A.  **Gramercy's tortious misrepresentation and failure to disclose material facts caused injury in Tennessee. For that reason alone, the Middle District of Tennessee has jurisdiction over Gramercy.**

The Amended Complaint filed in the Middle District of Tennessee alleges that Gramercy conspired with the co-defendant, BDO Seidman, LLC to sell illegal tax shelters to numerous persons, including Messrs. Jones. *See e.g,.* Amended Complaint at ¶¶ 18, 29-36, 55-59, 73, 143-159][1] In the course of this conspiracy, numerous misrepresentations were made to Messrs. Jones and material facts were concealed from them. [Amended Complaint, ¶¶ 86-99, 112]. Many of these misrepresentations and concealments were made by BDO acting as co-conspirator with Gramercy. [Amended Complaint, ¶¶ 76-78, 87-93, 112]. Therefore, those misrepresentations and concealments are attributable to Gramercy and Gramercy is liable for them. [Amended Complaint, ¶¶ 78, 87].

Additional facts were concealed and misrepresentations were made directly by Gramercy during a meeting in New York City. The allegations of the Amended Complaint concerning that meeting include the following:

> 94.    In April of 2002, Messrs. Jones, Steve Solys[2] and Puckett (representing BDO) met with Johnston (representing Gramercy) at the offices of BDO in New York.

---

[1] A copy of the Amended Complaint from the Tennessee Case is Exhibit 2 to the declaration of Winston S. Evans (hereinafter "Evans Declaration").

[2] Mr. Solys is the financial planner for Messrs. Jones.

A-1

95. Prior to the meeting, Puckett told Messrs. Jones that they should not ask any questions of Gramercy concerning the tax implications of the transactions which BDO had recommended. He explained that it was important for Gramercy to be independent and separate from BDO and the tax advice it was giving in order for the transactions to survive any scrutiny by the IRS. Thus, he expressly or impliedly represented that Gramercy was acting independently and separately from BDO and the tax advice it was giving.

96. In truth and in fact, BDO and Gramercy were not independent. Instead, BDO and Gramercy were acting as co-promoters for the tax shelter which was being sold to Messrs. Jones and had acted as co-promoters on tax shelters which had been sold and recommended to other clients. Neither BDO nor Gramercy ever revealed this to Messrs. Jones.

97. To make matters worse, BDO and Gramercy even had an established practice of sharing "consulting fees" which were paid to BDO by clients who invested in the tax shelters which BDO had recommended, including the tax shelters which were being recommended to Messrs. Jones. **Exhibit 4.**[3] Indeed, BDO and Gramercy intended to share the consulting fees which Messrs. Jones would pay to BDO. Neither BDO nor Gramercy ever revealed this to Messrs. Jones.

98. BDO's sharing of consulting fees, including the consulting fees paid by Messrs. Jones, was an unethical fee-splitting arrangement and in violation of Section 53 of the AICPA Code of Professional Conduct. Neither BDO nor Gramercy ever revealed this fee splitting arrangement to Messrs. Jones.

99. At the meeting in the New York offices of BDO, Messrs. Jones and Mr. Solys inquired as to what compensation Gramercy would receive for implementing the transactions. In response, Puckett and Johnston represented that Gramercy would receive a standard monthly management fee (equal to a small percentage of assets under management) and annual performance based fee (20% of the capital appreciation in the accounts of Messrs. Jones, net of management fee and expenses). This was false. They did not disclose that BDO and Gramercy would split the consulting fees which Messrs. Jones would pay to BDO.

Even though these tortious acts of Gramercy occurred in New York, the resulting tortious injury was still sustained within Tennessee. Therefore, jurisdiction lies in Tennessee. *See*, *Neal v.*

---

[3] At one point, BDO even deposited $800,000 with Gramercy. **[**Amended Complaint, Exhibit 5**]**

*Jannsen*, 270 F.3d 328 (6th Cir. 2001) which stated as follows in affirming the Middle District of Tennessee and finding that jurisdiction existed over a non-resident of Tennessee:

> Tennessee allows a court to exercise jurisdiction "if a tortious act is committed outside the state and the resulting injury is sustained within the state, the tortious act and the injury are inseparable, and jurisdiction lies in Tennessee." *Tenn. Code Ann. § 20-2-214(a)*. Accordingly, even a single act by defendant directed toward Tennessee that gives rise to a cause of action can support a finding of minimum contacts sufficient to exercise personal jurisdiction without offending due process. See *Calder v. Jones*, 465 U.S. 783, 79 L. Ed. 2d 804, 104 S. Ct. 1482 (1984) (minimum contacts with California found where journalist wrote defamatory article in Florida that he knew would affect plaintiff in California).

270 F.3d at 331 (emphasis supplied).

In *Jasper Aviation, Inc. v. McCollum Aviation, Inc.*, 497 S.W.2d 240 (Tenn. 1972), a Tennessee corporation was defrauded by misrepresentations made by a resident of Illinois. Explaining as follows, the Tennessee Supreme Court held that it was immaterial whether the misrepresentations were made within or without Tennessee:

> . . . But, we need not reach the question of whether the misrepresentations themselves were made within or without the State, for even if all the tortious acts in a case were committed outside the State of Tennessee, as in *Hanvy*, but the resulting tortious injury was sustained within the State, then the tortious acts and the injury are inseparable and jurisdiction lies in *Tennessee*. [citations omitted]

497 S.W.2d at 244 (underlining supplied, italics in original).

In *Third National Bank in Nashville v. Shearson Equipment Management Corporation,* 619 F.Supp. 907 (N.D. Tenn. 1984), a non-resident defendant moved to dismiss for lack of jurisdiction. Defendant was a Delaware corporation with its principal place of business in New York. Its personnel had solicited personnel of the Third National Bank for a tax shelter. In denying the motion to dismiss, Judge Neese stated as follows:

A-3

> The further fact that any tortious action of the defendant allegedly causing proximately damage to the Bank within Tennessee was committed outside of Tennessee, does not prevent the Bank from reaching the purported tort-feasor under the "long-arm statute" of Tennessee.

619 F.Supp. at 911 *citing, Jasper Aviation, supra*.

*See also, Cannon v. Metcalfe*, 458 F.Supp. 843 (E.D. Tenn.1977) (Where a non-resident defendant committed tortious acts outside Tennessee but the resulting tortious injury was sustained within Tennessee, the tortious acts and injury were inseparable so that jurisdiction lay in Tennessee); *Steelman v. Strickland*, 78 F.R.D. 187 (E.D. Tenn. 1976)(same); and *National Union Fire Insurance v. Aerohawk*, 259 F.Supp.2d 1096, 1102 (D. Idaho 2003)(allowing jurisdictional discovery and holding that jurisdiction would lie where tortious acts outside Idaho caused injury to be sustained within Idaho).

In *Masada Investment Corp. v. Allen,* 697 S.W.2d 332 (Tenn. 1985) a Texas attorney prepared documents to consummate a real estate transaction in Tennessee. While the attorney never entered Tennessee and had no direct financial interest in the transaction, his work was a vital component of the transaction. The plaintiff alleged that the attorney had used an incorrect property description and that his error had caused injury in Tennessee. Explaining as follow, the Tennessee Supreme Court held that this was sufficient for Tennessee to exercise jurisdiction over that non-resident attorney from Texas:

> T.C.A. § 20-2-214 was considered a "single act" statute, one in which jurisdiction was assumed only over causes of action arising out of the defendant's activities in the state, until the addition of subsection (6) in 1972. A three-pronged test had been developed to determine the outer limits of personal jurisdiction based on a single act; the defendant must purposefully avail himself of the privilege of acting in or causing a consequence in the forum State; the cause of action must arise from the defendant's activities there; and defendant's acts or consequences must have a substantial connection with the forum to make the exercise of jurisdiction reasonable. *Southern*

> *Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). <u>Subsection (6) changed the long-arm statute from a "single act" statute to a "minimum [**7] contacts" statute which expanded the jurisdiction of Tennessee courts to the full limit allowed by due process</u>. *Shelby Mutual Ins. Co. v. Moore*, 645 S.W.2d 242, 245 (Tenn. App. 1981). <u>That decision, quoting extensively from *Gullett v. Qantas Airways Ltd.*, 417 F. Supp. 490 (M.D. Tenn. 1975), noted that the *Mohasco* test was now too restrictive</u>. The *Moore* court noted that three primary factors are to be considered in determining whether the requisite minimum contacts were present: the quantity of the contacts, their nature and quality, and the source and connection of the cause of action with those contacts. Two lesser factors to be considered are the interest of the forum State and convenience. The *Moore* court concluded:
>
>> The phrase "fair play and substantial justice" must be viewed in terms of whether it is fair and substantially just to both parties to have the case tried in the state where the plaintiff has chosen to bring the action. In each case, the quality and nature of those activities in relation to the fair and orderly administration of the law must be weighed. As stated above in *Qantas*, this must involve some subjective value judgment [**8] by the courts.
>
> *645 S.W.2d at 246*.

697 S.W.2d at 334-335 (emphasis supplied).

*See also, Shelby Mutual Insurance Company v. Moore*, 645 S.W.2d 242 (Tenn.Ct.App. 1981) (likewise explaining at length that the *Mohasco* test is too restrictive because Tennessee long-arm statute now extends "to the full constitutionally permissible limits"); and *Progeny Marketing v. Farmers & Merchants Bank*, 2005 Tenn.App. LEXIS 208 (Tenn.Ct.App., Middle Section 2005) (*Mohasco* test too restrictive because amendment to Tennessee long-arm statute changed that statute from a "single act" statute to a "minimum contacts" statute).

Finally, out of state entities should not be permitted to escape jurisdiction even if the sole basis for jurisdiction is tortious conduct outside the state which causes injury inside the state. As Judge Hull stressed in *First Federal Savings Bank of Tennessee v. Jefferson Savings & Loan Association*, 640 F.Supp. 47 (E.D.Tenn. 1986):

> . . . <u>It would indeed seem odd if we were to allow an out of state entity, whose sole contact with the state was a fraudulent act to escape jurisdiction for the reason that it did not have sufficient contacts with the forum. Although the contact in such a case is minimal, it is nonetheless purposeful. The cause of action arises from the defendant's contact with the forum; and, the forum state has a substantial interest in affording its citizens convenient and effective redress in these circumstances</u>. . . .

640 F.Supp. at 49 (emphasis supplied).

    **B.**    **Additional facts further establish that Gramercy has had sufficient contacts with Tennessee for the Middle District of Tennessee to exercise jurisdiction over it.**

As explained, the misrepresentations and omissions of Gramercy are *alone* sufficient for jurisdiction to be exercised over it. However, there are additional facts which establish that Gramercy had substantial and continuing contacts with Tennessee. *A fortiori*, Gramercy had the requisite "minimum contacts" for jurisdiction in the Middle District of Tennessee.

To begin, the documents which Messrs. Jones signed, including the Investment Management Agreements ["IMAs"], were prepared by Gramercy and sent to Messrs. Jones in Tennessee. Messrs. Jones signed those documents in Tennessee.

The IMA's specified that the initial term of those agreements would be one year and would automatically renew for additional annual terms. Further, the agreements continued have continued in effect <u>for more than four years</u>. Thus, this was not the proverbial "one shot" transaction.

Next, The IMA's specified that Messrs. Jones would invest a total of <u>$2,400,000</u> to be managed by Gramercy. As required by the IMAs, Messrs. Jones invested approximately this amount for management by Gramercy. This alone demonstrates that Gramercy's dealing with Messrs. Jones was a significant commercial transaction.

During the time that Gramercy has managed investments for Messrs. Jones, it has sent monthly statements to Messrs. Jones in Tennessee. It has also conducted telephonic conference calls on a regular basis with its investors, including Messrs. Jones in Tennessee. Messrs. Jones participated from Tennessee in several of those conference calls. Thus, Gramercy has sent numerous communications to Tennessee and has done that on a continuing and systematic basis.

During those same years, Gramercy has received substantial fees for managing the accounts of Messrs. Jones. It is believed that those fees exceed $350,000.[4] This is *in addition to that portion of the fees which Messrs. Jones paid to BDO and which it is believed that BDO secretly paid to Gramercy.* Thus, it appears that Gramercy may have received as much as $750,000 from its dealings with Messrs. Jones who are residents of Tennessee.[5]

Finally, Gramercy sent brochures to Carleton Jones and John Jones in Tennessee in 2005, soliciting them for investments in three other funds which are managed by it. This alone demonstrates that Gramercy has purposely availed itself of the privilege of doing business in Tennessee.

All of this is *in addition to* the fact that Gramercy committed tortious acts which caused injury to be sustained within Tennessee. Thus, there is a compelling basis for jurisdiction in Tennessee.

---

[4] The statements which Gramercy sent to Messrs. Jones for the period prior to March 31, 2004 do not reveal the amount of fees which Gramercy charged to their accounts. The statements for the period April 1, 2004 through December 31, 2006 reveal that Gramercy charged $253,397 in fees during those months alone.

[5] In the Tennessee Case, Messrs. Jones have propounded interrogatories and document requests to BDO and Gramercy attempting to discover the amount of fees which BDO "split" with Gramercy.

A-7

II. **GRAMERCY CONSPIRED WITH BDO AND BDO COMMITTED OVERT ACTS IN FURTHERANCE OF THAT CONSPIRACY IN TENNESSEE. FURTHER, THE MIDDLE DISTRICT OF TENNESSEE UNDENIABLY HAS JURISDICTION OVER BDO. FOR THIS REASON ALONE, THE MIDDLE DISTRICT OF TENNESSEE HAS JURISDICTION OVER GRAMERCY.**

In order for this Court to exercise its jurisdiction over Gramercy, Messrs. Jones do not rely solely on the contacts which Gramercy has had with Tennessee. As an alternative basis for personal jurisdiction, they also rely on the fact that Gramercy conspired with BDO and BDO committed overt acts in furtherance of that conspiracy in Tennessee. Further, BDO is clearly subject to the jurisdiction of the Middle District of Tennessee. For this reason alone, the Middle District of Tennessee has jurisdiction over Gramercy. *Chenault v. Walker*, 36 S.W.3d 45 (Tenn. 2001) (non-resident defendant who lacks sufficient "minimum contacts" with the forum state but who is involved in a conspiracy may nevertheless be subject to jurisdiction because of a co-conspirator's contacts with the forum). *See also*, *Kentucky Speedway, LLC v. NASCAR*, 410 F. Supp. 2d 592, 600 (E.D.Ky. 2006)("The court holds that these allegations are sufficient to meet the conspiracy theory of personal jurisdiction as above described and that the better view is to recognize this doctrine in appropriate cases").

> This **[*15]** "conspiracy theory" of personal jurisdiction is widely accepted by the courts. See, e.g., *Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1392 (7th Cir. 1983) (citing cases); *Remmes v. Int'l Flavors & Fragrances, Inc.*, 389 F. Supp. 2d 1080, 1093-94 (N.D. Iowa 2005) (citing cases); *Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 574 (S.D.N.Y. 2003), vacated in part on other grounds by 388 F.3d 39 (2d Cir. 2004). Whether an alleged conspiracy can establish personal jurisdiction is a question of state law. *Remmes*, 389 F. Supp. 2d at 1094 (citing *Davis v. A&J Elec.*, 792 F.2d 74, 76 (7th Cir. 1986); *Textor*, 711 F.2d at 1392-93). Minnesota has endorsed the conspiracy theory of personal jurisdiction.

*Personalized Brokerage Services v. Lucius*, 2006 U.S. Dist. LEXIS 36176 (D.Minn. 2006)(emphasis supplied).

At this point, Messrs. Jones are seeking to conduct discovery in order to establish facts demonstrating the existence of the conspiracy between BDO and Gramercy. In the meanwhile, there is ample reason to believe that this conspiracy existed. The proverbial "smoking guns" are found in *United States of America v. BDO Seidman, LLP* (United States District Court for the Northern District of Illinois, Eastern Division) [Civil Action No. 02-4822]. In that case, Internal Revenue Agent Sandra Alvelo has filed several declarations. Her Second Supplemental Declaration and her Fifth Supplemental Declaration are particularly revealing.[6] Those declarations establish that Gramercy did conspire with BDO and had an established practice of secretly splitting the fees which clients paid to BDO. The Fifth Supplemental Declaration of Agent Alvelo includes the following:

> 7. Based upon my examination of *BDO* thus far, I have found that in 2001, *BDO* and *Gramercy* marketed prepackaged distressed debt tax shelter transactions to Intervenors Cuillo, Khan, Lowry, and Moffit;
>
> . . .
>
> 24. During 2000, *BDO* marketed distressed debt products developed by both *Gramercy Advisors* and ICA/Bricolage. See e-mail dated August 11, 2000, Govt. Ex. A-13; TSG Agenda dated November 5, 2000, Govt. Ex. A-16; e-mail dated November 16, 2000; Govt. Ex. A-17; e-mail dated December 22, 2000, Govt. Ex. A-19; e-mail dated December 27, 2000, Govt. Ex. A-20; e-mail dated January 2, 2000, Ex. A-21; e-mail dated January 2, 2000, Govt. Ex. A-22; e-mail dated January 4, 2001, Govt. Ex. A-26; e-mail dated February 9, 2001, Govt. Ex. A-27.
>
> . . .
>
> 27. A *BDO* e-mail dated January 23, 2002, reflects that <u>in January 2001, BDO paid *Gramercy* $800,000 as a 50% deposit of the broker's fee for distressed debt funds (with *Gramercy* paying the other 50%), and that it was initially intended that BDO's portion of the deposit would be repaid by *Gramercy* to BDO by October, 2001</u>. See e-mail dated January 23, 2002, Govt. Ex. A-46, attached hereto;
>
> . . .

---

[6]Copies of these declarations are attached as Exhibits 8 and 9 to the Declaration of Winston S. Evans.

29. By e-mail dated April 5, 2001, Robert Greisman of *BDO* wrote to Charles Bee of BDO concerning the agenda for a TOC meeting to compare *BDO's* fee structure with *Gramercy* to that of Diversified Group, Inc. ("Diversified"), dating:

> When we have our TOC call on Monday at 10 on the new deal, we should also cover pricing and fees. (you should have received a pricing sheet from Jimmy [Haber of Diversified] after our call with him early in the week.) In comparing to *Gramercy*, I think it's about the same fee to us. Assuming no expenses in *Gramercy* deal, we net 4.6 (capital at 7% x 2/3) and 6.6% ordinary (10% x 2/3). With Jimmy, it looks like we'd be at 4.5% capital and 6% ordinary (see his worksheet.) Moreover, if he's only taking 2.25% I presume we'll be on our own in absorbing ADC fees, <u>whereas *Gramercy* shares them with us.</u> All that said, not a bad deal with Jimmy, but not head and shoulders better than *Gramercy*. Let me know if you see it different.

See *BDO* e-mail dated 4/5/01, Govt. Ex. A-47, attached hereto;

. . .

31. Charles Bee further commented (a few minutes later):

> I went over diversified's "listing" analysis. It raises some interesting points, in particular, #5 but I don't see how they are concluding that a 5% of tax profit potential exempts promoters from listing. However, this is not inconsistent with the IRS boast that none of the deals have "any" profit potential.
>
> Did you see that OTSA [IRS Office of Tax Shelter Analysis] is setting up teams for each promoter. This worries me about Diversified and ICA/Bricolage. The newspapers have contacted all of them as well as us. We got our letter. They are putting together information about us and them. I think we ought to be hedging our bets. They don't have "privilege." I think we should go forward with *Gramercy* on some kind of transaction, similar to the ICA deal and Diversified's deal but different. We should also go forward with Bricolage for the time being. What do you think?

>See *BDO* e-mail dated 4/5/01, Govt. Ex. A-48, attached hereto;

. . .

38. By e-mail dated April 26, 2001, at 3:19 p.m., Robert Greisman reported to *BDO's* TOC:

>In connection with the Helios (Haber) transaction - - please respond to this question: should Helios charge its fee and we charge our fee independently, or should we charge the entire fee and pay Helios, *as we do with Gramercy*? Please respond to the committee with your answer and reasoning by the close of business on Monday April 30 (sooner if possible) so that we can bring our pricing considerations on this structure to a conclusion.

>See e-mail dated April 26, 2001, at 3:19 p.m., Govt. Exs. A-54 and A-55, attached hereto;

. . .

42. On May 2, 2001, Michael Kerekes reported to *BDO's* TOC that an issue had arisen with respect to "packages of distressed debt *Jay Johnston [of Gramercy]* wants to acquire to use in our transactions." Kerekes explains that if the debt is subject to the "mark to market" rules in the Internal Revenue Code, it "would of course render it useless for our purposes." See Kerekes memo dated May 2, 2001, Govt. Ex. A-57, attached hereto . . .

(underlining and italics supplied)[7]

At ¶¶53-69, Agent Alvelo describes three "Gramercy distressed debt transaction[s]" (abusive tax shelters). She states that, in the Cuillo 2001 Gramercy distressed debt transaction, the taxpayer (Cuillo) paid $1,470,000 to BDO and that BDO paid $499,800 of that amount to Gramercy. Alvelo Fifth Supplemental Declaration at ¶¶55, 56.

The Second Supplemental Declaration of Agent Alvelo includes the following:

---

[7] Jay Johnston is the co-managing partner of Gramercy.

A-11

38. J&G [Jenkins & Gilchrist] produced a list of 43 "clients" who invested in Bricolage, *Gramercy*, or J&G "type transactions" in 2000, all of whom were also claimed by BDO in this action to have been *BDO* "clients" [See list, Govt. Ex. B-16 (redacted)];

39. J&G produced a list of 16 "clients" who participate in *Gramercy*/Bricolage type transactions, which listed the amounts of the capital and/or ordinary loss to be generated, the amount of the loss utilized, and the amount of the fee to *Gramercy* and/or Bricolage [See *Gramercy*/Bricolage Fees, Govt. Ex. B-17 (redacted)];

. . .

45. The binary option transaction is the same as or substantially similar to one of the abusive tax shelter transactions identified in IRS Notice 2000-44

46. The distressed debt transaction is a hybrid of the abusive tax shelter transactions identified in IRS Notices 2000-44, 2002-50, and 2002-65.

47. As detailed herein, *BDO*, Brown & Wood and *Gramercy* co-developed, promoted and marketed a binary option tax shelter;

48. By e-mail dated November 16, 2000, *Jay Johnston of Gramercy Advisors*, notified Charlie Bee of *BDO* and Ruble of B&W that *Gramercy* had translated data in Brazilian Real for use in their distressed debt product [See e-mail dated November 16, 2000, Govt. Ex. A-17];[8]

49. By e-mail dated December 1, 2000, Lawrence Cohen of *BDO* forwarded Ruble of B&W a file marked "binary opinion" [E-mail dated December 1, 2000, Govt. Ex. A-18];

50. By e-mail dated December 22, 2000, Ruble of B&W forwarded *Johnston of Gramercy* and Larry Cohen and Michael Kerekes of *BDO* "a first cut at the basic option for the Fund deals," attached as a file marked "*BDO* Model Distressed Debt Fund," to take a look at" and "give me your thoughts" [See e-mail dated December 22, 2000, Govt. Ex. A-19];

---

[8]These materials include several references to communications between Johnston of Gramercy and R.J. Rubel, an attorney at the law firm of Brown and Wood. Mr. Rubel is one of several defendants who have been indicted for promoting and selling fraudulent tax shelters in *U.S. v. Stein,* Case No. 05cr00888 (S.D.N.Y.).

51. By e-mail dated December 27, 2000, *Johnston of Gramercy* responded "[p]lease see the changes that I made and let me know what your thoughts are," to which he attached a file marked "*BDO* Model Distressed Debt Fund Opinion Draft.doc" [See e-mail dated December 27, 2000, Govt. Ex. A-20]'

. . .

58. By e-mail dated January 4, 2001, Ruble of B&W forwarded, at the request of *Johnston of Gramercy*, a copy of the model distressed debt fund opinion to an outside attorney, Siegal, who had a client doing a distressed debt transaction:

> At hte [sic] request of *Jay Johnston* I am forwarding to you the form of tax opinion that we propose to issue. The attached has been reviewed by *BDO* Seidman *and by Jay [Johnston]*.

[See e-mail dated January 4, 2001, Govt. Ex. A-26];

. . .

61. By e-mail dated January 23, 2001, *Jay Johnston of Gramercy Advisors* wrote to Ruble of B&W, "[h]ow are we doing on tax opinions? On the binaries, what information do you need from me to get things done. Let me know how I can help." [See e-mail dated January 23, 2001, Govt. Ex. A-29];

. . .

63. By e-mail dated January 26, 2001, Ruble of B&W wrote to *Johnston of Gramercy*:

> I have a long standing relationship with partners in the Personal Financial Planning group at KPMG. One of their San Francisco partners and an old friend, Randy Bickham, inquired whether I would be able to put him in contact with someone who could manage a 704(c) type of fund and find the distressed debt. He had heard about the structure in the market and has a limited number of clients, perhaps 3 or 4 (but at least 1 in the 100 million range), who would probably be willing to get into some kind of tax enhanced investment fund, but would be less comfortable about a pure loss type of transaction.

>**I did not mention you, because I'm sensitive to your relationship with _BDO_.** On the other hand others do similar deals, so I don't believe that the technology is proprietary. Would you have an interest in speaking with Randy on the basis that he conversation would be held in confidence by all concerned?

[See e-mail dated January 26, 2001, Govt. Ex. A-31 (emphasis supplied)]

. . .

68. By e-mail dated January 29, 2001, _Jay Johnston of Gramercy_ wrote to Ruble of B&W, stating:

> Let me know if there are things you need from Gramercy to assist in the completion of the opinions. Also, are you still okay writing a 2000-44 opinion for .... They should be virtually identical.

[See e-mail dated January 29, 2001, Govt. Ex. A-33 (redacted)];

. . .

73. By e-mail dated April 12, 2001, Ruble of B&W forwarded the "_BDO_ Distressed Debt Fund Basis . . ." document to _Johnston of Gramercy_ and Cohen of BDO [See e-mail dated April 12, 2001, Govt. Ex. A-38];

74. By e-mail dated April 12, 2001, Ruble of B&W wrote Cohen of _BDO_, stating:

> [w]ere working on [the Binary options] now. I can't get the rep letter set up without the attachment and I can't do that until we incorporate _Jay [Johnston]_**'s** info into the text. That will happen tonight on all but .... _Jay [Johnston]_ sent info on those, but in mime, which is totally incompatible with out sstem [sic]. We won't be able to get those converted until tomorrow am.

[See e-mail dated April 12, 2001, Govt. Ex. A-39 (redacted)];

. . .

A-14

141. Based upon subsequent communications, detailed below, it appears that the BDO consulting agreements with Lowry and Moffitt were used to purchase the binary option transaction that *BDO* and Brown & Wood co-developed with *Gramercy*;

142. By e-mail dated April 13, 2001, Ruble wrote to Lawrence Cohen of *BDO*, with a copy to *Jay Johnston of Gramercy Advisors*, under the subject line "Binaries that I have," stating:

> I am attaching the 6 binaries that I have and have incorporate [sic] information from *Jay [Johnston]*. Please review the facts on the first 5 pages. Please add any additional fact, such as additional cash, options, contributions to partnerships that you are aware of. I will then do everything in my power to turn them, but I cannot make any promises as to time at this point. Because the rep letter relies on an accurate statement of facts, as set forth in the attachment, I can't even get the rep letters to you and Paul, which I sincerely want to do until I get the full facts (if there are any more from you, *Jay [Johnston]*, Paul or some [sic] anybody else).

[See e-mail dated April 13, 2001, Govt. Ex. D-4 (redacted)] . . .

(Underlining and italics supplied; boldfacing in original).[9]

Further reason to believe that Gramercy was involved in promoting abusive tax shelter is found in *Ronen Olshansky v. Gramercy Advisors, LLC* [Docket No. 03-CV-9943], filed in the Southern District of New York. In that case, the plaintiff, Ronen Olshansky, alleged that he was wrongfully terminated from his position as a vice-president of Gramercy. In particular, he alleged the following:

1. This is an action arising from the unlawful termination of Plaintiff's employment as a Vice President of Gramercy (a hedge fund manager). Plaintiff was terminated because he told Gramercy and its principals that they should comply with United States tax laws regarding abusive tax shelters, and because Gramercy perceived the threat that Plaintiff would act as a

---

[9] For clarity, "[Johnston"] has been added when there was a reference simply to "Jay" in the original document.

whistleblower on <u>Gramercy's very lucrative, but unlawful business of structuring transactions, which generated large tax losses, but had little or no economic substance</u>.

. . .

9. . . . In early 2002, one of Gramercy's principals approached Plaintiff about coming to work for Gramercy as an investment analyst and bond trader, using the expertise he had acquired at Lehman Brothers in the foreign currency markets.

10. Subsequently, Plaintiff was offered a position as Vice President and was promised that he would work as an investment analyst and bond trader.

. . .

20. Over the course of Plaintiff's employment, he began to realize that he was not being asked to trade in securities or do investment analysis. Rather, he was being asked to work on the <u>structuring of large transactions which generated significant tax losses for Gramercy clients, while sheltering them from the economic risk of incurring actual cash losses or gains of any significance</u>.

21. Over time, it became clear to Plaintiff that these <u>tax oriented transactions were responsible for a substantial proportion of Gramercy's profits, while Gramercy's ostensible core business of trading in securities for investors accounts for investment gains was doing poorly, and in fact substantially underperforming comparable market indices</u>.

. . .

23. In June or July of 2003, Gramercy received from BDO Seidman, an accounting firm with which Gramercy had extensive business activities, an Information and Document Request from the US Internal Revenue Service (the "IDR"), questioning a transaction that Gramercy had structured and executed on behalf of a partnership managed by Gramercy and largely owned by a client referred to Gramercy by BDO Seidman.

24. The IDR questioned the investment rationale of this transaction as well as the economic value and substance of the "worthless assets" which were purchased for the partnership and which had generated large tax losses for Gramercy's and BDO Seidman's mutual client.

. . .

A-16

26. At a meeting held at the end of July 2003 in Gramercy's offices, with outside professionals participating by conference call, the focus of discussion was how to structure a partnership for a new investor which would generate significant capital losses to offset the capital gains attributable to the sale of a family business. At this meeting, Plaintiff suggested that in order to comply with Federal law and IRS regulations, Gramercy should consider registering the transaction with the IRS as a "potentially abusive tax shelter."

27. Plaintiff was immediately informed by one of Gramercy's principals that he should not concern himself with this issue, and that other people would deal with it.

28. Shortly thereafter and as a result of his comments at the July 2003 meeting, Plaintiff's duties and responsibilities at the firm were substantially diminished. . . .

29. Plaintiff was also requested to write a memorandum on each of the tax oriented transactions that Plaintiff had been involved in, setting forth the investment rationale and economic substance behind these transactions.

30. Plaintiff informed Gramercy's principal that he would not lie or make up facts in preparing these memoranda.

31. <u>Plaintiff had also informed Gramercy's principal that he was particularly uncomfortable with the lack of substance and transparency of the firm's investments in Russia.</u>[10]

. . .

34. On September 15, 2003, Plaintiff returned from a short trip to Europe and called into the office. During this call, he was informed that he had been terminated, effective that day. . . .

. . .

37. The real reason for which Plaintiff was fired was because: (1) he had told the principals of Gramercy firm that they should comply with the United States tax laws relating to abusive tax shelters, including the law requiring them to register certain transactions which created very large tax losses, but almost no likelihood of economic gain, as potentially abusive tax shelters under the Internal Revenue Code; and (2) because Gramercy's principals feared that

---

[10] Note that the tax shelter for Messrs. Jones likewise involved distressed debt of an entity in Russia.

A-17

>   Plaintiff would be a "whistleblower" on their unlawful activities, and that Plaintiff would not cooperate with them in trying to justify their bogus transactions as having economic reality or in structuring future abusive tax shelters.
>
>   . . .
>
>   71.   Gramercy has engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its business by (a) not informing prospective employees that they would be asked to work on abusive tax shelters, (b) <u>fraudulently promoting, selling, or implementing abusive tax shelters</u>, (c) <u>falsely representing to investors that Gramercy is engaged exclusively in trading in emerging market securities for profit</u>, (d) <u>failing to disclose to investors that Gramercy devotes a substantial portion of its resources to packaging and executing tax shelters in economic substance</u>, and (e) otherwise aiding, abetting or engaging in deceptive, fraudulent or illegal business practices or requesting its employees to do so.

(emphasis supplied).[11]

Also of interest is a memorandum filed by the Government in *U.S. v. Stein* (S.D.N.Y. Docket #05CR-888). *Stein* is an ongoing prosecution of former principals of KPMG and others (including Mr. Rubel from the firm of Brown & Wood) for promoting and selling abusive tax shelters. At page 24 of its Memorandum of Law in Support of its Motion Seeking the Admission of Certain "Other Crimes" Evidence, <u>the Government describes Gramercy as a "tax shelter promoter</u>." [Evans Declaration, Exhibit 11.]

At page 16, the Government states that "Hasting [a co-defendant] was paid a secret $75,000 commission by Gramercy in consideration for Hasting recommending or counseling KPMG clients to engage in Gramercy 'distressed debt' tax shelter transactions." [Evans Declaration, Exhibit 11.] It was such a "distressed debt" transaction which BDO and Gramercy induced Messrs. Jones to enter.

---

[11]The *Olshansky* case was apparently settled in April, 2004. In an attempt to learn more about the facts giving rise to Olshansky's complaint, Messrs. Jones have, in the Tennessee Case, issued and served a subpoena *duces tecum* upon Olshansky's lawyer, Mr. Sam Goldman. The subpoena seeks production of documents relating to that lawsuit.

Finally, there is the Form ADV which Gramercy, as a registered investment advisor, must deliver to its clients and file with the Securities and Exchange Commission.[Evans Declaration, Exhibit 12.]   At §11 of its Form ADV from April, 2003, Gramercy states as follows:

> Gramercy provides clients services including goal setting, investment strategies and <u>tax execution</u>.

(Emphasis supplied).

This further confirms the involvement of Gramercy in promoting tax shelters and its conspiracy with BDO.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **APPENDIX A TO MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS, STAY OR TRANSFER** has been served via **Electronic Transmission** upon:

Michael Edward Petrella, Esq.
O'Shea Partners, LLP
90 Park Avenue, 20th Floor
New York, NY 10016

Richard D. Meadow, Esq.
The Lanier Law Firm, PLLC
126 East 56th Street, 6th Floor
New York, NY 10022

via **Electronic Transmission and Federal Express** upon:

Hon. Lawrence M. McKenna, District Judge
United States Courthouse
500 Pearl St., Room 1640
New York, NY 10007


this 19th  day of June, 2007.


                                                      s/ Winston S. Evans

361400.031