# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

```
------------------------------------------------------------X
JOHN A. JONES and CARLETON A.          |
JONES, III,                            |
                                       |      Case No. 3:06-CV-1115
Plaintiffs,                            |      Judge Echols
                                       |
v.                                     |      Magistrate Judge Brown
                                       |
BDO SEIDMAN, LLP and GRAMERCY          |
ADVISORS, LLC,                         |
                                       |
Defendants.                            |
------------------------------------------------------------X
```

**MEMORANDUM OF LAW OF DEFENDANT GRAMERCY ADVISORS LLC IN
SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT FOR LACK OF
PERSONAL JURISDICTION OR, ALTERNATIVELY, TO DISMISS PURSUANT TO
*FED. R. CIV. P.* 9(b), 12(b)(1) AND 12(b)(6)**

Julie Murphy Burnstein (No. 18149)
**BOULT, CUMMINGS, CONNERS &
   BERRY, PLC**
1600 Division Street
Suite 700
P.O. Box 340025
Nashville, TN 37203
Tel. (615) 252-2338

Sean F. O'Shea (admitted *pro hac vice*)
Michael E. Petrella (admitted *pro hac vice*)
**O'SHEA PARTNERS LLP**
90 Park Avenue, 20th Floor
New York, New York 10016
Tel: (212) 682-4426

*Attorneys for Gramercy Advisors LLC*

## PRELIMINARY STATEMENT

Defendant Gramercy Advisors LLC ("Gramercy") submits this Memorandum of Law in support of its motion pursuant to *Fed. R. Civ. P.* 12(b)(2) to dismiss the Amended Complaint on the grounds that this Court lacks personal jurisdiction over Gramercy or, in the alternative: (1) pursuant to *Fed. R. Civ. P.* 9(b), for failure to plead fraud with specificity; (2) pursuant to *Fed. R. Civ. P.* 12(b)(6) on the ground that the Complaint fails to state a claim upon which legal relief may be granted; and (3) pursuant to *Fed. R. Civ. P.* 12(b)(1), on the ground that the Court should decline to entertain Plaintiffs' demand for declaratory judgment.

The Court should dismiss this action as to Gramercy because it lacks personal jurisdiction. As is apparent from the face of the Amended Complaint, Plaintiffs traveled to New York to retain Gramercy to perform services outside of Tennessee. Gramercy's only contact with Tennessee consisted of purely incidental communications with Plaintiffs that, as a matter of law, do not give rise to *in personam* jurisdiction. That Plaintiffs allegedly felt their injuries here is insufficient to overcome the absence of any purposeful availment of the forum by Gramercy.

Even if the Court were to assert jurisdiction, it should nevertheless dismiss on the merits. Plaintiffs – who are sophisticated multimillionaires – claim they were sold bad tax advice. It is difficult to discern Gramercy's place in this lawsuit, since the Amended Complaint is explicit – adamant, even – that Gramercy never rendered any tax advice to the Plaintiffs. As Plaintiffs themselves tacitly acknowledge, the investment strategy at issue was designed and conceived by Plaintiffs' legal, tax, and accounting advisors, Defendant BDO Seidman, LLP ("BDO") and De Castro, West, Chodorow, Glickfield & Nass, Inc. ("De Castro"), which allegedly advised Plaintiffs that the prescribed financial transactions would have beneficial tax consequences.[1] BDO subsequently referred Plaintiffs to Gramercy, which was retained to execute the transactions necessary to effectuate the strategy designed by BDO and De Castro. (See

---

[1] Gramercy expresses no opinion at this time regarding the legality of the tax strategy pursued by Plaintiffs, and nothing herein should be construed to state or imply that BDO or De Castro engaged in misconduct.

1

Amended Complaint,[2] ¶ 34).  BDO – not Gramercy – later prepared Plaintiffs' tax returns, which reflected the tax benefits allegedly promised by BDO and De Castro.

Moreover, by Plaintiffs' own explicit and implicit admissions, Gramercy – in contrast to BDO – did not possess any tax expertise (*see id.*, ¶¶ 27, 71, 169-183), and is not alleged to have made any tax- or IRS-related representations whatsoever.  Indeed, the Investment Management Agreements ("IMA") between Gramercy and Plaintiffs and associated written instruments stated in the clearest possible terms that Gramercy was not rendering any opinion on the tax implications of the transactions effectuated for Plaintiffs, and could not be held responsible therefor.

Gramercy was not even *mentioned* in the initial Complaint.  Even a cursory reading of the Amended Complaint shows that the instant dispute remains in substance one between Plaintiffs and their tax advisors at BDO.  Of the relatively few concrete factual allegations to be found within the pleading's nearly 200 paragraphs, almost all relate exclusively to BDO.  (Indeed, the Amended Complaint simply attempts to tar Gramercy by mere guilt-through-association with BDO).  Gramercy has been crudely shoehorned into the Amended Complaint as an afterthought, either to add a second presumed "deep pocket" or, worse, as a tactical gambit to defeat arbitration clauses in BDO's consulting agreements with Plaintiffs.  As set forth in detail below, all of Plaintiffs' claims against Gramercy are legally defective for multiple reasons.

## STATEMENT OF FACTS[3]

Stripped of rhetoric and conclusory allegations, the Amended Complaint makes the following basic allegations about the parties' interactions.

---

[2]    The Amended Complaint in this action is also referred to hereinafter as "Am. Compl."

[3]    To the extent that facts set forth in this memorandum assume, for purposes of *Fed. R. Civ. P.* 12(b)(6) analysis, the truth of the allegations of the Amended Complaint, they should not be construed as admissions regarding the truth or falsity of those allegations.  The Amended Complaint is attached as Exhibit 34 to the accompanying Declaration of Sean F. O'Shea, dated May 18, 2007 (hereinafter the "O'Shea Decl.").

2

## A.    The Parties.

BDO is a nationally-renowned accounting firm that, according to Plaintiffs, is in the business of providing tax advice to clients, and "held itself out as having special expertise in THE [sic] field of federal income taxation."  (Am. Compl., ¶ 5, 6).

Gramercy is a limited liability company organized under the laws of the State of Delaware,[4] with its principal place of business in Greenwich, Connecticut.  (*Id.*, ¶ 11; Declaration of Jay A. Johnston, dated May 25, 2007, submitted herewith ("Johnston Decl."), ¶ 2).  Gramercy is an SEC-registered investment advisor (Am. Compl., ¶ 12), as well as the investment manager to several affiliated investment funds and a number of private investment partnerships and managed accounts.  (*Id.*, Ex. 1, at, *e.g.*, 7).  Generally speaking, Gramercy specializes in foreign emerging market distressed debt investments.  (*Id.*)

Plaintiffs, residents of Tennessee, are wealthy, sophisticated businessmen.  In 2002, Plaintiffs desired to offset multimillion dollar capital gains they incurred in connection with the sale of their interests in several newspaper companies.  (*Id.*, ¶¶ 1, 2, 29, 34, 82, 83).

## B.    The Development of BDO's Tax Strategy and BDO's Solicitation of Plaintiffs.

Plaintiffs' "conspiracy" story begins by recounting the growth of BDO's tax advisory business, and the allegedly aggressive business culture and solicitation practices of that unit.  (*Id.*, ¶¶ 38-54).  In 1999 and 2000, the IRS issued two public Notices that, according to Plaintiffs, invalidated the tax-advantaged investment strategies later pitched to them by BDO.  (*Id.*, ¶¶ 55, 58).  Further, in December 2000, the IRS notified BDO of potential tax shelter violations, and requested that BDO register such shelters and maintain and furnish the IRS with a list of participating clients.  (*Id.*, ¶ 61).  BDO failed to do so.  (*Id.*, ¶ 62).  None of the foregoing allegations relate to Gramercy.

As further evidence that BDO knew that its tax-oriented investment strategy was faulty, Plaintiffs cite an August 11, 2000 internal BDO memorandum (the "Kerekes Memorandum").

---

[4]    The Amended Complaint incorrectly alleges that Gramercy is a Connecticut limited liability company. (See *id.*, ¶ 11).

3

(*Id.*, ¶¶ 71-72).  According to Plaintiffs, the Kerekes Memorandum evinced an awareness that BDO's tax strategy was illegal, and "completely contradicted the statements [(later)] made to Messrs. Jones by BDO, and completely contradicted the advice provided in the opinion letters which BDO delivered to" Plaintiffs.  (*Id.*, ¶ 72).  Plaintiffs do not allege that Gramercy was aware of this internal BDO memorandum or its substance.

Plaintiffs were introduced to BDO through Plaintiff John Jones' ex-wife.  (Am. Compl., ¶¶ 79-82).  In 2001, Plaintiffs planned to sell their interests in several newspapers owned by them.  The sales would yield massive profits and correspondingly massive taxable capital gains in 2002.  (*Id.*, ¶ 83).  Mark Puckett, a BDO partner, learned of the impending transactions, and represented to Plaintiffs that BDO had developed an investment strategy by which Plaintiffs could avoid capital gains tax on the sale.  (Am. Compl., ¶ 83-86).  Despite BDO's alleged knowledge that the IRS viewed the tax strategy as illegal and was challenging its implementation (*id.*, ¶¶ 55, 58, 61-72), BDO allegedly falsely represented to Plaintiffs that, *inter alia*, the strategy would yield legitimate tax benefits; that major law firms had vetted the strategy; that other BDO clients had implemented the strategy without IRS challenge; and that BDO would "vigorously defend" Plaintiffs in the event of such a challenge.  (*Id.*, ¶¶ 86, 88).

According to Plaintiffs, "[m]any of these representations were . . . made to" Plaintiffs in an October 18, 2001 meeting with Puckett in Davidson County, Tennessee (another BDO employee allegedly participated via telephone).  (*Id.*, ¶ 93).  Gramercy is not alleged to have participated in the meeting, nor is it alleged to have actually made any of these alleged misrepresentations, or even to have been aware of the meeting or the representations.  (See *id.*)  Several months after the October 2001 meeting, in December 2001, the IRS issued a summons to BDO seeking records of a client transaction the IRS suspected to be an abusive tax shelter.  (*Id.*, ¶¶ 64).  Again, that allegation does not relate to Gramercy.

BDO recommended that Plaintiffs retain Gramercy to effectuate the transactions essential to the tax strategy.  (*Id.*, ¶ 34).  In April 2002, Plaintiffs, accompanied by their financial planner, Steve Solys, traveled to New York to meet with Puckett of BDO and Jay Johnston of Gramercy

at BDO's New York City office.  (*Id.*, ¶ 94).  Prior to the meeting, Puckett told Plaintiffs ***not to discuss any of the tax implications with Gramercy***.  (*Id.*, ¶ 95).  Puckett said this was in order for Gramercy to remain "independent and separate from BDO and the tax advice [BDO] was giving."  (*Id.*)  Plaintiffs do not allege that *Gramercy* made a similar representation.  According to Plaintiffs, Gramercy and BDO were not in fact independent because "BDO and Gramercy intended to share the consulting fees" to be paid to BDO by Plaintiffs.  (*Id.*, ¶ 99).  Notably, Plaintiffs do not allege that such fees were in fact shared.[5]  Nor do they explain how any fee sharing would have impinged Gramercy's independence.

At the meeting, Plaintiffs and Solys allegedly inquired about Gramercy's compensation for "implementing the transactions."  "Puckett and Johnston" represented that Gramercy would receive a monthly management fee and a percentage of capital appreciation, but allegedly failed to disclose any fee sharing.  (*Id.*, ¶ 99).  Plaintiffs identify no substantive law or legal duty violated thereby.  Although they allege that such fee splitting would violate a rule of the American Institute of Certified Public Accountants (*id.*, ¶ 98), those rules have no application to Gramercy, which is not an accounting firm.  Consistent with Puckett's alleged admonition to refrain from discussing tax matters with Gramercy, Plaintiffs do not allege that Gramercy made any representations at the April 2002 meeting concerning the tax benefits of BDO's investment strategy; past IRS inaction with respect to other BDO clients; anticipated IRS inaction with respect to Plaintiffs' transactions; or any other matter touching on the legality or efficacy of BDO's investment strategy.  (*See, e.g., id.*, ¶¶ 86, 91-95, 99).

On May 2, 2002, the IRS allegedly issued additional summonses to BDO with respect to suspected shelters.  (*Id.*, ¶¶ 65-66).  Plaintiffs do not allege that Gramercy was aware of the summonses.

---

[5]      Plaintiffs cite a January 23, 2002 e-mail (see Am. Compl., Ex. 5), but the document says nothing about fee sharing or Plaintiffs.  It was written months before Plaintiffs were ever introduced to Gramercy and months before Plaintiffs paid any consulting fees to BDO.  (See *id.*, ¶¶ 109-110).  Indeed, the document specifically states that the deposit was intended for "broker's fees for distressed debt funds."  (*Id.*, Ex. 5).

5

C.    **Plaintiffs Enter into the Tax Strategy with Full Knowledge of the Risks and the Limited Nature of Gramercy's Role.**

Several weeks after the April 2002 meeting in New York, on May 14 and June 3, 2002, respectively, Plaintiffs entered into consulting agreements with BDO, and paid BDO a substantial fee. (*Id.*, ¶¶ 107-08). Plaintiffs also retained De Castro, at BDO's urging, to issue legal opinion letters. (*Id.*, ¶ 104). In June and July, 2002, after BDO withheld several documents under a claim of privilege, the IRS petitioned to enforce the summonses earlier issued to BDO. (*Id.*, ¶¶ 67-69). Plaintiffs do not allege that Gramercy was aware of those enforcement proceedings.

In mid-June 2002, Plaintiffs retained Gramercy to execute the transactions recommended by BDO, executing several agreements with Gramercy. (*Id.*, ¶ 104; see O'Shea Decl., Exs. 1, 2, 16, 17). In connection with their retention of Gramercy, Plaintiffs each signed an Investment Management Agreement ("IMA") stating in the clearest possible terms that Gramercy was not rendering, and could not render, any advice whatsoever concerning the tax implications of the transactions it was being asked to effectuate for Plaintiffs:

> [Gramercy] is not required to inquire into or take into account the effect of any tax laws or the tax position of [Jones] in connection with managing the account. To the fullest extent permitted by law, ***neither [Gramercy], its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents shall be liable in any manner to [Jones] with respect to the effect of any U.S. federal, state, local or any other taxes of any nature whatsoever on the Account of [Jones] in connection with managing the Account or in connection with this Agreement or otherwise***. [Jones] agrees that [he] has consulted [his] own tax advisor regarding the possible tax consequences of establishing the Account or entering into any investment made under or in connection with this Agreement.

(O'Shea Decl., Ex. 1, IMA ¶ 7(c), Ex. 16, IMA ¶ 7(c) (emphasis added)).

Similarly, in side "belief" letters, each Plaintiff explicitly represented to Gramercy that

> (a) [he] has consulted with [his] own financial, tax and legal advisors with respect to the Transactions ***and, in particular, the***

6

> ***effect of the tax laws and regulations and the impact of any
> notices or announcements issued by the IRS***, (b) [he] ***has not
> relied on [Gramercy] for any financial, tax or legal advice with
> respect to the Transactions***, and (c) [he] ***shall not have any claim
> against [Gramercy] in the event that any tax liability, problem or
> issue should arise in connection with the Transactions*** other than
> as a direct result of any negligence of [Gramercy] in effecting the
> investments pursuant to the [IMA].

(*Id.*, Exs. 2, 17 (emphasis added)).

Plaintiffs admit that they were aware of the obvious risks generally inherent in BDO's tax
strategy.  Prior to entering the transactions at issue, Plaintiffs were aware that the IRS was
attacking tax shelters.  (*Id.*, ¶ 74).  This awareness prompted Plaintiffs repeatedly to question
BDO – not Gramercy – about the validity of the proffered tax strategy both before and after
entering the transactions in question.  (*Id.*)  BDO – not Gramercy – allegedly falsely represented
that its tax strategy employed transactions "distinct from the types of tax shelters which the IRS
was attacking."  (*Id.*)  Plaintiffs admit, however, that BDO told them there was as much as a
forty-nine percent chance that the IRS would ***not*** accord the transactions favorable treatment.
(*Id.*, ¶ 131 n.5).  In fact, Plaintiffs admit that BDO disclosed that two of its own similar client
transactions were under IRS review.  (*Id.*, ¶ 86(4)).

Moreover, it is instructive to compare what Plaintiffs now claim they were or were not
told by BDO before committing to the tax strategy, with documentary evidence of what they
were in fact told – specifically, an appendix to the BDO consulting agreements separately and
personally signed by each Plaintiff (see *id.*, Exs. 7, 8):

| Amended Complaint | Appendix to Consulting Agreement |
| --- | --- |
| "BDO never stated or even implied that penalties might be assessed. . . ." (¶ 132).<br><br>"BDO led [Plaintiffs] to believe that there was not even a possibility that the IRS would assess penalties." (¶ 133).<br><br>"BDO never represented or disclosed to [Plaintiffs] that there was even a possibility the IRS would impose a penalty." (¶ 134). | "BDO has advised me . . . that if the IRS . . . challenges the tax treatment of the Transactions they could assert that I owe additional tax, interest and penalties." |
|  |  |

7

| | |
|---|---|
| BDO said the recommended transactions were distinct from those being challenged by the IRS, and would withstand any such challenge. (¶¶ 73, 74, 86, 112(2), 131)<br><br>BDO stated that similar transactions had been employed by BDO clients without IRS challenge (¶ 86(3)-(4), 112(3), 130(1)) | "BDO has made no representation concerning whether these Transactions might or might not cause my tax return to be examined by the IRS. Additionally, BDO has advised me that these transactions may be required to be disclosed in my income tax returns." |
| BDO did not disclose that it had "failed and refused" to register its investment program as an abusive tax shelter, notwithstanding IRS threats, summonses, and petitions. (¶¶ 60-69, 73) | "IRS regulations require BDO to maintain certain records for some tax-advantaged transactions and, on request, to provide this information to the IRS. . . . *I understand that the Transactions could be subject to these rules*. . . . [BDO has informed me that they have not registered the Transactions as a tax shelter under the Internal Revenue Code as BDO believes that such Transactions are not required to be registered. I understand that there can be no assurance that the IRS will agree with this determination." (Emphasis added). |

While the Amended Complaint is replete with conclusory assertions of reliance on the professional advice of BDO and Gramercy, notably absent is a key fact. Consistent with the aforementioned disclaimers in Plaintiffs' IMAs and "belief" letters, Plaintiffs separately retained two tax lawyers – J. Lee Griffith, Esq. and Richard A. Johnson, Esq. of the Nashville firm Waller Lansden Dortch & Davis[6] – to carefully review BDO's tax advice and investment strategy. Counsel's representation is evident from the Consulting Agreements between Plaintiffs and BDO, which lists Mr. Johnson in the "Notices" section. (Am. Compl., Ex. 8, at 6 ¶ 13; see also O'Shea Decl., Ex. 31 § 2(B)). Additionally, each Plaintiff specifically represented that counsel had received from BDO all materials necessary and desirable for their review of BDO's

---

[6]    The Court will note that the transactions effectuated on Plaintiffs' behalf by Gramercy employed multiple LLCs. (O'Shea Decl., *e.g.*, Exs. 3, 18). The biographies of Messrs. Griffith and Johnson from Waller Lansden's web site are annexed as Exhibits 32 and 33 to the O'Shea Declaration. Mr. Johnson's biography notes, *inter alia*, that he "combines his vast experience with LLCs . . . with strategic tax planning to minimize corporate and personal tax liabilities . . . ." (*Id.*, Ex. 32, 1st page). Likewise, Mr. Griffith "was the principal draftsman of the Tennessee Limited Liability Company Act;" "has published extensively on . . . taxes and the Limited Liability Company in Tennessee;" and has "extensive experience with the Tennessee Limited Liability Company Act and . . . federal tax issues." (*Id.*, Ex. 33).

8

strategy.[7]  There is no allegation that Messrs. Griffith or Johnson colluded with Defendants, and – evidently – both concurred that the potential benefits of BDO's investment strategy were worth the attendant risks (including the risks disclosed in the Appendix to the Consulting Agreement (Am. Compl., Exs. 7-8)).

On September 11, 2002, Plaintiffs each invested $1,120,000 with Gramercy to effectuate the transactions.  (*Id.*, ¶ 110).   In general terms, the tax strategy pursued by Plaintiffs in this case involved the acquisition of certain securities with a high cost basis but a low market value. According to the strategy, the subsequent sale of those assets at the then-current market value would generate capital losses that would be used to offset the Plaintiffs' capital gains from other sources.  (Johnston Decl., ¶ 16).

### D.    Plaintiffs File Their 2002 Tax Returns and Are Audited by the IRS.

On October 10, 2003, BDO issued its own tax opinion letters to Plaintiffs, and several days later prepared and filed 2002 tax returns for Plaintiffs.  The returns claimed losses generated by BDO's investment strategy as offsets to the capital gains incurred in Plaintiffs' 2002 sale of their newspaper interests.  (*Id.*, ¶¶ 114-122).  Once again, Gramercy is not alleged to have had any role in the tax opinion or the preparation or filing of the returns.

In "the latter part of 2005," the IRS determined that the deductions on Plaintiffs' 2002 returns would be disallowed, and proposed a settlement imposing monetary penalties on Plaintiffs.  (*Id.*, ¶¶ 135-37).   Contrary to BDO's alleged promise to "vigorously defend" Plaintiffs, BDO advised Plaintiffs to accept the proposed settlement rather than attempting to negotiate a more favorable one.  (*Id.*, ¶¶ 128-139).  Putting Plaintiffs' allegations squarely into the domain of the surreal is the fact that they *recently solicited BDO for accounting services*, well after having formally accused BDO of corruption, malpractice, and breach of fiduciary duty. (See O'Shea Decl., Ex. 31, § 2(B)).

---

[7]     See Am. Compl., Exs. 7, 8, Appendix to Consulting Agreement ("I [(Plaintiff)] have received, reviewed, and evaluated such information and materials as I and my advisors deemed relevant, and have made an independent decision to participate in the Transactions.")

9

Plaintiffs do not even briefly describe the services rendered and transactions effectuated by Gramercy.  They do not allege that those services or transactions were improperly rendered or executed, or that Plaintiffs were damaged in any way by the rendition or execution of the services and transactions.  Plaintiffs allege only that the transactions did not receive favorable tax treatment as represented by BDO.

## LEGAL ARGUMENT

The absence of personal jurisdiction of Gramercy is the clearest and most pressing reason to dismiss this action.  In the unlikely event that the Court disagrees, Gramercy moves in the alternative pursuant to *Fed. R. Civ. P.* 9(b), 12(b)(1) and 12(b)(6) to dismiss Plaintiffs' claims.

## I.    THE COURT LACKS PERSONAL JURISDICTION OF GRAMERCY.

It is Plaintiffs' burden to establish jurisdiction.  *Watkins v. Kajima Int'l Inc.*, No. 3:06-0197, 2007 WL 865823, *3 (M.D. Tenn. Mar. 16, 2007) (**Echols, J.**)[8]  A complaint may be dismissed as defective on its face if it fails to state a prima facie case for jurisdiction.  *Cotton v. Limestone County, Texas*, 21 Fed. Appx. 592, 593 (9th Cir. 2001).  Conclusory allegations in a complaint are insufficient to avoid dismissal on jurisdiction grounds.  *Zecco v. Solaris Hotel & Resorts, Inc.*, 820 F. Supp. 962, 963 (E.D. Pa. 1993).  The Amended Complaint fails on its face to show personal jurisdiction of Gramercy, and the Court should dismiss it on that basis.[9]  Alternatively, the Johnston Declaration furnishes additional pertinent facts which, in conjunction with the allegations in the Amended Complaint, demonstrate that Gramercy is not subject to jurisdiction in Tennessee.

### A.    Gramercy Lacks Jurisdictionally-Sufficient Minimum Contacts with the Forum.

This Court recently articulated the general standards governing personal jurisdiction in diversity cases:

---

[8]    Pursuant to Local Rules 7.01(e)(3) and (5), a copy of this and all other unreported opinions and non-Tennessee state cases cited herein are furnished in the Appendix annexed hereto.

[9]    Notably, Plaintiffs allege that BDO "is subject to personal jurisdiction" in the Middle District of Tennessee (*id.*, ¶¶ 16, 20), but there is no similar allegation that Gramercy is subject to personal jurisdiction here (*compare id.*, ¶ 20).

10

> The Plaintiffs must show that the Defendants had sufficient minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. "Minimum contacts" exist when the Defendants' conduct and connection with the forum state are such that the Defendants should reasonably anticipate being haled into court there. The Defendants must purposefully avail themselves of the privilege of conducting activities within the forum state and thereby invoke the benefits and protections of the state's laws. This ensures that Defendants will not be haled into a particular forum on the basis of random, fortuitous, or attenuated activity, or by the unilateral activity of some other party or person.

*Young v. Affilatrici 3M*, No. 3:05-0947, 2007 WL 626332, *4 (M.D. Tenn. Feb. 23, 2007) (**Echols, J.**) (citations and internal quotation marks omitted).

Gramercy indisputably lacks the "continuous and systematic" contacts with Tennessee necessary for "general" jurisdiction, *see Young*, 2007 WL 626332 at *4, because it has no meaningful economic presence here. Gramercy does not transact business in Tennessee;[10] does not maintain licensing under the Tennessee foreign limited liability companies laws to transact business here, *see* Tenn. Code. § 48-246-301; does not pay income or sales taxes here; does not own or lease real or personal property here; does not maintain offices, bank accounts, telephone listings, employees, or representatives here; does not advertise or affirmatively solicit business here; and over the past seven years has derived only a very small percentage of its income (well under 1 percent) from just three clients (*two of whom are the Plaintiffs*) that – merely coincidentally – reside in Tennessee. (Johnston Decl., ¶¶ 4-15). *See State Indus., Inc. v. Beckett Gas, Inc.*, 200 F.R.D. 392, 397 (M.D. Tenn. 2001) (no general jurisdiction over nonresident where less than 4 percent of nonresident's sales revenue attributable to sales in forum state). Rather, Gramercy's business and financial activities are focused on New York, Connecticut, and overseas. (Johnston Decl., ¶¶ 2, 3, 17; Am. Compl., Ex. 1).

---

[10]    In an artful elision, Plaintiffs allege that Gramercy "conducted business **with**" Plaintiffs, who happen to reside in Tennessee, but do not allege that Gramercy conducted business **in** Tennessee. (¶ 17; emphasis added).

11

With respect to "specific" jurisdiction, *see Young, id.*, this Court has emphasized the importance of defendants' purposeful availment of the forum and the benefits and protections afforded by its laws. *Id.* at *5. Here, Gramercy did not solicit Plaintiffs. Instead, Plaintiffs came to New York to retain Gramercy for the purpose of executing various transactions occurring wholly outside of Tennessee. (Am. Compl., ¶ 94; O'Shea Decl., *e.g.*, Exs.1 and 16, at p. 10, Exs. 4, 10, 11, 15, 19, 20, 26, 27). Plaintiffs' IMAs with Gramercy and other legal instruments signed by Plaintiffs (or entities through which Plaintiffs conducted the transactions) contained New York choice of law clauses (*id.*, Exs. 1 ¶ 14(d), 16 ¶ 14(d), 10, 11, 19, 26, 27); some contained New York forum selection clauses as well (*id.*, Exs. 3, 5, 6-9, 12-14, 18, 20-25, 28-30). If anything, these facts evince Gramercy's – and Plaintiffs' – purpose to avail themselves of fora *other than* Tennessee. *Cf. Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482 (1985) (choice of law provision "reinforce[s]" a party's "deliberate affiliation with the forum State" for purposeful availment analysis).

Moreover, Gramercy did not subject itself to Tennessee jurisdiction simply by contracting with a Tennessee resident. *See Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 151 (6th Cir. 1997) ("mere fact that Paragon entered into a contract with a Michigan corporation does not mean that Paragon purposefully availed itself of the benefits and protections of Michigan law") (internal quotation marks omitted); *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1265 (6th Cir. 1996) ("merely entering into a contract . . . would not, without more, establish sufficient minimum contacts"). Gramercy's performance was rendered entirely outside of Tennessee. (Johnston Decl., ¶¶ 11-13, 17). This strongly militates against jurisdiction, notwithstanding Gramercy's contracts with Tennessee residents. *See Calphalon Corp. v. Rowlette*, 228 F.3d 718, 722-23 (6th Cir. 2000) (mere existence of contract with forum resident plaintiff insufficient for jurisdiction of nonresident who acted as plaintiff's sales representative in states other than forum).

As a corollary to the principle that contracting with a citizen of another state does not by itself subject a party to jurisdiction in the counterparty's state, it is largely immaterial that a

12

plaintiff felt his injury in his home state. *See Kerry Steel,* 106 F.3d at 151 (plaintiff's "Michigan bank account did suffer, to be sure, but the locus of such a monetary injury is immaterial, as long as the obligation did not arise from a privilege the defendant exercised in [Michigan]") (internal quotation marks omitted).    Thus, the Supreme Court has "consistently held" that mere foreseeability of causing injury in a state is insufficient for minimum contacts.  *Burger King*, *supra*, 471 U.S. at 462; *Neogen Corp. v. Vicam*, No. 5:96-CV-138, 1997 WL 481021, *7 (W.D. Mich. Feb. 20, 1997) (defendant's knowledge of plaintiff's residence and that plaintiff would suffer injury there does not establish minimum contacts) (collecting cases).

Additionally, the bare fact that BDO – a large accounting firm with a nationwide (indeed, worldwide) clientele – referred to Gramercy clients (Plaintiffs) who happened to reside in Tennessee is precisely the sort of "random, fortuitous" contacts, *Burger King*, 471 U.S. at 475, from which jurisdiction does not arise.  A nonresident professional firm to which a client is referred by a third-party, for performance of services outside the client's forum state, does not subject itself to jurisdiction in the client's forum state.  *See, e.g., Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas*, 675 F.2d 587, 589 (3d Cir. 1982) (unsolicited referral of Pennsylvania client to Missouri law firm did not give Pennsylvania court jurisdiction over firm); *Salisbury Cove Assoc., Inc. v. Indcon Design (1995), Ltd.*, 211 F. Supp. 2d 184, 195 (D. Maine 2002) ("where a defendant attorney, solicited by a forum-based client, represents the client in a non-forum state and . . . accepts payment from a forum-based bank, makes telephone calls, and sends letters to the client, purposeful availment does not exist because there is no deliberate creation of a substantial connection with the forum.") (internal quotation marks omitted); *Roetenberg v. King & Everhard, P.C.*, No. Civ.A. 00-1452, 2000 WL 1705787, *4 (E.D. Pa. Nov. 6, 2000) (referral of client to Virginia attorney to conduct litigation in District of Columbia did not subject attorney to jurisdiction in client's forum state).    Conversely, the fact that Plaintiffs, at the instance of their tax advisors, reached out to a nonresident, Gramercy, for performance of services outside Tennessee weighs against jurisdiction here.  *See Kerry Steel*,

13

106 F.3d at 151 (holding purposeful availment lacking where forum resident made initial approach to nonresident outside forum).

Finally, incident to their contractual relationship, Gramercy allegedly sent "numerous communications" into Tennessee.  (Am. Compl., ¶ 17).  This is plainly insufficient to confer jurisdiction.[11]  Notably, Plaintiffs do not identify any *misrepresentations* directed by Gramercy to Tennessee.

### B. Plaintiffs' Conclusory Allegations of Conspiracy Are Insufficient to Confer Jurisdiction of Gramercy.

Clearly, in view of the paucity of Gramercy's contacts with Tennessee, Plaintiffs' jurisdiction hopes are pinned on their allegation that Gramercy conspired with BDO to defraud them.  (See Am. Compl., ¶ 18).  As a preliminary matter, district courts in this Circuit have expressed doubt as to conspiracy-based jurisdiction.  *Am. Copper & Brass, Inc. v. Mueller Europe, Ltd.*, 452 F. Supp. 2d 821, 829 (W.D. Tenn. 2006).[12]  In any event, as demonstrated in Point II(A) and (B), *infra*, Plaintiffs' fraud and conspiracy allegations are woefully inadequate, and, therefore, BDO's actions cannot serve as the predicate for jurisdiction of Gramercy.  *Id.* at 830-31 (concrete evidence of conspiracy, rather than "conclusory allegations and farfetched inferences," are required for prima facie showing of jurisdiction); *Merkel Assoc., Inc. v.*

---

[11]    *See Cobb v. Time, Inc.*, No. 3:94-0836, 1995 WL 507212, *4 n.1 (M.D. Tenn. Apr. 7, 1995) (**Echols, J.**) ("calls and faxes to persons in Tennessee, by themselves, do not constitute sufficient contact" for personal jurisdiction).  *See also Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007) (conclusory allegations that a defendant in tax shelter case directed communications into, and "otherwise conducted business" in, the forum are insufficient); *Calphalon*, 228 F.3d at 723 (nonresident defendant's communications and visits to forum were merely result of plaintiff's choice of residence, not purposeful effort by defendant to promote its business in forum and did not confer jurisdiction); *Kerry Steel*, 106 F.3d at 151 (holding that nonresident's telephone and facsimile communications to forum state were "immaterial" where forum resident solicited nonresident and performance was rendered outside forum); *Austad Co. v. Pennie & Edmunds*, 823 F.2d 223, 226 (8th Cir. 1987) (nonresident law firm's numerous mailings and telephonic communications to South Dakota client, plus three-day visit by associate, did not create jurisdiction in South Dakota); *Roetenberg*, 2000 WL 1705787 at *4-5 (collecting cases); *Warren v. Dynamics Health Equip. Mfg. Co., Inc.*, 483 F. Supp. 788, 791 (M.D. Tenn. 1980) (non-resident defendants' telephone and mail communications with Tennessee resident concerning contract, standing alone, did not create personal jurisdiction).

[12]    Although the Tennessee Supreme Court has upheld conspiracy as a basis for jurisdiction of extraterritorial co-conspirators, *see Chenault v. Walker*, 36 S.W.3d 45 (2001), a state court decision obviously cannot bind a federal court as to the interpretation of the U.S. Constitution, *e.g.*, whether conspiracy allegations establish an extraterritorial defendant's constitutionally-sufficient minimum contacts with the forum. *See First Am. Title Co. v. Devaugh*, 480 F.3d 438, 455 (6th Cir. 2007) ("state court's opinion on an issue of federal law . . . is entitled to no deference whatsoever").

*Bellofram Corp.*, 437 F. Supp. 612, 618 (W.D.N.Y. 1977) (jurisdiction of nonresidents could not be established by deficient allegations casting business relationships between residents and nonresidents as conspiracy).

## II.   PLAINTIFFS' CONSPIRACY, FRAUD, AND BREACH OF FIDUCIARY DUTY CLAIMS VIOLATE FEDERAL RULE OF CIVIL PROCEDURE 9(b).

Federal Rule of Civil Procedure 9(b) requires that all averments of fraud be stated with particularity.   Thus, "a complaint alleging fraud or misrepresentation must (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent." *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 939 (M.D. Tenn. 1999).   Where claims of conspiracy or breach of fiduciary duty are grounded in fraudulent conduct, they too are subject to Rule 9(b)'s heightened pleading requirements.[13]   As this Court has observed, Rule 9(b)

> serve[s] three purposes: (1) to ensure that fraud allegations are concrete enough to give defendants fair notice of the grounds of the complaint; (2) to protect defendants' reputations or goodwill from the harm that comes from being accused of serious wrongdoing; and (3) to inhibit the filing of complaints that are a pretext for the discovery of unknown wrongs or that are groundless claims designed to coerce a settlement out of defendants who wish to avoid the time and expense of defending themselves.

*Sirrom Capital*, 84 F. Supp. 2d at 939.   All three concerns are implicated by Plaintiffs' threadbare accusations against Gramercy.   Additionally, Plaintiffs' Rule 9(b) violations assume Constitutional dimension, as their conspiracy allegations are being used to hale Gramercy into a distant forum.

---

[13]      *See, e.g., Swartz*, 475 F.3d at 765 ("Rule 9(b) imposes heightened pleading requirements where the object of the conspiracy is fraudulent") (internal quotation marks omitted); *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996) (holding Rule 9(b) applicable to allegations of conspiracy to defraud); *Thornton v. Evans*, 692 F.2d 1064, 1083 (7th Cir. 1983) (where fraud alleged, "even claims of a breach of fiduciary duties are subject to Rule 9(b)"); *Krieger v. Gast*, No. 4:99-CV-86, 2000 WL 288442 at *6-8 (W.D. Mich. 2000) (Rule 9(b) applies to non-fraud claims "'grounded in fraud,'" including breach of fiduciary duty and conspiracy); *Mulbarger v. Royal Alliance Assoc., Inc.*, 1999 WL 33432317, at *2 (S.D. Ohio Dec. 22, 1999) ("Rule 9(b) particularity requirement also applies to claims of breach of fiduciary duty predicated upon fraud").

15

A.     **There Are No Well-Pleaded Allegations of Any Representations or Omissions by Gramercy, Fraudulent or Otherwise, Concerning the Tax Implications of BDO's Investment Strategy.**

Plaintiffs allege in conclusory fashion that Gramercy engaged in fraud and misrepresentation (Am. Compl., ¶¶ 140-42) and, more generally, that Gramercy conspired with BDO to defraud and mislead Plaintiffs with erroneous tax advice (*id.*, ¶¶ 143-159). The alleged fraudulent misrepresentations and omissions presumably also form at least part of the basis for Plaintiffs' breach of fiduciary duty claims. (*Id.*, ¶¶ 160-162).

1.     *Plaintiffs Have Not Pleaded the "Who," "What," "When," "Where," or "How" Required by Rule 9(b).*

"[A]t a minimum, Rule 9(b) requires that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (internal quotation marks omitted). Plaintiffs have not pleaded even a single tax-related misrepresentation by Gramercy. To the contrary, Plaintiffs allege that Puckett of BDO told them (prior to their only meeting with Gramercy) that they should *not* discuss any tax matters with Gramercy. (*Id.*, ¶ 95). The Amended Complaint does have several wholly conclusory assertions that Gramercy gave tax advice or recommended that Plaintiffs undertake BDO's tax strategy. (See *id.*, ¶¶ 28, 29, 30, 34, 73, 74, 104, 105, 113, 141, 150, 177, 188). These, however, specify neither the speaker; nor the approximate time and place of the statements; nor the contents of the statements, and are manifestly inadequate under Rule 9(b). *See Sirrom Capital*, 84 F. Supp. 2d at 939. Moreover, these allegations invariably attribute the statements to "BDO and Gramercy," impermissibly lumping the defendants together. *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) ("blanket references to acts or omissions by all of the 'defendants'" are insufficient under Rule 9(b)).

Indeed, it is not possible to comprehend what Gramercy stands accused of, as Plaintiffs frequently appear to retract their own conclusory allegations. For example, Plaintiffs baldly allege that BDO and Gramercy recommended the "tax shelter" (Am. Compl., ¶ 74), but in the

very next paragraph (*id.*, ¶ 75) speak only of their trust and confidence in *BDO's* representations. Several paragraphs later, Plaintiffs imply that only *BDO* gave them tax advice and recommended the alleged tax shelters. (*Id.*, ¶¶ 95, 97). And by paragraphs 128-134, Plaintiffs abandon any pretense that Gramercy rendered any tax advice.

In short, there are no tax-related misrepresentations or omissions by Gramercy to be found in the Amended Complaint. What Plaintiffs are doing is seeking to impute to Gramercy *BDO's* misrepresentations and omissions, solely on the basis of an alleged conspiracy between them. Plaintiffs explicitly say as much. (See *id.*, ¶¶ 77-78, 86-87). As discussed in Point II(B), *infra*, this predicate conspiracy is defectively pleaded and cannot serve as the basis to hold Gramercy liable for BDO's alleged misdeeds.

> 2.    *Plaintiffs Have Not Demonstrated that Gramercy Acted with Fraudulent Intent.*

Critical to the instant motion is the Sixth Circuit's admonition that Rule 9(b) requires a plaintiff to allege "a sufficient factual basis to support an inference that [fraudulent statements or omissions] were **knowingly made**." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999) (emphasis added). Here, the Amended Complaint lacks any allegations supporting an inference that Gramercy knew that BDO's tax advice was flawed, and actually demonstrates precisely the opposite.

Gramercy is not a law firm, an accounting firm, or a tax advisor, and was institutionally incapable of assessing the merits of the BDO tax strategy. (Johnston Decl., 18; Am. Compl., Ex. 1, at, *e.g.*, 7)). Thus, Plaintiffs specifically and repeatedly acknowledged in writing that Gramercy did not render any advice on the tax implications of BDO's investment strategy; that Plaintiffs did not rely on any such advice; that Plaintiffs in fact consulted other parties for legal and tax advice; and that Plaintiffs would have no claim against Gramercy in the event the transactions failed to yield the desired tax benefits. (*Id.*, Exs. 1 ¶ 7(c), 2, 16 ¶ 7(c), 17).

Even a cursory reading of the Amended Complaint reveals Plaintiffs' **acknowledgment** that Gramercy did not, and could not, assess the tax aspects of BDO's investment plan:

17

- Plaintiffs allege that BDO held itself out as a tax expert (Am. Compl., ¶¶ 6, 118), but make no corresponding allegations as to Gramercy.

- Only BDO – not Gramercy – is alleged to have owed a duty to possess and exercise skill in federal income taxation and accounting matters. (*Id.*, ¶¶ 27, 118).

- It was BDO – not Gramercy – that advised Plaintiffs that by engaging in certain transactions, they would be able to take tax deductions. (*Id.*, ¶¶ 34, 84-88, 92-93, 130-34). Indeed, Plaintiffs claim they were explicitly told by BDO ***not to discuss with Gramercy the tax implications of BDO's strategy***. (*Id.*, ¶ 95).

- According to Plaintiffs, BDO provided consulting services with the stated aim of reducing Plaintiffs' capital gains tax exposure (*id.*, ¶ 106), but no corresponding allegation is made regarding Gramercy.

- It was BDO – not Gramercy – that issued tax opinion letters to Plaintiffs. (*Id.*, ¶ 114).

- BDO – not Gramercy – prepared Plaintiffs' tax returns taking the deductions. (*Id.*, ¶¶ 117-25).

- Prior to accepting the tax strategy, Plaintiffs (who were aware of recent IRS challenges to abusive tax shelters, including IRS scrutiny of other allegedly similar BDO client transactions) voiced their concerns to BDO – not Gramercy – and received repeated assurances from BDO – not Gramercy. (*Id.*, ¶ 74).

- BDO – not Gramercy – allegedly promised to defend Plaintiffs in the event of an IRS challenge. (*Id.*, ¶ 128).

- When the IRS ultimately challenged Plaintiffs' tax returns, Plaintiffs went to BDO – not Gramercy – for advice and assistance. (*Id.*, ¶¶ 135-39).

Thus, in view of the clear evidence that Gramercy's relationship with BDO and Plaintiffs did not entail any knowledge or understanding of the tax aspects of BDO's investment strategy, Plaintiffs' allegations simply do not support the inference that Gramercy knowingly misstated or failed to disclose anything regarding tax issues.[14]

Furthermore, where the Amended Complaint does charge Gramercy with knowledge of the tax consequences of the BDO tax strategy, the conclusory allegations are wholly inadequate

---

[14]    Plaintiffs note that Gramercy's services included "*tax execution*" (*id.*, ¶ 13; emphasis in original), but this is plainly not tax *advice*. Gramercy assisted Plaintiffs with trading and related activities necessary to execute the tax-oriented investment strategy conceived by BDO and De Castro. Gramercy did not (and could not) opine on the tax implications of those transactions. (Johnston Decl., ¶ 18).

18

under Rule 9(b). For example, Plaintiffs allege that Gramercy knew the tax strategy would be disallowed by the IRS and knew the IRS had been prosecuting "similar 'abusive tax shelters,'" but do not even hint at how Gramercy could have learned this information. (*Id.*, ¶¶ 30-31). While the IRS had issued two public Notices that allegedly invalidated BDO's tax strategy (*id.*, ¶¶ 55-58), there is no rational basis to infer that Gramercy (which is not a tax advisory firm) was actually aware of these Notices. And even if Gramercy *had* been aware, Plaintiffs do not explain why Gramercy was in any better position than Plaintiffs to discount the alleged assurances of BDO and De Castro that the types of transactions targeted by recent IRS anti-tax shelter initiatives were distinct from the distressed debt transactions underlying the tax strategy. (*See* Am. Compl., ¶ 74). Notably, Plaintiffs were separately advised by independent tax counsel. (*Id.*, Ex. 8, at 6 ¶ 13; O'Shea Decl., Ex. 31 § 2(B)). Either these counsel were aware of the IRS Notices and advised Plaintiffs that BDO's interpretation was correct, or they were not aware of them. Either way, it is plainly irrational to infer that Gramercy had more tax expertise than Plaintiffs' own tax and financial advisors.

Additional examples of other unsubstantiated allegations abound, wherein Plaintiffs specifically target BDO but then incongruously tack on Gramercy as an afterthought:

- Plaintiffs assert that the IRS served various summonses on, and commenced related enforcement proceedings against ***BDO***. (*Id.*, ¶¶ 60-69). Plaintiffs then bizarrely conclude that "[a]s a result of the aforesaid actions of the IRS, BDO ***and Gramercy*** knew. . . ." (*Id.*, ¶ 70; emphasis added).

- Plaintiffs cite an ***internal*** BDO memorandum allegedly acknowledging the illegality of BDO's investment strategy (*id.*, ¶¶ 71-72), but then state "[h]ence, BDO ***and Gramercy*** knew" (*id.*, ¶ 73; emphasis added), with no suggestion how Gramercy could have known of the document.

- Paragraphs 86 through 88 list various alleged misrepresentations by BDO, but Plaintiffs then allege, without substantiation, that "BDO ***and Gramercy*** knew. . . the representations were false . . . ." (*Id.*, ¶ 89).

- Plaintiffs list a number of allegedly material facts known ***to BDO*** (*id.*, ¶ 91), but then charge BDO ***and Gramercy*** with failing to reveal them (*id.*, penultimate sentence).

19

- Several other wholly conclusory allegations of Gramercy's knowledge of, or implied expertise in, tax matters also lack any semblance of factual support. (*Id.*, ¶¶ 112, 146, 156). [15]

Further reflecting the dearth of factual evidence against Gramercy are Plaintiffs' own causes of action. Plaintiffs' professional negligence claim – alleging incompetent tax advice – is asserted against BDO only. (*Id.*, ¶¶ 169-75). Likewise, Plaintiffs' negligent misrepresentation claim – also specifically alleging incompetent tax advice – is asserted against BDO, but not Gramercy. (*Id.*, ¶¶ 176-83). The four substantive causes of action that *are* asserted against Gramercy do not reference tax advice, but instead rest on some unspecified basis to be derived from the common allegations in the Amended Complaint. (*Id.*, ¶¶ 140-42, 160-68). Plaintiffs thus concede that Gramercy had no tax expertise or involvement in the tax aspects of the BDO investment strategy, and therefore furnish no factual basis – as required by Rule 9(b) – to infer that Gramercy knowingly made any false or misleading statements or omissions. *See Advocacy Org.*, 176 F.3d at 322 (Rule 9(b) requires reasonable factual basis from which to infer defendant's knowledge of fraudulent nature of representations).

### B.    The Amended Complaint Does Not Adequately Plead the Existence of A Conspiracy between BDO and Gramercy.

"An essential element of a conspiracy claim is that the conspiring parties *intend* to accomplish an *unlawful* purpose, or a lawful purpose by unlawful means." *Kincaid v. Southtrust Bank*, No. M2005-00121-COA-R3-CV, 2006 WL 3093226, *5 (Tenn. Ct. App. 2007) (emphasis added). *Accord In re: Terrorist Attacks On September 11, 2001*, 464 F. Supp. 2d 335, 340 (S.D.N.Y. 2006) ("Liability for [(civil)] conspiracy . . . requires that the defendant, among other things, 'know the wrongful nature of the primary actor's conduct'"). Because conspiracy requires a conscious decision to do something one knows to be unlawful, one cannot conspire to

---

[15]    Plaintiffs allege that Gramercy was a "co-promoter" of the tax investment scheme. (*Id.*, ¶ 33). First, there are absolutely no facts alleged showing that Gramercy assisted BDO in designing the tax strategy. Indeed, the closest Plaintiffs come is the implication (again, no details) that BDO referred a number of clients to Gramercy. (*Id.*, ¶¶ 144-49). But accepting several client referrals from a professional firm hardly makes one an author of that firm's services or programs. And again, even if Gramercy contributed its own particular institutional competencies to assist BDO in refining its investment strategies, there is no showing that Gramercy could assess whether the tax objectives of BDO's strategy were sound or unsound.

20

engage in reckless or negligent conduct,[16] nor can one, through recklessness or negligence, join a conspiracy.[17]

Moreover, "Plaintiffs may not simply rely on the proposition that Defendants must have known or should have known of, and participated in, the fraud. Generalized and conclusory allegations that the Defendants' conduct was fraudulent do not satisfy Rule 9(b)." *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001). As one District Court noted, "[m]erely showing the business interrelationship of the defendants without more is insufficient. To hold otherwise would be to subject all interrelated groups to charges of conspiracy when any one of the group acts." *Merkel Assoc.*, 437 F. Supp. at 618. *See also Dean v. Burrows*, 732 F. Supp. 816, 824 (E.D. Tenn. 1989) (proof that defendants lived in same city, had social relationship, and engaged in a few isolated business transactions did not establish existence of civil conspiracy). Thus, bare allegations that *BDO* knew that its tax strategy was unlawful obviously do not establish *Gramercy's* conspiratorial participation. *See King v. Deutsche Bank AG*, No. CV 04-1029-HU, 2005 WL 611954, *35 (D. Or. Mar. 8, 2005) (dismissing civil conspiracy claims in tax shelter case: "General allegations from which the necessary element of intent cannot be inferred **with respect to each defendant** are insufficient") (emphasis added).

In essence, Plaintiffs allege that BDO and Gramercy conspired to foist bad tax advice on BDO clients in order to extract substantial fees. Plainly, however, Gramercy could not have

---

[16]     "Since a civil conspiracy cause of action requires a showing of intentional conduct, negligence cannot serve as the underlying tort." *Rosen v. Brown & Williamson Tobacco Corp.*, 11 A.D.3d 524, 525, 782 N.Y.S.2d 795, 795 (2d Dep't 2004). *See also Berry v. Lee*, 428 F. Supp. 2d 546, 562 (N.D. Tex. 2006) ("Because conspiracy requires specific intent, [a] negligence claim can[not] serve as the basis for her conspiracy claim. . . . [O]ne cannot agree or conspire to be negligent") (citation and internal quotation marks omitted); "Logic dictates that parties cannot conspire or agree to commit negligence." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 633 (S.D.N.Y. 2001); *Haskin v. R.J. Reynolds Tobacco Co.*, 995 F. Supp. 1437, 1440 (M.D. Fla. 1998) (cannot conspire to engage in negligence or recklessness); *Sackman v. Liggett Group, Inc.*, 965 F. Supp. 391, 395 (E.D.N.Y. 1997) (because conspiracy requires a showing of intentional conduct, "there can hardly be conspiracy to commit negligence" under New York law); *Sonnenreich v. Philip Morris, Inc.*, 929 F. Supp. 416, 419 (S.D. Fla. 1996) (conspiracy to commit negligence is a "non sequitur"); *Rogers v. Furlow*, 699 F. Supp. 672, 675 (N.D.Ill.1988) (a conspiracy to commit negligence is "a paradox at best").

[17]     *Foodcomm Int'l v. Barry*, 463 F. Supp. 2d 818, 830-31 (N.D. Ill. 2006) ("accidental, inadvertent, or negligent participation in a common scheme does not amount to a civil conspiracy. Simply knowing of the fraudulent or illegal actions of another is also not enough to show a conspiracy") (citations and internal quotation marks omitted); *Hux v. Butler*, 220 F. Supp. 35, 41 (W.D. Tenn. 1963) (even gross negligence is insufficient to make a party a co-conspirator), *rev'd on other grounds*, 339 F.2d 696 (6th Cir. 1964).

21

conspired to do so unless it knew the tax advice was flawed. *See Foodcomm Int'l*, 463 F. Supp. 2d at 830-31 ("[a] defendant who innocently performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy").  As discussed in Point II(A), *supra*, however, the Amended Complaint provides absolutely no basis to conclude that Gramercy could *independently* have discerned (or did in fact discern) the alleged illegality of BDO's investment strategy.

Tellingly, most of the key allegations in Plaintiffs' "Civil Conspiracy" count (Am. Compl., ¶¶ 143-159) are pleaded "[u]pon information and belief" (¶¶ 144, 146, 147, 151). Allegations governed by Rule 9(b), however, "cannot be based upon 'information and belief,' except where the relevant facts lie exclusively within knowledge and control of the opposing party, and even then, the plaintiff must plead a particular statement of facts upon which his belief is based." *Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485, 489 (6th Cir. 1990).  None of Plaintiffs' "information and belief" allegations set forth the basis forth therefor, in violation of Rule 9(b).

Just three months ago, in *Swartz,* 476 F.3d at 764-65, the Ninth Circuit made short work of the sort of paltry, glib accusations leveled by Plaintiffs here. *Swartz* concerned claims arising from a "BLIPS" tax strategy allegedly similar to the strategy at issue herein. (See Am. Compl., ¶ 30).  Like Plaintiffs, Swartz sued not only the tax advisor (KPMG) and law firm (Brown & Wood) that actually conceived the investment program and made representations about its tax benefits, but also the investment firm (Presidio) and bank (Deutsche Bank) that, like Gramercy here, merely executed the underlying transactions. *Id.* at 758-59.  Like Plaintiffs, Swartz evidently lacked any evidence of culpable conduct by Presidio or Deutsche Bank, so he merely described the business transactions undertaken by them in furtherance of KPMG's tax strategy, characterized these as conspiratorial, and laced his complaint with allegations against "the defendants" and unsubstantiated assertions that Presidio and Deutsche Bank knew KPMG's tax strategy was illegal.  This fell far short of Rule 9(b)'s requirements:

22

> With respect to Presidio and DB [(Deutsche Bank)], the allegations in Swartz's original complaint patently fail to comply with Rule 9(b). The complaint is shot through with general allegations that the "defendants" engaged in fraudulent conduct but attributes specific misconduct only to KPMG and B & W. Conclusory allegations that Presidio and DB "knew that [KPMG and B & W] were making ... false statements to clients, including Swartz, and thus were acting in concert with [KPMG and B & W]" and "were acting as agents [of KPMG and B & W]" and were "active participants in the conspiracy" without any stated factual basis are insufficient as a matter of law.

*Id.* at 765. These comments could have easily been written about Plaintiffs' Amended Complaint, except that unlike Swartz, Plaintiffs do not deign to even describe the transactions effectuated by Gramercy, contenting themselves with conclusory allegations that Gramercy co-developed BDO's tax strategy. *See King, supra*, 2005 WL 611954 at *27 (dismissing civil RICO claims by investor against investment advisors in alleged tax shelter scheme where no allegations that defendants were aware of nature and scope of alleged criminal enterprise).

The Amended Complaint is nearly 200 paragraphs long. Clearly, the indispensable details of Gramercy's alleged complicity in BDO's alleged tax advice scam were not omitted in the interests of brevity or notice pleading. If Plaintiffs had a basis to believe Gramercy was aware of the flawed advice, they would have pleaded it. Indeed, if Gramercy really did play what the Court is *now* told was an integral role, why was it not even mentioned in Plaintiffs' initial Complaint (wherein Plaintiffs expended sixty-six paragraphs telling of the genesis of the tax strategy, of the solicitation of Plaintiffs, of the tax advice they received, and of the alleged harm therefrom)? Plaintiffs obviously have no more than a mere suspicion, and have brought suit in the hopes that discovery will substantiate it or that Gramercy will settle to avoid the costs of discovery. The Court should not countenance such a patent violation of Rule 9(b).

23

### III.    PLAINTIFFS FAIL TO STATE A CLAIM AGAINST GRAMERCY FOR FRAUD.[18]

The elements of a fraud claim are "a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006). The allegedly fraudulent statements and omissions here fall into two categories: the tax implications of BDO's investment strategy, and the alleged fee sharing between BDO and Gramercy. (Am. Compl., *e.g.*, ¶¶ 86-87, 95-102). Both possess fatal deficiencies with respect to multiple elements.

### A.    Plaintiffs Have Not Established the Representation or Falsity Elements with Respect to Their Fee-Sharing Allegations.

Plaintiffs' fee-sharing allegations are a "red herring" with absolutely no legal significance, since Plaintiffs cannot establish loss causation. (See Point III(D), *infra*). Apart from that, however, Plaintiffs do not allege that BDO did in fact share its fee with Gramercy,

---

[18]    New York substantive law governs Plaintiffs' causes of action by virtue of the New York choice of law clauses in the parties' contracts (see O'Shea Decl., Exs. 1 ¶ 14(d), 16 ¶ 14(d)), and because New York is the "center of gravity" of the parties' relationship under the tests of Restatement (Second) of Conflict of Laws, §§ 145, 148 (1971) followed by Tennessee courts. *Hari & Assocs. v. RNBC, Inc.*, 946 F. Supp. 531, 536 (M.D. Tenn. 1996) (Tennessee applies Restatement § 145 for tort claims); *Rowe v. Marietta Corp.*, 955 F. Supp. 829, 832 (W.D. Tenn. 1996) (in fraud and misrepresentation cases, Tennessee courts also apply Rest. (2d) Conflict of Laws § 148).
    Here, Plaintiffs traveled to New York to meet with Gramercy (and BDO), for the purpose of retaining Gramercy. The only specific representations attributed to Gramercy (see Point II(A), *supra*) were made at this meeting. (Am. Compl., ¶¶ 94-99). BDO – with which Gramercy allegedly worked closely – is organized under New York law (*id.*, ¶ 3), and has a large office in New York City (*id.*, ¶ 94). In connection with the various transactions implemented by Gramercy, Plaintiffs signed a plethora of contracts containing not only New York choice of law provisions, but also New York forum selection clauses. (O'Shea Decl., Exs. 1 ¶ 14(d)), 3, 5, 6-14, 16 ¶ 14(d), 18-30). In addition, various financial activities attendant to the transactions effectuated by Gramercy for Plaintiffs – such as several options purchases and assignments – were executed through New York City-based brokers and banks. (*Id.*, Exs. 4, 10-11, 15, 19, 20, 26, 27). The mere fact that Plaintiffs reside in Tennessee is hardly sufficient to overcome the preponderance of other Restatement factors, as this Court's jurisprudence clearly demonstrates. *See Hari*, 946 F. Supp. at 536 (where construction loan contracts and other agreements were executed in Georgia, and Georgia bank defendant's alleged misrepresentations emanated from there, Georgia had most significant relationship to dispute, notwithstanding that construction loans concerned Tennessee motel project and plaintiff resided, received misrepresentations, and was injured, in Tennessee). *See also Chase Manhattan Bank, N.A. v. CVE, Inc.*, 206 F. Supp. 2d 900, 905 (M.D. Tenn. 2002) (Tennessee had most significant relationship to claims where Tennessee corporation deceptively persuaded New York bank to transfer shares to corporation, and subsequently refused to return them; fraudulent representations and injurious conduct occurred in Tennessee); *Gregory v. Chem. Waste Mgmt., Inc.*, 38 F. Supp. 2d 598, 620 (W.D. Tenn. 1996) (under Tennessee choice of law rules, notwithstanding that injured plaintiffs resided in, *inter alia*, Tennessee, parties' business relationship was centered on Alabama, where Alabama defendants, operators of Alabama waste disposal facility, sent quarterly royalty statements to plaintiffs falsely understating plant's revenues).

only that the parties intended to do so.  (Am. Compl., ¶ 97).  This fails to establish a falsely-represented fact or an omission.  Likewise, with respect to the alleged false statement on Gramercy's Form ADV (*id.*, ¶¶ 99, 102), the Form is indisputably accurate.[19]

Similarly, while Plaintiffs allege that, prior to their April 2002 meeting with Gramercy, BDO's Puckett "represented that Gramercy was acting independently and separately from BDO" (Am. Compl., ¶ 95), Plaintiffs do not allege that *Gramercy* made any such representation, nor do Plaintiffs explain the legal significance of the purported lack of independence.

### B.    Plaintiffs Have Not Established that Gramercy Misrepresented or Omitted Facts with Fraudulent Intent.

Plaintiffs have not alleged ***any*** tax-related misrepresentations by Gramercy (as opposed to BDO), and their allegations of fraudulent omissions and of conspiracy (so as to impute to Gramercy BDO's alleged misrepresentations) do not satisfy Rule 9(b).  (See Point II, *supra*). Even if this were not the case, as discussed in Point II(A)(2), *supra*, Plaintiffs have alleged no facts from which it reasonably can be inferred that Gramercy understood that BDO's investment strategy was flawed, and thus Plaintiffs fail to establish Gramercy's scienter.  With respect to Gramercy's alleged omissions with respect to fee sharing, Plaintiffs have not even hinted at any illicit motive of Gramercy to do so.

### C.    Plaintiffs Cannot Establish Either Actual or Reasonable Reliance on Gramercy's Alleged Misrepresentations or Omissions.

Under New York law, a fraud claimant "must show not only that [it] actually relied on the misrepresentations, but also that such reliance was reasonable."  *See Stuart Silver Assocs., Inc. v. Baco Dev. Corp.*, 245 A.D.2d 96, 98, 665 N.Y.S.2d 415, 417 (1st Dep't 1997).

---

[19]    Plaintiffs have completely misrepresented the import of the Form ADV.  They allege that Gramercy "represented at ¶ 8(c) of the Form ADV that it did not have with an accounting firm any arrangement that was material to its advisory business."  (Am. Compl., ¶ 102).  That is not what Form ADV asks.  It asks only about the existence of "arrangements . . . with *a related person* who is a[n] . . . accounting firm . . ." (*Id.*, Ex. 1, at 4, ¶ 8(c); emphasis added) – something that Plaintiffs deceptively omit.  Form ADV defines a "[r]elated person" as "[a]ny officer, director or partner of applicant or any person directly or indirectly controlling, controlled by, or under common control with the applicant. . . ." (*Id.*, Ex. 1, at 2).  BDO meets none of these criteria even under the most generous construction of Plaintiffs' allegations.

25

        *1.     Plaintiffs' Express Disclaimer of Reliance is Enforceable.*

To the extent that Plaintiffs' fraud and misrepresentation claims against Gramercy are predicated on allegedly erroneous tax advice, Plaintiffs expressly disclaimed reliance on any representations or omissions by Gramercy regarding that subject.  (O'Shea Decl., Exs. 1 ¶ 7(c), 2, 16 ¶ 7(c), 17).  And a party who, in a contract, expressly disclaims reliance upon a particular representation cannot, in a subsequent action for fraud, assert that he was fraudulently induced by the very representation he has disclaimed.  *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 734 (2d Cir. 1984) (citing *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320-21, 157 N.E.2d 597, 598-99, 184 N.Y.S.2d 599, 601-02 (1959)).  In *Danann*, New York's Court of Appeals articulated the fundamental absurdity of Plaintiffs' claims against Gramercy:

> plaintiff has in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded. Such a specific disclaimer destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon these contrary oral representations.

Of particular relevance here, the court trenchantly illustrated how such disclaimers are a contractually-agreed allocation of risks between the parties:

> In this case, of course, the plaintiff made a representation in the contract that it was not relying on specific representations not embodied in the contract, while, it now asserts, it was in fact relying on such oral representations. Plaintiff admits then that it is guilty of deliberately misrepresenting to the seller its true intention. To condone this fraud would place the purchaser in a favored position. . . .
>
> ***If the language here used is not sufficient to estop a party from claiming that he entered the contract because of fraudulent representations, then no language can accomplish that purpose. To hold otherwise would be to say that it is impossible for two businessmen dealing at arm's length to agree that the buyer is not buying in reliance on any representations of the seller as to a particular fact.***

*Id.* at 323, 157 N.E.2d at 600, 184 N.Y.S.2d at 604 (emphasis added).  *See also Republic National Bank v. Hales*, 75 F. Supp. 2d 300, 316 (S.D.N.Y. 1999) (as a matter of law, party to

equity swap transaction could not establish justifiable reliance on alleged misrepresentations by bank where he "specifically disclaimed having relied upon Republic for investment advice or for an evaluation of the terms of the agreements he was entering").

Here, the IMA, as well as the attendant "belief" letters executed by Plaintiffs, stated in the plainest terms that Plaintiffs had neither received nor relied upon any tax advice from Gramercy, and that Gramercy could not be held liable for any tax problems arising from the transactions executed by Gramercy. (O'Shea Decl., Exs. 1 ¶ 7(c), 2, 16 ¶ 7(c), 17). In light of such disclaimers, as a matter of law Plaintiffs cannot establish that they relied on any alleged oral misrepresentations or omissions by Gramercy concerning the tax implications of the transactions.[20]

2.    *Plaintiffs' Retention of Independent Legal and Financial Advisors, In Conjunction With the Allegations of the Amended Complaint, Forecloses Reasonable Reliance as a Matter of Law.*

Next, Plaintiffs' retention of independent tax counsel at Waller Lansden Dortch & Davis, as well as Steve Solys, their financial planner, to closely review BDO's investment strategy (O'Shea Decl., Exs. 1 ¶ 7(c) and 16 ¶ 7(c), Exs. 2, 16, Ex. 31 § 2(B); Am. Compl., Ex. 8 ¶ 13; *id.*, ¶ 94) definitively establishes the absence of reliance-in-fact on any representations or omissions by Gramercy regarding tax issues. *See Arnold Constable Corp. v. Chase Manhattan Mortgage and Realty Trust*, 59 A.D.2d 666, 666, 398 N.Y.S.2d 422, 423 (1st Dep't 1977) ("a fraud claim will not be sustained where the party making such claim relied on an independent investigation of its own lawyer"); *Ashe v. 1907 Ditmas Ave. Realty Corp.*, 125 A.D.2d 432, 433, 509 N.Y.S.2d 364, 365 (2d Dep't 1986) (purchaser of real property could not establish reliance on alleged misrepresentations by sellers' attorney where purchaser was represented in the

---

[20]    Tennessee law is in accord. *See Freightliner of Knoxville, Inc. v. DaimlerChrysler Vans, LLC*, 438 F. Supp. 2d 869, 886-87 (E.D. Tenn. 2006) (in view of sophistication of plaintiff, express disclaimer of reliance on any representations by defendant barred reasonable reliance on alleged representation that plaintiff was purchasing exclusive franchise), *aff'd in part, rev'd in part on other grounds*, No. 06-6054, — F.3d —, 2007 WL 1214695 (6th Cir. Apr. 26, 2007).

27

transaction by independent counsel; "even if the plaintiff acted in reliance upon such representations, she conceded doing so upon the advice of independent counsel and, therefore, cannot maintain her action . . ."). Indeed, had Plaintiffs actually been relying on BDO, De Castro, and Gramercy, there would have been no need to consult with his trusted personal attorneys and financial professionals. *See In re Simon II Litigation*, 211 F.R.D. 86, 140 (E.D.N.Y. 2002) (noting that under New York law, if fraud plaintiff "makes independent inquiries as to the veracity of the [defendant's] assertions, then the former is deemed not to have relied on the latter's assertions."), *vacated on other grounds*, 407 F.3d 125 (2d Cir. 2005).

Additionally, as demonstrated in Point II(A), *supra*, a fair reading of the Amended Complaint itself yields the conclusion that Plaintiffs never looked to Gramercy, as opposed to BDO, for tax advice. Thus, the fraud claim should be dismissed for failure to plead reliance.

Finally, Plaintiffs' retention of independent tax counsel also defeats any claim with respect to the alleged failure to disclose fee-sharing. Plaintiffs claim that the significance of the alleged fee sharing is that the information would have revealed Gramercy's alleged lack of independence. (Am. Compl., ¶¶ 95-99). By retaining their own personal independent advisors – the Waller Lansden firm and Solys – Plaintiffs declined to rely on Gramercy's "independence,"[21] opting instead to heed the undisputedly independent counsel of their own tax and financial professionals.

> 3.    *Plaintiffs' Failure to Exercise Reasonable Diligence Forecloses Reasonable Reliance as a Matter of Law.*

Furthermore, Plaintiffs have failed to allege any facts indicating that they – sophisticated businessmen who had just sold business interests worth tens of millions of dollars – exercised appropriate diligence in relying upon any of the Defendants' purported representations or omissions. Under New York law, "a party entering into a transaction has a duty to conduct an independent appraisal of the risk it is assuming and a duty to investigate the nature of its business

---

[21]    Notably, Plaintiffs imply that BDO's characterization of Gramercy as independent was made with a wink and a nod. (See Am. Compl., ¶ 95).

28

transaction." *See Granite Partners, L.P. v. Bear, Stearns & Co. Inc.,* 17 F. Supp. 2d 275, 289-90 (S.D.N.Y. 1998). Indeed, "[t]he broad rule is that where parties have access to information that could expose a misrepresentation, courts will not find their reliance sufficiently justifiable to merit legal protection." *Giannacopoulos v. Credit Suisse,* 37 F. Supp. 2d 626, 633 (S.D.N.Y. 1999). This is particularly true where the representations or omissions concern regulatory or statutory provisions or other public records.[22]

Accordingly, if

> a party has been put on notice of the existence of material facts . . .
> and he nevertheless proceeds with a transaction without . . .
> inserting appropriate language in the agreement for his protection,
> he may truly be said to have willingly assumed the business risk
> that the facts may not be as represented. Succinctly put, a party
> will not be heard to complain that he has been defrauded when it is
> his own evident lack of due care which is responsible for his
> predicament.

*Rodas v. Manitaras,* 159 A.D.2d 341, 343, 552 N.Y.S.2d 618, 620 (1st Dep't 1990).

Moreover, "[c]ircumstances may be so suspicious as to suggest to a reasonably prudent plaintiff that the defendants' representations may be false, and that the plaintiff cannot reasonably rely on those representations . . . ." *Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91, 98 (2d Cir. 1997). *See Crigger v. Fahnestock & Co., Inc.,* 443 F.3d 230, 234-35 (2d

---

[22]     *See Wardrop v. Amway Asia Pacific Ltd.,* No. 99 CIV 12093 (DC), 2001 WL 274067, *5 (S.D.N.Y. Mar. 20, 2001) (under federal securities laws, no reasonable reliance on defendant offerors' failure to reflect impact on share price of China's entry into World Trade Organization, as event was a matter of public record when tender offer announced); *KML Laboratories Ltd. v. Hopper,* 830 F. Supp. 159, 167 n.7 (E.D.N.Y. 1993) (plaintiff could not have relied on false statements concerning incinerator permits since "regulatory situation was not a matter peculiarly within [defendant]'s knowledge"); *Simms v. Biondo,* 816 F. Supp. 814, 822 (E.D.N.Y. 1993) (property purchasers did not reasonably rely on appraisal reflecting inflated sale price of adjoining property where true price of adjoining property was available in public records); *Shao v. 39 College Point Corp.,* 309 A.D.2d 850, 852, 766 N.Y.S.2d 75, 76 (2d Dep't 2003) (plaintiff purchaser could not establish justifiable reliance on defendant's claim to be an officer of corporate property owner where publicly available records demonstrated falsity of defendant's representation); *DiFilippo v. Hidden Ponds Associates,* 146 A.D.2d 737, 738, 537 N.Y.S.2d 222, 224 (2d Dep't 1989) (townhouse purchaser's claim of fraud alleging misrepresentation of the requirements of applicable zoning ordinance failed to establish justifiable reliance; import of applicable zoning ordinance was "not a matter peculiarly within the defendants' knowledge"); *Most v. Monti,* 91 A.D.2d 606, 606, 456 N.Y.S.2d 427, 428 (2d Dep't 1982) (plaintiff did not reasonably rely on misrepresentation that purchased real estate had been fully assessed for tax purposes; assessment status was independently ascertainable by plaintiff); *Foxley v. Sotheby's Inc.,* 893 F. Supp 1224, 1229 (S.D.N.Y. 1995) (no reasonable reliance on misrepresentations or omissions with respect to letter purportedly exposing lack of authenticity of painting, where plaintiff had ability to obtain and examine letter, which was in public domain) (citation and internal quotation marks omitted).

29

Cir. 2006) ("Reasonable reliance entails a duty to investigate the legitimacy of an investment opportunity where plaintiff was placed on guard or practically faced with the facts. . . . The law is indulgent of the simple or untutored; but the greater the sophistication of the investor, the more inquiry that is required").

Here, Plaintiffs had ample actual and constructive notice of potential pitfalls associated with the tax strategy so as to render their reliance on any purported assurances of success patently unreasonable. As demonstrated in Point I(B) of the Memorandum of Law in Support of BDO Seidman, LLP's Motion to Dismiss or, in the Alternative, to Compel Arbitration, dated May 7, 2007 ("BDO Memorandum of Law"), there was substantial public information concerning IRS scrutiny of alleged tax shelters – and specifically, **BDO's** tax-oriented investment strategies – before Plaintiffs committed to the transactions. Plaintiffs admit a general awareness of that information. (Am. Compl., ¶ 74). The IRS Notices that Plaintiffs now contend expose the infirmity of the BDO tax strategy (Am. Compl., ¶¶ 55-58) were also publicly available before they committed to pursue that strategy, including via the Internet. See http://www.irs.gov/pub/irs-utl/notice_1999-59.pdf; http://www.irs.gov/pub/irs-utl/notice_2000-44.pdf.[23] Additionally, the Addendum to the BDO Consulting Agreement contained a litany of stern warnings regarding the potential adverse consequences of pursuing the tax strategy. (Am. Compl., Exs. 7-8, at Appendix to Consulting Agreement). Plaintiffs were also warned of as much as a forty-nine percent chance the strategy would not work. (*Id.*, ¶ 131 n.5).

The foregoing information should have, and in fact did, cause Plaintiffs to be wary of the propriety of the tax strategy, and prompted them to seek the advice of their independent tax counsel and financial advisor. (*Id.*, ¶ 94, 99 and Ex. 8 at 6, ¶13). Thus, Plaintiffs either knew or should have known of the risks they were taking, and could not possibly have reasonably relied on *any* alleged reassurances by BDO or De Castro, even if they were knowingly false. *See Schlaifer Nance*, 119 F.3d at 99 (holding that although defendant clearly misrepresented facts to

---

[23]    Indeed, Plaintiffs or their tax counsel could have simply called one of the IRS' public telephone assistance hotlines to ascertain the IRS' view of the tax strategy. See http://www.irs.gov/help/article/0,,id=96730,00.html.

plaintiff in connection with business transaction, plaintiff did not reasonably rely on misrepresentations and omissions because circumstances should have indicated to plaintiff, a sophisticated party, that defendant's representations were false); *Abrahami v. UPC Constr. Co.*, 224 A.D.2d 231, 234, 638 N.Y.S.2d 11, 14 (1st Dep't 1996) (holding that sophisticated investors suing corporation and officers for fraud unjustifiably relied on financial statements overstating assets because investors were on notice of falsity of defendant's representations and had duty to appraise risks independently).[24]

In light of these patent "red flags," New York law obligated Plaintiffs to either demand protective provisions in the IMA holding Gramercy responsible for tax related matters, or bear the risk of adverse tax consequences themselves.  *See Rodas*, 159 A.D.2d at 343, 552 N.Y.S.2d at 620 (sophisticated parties required to protect themselves from fraud on matters of importance by securing protective provisions in contract).  *See also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 196 (2d Cir. 2003) (sophisticated investor did not reasonably rely on corporation's misrepresentations regarding financial information for purposes of fraud claim; plaintiff should have protected itself by insisting that representation be included in stock purchase agreement).  Incredibly, Plaintiffs not only failed to secure such a protective provision, they did the **exact opposite**, expressly *disclaiming* any reliance on Gramercy with regard to tax matters, and exonerating the firm from all liability on the subject.  (O'Shea Decl., Exs. 1 ¶ 7(c), 2, 16 ¶ 7(c), 17).  In fact, Gramercy's demand (in the IMAs and "belief" letters) for full immunity concerning tax matters itself rendered Plaintiffs' reliance unjustifiable.  *See, e.g., Curran, Cooney, Penney, Inc. v. Young & Koomans*, 183 A.D.2d 742, 743-44, 583 N.Y.S.2d 478, 479 (2d Dep't 1992) (defendant business owners' refusal to make any representations concerning accounting basis for income reflected on tax return put plaintiff on notice of material facts

---

[24]     Tennessee law yields the same result.  *See Coffey v. Foamex L.P.*, 2 F.3d 157, 162-63 (6th Cir. 1993) (under Tennessee law, plaintiff cannot establish reasonable reliance where he "is put on notice of potential harm or damage," notwithstanding reassurances from defendant).

31

concerning business' income; by proceeding with transaction without securing documentation or protective contractual provisions, plaintiff assumed risk of misrepresentation).

    4.    *Plaintiffs' Conclusory Allegations of Reliance on the Alleged Fee Sharing Omissions Are Deficient as a Matter of Law.*

Finally, the foregoing is largely academic, as the only actual misrepresentations or omissions attributed to Gramercy in the Amended Complaint are Gramercy's alleged failure to disclose its alleged receipt of a portion of the fees paid BDO by Plaintiffs.  (Am. Compl., ¶¶ 97-103).  Plaintiffs, however, have failed to plead more than conclusory allegations of reliance on the lack of that information.  *See, e.g., Coffey*, 2 F.3d at 163 (dismissing fraud claim where plaintiff failed to allege facts demonstrating reasonable reliance); *Evans v. Pearson Enters., Inc.*, 434 F.3d 839, 852-53 (6th Cir. 2006) ("Conclusory statements of reliance are not sufficient to explain with particularity how [plaintiff] detrimentally relied on the alleged fraud").  Plaintiffs do no more than baldly assert that they relied on the misrepresentations or omissions regarding fee sharing (Am. Compl., ¶ 103-104), and as explained in Point III(C)(2), *supra*, their retention of independent counsel contradicts any assertion that they relied on Gramercy.

Plaintiffs' claim of reliance on Gramercy's Form ADV (which they falsely assert should have disclosed the alleged fee sharing with BDO, see footnote 19, *supra*) is patently false, since the document, which is dated April 1, 200*3* (see *id.*, Ex. 1 at 2, upper right) could not have induced Plaintiffs' reliance in 200*2*, when Plaintiffs entered into the agreements with Gramercy and BDO and the underlying transactions were conducted.  Moreover, Plaintiffs do not even allege that they *read* the Form ADV so as to be deceived by it.

**D.    Plaintiffs Have Not Alleged Loss Causation.**

Under New York law, a plaintiff stating a claim for fraud must also plead facts establishing causation.  To do that, the "plaintiff must show ***both*** that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) ***and that the misrepresentations directly caused the loss about which plaintiff***

32

*complains (loss causation)*." *Laub v. Faessel*, 745 N.Y.S.2d 534, 536 (1st Dep't 2002) (emphasis added). Plaintiffs allege injury because the tax benefits of BDO's investment strategy were not as represented. Gramercy, however, was not retained, and expressly disclaimed, to opine on the tax implications of BDO's investment strategy, and Plaintiffs do not claim to have been injured by any of the services rendered by Gramercy. There is, therefore, no link between Plaintiffs' alleged damages and Gramercy's alleged receipt of fees from BDO or its alleged lack of independence from BDO.[25]

Additionally, even if Gramercy had been retained to advise on tax matters or its independence was somehow compromised by alleged fee sharing, Plaintiffs' *independent* tax counsel at Waller Lansden and financial advisor Solys agreed that BDO's tax strategy was meritorious and recommended that Plaintiffs pursue it. Plaintiffs thus cannot show that any alleged misrepresentations or omissions by Gramercy caused any damages to Plaintiffs. *See Zinn v. Salomon, Smith Barney, Inc.*, 14 A.D.3d 354, 355-56, 787 N.Y.S.2d 309, 310-311 (1st Dep't 2005) (proximate cause not established with respect to decline in investment portfolio value where trustee followed investment strategy concurred in by plaintiff after active review and oversight)

### E.    The Representations and Omissions at Issue Concerned Nonactionable Opinions of Law or Predictions of Future Events.

Gramercy joins in the arguments presented in Point II(A)(2) of the BDO Memorandum of Law.

---

[25]    Plaintiffs allege that BDO violated a rule of the American Institute of Certified Public Accountants by sharing fees with Gramercy. (Am. Compl., ¶ 98). It is well-established, however, that violation of a professional ethical rule, in itself, does not generate a civil cause of action, *see, e.g., Shapiro v. McNeil,* 92 N.Y.2d 91, 97, 699 N.E.2d 407, 409, 677 N.Y.S.2d 48, 50 (N.Y. 1998) ("an ethical violation will not, in and of itself, create a duty that gives rise to a cause of action that would otherwise not exist at law"), and in any event Gramercy is not an accounting firm and is not bound by AICPA rules.

33

IV.    **PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM MUST BE DISMISSED FOR THE ADDITIONAL REASON THAT PLAINTIFFS HAVE NOT ESTABLISHED THE EXISTENCE OF A FIDUCIARY RELATIONSHIP WITH GRAMERCY.**

Plaintiffs' breach of fiduciary duty claim against Gramercy (Am. Compl., ¶¶ 160-62) fails for many of the reasons enumerated above, including lack of specificity (Point II(A) and (B), *supra*), falsity (Point III(A), *supra*), reliance (Point III(C), *supra*), and causation (Point III(D), *supra*). Notably, at least one district court has dismissed such claims against investment advisors in a "tax shelter" case where, as here, the plaintiff pleaded no facts showing the defendant's knowledge that the investment strategy was unlawful. *King*, 2005 WL 611954 at *33. But Plaintiffs have also not established that Gramercy owed Plaintiffs *any* fiduciary duty, or that any such duties that were owed were breached.

"Absent 'extraordinary circumstances,' New York law does not recognize the existence of a fiduciary duty between sophisticated commercial entities contracting at arm's length." *Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 456 (S.D.N.Y. 2006). The existence of a fiduciary duty generally turns upon the issue of "whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge." *Green v. Beer*, 2007 WL 576089, **3 (S.D.N.Y. Feb. 22, 2007) (internal quotations and citations omitted). However, "[s]imply because one reposes trust or confidence in another does not give rise to a fiduciary duty; the trust must be accepted as well." *Regions Bank v. Wieder & Mastroianni, P.C.*, 423 F. Supp. 2d 265, 270 (S.D.N.Y. 2006).

To that end, the scope of a fiduciary duty can be limited by contract. *Chase Manhattan Bank, N.A. v. Remington Prods., Inc.*, 865 F. Supp. 194, 200 (S.D.N.Y. 1994). "Generally, where parties have entered into a contract, courts look to that agreement 'to discover . . . the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency." And "[i]f the parties . . . do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them." *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19, 832 N.E.2d

34

26, 31, 799 N.Y.S.2d 170, 175 (N.Y. 2005) (quoting *Northeast Gen. Corp. v. Wellington Adv.*, 82 N.Y.2d 158, 624 N.E.2d 129, 604 N.Y.S.2d 1 (1993)) (citations omitted).  More specifically, "[u]nder New York law, parties to a commercial contract do not ordinarily bear a fiduciary relationship to one another unless they ***specifically so agree***."  *Calvin Klein Trademark Trust v. Wachner*, 123 F. Supp. 2d 731, 733-34 (S.D.N.Y. 2000) (emphasis added).

The language of the contracts signed by Plaintiffs establishes that there was no fiduciary duty contemplated by Plaintiff or accepted by any of the Defendants.  The IMA and accompanying "belief" letters expressly stated that Gramercy had not and would not advise Plaintiffs on any tax matters.  (O'Shea Decl., Exs. 1 ¶ 7(c), 2, 16 ¶ 7(c), 17).   As a matter of law, then, Gramercy could not have owed any fiduciary duty to advise Plaintiffs on the tax implications of the transactions effectuated for them.  *See Cooper v. Parsky*, 140 F.3d 433, 440-41 (2d Cir. 1998) (breach of fiduciary duty claim could not be maintained where contract disclaimed fiduciary relationship).  Likewise, Paragraph 11 of the IMA expressly stated that the parties had an independent contractor relationship (O'Shea Decl., Exs. 1 ¶ 11, 16 ¶ 11), and, therefore, no principal-agent fiduciary relationship existed between them.

Additionally, in the instant case, Gramercy was retained to implement an investment strategy preconceived by Plaintiffs' tax advisors.  (Am. Compl., ¶ 34).  Gramercy at most acted as, in effect, a broker on a non-discretionary securities account charged with simply consummating trades ordered by its client.  Such brokers clearly owe no fiduciary duty.  *See Perl v. Smith Barney Inc.*, 230 A.D.2d 664, 666, 646 N.Y.S.2d 678, 680 (1st Dep't 1996) (allegations of breach of fiduciary duty that do not assert relationship different from ordinary broker-client relationship properly dismissed as "broker does not, in the ordinary course of business, owe a fiduciary duty to a purchaser of securities.") (internal quotations and citation omitted).

Finally, any lingering doubts regarding the non-existence of a fiduciary relationship are definitively allayed by *Green, supra*, 2007 WL 576089, a case that is directly on point and involved a transaction almost identical to the distressed debt transactions at issue here.  In *Green*, the defendants had (like BDO) approached the plaintiffs about an investment proposal with the

potential to generate significant tax advantages, and offered them an opinion from a law firm confirming the transaction's legality. The plaintiffs (like the Joneses) accepted that proposal and paid the law firm a large fee. After the IRS found the transaction to be improper, the plaintiffs sued, alleging, *inter alia*, that the defendants breached a fiduciary duty owed to them. Despite the fact that the plaintiffs alleged that they had relied on defendants' assurances in agreeing to engage in the tax strategy – something Plaintiffs cannot even plead with respect to Gramercy – the court nonetheless dismissed their fiduciary duty claim, noting that they had "not alleged that they enjoyed a fiduciary relationship with [d]efendants before the advent of the tax-shelter transaction" and therefore did not properly allege the existence of a fiduciary relationship. *Green, supra*, 2007 WL 576089, at *3. In other words, the court recognized that the plaintiffs' only contact with defendants was in connection with defendants' attempt to sell them a tax strategy, an arm's-length business pitch hardly indicative of a fiduciary relationship. *Accord Swartz v. KPMG LLP*, 401 F. Supp. 2d 1146, 1155-56 (W.D. Wash. 2004) (plaintiff's consulting agreement with alleged tax shelter promoter KPMG was arms' length, not fiduciary).

## V.    PLAINTIFFS' BREACH OF FIDUCIARY DUTY AND GROSS NEGLIGENCE CLAIMS ARE BARRED BY NEW YORK'S MARTIN ACT.

New York's Martin Act, N.Y. Gen. Bus. Law, Art. 23-A, §§ 352 *et seq*., governs fraud and deception in the purchase, sale, promotion, or investment advice of securities. It preempts common law claims of breach of fiduciary duty and negligence in connection with any sale of securities. *Granite Partners, supra*, 17 F. Supp. 2d at 291-292.

Securities are broadly defined under the Martin Act to include "any stocks, bonds, notes, evidences of interest or indebtedness or other securities." N.Y. Gen. Bus. Law. § 352(1). The tax strategy devised by BDO and procured by Plaintiffs involved the purchase and sale of securities cleared through New York financial institutions, as well as the purchase and sale of interests in limited liability companies. (O'Shea Decl., *e.g.*, Exs. 4, 6, 8, 10, 11, 18-23, 25-27, 29; Johnston Decl., ¶ 17). The Martin Act therefore mandates that Plaintiffs' claims for breach of fiduciary duty and gross negligence be dismissed.

36

## VI.   PLAINTIFFS' GROSS NEGLIGENCE CLAIM IS BARRED BY THE "ECONOMIC LOSS" RULE.

Under New York law, a claim for negligence (of which gross negligence is a variation) cannot lie where, as here, the parties' relationships are governed by a contract.  *Bristol-Myers Squibb, Indus. Div. v. Delta Star, Inc.*, 206 A.D.2d 177, 179-81, 620 N.Y.S.2d 196, 197-199 (4th Dep't 1994) (party to contract alleging negligent performance of contractual duty to install transformer cannot transform simple breach of contract into tort).  This is due to New York's "economic loss" rule which "reflects the principle that damages arising from the failure of the bargained-for consideration to meet the expectations of the parties are recoverable in contract, not tort."  *Id.*, 620 N.Y.S.2d 198-199.  *Accord AT & T v. N.Y.C. Human Resources Adm.*, 833 F. Supp. 962, 982-85 (S.D.N.Y.1993) (upholding dismissal of negligence claims under economic loss rule because there was "no contention [that] . . . alleged negligence resulted in personal injury or property damage").  Plaintiffs are therefore precluded from stating any such claim as a matter of law.

## VII.  THE TENNESSEE CONSUMER PROTECTION ACT IS INAPPLICABLE BECAUSE GRAMERCY ENGAGED IN NO TRADE OR COMMERCE IN TENNESSEE AND PLAINTIFFS' CLAIMS ARE NOT PLEADED WITH REQUISITE SPECIFICITY.

The Tennessee Consumer Protection Act, Tenn. Code. § 47-18-101 *et seq.* ("TCPA") prohibits only "unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly ***within***" Tennessee.  Tenn. Code § 47-18-102(2).  The Amended Complaint alleges no facts showing that Gramercy engaged in any trade or commerce in Tennessee.  To the contrary, Plaintiffs traveled to New York to retain Gramercy to perform services outside of Tennessee.  Plaintiffs' TCPA claim against Gramercy (Am. Compl., ¶¶ 166-68) therefore must be dismissed.

Additionally, TCPA claims must be pleaded with specificity.  *McKee Foods Corp. v. Pitney Bowes, Inc.*, No. 1:06-CV-80, 2007 WL 896153, *5 (E.D. Tenn. Mar. 22, 2007).

Plaintiffs do not do so (see Am. Compl., ¶¶ 166-68), failing even to identify the particular TCPA provision allegedly violated.

## VIII.  EACH OF PLAINTIFFS' NON-DECLARATORY CAUSES OF ACTION AGAINST GRAMERCY IS TIME-BARRED.

A court may dismiss claims on a Rule 12(b)(6) motion where it appears from the face of the complaint that the claims are time-barred. *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744-45 (6th Cir. 1992). In diversity cases, the court applies the procedural law of the forum state to statute of limitations issues. *Spence v. Miles Labs., Inc.*, 37 F.3d 1185, 1188 (6th Cir. 1994).

### A.    Plaintiffs' Tort Claims Are Time-Barred under Tenn. Code § 28-3-105.

Plaintiffs' fraud, negligence, and breach of fiduciary duty claims against Gramercy, each alleging injury to personal property, must have been commenced within three years of their accrual. Tenn. Code § 28-3-105; *Med. Educ. Assistance Corp. v. State of Tennessee*, 19 S.W.3d 803, 817 (Tenn. Ct. App. 1999) (intentional and negligent misrepresentation); *Keller v. Colgems-EMI Music, Inc.*, 924 S.W.2d 357, 360-61 (Tenn. Ct. App. 1996) (breach of fiduciary duty). Plaintiffs' tort claims against Gramercy are thus time-barred if they accrued prior to March 27, 2004. Such claims accrue when the plaintiff has actual or constructive knowledge of his injury and the cause thereof. *Med. Educ. Assistance Corp.*, *id.*

Gramercy joins in and adopts the arguments set forth in Point I of the BDO Memorandum of Law. BDO has exhaustively demonstrated that Plaintiffs were constructively, if not actually, aware of the alleged defects in BDO's tax strategy and of IRS investigative initiatives well before March 27, 2004, by virtue of the IRS Notices and Senate investigations referenced in the Amended Complaint, as well as media attention. Notably, Plaintiffs admit they "were generally aware" of such matters in or about late 2001 and early 2002, when BDO pitched the strategy to them. (Am. Compl., ¶¶ 74, 92-93). BDO has also established the absence of any fraudulent concealment by BDO (BDO Memorandum of Law, at 13-17) – something applying with even greater force to Gramercy, which had little interaction with Plaintiffs.

38

**B.    Plaintiffs' Claims under the Tennessee Consumer Protection Act Are Time-Barred.**

Any private action pursuant to the TCPA "shall be brought within one (1) year from a person's discovery of the unlawful act or practice." Tenn. Code § 47-18-110. Constructive knowledge is sufficient to constitute discovery. *Power & Tel. Supply Co., Inc. v. Suntrust Banks, Inc.*, 447 F.3d 923, 930 (6th Cir. 2006). Plaintiffs indisputably discovered the alleged basis for the claims herein no later than "the latter part of 2005," when the IRS audited their 2002 tax returns and disallowed the losses generated by BDO's investment strategy and imposed penalties.[26] (Am. Compl., ¶¶ 135-36). (In fact, Plaintiffs were notified of the audits on or about August 8, 2005 and September 26, 2005, respectively. (See BDO Memorandum of Law, at 12-13).

Plaintiffs commenced this action as against BDO on November 20, 2006 (O'Shea Decl., Ex. 35), but did not join Gramercy until March 27, 2007 (*id.*, Ex. 34) – more than one year from "the latter part of 2005." There is no plausible argument that Plaintiffs failed to name Gramercy due to mistake as to, or ignorance of, Gramercy's identity. Therefore, Plaintiffs' TCPA claim against Gramercy is untimely and must be dismissed with prejudice. *See, e.g., Sallee v. Barrett*, 171 S.W.3d 822, 830-31 (Tenn. 2005) (failure to name city as party in initial complaint against police officer precluded amendment of complaint to add claim against city outside of limitations period).

**IX.    PLAINTIFFS' CONSPIRACY CLAIM MUST BE DISMISSED BECAUSE THERE IS NO SUBSTANTIVE CAUSE OF ACTION FOR CIVIL CONSPIRACY.**

There is no independent cause of action for civil conspiracy under New York (or, for that matter Tennessee) law.[27] Plaintiffs' separate cause of action for civil conspiracy (Am. Compl.,

---

[26]    Plaintiffs allege that the BDO-Gramercy "conspiracy . . . came to light" after a Senate investigation and issuance of several reports. (Am. Compl., ¶ 32). This is demonstrably false; the Senate reports say absolutely nothing about Gramercy. If the allegations are taken at face value, however, then Plaintiffs were on notice of the "conspiracy" as early as November 2003, when the first of the Senate reports was issued. (Am. Compl., ¶ 32).

[27]    *See, e.g., Alexander & Alexander of New York, Inc. v. Fritzen*, 68 N.Y.2d 968, 969, 503 N.E.2d 102, 103, 510 N.Y.S.2d 546, 547 (1986) ("a mere conspiracy to commit a [tort] is never of itself a cause of action. Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort") (citation and internal quotation marks omitted); *see also Freeman Mgmt. Corp. v. Shurgard Storage Centers, LLC*, 461 F. Supp. 2d 629, 642-43 (M.D. Tenn 2006) (civil conspiracy not actionable under Tennessee law

39

¶¶ 143-159) therefore must be dismissed. *See Swartz*, 401 F. Supp. 2d at 1157 (dismissing conspiracy claim where underlying claims were dismissed). Similarly, because Plaintiffs have pleaded no viable substantive claims against Gramercy or BDO, there is no foundation for co-conspirator liability. *See Alexander & Alexander*, *id.*

## X.    PLAINTIFFS' CAUSE OF ACTION FOR DECLARATORY JUDGMENT MUST BE DISMISSED.

Aside from the overarching personal jurisdiction defect, the Court should dismiss Plaintiffs' declaratory judgment cause of action because it is abusive and serves no useful purpose. Plaintiffs' IMAs with Gramercy obligate them to, *inter alia*, (1) indemnify Gramercy against costs and expenses incurred in defending any action by Plaintiffs against it (subject to certain exceptions), and (2) prior to any determination on the merits, to advance funds to Gramercy to cover legal fees and other costs incurred in defending such action (subject to an obligation to repay such advances in the event it is determined that Gramercy is not entitled to indemnification). (See O'Shea Decl., Exs. 1 and 16, ¶¶ 7(e)-(f)). Plaintiffs commenced this action as against Gramercy on March 27, 2007, and the Amended Complaint expressly repudiated Plaintiffs' indemnification and advancement obligations. (Am. Compl., ¶¶184-192). Thus, on April 9, 2007, Gramercy commenced an action against Plaintiffs in the United States District Court for the Southern District of New York ("SDNY") seeking, *inter alia*, (1) specific performance of Plaintiffs' advancement obligation, and (2) a declaration that Plaintiffs were obligated to indemnify Gramercy. (See O'Shea. Decl., Ex. 36).

The decision to exercise jurisdiction over a declaratory judgment action is committed to the discretion of the court. *Cool Springs Press, A Division of Thomas Nelson, Inc. v. Belo Co.*, No. 3:05-0879, 2006 WL 1006728, *2 (M.D. Tenn. Apr. 14, 2006) (**Echols, J.**) The Sixth Circuit employs a five-factor test to determine whether a declaratory judgment action should be entertained:

---

absent underlying substantive tort); *Levy v. Franks*, 159 S.W.3d 66, 82 (Tenn. Ct. App. 2004) (civil conspiracy not a substantive cause of action, but instead depends on an underlying wrong).

(1) whether the judgment would settle the controversy;

(2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;

(3) whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race for res judicata;

(4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction;  and

(5) whether there is an alternative remedy that is better or more effective.

*AmSouth Bank v. Dale*, 386 F.3d 763, 785 (6th Cir. 2004) (internal quotation marks omitted). These factors will be addressed in a different order than as enumerated in *AmSouth* (the fourth factor being omitted, as there are no state proceedings).

A.      **The Declaratory Remedy Is Being Used Merely for the Purpose of Procedural Fencing or to Provide an Arena for a Race for Res Judicata.**

Normally, a court will decline a declaratory judgment action by a putative wrongdoer in favor of a subsequent, coercive action by the "natural" plaintiff, absent some demonstrable and extraordinary harm occasioned by the "natural" plaintiff's delay in bringing suit.  *Cool Springs Press*, 2006 WL 1006728 at *3.  The Sixth Circuit has warned that

> [c]ourts take a dim view of declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a "natural plaintiff" and who seem to have done so for the purpose of acquiring a favorable forum. . . . [W]here a putative defendant files a declaratory action whose only purpose is to defeat liability in a subsequent coercive suit, no real value is served by the declaratory judgment except to guarantee to the declaratory plaintiff her choice of forum--a guarantee that cannot be given consonant with the policy underlying the Declaratory Judgment Act. . . . "[D]eclaratory actions founded exclusively on a defense to a state law claim should be dismissed as a tactical maneuver calculated to deny potential plaintiffs of their traditional right to choose the forum and time of suit. . . . [T]he natural plaintiff's choice of forum and law will be disturbed only in exceptional circumstances.

41

*AmSouth*, 386 F.3d at 788 (citations and internal quotation marks omitted).

These are precisely the circumstances here. Plaintiffs understood that, by commencing the present action, Gramercy would sue them under the indemnification and advancement provisions of the IMA. (See Am. Compl., ¶ 186). And that is what happened: Gramercy commenced the SDNY action just thirteen days after being sued by Plaintiffs. (O'Shea Decl., Ex. 36). Thus, Plaintiffs' declaratory judgment cause of action is an obvious effort to preempt Gramercy's SDNY action and secure a more favorable or convenient forum for litigation of what clearly are nothing more than state law affirmative defenses in that case. Indeed, Plaintiffs have tacitly conceded as much, having moved this Court to enjoin Gramercy from prosecuting the SDNY action arguing, *inter alia*, that this action was first-filed and that Gramercy's indemnification and advancement claims are compulsory counterclaims herein. (O'Shea Decl., Ex. 37).

**B.      The Declaratory Judgment Action Would Not Serve a Useful Purpose in Clarifying the Legal Relations at Issue.**

Declaratory judgments are useful where they clarify a party's legal rights and responsibilities, and, in the absence of clarification, the party will be acting at its peril and thus harmed. *See AmSouth*, 386 F.3d at 786. Here, however, Plaintiffs have filed their various non-declaratory causes of action against Gramercy. Therefore, they cannot plausibly claim that they are being deterred from suing Gramercy, and thus harmed, on account of uncertainty over the enforceability of the IMAs. Their declaratory action clearly serves no useful purpose.

In any event, the threat that Gramercy might sue was not a proper basis for a declaratory action. *Id.* (quoting *Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 712 (7th Cir. 2002)). The *AmSouth* court, for example, rejected the notion that the declaratory defendants' threats of litigation presented a "'Damoclean sword'" over the declaratory plaintiff. *AmSouth*, 386 F.3d at 786-87. "Where a pending coercive action, filed by the natural plaintiff, would encompass all the issues in the declaratory judgment action, the policy reasons underlying the creation of the extraordinary remedy of declaratory judgment are not present, and the use of that remedy is

unjustified." *Id.* at 787. Here, Gramercy, the natural plaintiff, immediately commenced its SDNY coercive action, obviating the instant declaratory judgment action. The SDNY proceeding now constitutes the best forum to adjudicate IMA issues.

> **C.    The SDNY Action Offers An Alternative Remedy That Is Better or More Effective.**

Plaintiffs challenge the IMAs' indemnification and advancement provisions on (1) various grounds of contract interpretation (Am. Compl., ¶¶ 188-89), and (2) the ground that the contracts are void due to fraud (*id.*, ¶¶ 188, 192). The first set of challenges raise legal issues that are entirely extraneous to the principal issues in this case – whether BDO and Gramercy in fact conspired to defraud Plaintiffs. The SDNY action therefore presents no inefficiency or duplication of effort concerns in this respect. Additionally, the IMAs are governed by New York law. (O'Shea Decl., Exs. 1 and 16, ¶ 14(d)). It is no derogation of this Court to note that the federal courts sitting in New York routinely apply New York contract law, and likely can do so more expeditiously than this Court (just as this Court obviously is better situated than a New York court to apply Tennessee law).

Plaintiffs' second ground for challenging the IMA – essentially affirmative defenses to Gramercy's SDNY action – do overlap with some of the issues in the present action. BDO, however, has moved to compel arbitration pursuant to its consulting agreements with Plaintiffs.[28] Other courts have upheld such arbitration clauses against fraudulent inducement and other challenges by "tax shelter" plaintiffs,[29] and we anticipate that this Court will do so. If BDO is severed from this action, Plaintiffs will have to separately arbitrate against BDO the bulk of their claims, including the fraud allegations underlying their fraudulent inducement defense to the IMA. At that point there will be little benefit to Plaintiffs from litigating their fraudulent inducement defenses against Gramercy here as opposed to in the SDNY action, because multi-forum litigation will then be unavoidable.

---

[28]    Gramercy reserves the right to compel Plaintiffs to arbitrate their claims against Gramercy.
[29]    See BDO Memorandum of Law, at 25-26 (collecting cases).

43

**D.    The Judgment Would Not Settle the Controversy.**

If BDO is severed from the instant action, then any determination by this Court that the IMA is unenforceable on grounds of fraudulent inducement will not settle the broader controversy among the parties, because BDO will not be bound by any such ruling.  *See Bituminous Cas. Corp. v. J&L Lumber Co., Inc.*, 373 F.3d 807, 814 (6th Cir. 2004) (declaration that insurer was obligated to cover insured against claims of putative independent contractor would not resolve controversy, because contractor, nonparty to declaratory action, would not be bound).  This factor is thus neutral, at best.

With three of the five *Amsouth* factors strongly favoring dismissal, and only one favoring neither conclusion (the fifth factor – federal-state friction – being irrelevant), the proper result is clear.  The Court should dismiss Plaintiffs' declaratory cause of action.

44

**CONCLUSION**

For all of the foregoing reasons, the Court should dismiss the action as against Gramercy with prejudice for lack of personal jurisdiction. Alternatively, it should dismiss all of Plaintiffs' non-declaratory claims, with prejudice, for failure to plead with specificity or failure to state a cognizable legal claim. The Court should decline to entertain Plaintiffs' declaratory cause of action.

Dated: Nashville, Tennessee
      May 25, 2007

/s/ Julie Murphy Burnstein
Julie Murphy Burnstein (No. 18149)
**BOULT, CUMMINGS, CONNERS & BERRY, PLC**
1600 Division Street
Suite 700
P.O. Box 340025
Nashville, TN 37203
Tel. (615) 252-2338

Sean F. O'Shea (admitted *pro hac vice*)
Michael E. Petrella (admitted *pro hac vice*)
**O'SHEA PARTNERS LLP**
90 Park Avenue, 20th Floor
New York, New York 10016
Tel: (212) 682-4426

*Attorneys for Gramercy Advisors, LLC*

45

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded electronically via the Court's electronic filing system or via U.S. Mail to:

Winston S. Evans
Thomas V. Shumate, IV
Evans, Jones & Reynolds, P.C.
1810 One Nashville Place
150 Fourth Avenue North
Nashville, TN 37219-2424
(615) 259-4685

Michael L. Dagley
Brian D. Roark
Bass, Berry & Sims
315 Deaderick Street
Suite 2700
Nashville, TN 37238
(615) 742-6200

Robert S. Markin
Mike Poulos
DLA Piper US LLP
203 N. LaSalle Street
Suite 1900
Chicago, IL 60601
(312) 368-2190

on this the 25th day of May, 2007.

/s/ Julie Murphy Burnstein
Julie Murphy Burnstein

46