# E X H I B I T   2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

JOHN A. JONES and )
CARLETON A. JONES, III, )
              )
       Plaintiffs, )
              )
v. )   Case No. __3__ __0 6__ __1 1 1 5__■
              )
BDO SEIDMAN, LLP, )   Judge _____
              )
       Defendant. )

## COMPLAINT

1.     Plaintiff, John A. Jones ["John Jones"], is a citizen and resident of Washington County, Tennessee.

2.     Plaintiff, Carleton A. Jones, III ["Carleton Jones"], is a citizen and resident of Washington County, Tennessee.

3.     Defendant, BDO Seidman, LLP ["BDO"], is a limited liability partnership organized and existing under the laws of New York. Its headquarters and principal place of business are in Chicago, Illinois.

### Jurisdiction and Venue

4.     BDO has continuously and systematically engaged in business in this judicial district and throughout Tennessee.

5.     This is a suit between citizens of different states. The amount in controversy, exclusive of interest and costs, exceeds $75,000. Therefore, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(a) and (c).

6.     BDO is subject to personal jurisdiction in this judicial district. Further, a substantial part of the events and omissions giving rise to the claims of John Jones and Carleton Jones ["Messrs. Jones"] occurred in this district. Therefore, venue is proper under 28 U.S.C. §1391(a) and (c)

## Facts

7.     BDO is one of the largest accounting firms in the United States with more than 34 offices and 300 alliance firms nationwide.

8.     At all times relevant to this complaint, a major component of BDO's practice has been to provide tax advice to its clients.

9.     At all times relevant to this complaint, BDO claimed and represented itself as having special expertise in field of federal income taxation. Indeed, BDO claimed to have as much, if not more, expertise in this field as any other accounting or consulting firm.

10.     Mark D. Puckett ["Puckett"], is a partner in BDO.

11.     All acts and omissions by Puckett as described in this complaint were made within the scope of his authority as a partner of BDO.

12.     At all times relevant to this complaint, Puckett and BDO owed a fiduciary duty of care and loyalty to Messrs. Jones.

13.     At all times relevant to this complaint, Puckett and BDO owed to Messrs. Jones a duty to deal with them fairly and in good faith.

14.     At all times relevant to this complaint, Puckett and BDO owed to Messrs. Jones a duty to disclose fully all material facts.

15.     At all times relevant to this complaint, Puckett and BDO owed to Messrs. Jones a duty to possess and exercise the skill, prudence, and diligence which they represented themselves

2

as having in the specialized field of federal income taxation. In the alternative, Puckett and BDO owed to Messrs. Jones a duty to exercise the skill, prudence, and diligence as exercised by other accountants of ordinary skill and capacity who specialized in the field of federal income taxation or who claimed to have special expertise in the field of federal income taxation.

16.     On or about October 13, 1999, BDO notified its partners that its "Tax Sales Executive Group" had been renamed as the "Tax Solutions Group" with the responsibility "to continue to assist members of BDO who find potential transactions to prefilter those transactions, structure the transactions, and close and implement the transactions." **[Exhibit 1]**

17.     The most successful partners of BDO in the Tax Solutions Group were described as having wolf-like characteristics of "always friendly but never tame." As a result, these partners were known as the "Wolf Pack.

18.     According to BDO's internal documents, the "Wolf Pack" could "turn the grayest sky to green, . . . make it rain whenever we want to" and "turn a raging fire into a green river."

19.     Puckett was a member of the "Wolf Pack." *See,* BDO business card of Puckett **[Exhibit 2]**

20.     By Memorandum dated November 16, 1999, BDO's tax solutions group circulated a marketing list of transactions being promoted through its Tax Solutions Group, which included transactions characterized by BDO as "Capital Gains Eliminators." **[Exhibit 1]**

21.     By Memorandum dated November 20, 1999, BDO notified its professional personnel that it had established its "Tax Solutions" business as a separate business line designated as Office 782, that Tax Solutions engagements could only be created within Office 782, and that such engagements could only be setup by a member of its Tax Solutions Group. **[Exhibit 1]**

3

22. By Memorandum dated November 20, 1999, BDO notified its professionals that anyone who referred a potential tax solutions engagement to Office 782 might qualify for a finder's bonus. **[Exhibit 1]**

23. BDO characterizes as a "super product category" any engagement of the Tax Solutions Group and Office 782. **[Exhibit 1]**

24. During 1998, the Tax Solutions Group, then known as the Tax Sales Executive Group, generated profits of $2.2 million. **[Exhibit 1]**

25. By Memorandum dated May 5, 2000, BDO announced to all its partners that its Tax Solutions Group had already generated revenues in the amount of $77,890,425 for the year-to-date and was projecting to generate revenues of $100 million by year end. **[Exhibit 1]**

26. BDO easily exceeded its $100 million revenue target by the end of June, 2000 and notified all its employees of these revenues by an e-mail under the banner of "Tax $ell$." **[Exhibit 1]**

27. In 2000, BDO generated $500,000.00 in fees each day from its tax shelter business. Additionally, every million in fees generated from tax shelter business generated as much as a $5 million profit in hourly billings for *traditional* accounting work. Howard Allenberg, BDO's vice chairman, detailed in a memorandum that tax shelter revenues totaled $101.6 million for the first six months of 2000, up from $2 million in 1998.

28. The culture of corruption reached the highest echelon of BDO's executive management. The "WolfPack" was led by Denis Field, a senior executive at BDO, who was quickly elevated to Chairman and Chief Executive Officer of BDO in January 2000. In a partner

4

presentation titled "Wolves - - Always Friendly But Never Tame," Field proclaimed that "one word sums up the strategy of the Tax Business Line. Money!"

29.    In a firm-wide email titled "TAX $ELLS!!!," Field congratulated employees who had generated fees of as much as $4 million on the sale of tax shelters. One email highlights a single tax solution transaction that resulted in a "PROFIT OF $995,000 TO THE FIRM!!!" Another email praises an employee for closing a tax shelter deal "resulting in a PROFIT OF $3 MILLION TO THE FIRM!!!"

30.    In fact, BDO touted TAX $ELLS! on documents, coffee mugs, screen savers and mouse pads. TAX $ELLS! was more than a slogan, it was a "vision for the future," a strategy for "selling products, increasing fees and increasing profitability," and "Most importantly, TAX $ELLS! is a change in the culture of all our people, and our attitude to tax services."

31.    Prior to 2001, John Jones was married to Janet Givens ["Ms. Givens"].

32.    Ms. Givens was the administrator of a nursing home in Tennessee. She was an officer and member of the board of directors of the Tennessee Healthcare Association ["the Association"]. Most nursing homes in Tennessee are members of the Association. At the same time, BDO was performing auditing services for many nursing homes throughout Tennessee.

33.    John Jones frequently attended meetings and conventions of the Association while accompanying Ms. Givens to whom he was then married. During those meetings and conventions, he became acquainted with Puckett who represented BDO at those meetings and conventions.

34.    John Jones and Ms. Givens subsequently engaged Puckett and BDO to prepare a feasability study for an assisted living home which they were contemplating building and operating.

5

35.    During 2001, Puckett became aware that Plaintiffs, John Jones and Carleton Jones ["Messrs. Jones"], were about to sell their stock in several businesses. He further learned that these sales would require Messrs. Jones to recognize several million dollars of long-term capital gains for federal income tax purposes.

36.    Puckett and BDO then disclosed to Messrs. Jones certain transactions and represented that those transactions were proprietary to BDO and its clients ["the transactions"].

37.    Puckett and BDO urged Messrs. Jones to engage in these allegedly proprietary transactions.

38.    Puckett and BDO repeatedly represented to Messrs. Jones that the transactions would eliminate or substantially reduce the federal income taxes which Messrs. Jones would be required to pay as the result of selling stock in their various businesses. BDO and Puckett assured Messrs. Jones that the courts would reject any attempt by the IRS to challenge the tax benefits which would be realized from the transactions.

39.    To the extent that this representation might have been an opinion or projection, there was no reasonable basis for such an opinion or projection when it was made.

40.    Puckett and BDO repeatedly represented to Messrs. Jones that the similar transactions had been successfully utilized by BDO for other of its clients in order to shelter large capital gains from federal income taxes.

41.    Puckett and BDO repeatedly represented to Messrs. Jones that BDO would issue an opinion letter confirming to them that the transactions would receive favorable treatment by the IRS.

42.    Puckett and BDO repeatedly represented to Messrs. Jones that major law firms had reviewed transactions with structures similar to the transactions which Puckett and BDO were

6

proposing to Messrs. Jones. They further represented that those major law firms had issued opinions that the structure of those similar transaction would receive favorable treatment by the IRS.

43.    Puckett and BDO repeatedly represented to Messrs. Jones that they would refer Messrs. Jones to a major law firms which would issue an opinion letter to Messrs. Jones that the transactions would receive favorable treatment by the IRS.

44.    Puckett and BDO also represented that BDO would vigorously defend the transactions on behalf of Messrs. Jones if the IRS ever challenged those transactions.

45.    Each of the representations were made by Puckett and other professional employees of BDO to Messrs. Jones at various locations, including Davidson County, Tennessee.

46.    Each of these representations was repeatedly made at a lengthy meeting in Davidson County, Tennessee on October 18, 2001. The representations were made by Puckett. The representations were also made via telephone call by a person who was described as being a leading expert of BDO on such transactions.

47.    In reliance on the representations and statements which Puckett and BDO had made, Messrs. Jones entered Consulting Agreements with BDO.

48.    Pursuant to the Consulting Agreements BDO was to provide consulting services to Messrs. Jones so that they would attain the most beneficial tax results in the sale of their businesses, as well as other consulting services.

49.    Carleton Jones entered his Consulting Agreement on May 14, 2002 **[Exhibit 3]**. The Consulting Agreement required him to pay $600,000 in consulting fees to BDO.

50.    John Jones entered his Consulting Agreement on June 3, 2002 **[Exhibit 4]**. The Consulting Agreement required him to pay $585,000 in consulting fees to BDO

7

51. In reliance on the representations which Puckett and BDO had made, Messrs. Jones paid consulting fees to BDO as follows:

|                | Date    | Amount      |
|----------------|---------|-------------|
| John Jones     | 6/19/02 | $585,000    |
| Carleton Jones | 6/12/02 | $600,000    |
| **Total**      |         | $1,185,000  |

52. The reliance of Messrs. Jones on the representations of Puckett and BDO was reasonable.

53. After Messrs. Jones signed the Consulting Agreements and paid the consulting fees, Puckett and BDO continued to represent to Messrs. Jones that the transactions would eliminate or substantially reduce the federal income taxes which they would be required to pay as the result of selling stock in their various businesses. In reliance on this representation and the other representations which Puckett and BDO had made, Messrs. Jones invested in the transactions.

54. The amounts which Messrs. Jones made invested in the transactions were as follows:

| Investor       | Date    | Amount      |
|----------------|---------|-------------|
| John Jones     | 9/11/02 | $1,120,000  |
| Carleton Jones | 9/11/02 | $1,120,000  |
| **Total**      |         | $2,240,000  |

55. In 2003, Messrs. Jones employed BDO to prepare their federal income tax returns for the year 2002 ["the tax returns"].

56. BDO owed a duty to prepare the tax returns while exercising the same skill, prudence, and diligence which they represented themselves as having in the specialized field of federal income

8

taxation. In the alternative, Puckett and BDO owed to Messrs. Jones a duty to prepare the returns while exercising the same skill, prudence, and diligence as exercised by other accountants of ordinary skill and capacity who specialized in the field of federal income taxation or who claimed to have special expertise in the field of federal income taxation.

57.     BDO prepared the tax returns to reflect deductions from the transactions that eliminated most of the capital gains which Messrs. Jones had realized from the sale of their businesses. In doing so, BDO breached the duties which they owed to Messrs. Jones.

58.     By the time that it prepared and signed the tax returns, BDO knew or should have known that the IRS would likely not only disallow the deductions from the transactions but also impose penalties.

59.     By preparing the returns to claim deductions from the transactions so that most of the capital gains were eliminated, BDO breached the duties which it owed to Messrs. Jones and caused them to incur penalties which were subsequently assessed by the IRS.

60.     Messrs. Jones reasonably relied upon BDO to prepare their tax returns properly and in accordance with applicable law.

61.     BDO prepared the returns and signed them as the preparer of the returns.

62.     The tax returns were filed during or about October, 2003.

63.     Initially, Puckett and BDO represented to Messrs. Jones that the courts would reject any attempt by the IRS to challenge the tax benefits which would be realized from the transactions. Messrs. Jones reasonably relied on this representation when they signed the consulting agreements, paid the consulting fees, and invested in the transactions.

9

64.     From the time that BDO issued its tax opinion letter until the winter of 2005-2006, BDO continued to represent to Messrs. Jones that, more likely than not, the courts would reject any attempt by the IRS to challenge the tax benefits which would be realized from the transactions. BDO never stated or even implied that penalties might be assessed against Messrs. Jones. Messrs. Jones reasonably relied on this representation when they engaged BDO to prepare their 2002 tax returns. BDO led Messrs. Jones to believe that there was not even a possibility that the IRS would assess penalties.

65.     The fact that BDO was willing to prepare and sign the income tax returns of Messrs. Jones increased their trust and confidence in BDO and in this representation (that the courts would more likely than not reject any attempt by the IRS to challenge the tax benefits which would be realized from the transactions).

66.     The trust and confidence which Messrs. Jones had in BDO was increased even further by other representations which Puckett and BDO had made, *viz.,* (1) similar transactions had been successfully utilized by BDO for other of its clients in order to shelter large capital gains from federal income taxes (2) major law firms had issued letters in which they opined that transactions which had structures similar to the structure of the transactions of Messrs. Jones would receive favorable treatment by the IRS.

67.     During the latter part of 2005, the IRS examined the tax returns.

_____

'Prior to the time that Messrs. Jones entered the Consulting Agreements and paid the consulting fees, BDO and Puckett represented that the transactions would received favorable treatment. In the opinion letter which BDO subsequently issued during 2003, BDO opined it was "more likely than not" the transactions would received favorable treatment by the IRS.

68.     The IRS then notified Messrs. Jones that it was disallowing the deductions from the transactions as shown on the return *and was imposing penalties*.

69.     Neither Puckett nor BDO had ever represented or disclosed to Messrs. Jones that there was even a possibility the IRS would impose a penalty

70.     The IRS proposed a settlement which would allow Messrs. Jones to deduct the consulting fees which they had paid to BDO but would still require them to pay the following penalties:

|                | Amount       |
|----------------|--------------|
| John Jones     | $149,306.00  |
| Carleton Jones | $149,728.00  |
| Total          | $299,034.00  |

71.     Puckett and BDO told Messrs. Jones that they should accept this settlement and should not challenge this action of the IRS.

72.     Puckett and BDO told Messrs. Jones this (that they should accept the settlement and should not challenge this action of the IRS) even though they had previously represented to Messrs. Jones that *inter alia* they would vigorously resist any attempt by the IRS to deny favorable tax treatment for the transactions and that any attempt such attempt by the IRS would more likely than not be rejected by the courts.

73.     Instead of vigorously resisting the adverse action of the IRS, Puckett and BDO told Messrs. Jones that they should acquiesce in the action taken by the IRS and should accept the settlement which had been proposed by the IRS. Indeed, neither Puckett nor BDO recommended or suggested that Messrs. Jones should even attempt to negotiate a better settlement.

11

## CAUSES OF ACTION

### Accounting Malpractice and Professional Negligence

74.    The allegations of ¶¶ 1 through 73 are adopted and incorporated by reference.

75.    BDO agreed to provide accounting and consulting services to Messrs. Jones, including giving competent tax advice, and preparing tax returns.

76.    In providing those services, BDO was required to comply with the applicable standard of care and all applicable professional rules of conduct.

77.    In providing those services, BDO was required to act honestly and diligently.

78.    BDO failed to comply with the applicable standard of care.

79.    BDO failed to comply with applicable standards of professional conduct.

80.    BDO's failure to comply with the applicable standard of care and applicable standards of professional conduct proximately caused great damage to Messrs. Jones.

### Negligent Misrepresentation

81.    The allegations of ¶¶ 1 through 80 are adopted and incorporated by reference.

82.    As stated in this complaint, BDO represented to Messrs. Jones that the courts would reject any attempt by the IRS to challenge the tax benefits which would be realized from the transactions. From the time that BDO issued its tax opinion letter in 2003 until the winter of 2005-2006. BDO represented that, more likely than not, the courts would reject any attempt by the IRS to challenge the tax benefits which would be realized from the transactions.

83.    BDO intended for Messrs. Jones to rely on these representations in their business affairs and transactions.

12

84. In making these representations. BDO failed to exercise the skill, prudence, and diligence which they represented themselves as having in the specialized field of federal income taxation.

85 In the alternative, BDO made these representations without exercising the skill, prudence, and diligence as exercised by other accountants of ordinary skill and capacity who specialized in the field of federal income taxation or who claimed to have special expertise in the field of federal income taxation.

86. BDO knew or should have known that these representations were wrong.

87. BDO knew or should have known that the IRS would likely challenge the tax benefits which would be realized from the transactions and would impose penalties. BDO knew or should have known that the courts would sustain that challenge and imposition of penalties by the IRS.

88. Messrs. Jones reasonably relied on these representations by BDO and did so to their economic detriment.

## Breach of Fiduciary Duty

89. The allegations of ¶¶ 1 through 88 are adopted and incorporated by reference.

90. The acts and omissions of BDO as set forth in this complaint constitute a breach of the fiduciary duty which BDO owed to Messrs. Jones.

91. The breach of fiduciary duty has proximately caused great damage to Messrs. Jones.

## Recklessness and Gross Negligence

92. The allegations of ¶¶ 1 through 91 are adopted and incorporated by reference.

93. The acts and omissions of BDO as set forth in this complaint were made recklessly. In the alternative, these acts and omissions were made with gross negligence.

13

94.     The reckless and grossly negligent acts and omissions of BDO have proximately caused great damage to Messrs. Jones.

## Tennessee Consumer Protection Act

95.     The allegations of ¶¶ 1 through 94 are adopted and incorporated by reference.

96.     The acts and omissions of BDO as set forth in this complaint constitute unfair and deceptive acts in violation of the Tennessee Consumer Protection Act, T.C.A. §47-18-101, *et seq* ["The Act"].

97.     The violations of the Act by BDO have proximately caused great damage to Messrs. Jones.

WHEREFORE, Messrs. Jones demand:

1.      That they have judgment for compensatory damages in an amount to be shown at trial.

2.      That they have additional judgment for prejudgment interest.

3.      That they have additional judgment for punitive damages.

4.      That they have additional judgment for attorney's fees incurred in connection with this action.

5.      That all costs be taxed to BDO.

6.      That a jury be convened to try all issues.

7.      That they have such other and further relief as this Court deems just and proper.

14

Winston S. Evans (#6281)
Evans, Jones & Reynolds, P.C.
1810 One Nashville Place
150 Fourth Avenue North
Nashville, TN 37219-2424
(615) 259-4685

Attorneys for Plaintiffs

3614401k 001

# Selected Exhibits Relating to BDO Seidman Enforcement Actions

Tax Analysts has made available selected exhibits associated with the Justice Department's July 10 release of its enforcement actions against BDO Seidman.

**Document Type:** Justice Department Documents

**Tax Analysts Document Number:** Doc 2002-16496 (24 original pages) [PDF]

**Tax Analysts Electronic Citation:** 2002 TNT 136-8

**Citations:** (10 Jul 2002)

=============== FULL TEXT ===============

## EXHIBIT 21

September 26, 2000

Internal Revenue Service
LM:PFTG
Office of Tax Shelter Analysis
1111 Constitution Avenue, N.W.
Washington, DC 20224

Ref: BDO Seidman, LLP

To Whom It May Concern:

The above referenced accounting and consulting firm has been offering tax shelters to hundreds of individuals and some corporations through out the United States as evidenced by the enclosed materials. When they first started this "tax product" program very little information was made available to BDO's partners and staff since there was some concerns about the IRS picking up on what they were doing and putting a stop to it. During the process more information was made available but they were still very guarded about making much information available.

**EXHIBIT**

1

Opportunities came up with corporate gains but we were told they did not want to do anything with corporations since the tax return would require an M-1 item listed on the reconciliation of book income to taxable income and that would be a red flag to the IRS. In addition there were times when the tax product team and senior management of BDO became very nervous when the IRS had requested tax shelter information from certain Big 5 firms and emergency meetings were called to discuss and slow down the tax product sales. I recall one such meeting and the conclusion that I heard was reached was that they would continue to sell the tax products until congress changed the tax laws since typically the tax law was not retroactively applied and that the products were based on sound legal opinions and strategies. The legal opinions are suppose to protect the tax payer from penalties and it was explained to me that any interest penalty would be offset by the earnings the taxpayer may have benefited from by having the tax dollars not paid to the IRS available to the person to earn on until payment had to be made.

BDO and some legal firms have made a tremendous amount of money off of these tax products at a great expense to the American taxpayer and federal government. They plan on continuing these sales until the tax laws are changed or some other prohibitions are encountered. These tax products are worse than Al Capone in the amount of tax dollars literally not reported and paid due to the abusive tax shelters being utilized. We are talking about millions of tax dollars lost or deferred. I have heard of numerous instances in which the CPA for the potential taxpayer considering the tax product has strongly recommended that their client stay away from the tax strattel or dubious tax product that may ultimately be determined to be an abusive tax shelter.

I wish to remain anonymous at this point until I learn about any legal protection that may be available to me since I am sure BDO would pursue my demise. However, I would be willing to be a witness if adequate protection and compensation could be offered me. I will call 1-800-829-1040 periodically and use the following code as my identification to be able to stay in touch so to speak.

## EXHIBIT 22

Nancy Hannafin
Tax Department
33 N. Michigan Avenue
te 2500
hicago. IL 60620

Dear Ms. Hannafin:

We believe that your organization was involved in the promotion of transactions substantially similar to those described in Notice 2000-44, 2000-36 I.R.B. 255. Such transactions may be tax shelters within the meaning of Section 6111 of the Internal Revenue Code. If so, the transactions would have been subject to the registration requirements of Section 6111, and your firm would have an obligation to maintain a list of investors and to make that list available for our inspection as required by Section 6112.

For each transaction, we request (1) a detailed description of the transaction, including a description of its structure and the intended tax benefits, (2) a copy of any written materials that were presented to potential or actual participants in connection with the offering of sales of interests in the transaction, including any analyses or opinions relating to the intended tax benefits of the transaction, and (3) the list of investors in the transaction.

If it is your position that the transactions your firm promoted are not subject to the requirements of those Code sections, please provide us with an explanation and supporting information for your position.

ease forward the information requested in this letter to my attention to the address listed below within ten calendar days of the date this letter is received by your office.

> Internal Revenue Service
> 110 West 44th Street 6th Floor
> New York, New York 10036
> Attn: Stanley Colbert
> LM:FSH:1114

If you have any questions, you may call Revenue Agent Stanley Colbert, ID# 13-21193, at (212) 264-1595 or I may be reached at (212) 719-6118.

> Sincerely,
>
> Michael R. Friedman
> Team Manager, ID# 13-24456

Chris Leisner

## EXHIBIT 23

BDO Seidman, LLP
Chicago, Ill

## MEMORANDUM

To: Partners

Date: October 13, 1999

From: Denis Field

Re: Tax Solutions Group

The Tax Sales Executive Group has been renamed and is now the Tax Solutions Group.
The Group has been reorganized with the aim of making it more focused. Its
responsibilities will be to continue to assist members of BDO Seidman LLP who find
potential transactions to prefilter those transactions, structure the transactions, and close
   d implement the transactions. The Tax Solutions Group is also responsible for quality
control. The reorganized group have been allocated specific responsibilities and time
budgets to carry out this work. The new group is as follows:

Tax Solutions Group

Adrian Dicker
Charlie Bee
Denis Field

Larry Cohen
David Dimuzio
Bob Dudzinsky
Randy Frischer
Morry Gottlieb
Bob Greisman
Kurt Huntzinger
Michael Kerekes
Lee Klausner

Don Lenz
Mike Lichner
Lorin Luchs
Mike O'Hare
Paul Shanbrom

Adrian Dicker, Charlie Bee and Denis Field have overall responsibility for the development of this business line. They have allocated various responsibilities to the group above. The responsibilities to assist in various territories are set out on the attached schedules. Larry Cohen and Lorin Luchs will be involved primarily in structuring and quality control and have not been allocated to territories. Your first contact for a potential transaction should be to a member of the Tax Solutions Group other than Adrian Dicker, Charlie Bee and Denis Field. Usually you would go to the person allocated to your area. They may well pass you on to another member of the group once they have prefiltered the transaction. You should follow the instructions of the member of the group in order to qualify for the maximum finders bonuses as set out in the recently issued revised Bonus Program.

The Tax Solutions Group is now having weekly conference calls to keep them as up to te as possible regarding all the different aspects of the various transactions. As we all know, communication has been our greatest challenge and the hope is that a better informed core group will help with this. Members of the Tax Solutions Group will then in turn communicate with you in whatever way is most effective in your area. This may be via conference calls or meetings. It is unlikely to be via pieces of paper setting out the transactions.

Note that it is the responsibility of members of the Tax Solutions Group to develop relationships with Lincoln and the Alliance firms. Anyone who is not a member of the Tax Solutions Group is encouraged to develop their own relationships with other ADCs with the assistance of the Group.

## EXHIBIT 24

## MEMORANDUM

To: All Partners and Managers

Re: November 15, 1999

Re: Tax Solutions

From: redacted

The following is a summary of the most widely applicable tax solutions with which the related office has experience and knowledge. These highly profitable solutions can be implemented with minimal (if any) assistance of other offices thereby keeping more profit in. This memo is intended to be an overview of some of the more applicable solutions and not a detailed discussion of the fact requirements. If you think that any of these solutions may be useful to a current client or prospect, please contact the tax department for further consultation.

- Pennsylvania corporate net income ("CNI") tax - BDO has developed a tax-planning solution, which, under current Pensylvania law, can eliminate a corporation's PA CNI tax. The tax savings can be significant, immediate, and, in most circumstances, quite simple to implement. Also, other than the BDO fee, the cost of implementation may be minimal. In the right circumstances, this strategy is the proverbial "no-brainer" as it carries with it minimal tax exposure upon appeal. This solution may apply to other states in addition to Pennsylvania CNI tax and has no effect for federal purposes.

  o Pricing = based upon percentage of tax savings
- Merger & acquisition related costs - Many companies capitalize and amortize what they consider to be M&A related costs. Depending upon the type of cost incurred, the tax treatment of these costs can vary significantly from the book treatment. Often, costs categorized as acquisition related are really consulting related costs that may be currently tax deductible. Further, costs related to an expansion of an existing trade or business can be expensed rather than capitalized for tax. Accordingly, a thorough analysis of all capitalized costs should be done to determine if any capitalized costs can be deducted currently in lieu of capitalization. In many circumstances, the tax savings to the client can be significant and immediate.

  o Pricing = consulting fees based upon hourly billing rates
- Sales & use tax managed compliance - The BDO tax department has extensive hands on experience with regard to state sales and use taxes and managed compliance reduces a business's cost of administering the liability. This service benefits clients with a large physical presence in a state. It applies to any client who makes exempt purchases but is especially ideal for manufacturers.

  o Pricing = fixed fee basis

- Stock option, executive compensation and benefit planning -. The BDO tax department has extensive experience with regard to executive compensation and bonus planning, NQSO, IS0 and restricted stock option planning, golden parachute planning, benefit plan audits, etc.

    o Pricing = consulting fees based upon hourly billing rates

- Sales and use tax audit defense and overpayment review This service provides representation and advisory assistance to clients during state-initiated sales tax audits. BDO monitors the audit to ensure that the state uses favorable testing methodologies and completes the audit timely. An overpayment analysis is also conducted to review purchases and determine the extent of any overpayments and ensure that client refunds are received.

    o Pricing = either fixed fee or contingent fee basis

- Research & development ("R&D") income tax credit - The BDO tax department has extensive experience with regard to the U.S. federal R&D tax credit. The benefit we can provide to the client is developing a plan they can utilize to capture the required R&D data (employee payroll, supplies, contractors, etc.). Since this is a tax credit, the impact of any tax savings generated will be dollar for dollar. For companies with significant R&D costs, BDO can assist the client in establishing a tax savings mechanism for many years to come.

    o Pricing = consulting fees based upon hourly billing rates

- Capital Gain Eliminators - Applies to individuals or corporations with capital gains. Solutions can be tailored for taxpayers with gains exceeding $5 million.

    o Pricing = based upon percentage of tax savings

- Personal Holding Company ("PHC") Elimination - Appropriate target is a PHC where the assets inside the PHC are appreciated over the tax basis in an amount that exceeds $10 million. These solutions are generally easy to sell but hard to find.

    o Pricing = based upon percentage of tax savings

- Net operating loss ("NOL") and capital loss "refreshers" - For U.S. federal and state corporate income tax purposes, most NOL and capital loss carry forwards have a statutory life which if left unutilized can expire before the taxpayer has the opportunity to benefit from them. For U.S. federal NOL purposes, the life is either 15 or 20 years depending upon the year incurred. However, many states provide for a much shorter life (sometimes 5 years) for NOL's. Further, the U.S. federal capital loss carry forward life is also limited to 5 years. With this solution, a U.S. company can "refresh" the carry forwards and extend their useful life. Eligible companies must have good credit and expiring or unusable carry forwards exceeding $5 million.

    o Pricing = based upon percentage of tax savings

## EXHIBIT 25

### MEMORANDUM

To: All Professional Personnel

Date: November 20, 1999

Re: Time Charges in Connection with Tax Solutions

From: Howard Allenberg

Several questions have been raised regarding charging time to Tax Solutions engagements. I thought it would be helpful to set out the firm's policy on this issue and why we have this policy. As you may know, we have established the Tax Solutions business as a separate business line and it has been designated as Office 782. The firm wishes to encourage you to find transactions, but discourage you from becoming significantly involved in highly specialized and time consuming activities such as structuring and implementation. The primary issues driving this policy are quality
ntrol, efficiency and also ensuring that individuals meet the goals set for them for their main business line responsibilities.

If the Tax Solutions business line were operating in isolation it would obviously like everyone in the firm to be engaged in this business 100% of the time. Individuals would also like this since it would maximize bonus opportunities. However, let us not forget that ve must also maintain and grow a healthy and profitable core practice, as well as high margin consulting and specialized services. We must not become reliant on the Tax Solutions business as a key source of profitability. Accordingly this policy has been designed to discourage individuals from spending more time than is necessary on these Tax Solution engagements by restricting an individuals' ability to charge time in respect of these engagements.

Accordingly, the firm's policy is that only members of the Tax Solutions Group may harge time to the engagements created in Office 782 unless there has been specific uthorization by Adrian Dicker, Charlie Bee or Denis Field. Time spent by members of he firm in finding transactions should be treated as general marketing time of the ndividual's office, unless it is felt that such time can be recovered by the office as a fee arate from any Tax Solutions fee. Each person needs to balance their desire to earn a

bonus by finding transactions, against the impact it will have on their ability to reach their goals in respect of their business line responsibilities.

There may be occasions, *although we expect them to be rare*, where members of the firm who are outside of the Tax Solutions Group may need to become involved in some detailed aspect of a Tax Solutions engagement. In such a case, only Adrian Dicker, Charlie Bee or Denis Field can allocate a time budget to an individual for time to be charged to Office 782. Any time charged to Office 782 which has not been approved in advance by one of these three partners will be rejected and charged back to the individual's office.

Tax Solution engagements are to be billed and collected only by Office 782-they will not be allocated to the local offices or other business lines. Tax Solution engagements can be created only within Office 782 and may only be set up by a member of the Tax Solutions Group. All existing Tax Solution engagement codes are currently being cleared or transferred centrally into Office 782. By capturing all revenues, time and expenses in Office 782, instead of allowing such transactions to occur in a local practice office, we can better analyze our operating results in all parts of our business. Thanks for your understanding and cooperation in adhering to these important policies.

Best wishes for a happy Thanksgiving!

## EXHIBIT 26

## Business Line Strategy

Tax Services
Wolves -Always Friendly
But Never Tame

## Wolves - Always Friendly But Never Tame

## SOME HISTORY

When I was in my youth in 1984, Seidman and Seidman sent me away from the Grand Rapids office to the New York office to learn how to be logical, analytical, and practical. I came back thirteen years later to Chicago clinically eccentric-in the best case-and in the worst case MAD!!! I would just like to state I possibly might be completely sane and intellectually logical in my radical thinking!!

**We can turn the grayest sky to green.**

ane 30, 1998 $2.2 Million Actual Profit

We can make it rain whenever we want it to!

June 30, 1999 $14.8 Million Actual Profit

**We can turn a raging fire into a green river.**

June 30, 2000 **$75+ Million Profit Goal**

With all the <u>power we possess</u> we can change BDO into a **green** ocean.

Business Line Strategy

Tax Services
Wolves - Always Friendly
But Never Tame

⌐ r us, the **unattainable** must have special attraction. Our ambitions and fantasies must be strong enough to repel aside the doubts which lesser individuals might have. **Determination** and **faith** are our strongest weapons.

Three characteristics and attributes we must carry with us:

**Faith** in Ourselves

Great **Determination**

And Unlimited **Endurance**

We must travel this next year to distant heights. Accomplishing the unattainable means setting our sights high and destroying each rebuff with more determination to see our fantasies through to their fulfillment.

Tax Business Line Strategy

• One word sums up the Tax strategy

One word sums up the strategy of the Tax Business Line.

MONEY!

All of us in the Firm need to focus on money. Think Green. Green is good! There's nothing wrong with trying to make more money.

And I'm not talking only about the Firm's profitability. I'm also talking about individual profitability.

## Our Focus

**How do we get the money?** -There are several pieces to the profitability puzzle.

We must focus on our **talent.** We're in a talent business - our clients pay for talent, and we must buy the best talent we can afford.

We must create a very strong **culture.** We need to continue to participate in and encourage the breeding of the Wolf Pack throughout the entire Firm. We need to
    Ilaborate, cooperate and concentrate. These are the ingredients of the Wolf Pack formula for success.

Next, with regard to **training** dollars - they must be directly correlated to driving earnings. We have to support the talent and expertise we have by providing opportunities to stay on top of the game. Always.

And finally, **accountability** and **rewards.** This is easy. Those who perform get it, and those who don't perform do not. Think green. You bring in the money, you get the money.

## Why Are We Here?

Why are we here?

**The name of the game is Profitability.** And we can be much more profitable.

We have to move our focus away from compliance. The truth is compliance provides low
    fit margins, high risk and fixed costs. We need to reduce costs and increase efficiency
we can't devote limited resources to serving unprofitable accounts.

So we'll continue to use Compliance as a great source for cross- selling our value-added services.

But we need to charge appropriately for those services, based on the value we bring to the client's business - not as an adjunct for Compliance.

Look at it this way -

Home run fees of $1 million equal time-based fees of $5 million.

We need to increase our clients' appreciation of value and focus on our most profitable areas.

## Where Is The Money?

**Where is the real money?** SHOW ME THE MONEY -- It's right in front of our faces. Our clients have the money. And we have the services they'll pay for.

Our tax practice and assurance are our channels for sales. But here's what we're going to sell.

Tax consulting contributes more than **30%** of our revenue and a significantly higher percentage of our earnings. We can sell corporate tax, state and local tax, sales and use tax, multi-state tax, international tax and partnership tax. And we have GREAT tax consultants.

The Lincoln Alliance is critical. Financial planning and financial services are going to be an important part of this Firm's fabric for the next 10 to 20 years. Just look at the demographics. **Baby Boomers are aging. They're living longer, and they HAVE money. Follow the money!** It's a good strategy.

And then, of course, there's the super product category. Tax Solutions. But tax solutions can't be our focus. They can't be our life preserver. We have to leverage our clients and sell them tax consulting, financial services, Lincoln services, corporate finance and all the other value-added services that were originally generated by our assurance and tax partners over the years.

Profits From Tax Solutions

| Profit | Actual | Work In |

|              Budget              |        Profit        |      Process      |
|----------------------------------|----------------------|-------------------|
| June 30,1998 $1 Million          | $2.2 Million         | $1.1 Million      |
| June 30,1999 $5 Million          | $14.8 Million        | $25 Million       |
| June 30, 2000 $25 Million        | $75+Million*         | $100 Million      |

Look at the profits from Tax Solutions.

In 1998, we realized $2.2 million in profit.

In 1999, we soared to $14.8 million.

This year, we have committed to deliver **$25 million in profits** from tax solutions. $25 million.

But we're setting our sights even higher than that. Right now we're expecting actual profits of **$75 million. (Original Goal was $50 million in profits, Denis increased profits to $75 million following the annual partner meeting.)**

And you should know that, just as we did last year, we're perfectly willing to adjust these numbers higher if we must.

How Do We Increase Profitability

- Provide top producers with sizable bonuses
- Goal for Fiscal Year 2000 - $10-125 million in General bonuses
- Goal for Fiscal Year 2000 - $7.13 million in Tax Solution bonuses
- Oh! And make sure our expenses do not exceed our revenue

How exactly do we increase profitability?

We need to reward our top producers with sizable bonuses. This year was a good year with $4.6 million in tax solution bonuses.

But next year, we'll reach new heights. **Our goal for the year 2000 is $7.3 million in tax solution bonuses and $10.125 million in general bonuses!** Pretty impressive, isn't it?

Just one small thing to keep in mind . . . Make sure expenses don't exceed revenue or will lose our _____.

## Stairway to Profitability

At BDO, we have a number of stairways to success.

Our stairway to profitability is **one step at a time.**

Leveraging our assurance and tax clients to sell tax consulting

Lincoln services and tax solutions.

### Stairway to Money
### Tax Solutions

## Here's the stairway to money. The green stuff. The motivator.

- First step. It can't be emphasized enough. **Leverage your client relationships.** Of course you have to make sure you have a relationship that can be leveraged.
- Then, when you see an **opportunity, capitalize on it.**
- And you do that by **advancing our leading talent.** People will pay for talent.
- After this foundation is laid, the partners and everyone at BDO will sell it. We'll close the deal!
- Then you **reach the pinnacle - you're at the top** and you're successful. You know what you'll find there?

**The money.** Your reward for a job well done.

### Looking Ahead

Let's look ahead to the **ingredients for success** at BDO.

We'll hire the best talent we can afford.

We'll provide the technical training needed to ensure we're always on the cutting edge.

We'll make people accountable for driving profitability, and we can do that by giving them a cut of the action.

We'll enhance the reward system at BDO. But let's focus on the center box.

A culture change. We have <u>to foster a strong culture</u> of

ollaboration

Cooperation and

Concentration

## The Wolf Pack Formula
## for Teamwork

Nothing is more important than **collaboration, cooperation and concentration.** The Wolf Pack formula for teamwork . . . And for success.

### The Wolf Pack Formula

Collaboration, cooperation and concentration must become the HALLMARK of BDO - across the entire Firm.

And do you know what that adds up to?

## Compensation!

### FY 2000 Goals

- Profit budgeted for June 30, 2000: $25 million
- Anticipated actual profit: $50 million
- General bonus payout in 2000: $10.125 Million
- Tax Solutions bonuses in 2000: $7.13 million

The proof is in the money. Let's look again at our Year 2000 goals.

Our tax solutions profit goal for the year 2000 is $25 million **FIVE TIMES** what it was in 1999.

But we're setting our sights even higher than that. We're anticipating profits of $50 million, also five times the previous year and **TWENTY-FIVE TIMES** what it was just years ago.

For such astounding growth, it's only fitting that we should set our sights high for rewards as well. We want to establish a general bonus fund - funded by tax solutions - of .0.125 million for the year 2000, to reward the people who make it happen day in and day out.

And we hope to pay $7.13 million in tax solutions bonuses next year.

## The Next Millennium

You can all get in on this sea of green at BDO. With the power,talent, and knowledge we possess in our Wolf Pack, we can turn BDO into a green, green ocean.

I hope you'll be part of the pack.

I wish to acknowledge:

Charlie Bee - The key person in Tax Solutions

Terry Kelly - The developer of the Wolf Pack

$\sim$' awn Carson - The innovator of the Stairway to Profitability

Thank you all.

## EXHIBIT 27

## MEMORANDUM

**To:** To All Partners

**Date:** May 5, 2000

**Re:** WolfPack Successes

**From:** Howard B. Allenberg

This week has been an exciting and productive week for the BDO WolfPack. First, a Tax solution transaction was closed and a wire transfer was received for $900,000. Then, the largest Tax Solution transaction in the Firm to date was closed for $4,400,000, edging out .. .,800,000 transaction that had closed last month and which, at the time, held the,

distinction of "largest" to that point. !!! Well, if your hearts are not pumping enough with these successes, hold on. Yesterday we received a wire transfer for $1,750,000, which presented just the first payment on *a $6,250,000*Tax Solution transaction-which is now the undisputed "king" of the Tax Solution transactions-at least as of today!!!!.

As you may recall, at the beginning of our fiscal year the budget for Tax Solution Revenues was $15 million, just a slight increase over our actual results for FY 1999. As you may also remember, at our Annual Partners' meeting the Tax Group did a presentation on "green is good" and the bar was raised not once, but twice-first to $50 million-then, boldly to $75 million. And we are certain there were a number of skeptics in the audience at $50 million, not to mention when the goal was announced at $75 million.

Well, skeptics of the world, it's time to join the WolfPack! As a result of these huge successes this past week, we are pleased to report that our Tax Solution Revenues year-to-date are. . . .. . . hang on. . . *$77,089,425*. . . of which more than $56 million has been collected year-to-date. And there is MORE to come based on the transactions in the pipeline. Close your eyes and visualize this. . . . $100 Million. . . .. $100 Million. . . . . .$100 Million. . . . it is clearly within striking range!

we all owe a great amount of thanks to our Tax Solutions Group and the many other Partners and employees who have taken the initiative to bring these remarkable financial solutions to our clients and contacts. These results could not have been achieved without their creativity and marketing ability and drive, not to mention their Cooperation . . . . Collaboration . . . Concentration. . . . and Communication. . . . among themselves and with our clients.

Way to go WolfPack. . . *let's hit $100. . . .or do we hear* MORE!!!

cc: Denis M. Field

---

Code Section: Miscellaneous
Geographic Identifier: United States
Subject Area: Compliance
Cross Reference:
Institutional Author: Justice Department



**BDO Seidman, LLP**
Accountants and Consultants

Clark Tower
5100 Poplar Avenue, Suite 2600
Memphis Tennessee 38137
Telephone (901) 680-7600 Fax (901) 680-7601
Direct Dial: (901) 680-7608 Res. (901) 754-1386
email: mpuckett@bdo.com

**Mark D. Puckett, CPA**
Partner





**Cooperation. Collaboration. Concentration. Communication**

**EXHIBIT**

2

## CONSULTING AGREEMENT

This Consulting Agreement ("Agreement") is entered into as of the 14th day of May, 2002 (the "Effective Date") by and between Carleton A. Jones (the "Client") and BDO Seidman, LLP, a New York registered limited liability partnership ("BDO"), with offices at 5100 Poplar Avenue, Suite 2600, Memphis, TN 38137.

## WITNESSETH

WHEREAS, the Client is interested in making certain investments (the "Transactions");

WHEREAS, BDO is in the business of providing accounting, tax and consulting services; and

WHEREAS, the Client desires BDO to provide certain consulting, tax and accounting services in connection with the Transactions, and BDO desires to provide such consulting services to the Client, all upon the terms and conditions provided herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Term. Unless earlier terminated as provided herein, the term of this Agreement shall commence on the Effective Date and shall continue through December 31, 2003 (the "Term").

2.      Services.      (a)      During the Term, BDO agrees to provide the following consulting services to the Client (the "Services"): consulting services in conjunction with the sale of equity interest(s) in certain entities, including assistance in determining the overall tax and economic effects of potential sales price(s) and allocations thereof, assisting the Client and/or the Client's advisors in structuring the Transaction(s) to attain the most beneficial tax results, and assisting with certain income tax, estate tax, personal financial planning and other financial aspects of various anticipated investment activities. **BDO is not in the business of providing investment or legal advice or related services, thus, none of the services to be rendered by BDO to Client can or will include investment or legal advice and should not be considered as investment or legal advice. Client acknowledges and represents that it will, and is, not relying upon BDO for investment or legal advice or related services.**

(b)      BDO will provide the Client with an opinion reasonably acceptable to Client's counsel concerning the federal income tax consequences of the Transactions. The

**EXHIBIT**

3

2

opinion will be in addition to and not in lieu of the opinion the Client will receive from legal counsel. The fee for the opinion to be provided by BDO is included in the Consulting Fee set forth in this Agreement.

(c)     The Services hereunder do not include the preparation of any tax returns by BDO. Your tax returns may be selected for review by the tax authorities, and any proposed adjustments by the examining agents are subject to certain rights of appeal. Further, the Services hereunder do not include representation in any such review or any subsequent appeals. We are available on request to prepare tax returns for you or to represent you in any such proceedings. BDO's representation will be subject to a separate engagement letter(s), and we will render additional invoices for the time and expenses incurred.

(d)     BDO is bound by the ethics of its profession as Certified Public Accountants in the performance of its services hereunder. BDO however is not a guarantor of its advice and will be liable to Client only in the event one or more aspects of such professional advice constitutes professional negligence. Client agrees that BDO and its personnel shall not be liable to the Client for any claims, liabilities, or expenses relating to this Agreement for an aggregate amount in excess of the fees paid by the Client to BDO pursuant to this Agreement.

3.     Fees.

(a)     In consideration for the performance of the Services, the Client shall pay BDO $600,000 (the "Consulting Fee"). If the Client's account, after default, is referred to an attorney or collection agency for collection, the Client shall pay all of BDO's reasonable expenses incurred in such collection efforts including, without limitation, court costs and reasonable attorneys' fees. In the event that BDO's performance of the Services results in BDO being required to spend time or incur expenses with respect to any subsequent legal process or litigation involving a third party (for example, testifying in a litigation matter), BDO will charge the Client for that time at BDO's prevailing hourly rates and for reimbursement of those expenses.

(b)     The total Consulting Fee shall be due and payable from the Client to BDO on or before May 28, 2001 either by wire transfer to an account designated by BDO in writing to the Client or by Client check, whichever manner of payment is requested by BDO.

4.     Termination.

(a)     Either party shall have the right to terminate this Agreement if -

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

3

(i)    the other party breaches or defaults under this Agreement and fails to cure such breach or default within seven (7) days after receiving written notice from the non-breaching party; or

(ii)    the other party becomes insolvent or makes an assignment for the benefit of creditors, or a receiver or similar officer is appointed to take charge of all or part of such other party's assets.

(b)    The terms and conditions of Paragraphs 3, 5, 6, 7, 8, and 14 shall survive any expiration or termination of this Agreement. Client's obligation to pay the Consulting Fee as specified in paragraph 3 shall be unaffected by any expiration or termination of this Agreement. No refund of the Consulting Fee will be made in the event of any expiration or termination of this Agreement.

5.    Indemnification.    The Client, at its own expense, shall release and indemnify, defend and hold BDO and its affiliates, along with their respective partners, employees, agents, designees, insurers and assignees, harmless from and against, all losses, claims, damages, liabilities, costs and expenses (including reasonable legal or other out-of-pocket expense) incurred, caused by or arising out of the performance of the Services by BDO for the Client, the Transactions, or any transaction related thereto, or the Client's breach of this Agreement. This indemnity excludes a final adjudication that BDO engaged in gross negligence or willful misconduct in performing the Services which gave rise to the loss, claim, damage, liability, cost or expense sought to be recovered. Pending any such final decision, the indemnification and reimbursement provisions of this Agreement shall apply and the Client shall perform its obligations to reimburse BDO for its expenses.

6.    No Warranty.    **BDO makes no warranties, express or implied, under this Agreement with respect to the Services or otherwise. BDO expressly disclaims any implied warranty of merchantability or fitness for a particular purpose or use.** As stated above, the Services to be provided in connection with this Agreement include the issuance of an opinion regarding the federal income tax consequences of the Transactions. In this regard, BDO accepts responsibility for the opinion BDO will provide to Client. BDO does not assume any responsibility whatsoever, and shall not be held liable for any legal and/or tax opinions not prepared by BDO regarding any strategies that may be implemented by Client during the term of this Agreement. Client acknowledges and agrees that BDO has advised the Client to retain a law firm for legal as well as tax opinions on any strategies or Transactions in which Client engages during the term of this Agreement. The Client's exclusive remedy, and BDO's sole liability to the Client, for any cause whatsoever related in any way to this Agreement or to the Services provided by BDO to Client, shall be limited to the dollar amount of the Consulting Fees actually paid to BDO by the Client under this Agreement. The foregoing limitation of liability shall apply regardless of the form of action, whether contract or tort, including, without limitation, negligence. Notwithstanding anything to the contrary, in no event shall BDO be liable for

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

any loss of profit, revenue, or other commercial injury or any special, incidental, punitive, indirect or consequential damages suffered by the Client or any third party, whether or not BDO has been advised of the possibility of such loss, injury, damages or third party claim, under any cause of action arising out of or relating to this Agreement or the Services provided by BDO to the Client in connection with this Agreement.

7. No Assignment. Neither party shall assign this Agreement, in whole or in part, without the prior written consent of the other party, which written consent shall not be unreasonably withheld. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the successors, legal representatives and assignees of the parties hereto.

8. Dispute Resolution.

(a) If any dispute, controversy or claim arises in connection with the performance or breach of this Agreement, either party may, upon written notice to the other party, request mediation in accordance with the then current Dispute Resolution Rules for Professional Accounting and Related Services Disputes (Including Mediation) of the American Arbitration Association ("AAA") Such mediation shall be assisted by a neutral mediator acceptable to both parties and shall require the best efforts of the parties to discuss with each other in good faith their respective positions and, respecting their different interests, to finally resolve such dispute.

(b) Each party may disclose any facts to the other party or to the mediator, which it, in good faith, considers necessary to resolve the dispute. However, all such disclosures shall be deemed in furtherance of settlement efforts and shall not be admissible in any subsequent legal proceeding against the disclosing party. Except as agreed by both parties, the mediator shall keep confidential all information disclosed during negotiations. The mediator shall not act as a witness for either party in any subsequent arbitration between the parties.

(c) Such mediation shall conclude within sixty days from receipt of the written notice unless extended by mutual consent. The parties may also agree at any time to terminate or waive mediation . The costs incurred by each party in such negotiations shall be borne by it; the fees and expenses of the mediator, if any, shall be borne equally by the parties.

(d) If any dispute, controversy or claim arises in connection with the performance or breach of this Agreement and cannot be resolved by mediation within sixty days (or the parties agree to waive that process) then such dispute, controversy or claim shall be settled by binding arbitration under the then current Dispute Resolution Rules for Professional Accounting and Related Services Disputes (Including Mediation) of the American Arbitration Association ("AAA"), and shall take place in either the order of

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

5

Nashville, Johnson City or Memphis, Tennessee as mutually agreed by the parties unless the parties agree to a different locale. The arbitrator(s) shall permit each party to engage in limited discovery with a period of 60 days to complete any such discovery.

(e)    Unless the parties agree to a single arbitrator, such arbitration shall be conducted before a panel of three (3) persons, one (1) chosen by each party and the third selected by the two (2) party-selected arbitrators. The arbitration panel shall have no authority to award non-monetary or equitable relief, and any monetary award shall not include punitive damages. The confidentiality provisions applicable to mediation shall also apply to arbitration.

(f)    Judgment on the award issued by the arbitration panel may be entered in any federal or state court of competent jurisdiction. All reasonable costs of both parties, as determined by the arbitrators, including (1) the fees and expenses of the AAA and the arbitrators, and (2) the costs, including reasonable attorneys' fees, necessary to confirm the award in court shall be borne entirely by the non-prevailing party (to be designated by the arbitration panel in the award) and may not be allocated between the parties by the arbitration panel.

9.    Enforceability.    If any provision of this Agreement is declared invalid or unenforceable, such provision shall be deemed modified to the extent necessary and possible to render it valid and enforceable. In any event, the unenforceability or invalidity of any provision shall not affect any other provision of this Agreement, and this Agreement shall continue in full force and effect, and be construed and enforced, as if such provision had not been included, or had been modified as above provided, as the case may be.

10.    Independent Contractor.    BDO and the Client acknowledge that the relationship between the parties to this Agreement is exclusively that of an independent contractor and that BDO's obligations to the Client are exclusively contractual in nature. Nothing herein contained shall be construed to imply a joint venture, partnership or principal-agent relationship between BDO and the Client, and neither party shall have the right, power or authority to obligate or bind the other to any third party in any manner whatsoever.

11.    Governing Law.    This Agreement shall be governed and construed in accordance with the laws of the State of Tennessee, except for its conflict of law principles.

12.    Entire Agreement.    This Agreement (including Appendix A, which is incorporated herein as if the terms thereof were fully set forth in this Agreement) sets forth the entire agreement between the parties with respect to the subject matter herein, superseding all prior agreements, negotiations or understandings, whether oral or written,

6

with respect to such subject matter. This Agreement may not be amended or modified except in a writing signed by duly authorized representatives of the Client and BDO.

13.    Notice.    All notices and other communications required or desired to be given pursuant to this Agreement will be given in writing and will be deemed duly given upon personal delivery, or on the third day after mailing if sent by registered or certified mail, postage prepaid, return receipt requested, or on the day after mailing if sent by a nationally recognized overnight delivery service which maintains records of the time, place and recipient of delivery.

| | |
|---|---|
| If to BDO: | BDO Seidman, LLP<br>Attention: Mark D. Puckett<br>5100 Poplar Avenue, Suite 2600<br>Memphis, TN 38137<br>Phone: 901-680-7608 |
| If to Client: | Mr. Carleton A. Jones<br>2734 East Oakland Avenue, #18<br>Johnson City, TN 37601<br>Phone: 423-929-3111<br>Fax: 423-282-3025 |

*423-282-3025* (handwritten)

or to such other person, entity, address or facsimile number as a party may respectively designate in like manner, from time to time.

14.    Confidentiality Privilege

(a)    A confidentiality privilege under Internal Revenue Code Section 7525 may pertain to certain communications between BDO (federally authorized tax practitioners) and the Client regarding federal tax advice provided pursuant to this Agreement.    The Client understands that BDO makes no representation, warranty or promise and offers no opinion with respect to the applicability of such confidentiality privilege, if any, and the Client understands and agrees to this circumstance should such privilege be determined not to apply in any circumstance.

(b)    By retaining BDO, the Client agrees that BDO is authorized to claim the privilege on the Client's behalf with respect to any applicable communications, up to and until such time as the Client may waive any such privilege in writing, or BDO may otherwise be required by law to disclose such communications in compliance with any court order, subpoenas, summonses, or incurs costs in defending the assertion of the privilege on the Client's behalf, the Client will be responsible for such costs.

15.    Miscellaneous

7

     (a)    The Client represents and warrants that it has the full power and authority to enter into this Agreement and to carry out the transactions provided for herein. In addition, the Client represents that it has not entered into any agreement regarding the subject matter hereunder with any other party that covers the period during which BDO is authorized to act and provide services hereunder.

     (b)    The failure of either party to require performance by the other of any provision hereof shall in no way affect the right to require performance at any time thereafter, nor shall the waiver of a breach of any provision hereof be taken to be a waiver of any succeeding breach of such provision or as a waiver of the provision itself.

     (c)    The paragraph headings set forth in this Agreement are for the convenience of the parties, and in no way define, limit, or describe the scope or intent of this Agreement and are to be given no legal effect.

     (d)    A copy of BDO's privacy policy is attached as Appendix B.

     IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

BDO SEIDMAN, LLP

By: _____

Name: Mark D. Puckett

Title:  Partner

CARLETON A. JONES ("CLIENT")

By: _____

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

## APPENDIX A TO CONSULTING AGREEMENT

This Appendix A is incorporated in and made a part of the Consulting Agreement between Carleton A. Jones (the "Client" or "I") and BDO Seidman, LLP ("BDO"), dated May 14, 2001, as if this Appendix were set forth in full therein, and is subject to all of the terms and conditions of the Agreement. In connection with certain investments (the "Transactions") that I am making, I acknowledge that:

•BDO has advised me that, prior to entering into the Transactions, I should consult with a tax attorney or tax advisor independent of BDO concerning the potential tax treatment of the Transaction and the potential tax consequences to me of participating in the Transactions, and I have done so or declined to do so;

•BDO has advised me, and I understand, that like all tax positions, the tax treatment of the Transactions is subject to audit and challenge by the Internal Revenue Service (hereinafter "IRS") and/or a state or local taxing authority;

•BDO has advised me, and I understand, that if the IRS and/or a state or local taxing authority challenges the tax treatment of the Transactions they could assert that I owe additional tax, interest and penalties. Any such liability is solely my responsibility;

•I understand that in contributing property to any limited liability company that receives a contribution of property in the course of the Transactions, I can either contribute (a) a combination of certain leveraged assets and additional unleveraged assets or (b) solely unleveraged assets. BDO has recommended that I contribute solely unleveraged assets and has advised me that certain additional tax risks may arise if leveraged assets are contributed to the limited liability company. I represent that I have independently considered the type of assets to contribute;

•BDO has made no representation concerning whether these Transactions might or might not cause my tax return to be examined by the IRS, or other taxing authority. Additionally, BDO has advised me that these transactions may be required to be disclosed in my income tax returns;

•Federal, state and local laws, including tax laws, are subject to change. Changes in the law could be retroactive and could affect the tax treatment of the Transactions. BDO will not advise me of changes in the law unless specifically engaged in writing to do so;

•IRS regulations require BDO to maintain certain records for some tax-advantaged transactions and, on request, to provide this information to the IRS. Among the information required to be provided are the identity of investors and a description of the tax advantages expected to be derived from the transaction. I understand that the Transactions could be subject to these rules;

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

9

•BDO has informed me that they have not registered the Transactions as a tax shelter under the Internal Revenue Code. I understand that there can be no assurance that the IRS will agree with this determination;

•BDO does not provide investment or legal advice to its clients, and has not provided me with investment or legal advice concerning the Transactions; and

•I have received, reviewed, and evaluated such information and materials as I and my advisors deemed relevant, and have made an independent decision to participate in the Transactions.

Carleton A. Jones

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE

APPENDIX B TO CONSULTING AGREEMENT BETWEEN
CARLETON A. JONES AND BDO SEIDMAN, LLP

## BDO Seidman, LLP Privacy Policy

BDO Seidman, LLP may obtain nonpublic personal information about your family, income, expenditures, investments, estate, insurance coverage, or other personal matters that BDO Seidman, LLP may need in order to perform the services for which you have engaged the firm. This information may be obtained from the following sources:

a.  Forms you fill out to obtain our services;

b.  Documents that you provide to us;

c.  Documents that you authorize us to obtain from others;

d.  Discussions with you;

e.  Discussions with others that you authorize us to undertake.

BDO Seidman, LLP does not disclose any nonpublic personal information about our clients or former clients to anyone, except as required by law.

We restrict access to nonpublic personal information about you to our professionals and staff who need to know such information in order for BDO Seidman, LLP to provide you with its services. We maintain physical, electronic and procedural safeguards that comply with federal regulations and professional requirements to guard the confidentiality of your nonpublic personal information.

## CONSULTING AGREEMENT

This Consulting Agreement ("Agreement") is entered into as of the 3rd day of June, 2002 (the "Effective Date") by and between John A. Jones (the "Client") and BDO Seidman. LLP, a New York registered limited liability partnership ("BDO"), with offices at 5100 Poplar Avenue, Suite 2600, Memphis, TN 38137.

### WITNESSETH

WHEREAS, the Client is interested in making certain investments (the "Transactions");

WHEREAS, BDO is in the business of providing accounting, tax and consulting services; and

WHEREAS, the Client desires BDO to provide certain consulting, tax and accounting services in connection with the Transactions, and BDO desires to provide such consulting services to the Client, all upon the terms and conditions provided herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Term. Unless earlier terminated as provided herein, the term of this Agreement shall commence on the Effective Date and shall continue through December 31, 2003 (the "Term").

2.    Services.    (a)    During the Term, BDO agrees to provide the following consulting services to the Client (the "Services"): consulting services in conjunction with the sale of equity interest(s) in certain entities, including assistance in determining the overall tax and economic effects of potential sales price(s) and allocations thereof, assisting the Client and/or the Client's advisors in structuring the Transaction(s) to attain the most beneficial tax results, and assisting with certain income tax, estate tax, personal financial planning and other financial aspects of various anticipated investment activities. **BDO is not in the business of providing investment or legal advice or related services, thus, none of the services to be rendered by BDO to Client can or will include investment or legal advice and should not be considered as investment or legal advice. Client acknowledges and represents that it will, and is, not relying upon BDO for investment or legal advice or related services.**

(b)    BDO will provide the Client with an opinion reasonably acceptable to Client's counsel concerning the federal income tax consequences of the Transactions. The

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

EXHIBIT

4

2

opinion will be in addition to and not in lieu of the opinion the Client will receive from legal counsel. The fee for the opinion to be provided by BDO is included in the Consulting Fee set forth in this Agreement. It is anticipated that such opinion will include relevant issues and law for such calendar year addressed by the opinion.

(c)    The Services hereunder do not include the preparation of any tax returns by BDO. Your tax returns may be selected for review by the tax authorities, and any proposed adjustments by the examining agents are subject to certain rights of appeal. Further, the Services hereunder do not include representation in any such review or any subsequent appeals. We are available on request to prepare tax returns for you or to represent you in any such proceedings. BDO's representation will be subject to a separate engagement letter(s), and we will render additional invoices for the time and expenses incurred.

(d)    BDO is bound by the ethics of its profession as Certified Public Accountants in the performance of its services hereunder. BDO however is not a guarantor of its advice and will be liable to Client only in the event one or more aspects of such professional advice constitutes professional negligence. Client agrees that BDO and its personnel shall not be liable to the Client for any claims, liabilities, or expenses relating to this Agreement for an aggregate amount in excess of the fees paid by the Client to BDO pursuant to this Agreement.

3.    Fees.

(a)    In consideration for the performance of the Services, the Client shall pay BDO $585,000 (the "Consulting Fee"). If the Client's account, after default, is referred to an attorney or collection agency for collection, the Client shall pay all of BDO's reasonable expenses incurred in such collection efforts including, without limitation, court costs and reasonable attorneys' fees.

(b)    The total Consulting Fee shall be due and payable from the Client to BDO on or before June 7, 2002 either by wire transfer to an account designated by BDO in writing to the Client or by Client check, whichever manner of payment is requested by BDO.

(c)    In the event that BDO's performance of the Services results in BDO being required to spend time or incur expenses with respect to any subsequent legal process or litigation involving a third party (for example, testifying in a litigation matter), BDO will charge the Client for that time at BDO's prevailing hourly rates and for reimbursement of those expenses.

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

3

4.    Termination.

(a)    Either party shall have the right to terminate this Agreement if -

(i)    the other party breaches or defaults under this Agreement and fails to cure such breach or default within seven (7) days after receiving written notice from the non-breaching party; or

(ii)    the other party becomes insolvent or makes an assignment for the benefit of creditors, or a receiver or similar officer is appointed to take charge of all or part of such other party's assets.

(b)    The terms and conditions of Paragraphs 3(c), 5, 6, 7, 8, and 14 shall survive any expiration or termination of this Agreement.

5.    Indemnification.    The Client, at its own expense, shall release and indemnify, defend and hold BDO and its affiliates, along with their respective partners, employees, agents, designees, insurers and assignees, harmless from and against, all losses, claims, damages, liabilities, costs and expenses (including reasonable legal or other out-of-pocket expense) incurred, caused by or arising out of the performance of the Services by BDO for the Client, the Transactions, or any transaction related thereto, or the Client's breach of this Agreement. This indemnity excludes a final adjudication that BDO engaged in negligence or willful misconduct in performing the Services which gave rise to the loss, claim, damage, liability, cost or expense sought to be recovered. Pending any such final decision, the indemnification and reimbursement provisions of this Agreement shall apply and the Client shall perform its obligations to reimburse BDO for its expenses.

6.    No Warranty.    BDO makes no warranties, express or implied, under this Agreement with respect to the Services or otherwise. BDO expressly disclaims any implied warranty of merchantability or fitness for a particular purpose or use. As stated above, the Services to be provided in connection with this Agreement include the issuance of an opinion regarding the federal income tax consequences of the Transactions. In this regard, BDO accepts responsibility for the opinion BDO will provide to Client. BDO does not assume any responsibility whatsoever, and shall not be held liable for any legal and/or tax opinions not prepared by BDO regarding any strategies that may be implemented by Client during the term of this Agreement. Client acknowledges and agrees that BDO has advised the Client to retain a law firm for legal as well as tax opinions on any strategies or Transactions in which Client engages during the term of this Agreement. The Client's exclusive remedy, and BDO's sole liability to the Client, for any cause whatsoever related in any way to this Agreement or to the Services provided by BDO to Client, shall be limited to the dollar amount of the Consulting Fees actually paid to BDO by the Client under this Agreement. The foregoing limitation of liability shall apply regardless of the form of action, whether contract or tort, including, without limitation,

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

4

negligence. Notwithstanding anything to the contrary, in no event shall BDO be liable for any loss of profit, revenue, or other commercial injury or any special, incidental, punitive, indirect or consequential damages suffered by the Client or any third party, whether or not BDO has been advised of the possibility of such loss, injury, damages or third party claim, under any cause of action arising out of or relating to this Agreement or the Services provided by BDO to the Client in connection with this Agreement.

7.   No Assignment.     Neither party shall assign this Agreement, in whole or in part, without the prior written consent of the other party, which written consent shall not be unreasonably withheld. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the successors, legal representatives and assignees of the parties hereto.

8.   Dispute Resolution.

(a)   If any dispute, controversy or claim arises in connection with the performance or breach of this Agreement, either party may, upon written notice to the other party, request mediation in accordance with the then current Dispute Resolution Rules for Professional Accounting and Related Services Disputes (Including Mediation) of the American Arbitration Association ("AAA") Such mediation shall be assisted by a neutral mediator acceptable to both parties and shall require the best efforts of the parties to discuss with each other in good faith their respective positions and, respecting their different interests, to finally resolve such dispute.

(b)   Each party may disclose any facts to the other party or to the mediator, which it, in good faith, considers necessary to resolve the dispute. However, all such disclosures shall be deemed in furtherance of settlement efforts and shall not be admissible in any subsequent legal proceeding against the disclosing party. Except as agreed by both parties, the mediator shall keep confidential all information disclosed during negotiations. The mediator shall not act as a witness for either party in any subsequent arbitration between the parties.

(c)   Such mediation shall conclude within sixty days from receipt of the written notice unless extended by mutual consent. The parties may also agree at any time to terminate or waive mediation. The costs incurred by each party in such negotiations shall be borne by it; the fees and expenses of the mediator, if any, shall be borne equally by the parties.

(d)   If any dispute, controversy or claim arises in connection with the performance or breach of this Agreement and cannot be resolved by mediation within sixty days (or the parties agree to waive that process) then such dispute, controversy or claim shall be settled by binding arbitration under the then current Dispute Resolution Rules for Professional Accounting and Related Services Disputes (Including Mediation) of the

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

5

American Arbitration Association ("AAA"), and shall take place in either the cities of Nashville, Johnson City or Memphis, Tennessee as mutually agreed by the parties unless the parties agree to a different locale. The arbitrator(s) shall permit each party to engage in limited discovery with a period of 60 days to complete any such discovery.

(e)    Unless the parties agree to a single arbitrator, such arbitration shall be conducted before a panel of three (3) persons, one (1) chosen by each party and the third selected by the two (2) party-selected arbitrators. The arbitration panel shall have no authority to award non-monetary or equitable relief, and any monetary award shall not include punitive damages. The confidentiality provisions applicable to mediation shall also apply to arbitration.

(f)    Judgment on the award issued by the arbitration panel may be entered in any federal or state court of competent jurisdiction. All reasonable costs of both parties, as determined by the arbitrators, including (1) the fees and expenses of the AAA and the arbitrators, and (2) the costs, including reasonable attorneys' fees, necessary to confirm the award in court shall be borne entirely by the non-prevailing party (to be designated by the arbitration panel in the award) and may not be allocated between the parties by the arbitration panel.

9.    Enforceability.    If any provision of this Agreement is declared invalid or unenforceable, such provision shall be deemed modified to the extent necessary and possible to render it valid and enforceable. In any event, the unenforceability or invalidity of any provision shall not affect any other provision of this Agreement, and this Agreement shall continue in full force and effect, and be construed and enforced, as if such provision had not been included, or had been modified as above provided, as the case may be.

10.    Independent Contractor.    BDO and the Client acknowledge that the relationship between the parties to this Agreement is exclusively that of an independent contractor , i.e., BDO is rendering professional services in the capacity of a professional services firm and that BDO's obligations to the Client are exclusively contractual in nature. Nothing herein contained shall be construed to imply a joint venture, partnership or principal-agent relationship between BDO and the Client, and neither party shall have the right, power or authority to obligate or bind the other to any third party in any manner whatsoever.

11.    Governing Law.    This Agreement shall be governed and construed in accordance with the laws of the State of Tennessee, except for its conflict of law principles.

12.    Entire Agreement.    This Agreement (including Appendix A, which is incorporated herein as if the terms thereof were fully set forth in this Agreement) sets forth the entire agreement between the parties with respect to the subject matter herein.

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

6

superseding all prior agreements, negotiations or understandings, whether oral or written, with respect to such subject matter. This Agreement may not be amended or modified except in a writing signed by duly authorized representatives of the Client and BDO.

13.    Notice.        All notices and other communications required or desired to be given pursuant to this Agreement will be given in writing and will be deemed duly given upon personal delivery, or on the third day after mailing if sent by registered or certified mail, postage prepaid, return receipt requested, or on the day after mailing if sent by a nationally recognized overnight delivery service which maintains records of the time, place and recipient of delivery.

| | |
|---|---|
| If to BDO: | BDO Seidman, LLP<br>Attention: Mark D. Puckett.<br>5100 Poplar Avenue, Suite 2600<br>Memphis, TN 38137<br>Phone: 901-680-7608 |
| If to Client: | Mr. John A. Jones<br>2308 Rambling Road<br>Johnson City, TN 37604<br>Phone: 423-282-5128 |
| With Duplicate Original to: | Richard A. Johnson, Esq.<br>Waller Lansden Dortch & Davis, LLC<br>511 Union Street, Suite 2100<br>Nashville, TN 37239<br>Phone: 615-244-6380 |

or to such other person, entity, address or facsimile number as a party may respectively designate in like manner, from time to time.

14.    Confidentiality Privilege

(a)    A confidentiality privilege under Internal Revenue Code Section 7525 may pertain to certain communications between BDO (federally authorized tax practitioners) and the Client regarding federal tax advice provided pursuant to this Agreement. The Client understands that BDO makes no representation, warranty or promise and offers no opinion with respect to the applicability of such confidentiality privilege, if any, and the Client understands and agrees to this circumstance should such privilege be determined not to apply in any circumstance.

(b)    By retaining BDO, the Client agrees that BDO is authorized to claim the privilege on the Client's behalf with respect to any applicable communications, up to and

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

7

until such time as the Client may waive any such privilege in writing, or BDO may otherwise be required by law to disclose such communications in compliance with any court order, subpoenas, summonses, or incurs costs in defending the assertion of the privilege on the Client's behalf, the Client will be responsible for such costs.

15.    Miscellaneous.

(a)    The Client represents and warrants that it has the full power and authority to enter into this Agreement and to carry out the transactions provided for herein. In addition, the Client represents that it has not entered into any agreement regarding the subject matter hereunder with any other party that covers the period during which BDO is authorized to act and provide services hereunder.

(b)    The failure of either party to require performance by the other of any provision hereof shall in no way affect the right to require performance at any time thereafter, nor shall the waiver of a breach of any provision hereof be taken to be a waiver of any succeeding breach of such provision or as a waiver of the provision itself.

(c)    The paragraph headings set forth in this Agreement are for the convenience of the parties, and in no way define, limit, or describe the scope or intent of this Agreement and are to be given no legal effect.

(d)    A copy of BDO's privacy policy is attached as Appendix B.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

BDO SEIDMAN, LLP                         JOHN A. JONES ("CLIENT")

By: _____                      By: _____

Name: Mark D. Puckett

Title: Partner

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

8

## APPENDIX A TO CONSULTING AGREEMENT

This Appendix A is incorporated in and made a part of the Consulting Agreement between John A. Jones (the "Client" or "I") and BDO Seidman, LLP ("BDO"), dated June 3, 2002, as if this Appendix were set forth in full therein, and is subject to all of the terms and conditions of the Agreement. In connection with certain investments (the "Transactions") that I am making, I acknowledge that:

•BDO has advised me that, prior to entering into the Transactions, I should consult with a tax attorney or tax advisor independent of BDO concerning the potential tax treatment of the Transaction and the potential tax consequences to me of participating in the Transactions, and I have done so or declined to do so;

•BDO has advised me, and I understand, that like all tax positions, the tax treatment of the Transactions is subject to audit and challenge by the Internal Revenue Service (hereinafter "IRS") and/or a state or local taxing authority;

•BDO has advised me, and I understand, that if the IRS and/or a state or local taxing authority challenges the tax treatment of the Transactions they could assert that I owe additional tax, interest and penalties. Any such liability is solely my responsibility;

•I understand that in contributing property to any limited liability company that receives a contribution of property in the course of the Transactions, I can either contribute (a) a combination of certain leveraged assets and additional unleveraged assets or (b) solely unleveraged assets. BDO has recommended that I contribute solely unleveraged assets and has advised me that certain additional tax risks may arise if leveraged assets are contributed to the limited liability company. I represent that I have independently considered the type of assets to contribute;

•BDO has made no representation concerning whether these Transactions might or might not cause my tax return to be examined by the IRS, or other taxing authority. Additionally, BDO has advised me that these transactions may be required to be disclosed in my income tax returns;

•Federal, state and local laws, including tax laws, are subject to change. Changes in the law could be retroactive and could affect the tax treatment of the Transactions. BDO will not advise me of changes in the law unless specifically engaged in writing to do so;

•IRS regulations require BDO to maintain certain records for some tax-advantaged transactions and, on request, to provide this information to the IRS. Among the information required to be provided are the identity of investors and a description of the tax advantages expected to be derived from the transaction. I understand that the Transactions could be subject to these rules;

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

9

•BDO has informed me that they have not registered the Transactions as a tax shelter under the Internal Revenue Code as BDO believes that such Transactions are not required to be registered. I understand that there can be no assurance that the IRS will agree with this determination;

•BDO does not provide investment or legal advice to its clients, and has not provided me with investment or legal advice concerning the Transactions; and

•I have received, reviewed, and evaluated such information and materials as I and my advisors deemed relevant, and have made an independent decision to participate in the Transactions.

*John A. Jones*

John A. Jones

SUBJECT TO TAX PRACTITIONER PRIVILEGE
UNDER SECTION 7525 OF THE INTERNAL REVENUE CODE

10

## APPENDIX B TO CONSULTING AGREEMENT BETWEEN
### JOHN A. JONES AND BDO SEIDMAN, LLP

### BDO Seidman, LLP Privacy Policy

BDO Seidman, LLP may obtain nonpublic personal information about your family, income, expenditures, investments, estate, insurance coverage, or other personal matters that BDO Seidman, LLP may need in order to perform the services for which you have engaged the firm. This information may be obtained from the following sources:

a.   Forms you fill out to obtain our services;

b.   Documents that you provide to us;

c.   Documents that you authorize us to obtain from others;

d.   Discussions with you;

e.   Discussions with others that you authorize us to undertake.

BDO Seidman, LLP does not disclose any nonpublic personal information about our clients or former clients to anyone, except as required by law.

We restrict access to nonpublic personal information about you to our professionals and staff who need to know such information in order for BDO Seidman, LLP to provide you with its services. We maintain physical, electronic and procedural safeguards that comply with federal regulations and professional requirements to guard the confidentiality of your nonpublic personal information.